IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21-cv-00501-RJC-WCM

| | | |
|---|---|---|
| FS MEDICAL SUPPLIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| TANNERGAP, INC.; | ) | |
| TANNER PHARMA UK LIMITED; | ) | |
| RAYMOND FAIRBANKS BOURNE; | ) | |
| and STEPHEN JOHN SCALIA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on the following motions:

1.  Tanner Pharma UK Limited's Rule 12(b)(2) Motion to Dismiss Amended Complaint (Doc. 62);

2.  Tanner Pharma UK Limited's Rule 12(b)(6) Motion to Dismiss Amended Complaint (Doc. 65);

3.  TannerGAP, Inc.'s Rule 12(b)(6) Motion to Dismiss Amended Complaint (Doc. 67);

4.  Defendant Stephen John Scalia's Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Rule 12(b)(6) (Doc. 69); and

5.  Defendant Raymond Fairbanks Bourne's Motion to Dismiss Amended Complaint Under Rules 9(b) and 12(b)(6) (Doc. 71).

## I. Procedural Background

On or about March 24, 2021, FS Medical Supplies, LLC ("FSMS") filed a

complaint against TannerGAP, Inc. ("GAP"), Tanner Phrama UK, Limited

1

("TPUK") and "Does 1 through 50" in California state court. <u>See</u> Doc. 16-7 (the "Original Action"). GAP and TPUK removed the Original Action to the United States District Court for the Northern District of California and moved to dismiss based on a lack of personal jurisdiction.

On July 12, 2021, the court in the Northern District of California granted the motion and dismissed FSMS's complaint without prejudice. Doc. 16-7 at 10.

On September 23, 2021, FSMS filed its original complaint in the instant matter naming GAP and TPUK as defendants. Doc. 1.

In response, GAP and TPUK filed a motion to dismiss asserting, among other things, that this Court lacked personal jurisdiction over TPUK. <u>See</u> Docs. 15, 16.

On January 14, 2022, the parties filed a Notice stating that they had agreed to conduct early discovery related to jurisdictional issues. Doc. 19.

On March 8, 2022, the Court stayed this matter to allow the parties to conduct early jurisdictional discovery, denied the motion to dismiss without prejudice, and directed FSMS to file an Amended Complaint, or a notice of its intent not to amend, on or before April 22, 2022. Doc. 21.

Following multiple extensions of the deadline for the parties to complete jurisdictional discovery, <u>see</u> Docs. 22, 23, 26, 27, 34, 36, FSMS filed both sealed and redacted versions of an Amended Complaint. Docs. 40, 58. The Amended

Complaint added Raymond Fairbanks Bourne ("Bourne") and Stephen John Scalia ("Scalia") as defendants.

On October 14, 2022, Defendants filed the pending Motions to Dismiss. Docs. 62, 65, 67, 69, 71. The Motions have been fully briefed, and a lengthy hearing was conducted on May 16, 2023, after which the Motions were taken under advisement. This Memorandum and Recommendation now follows.

## II. The Amended Complaint

The Amended Complaint alleges as follows:

### A. The Parties

GAP and TPUK (the "Corporate Defendants") "along with other affiliates," hold themselves out as the "Tanner Pharma Group" Doc. 58 at 3. The Tanner Pharma Group's website describes the Group as "a 20-year-old specialist pharmaceutical services provider headquartered in Charlotte." Id. at 3. FSMS contends that Bourne and Scalia (the "Individual Defendants") "direct, control, and coordinate the activities of [the Corporate Defendants] from the corporate headquarters of Tanner Pharma Group in Charlotte, North Carolina." Id. at 4.

Bourne is the sole officer of GAP, the sole director of TPUK, and the owner of 75% of the shares of TPUK. Doc. 58 at 3. "The Tanner Pharma Group website says [Bourne] is the 'founder and CEO of Tanner Pharma Group.'" Id.

3

Scalia is described on the Tanner Pharma Group website as being the "President of 'Tanner Pharma Group'…" Id.

Both Bourne and Scalia are domiciled in North Carolina. Id. at 3-4.

FSMS was established in March of 2020 "at the beginning of the COVID-19 pandemic in order to source personal protective equipment ('PPE') and other COVID-related products." Doc. 58 at 4. FSMS had an established relationship with Orient Gene, "a well-respected manufacturer of medical supplies and devices…," and had executed, on May 25, 2020, a "Framework Purchase Agreement" with Orient Gene and Healgen (a subsidiary of Orient Gene) for the purchase of antigen rapid tests and other medical supplies. Id. at 6.

### B. The Non-Circumvention Agreement (Doc. 77-3)

On June 2, 2020, Jonathan Bracey ("Bracey"), a TPUK employee located in the United Kingdom, emailed FSMS on behalf of Bourne. Bracey described the Tanner Pharma Group as "international distributors of mainly pharmaceutical products" and stated that many of the Group's customers were coming to the Group "with PPE enquiries" such that the Group was "actively looking for appropriate partners to support that…" Id. at 5-6. It appears that following a conversation with FSMS, Bracey wrote to FSMS stating that he needed to "catch up" with his "boss" in Charlotte. Id. The next day, Bracey requested a follow up call and explained that the "Tanner Pharma Group wanted to focus on 'rapid test kits and prices'" from Healgen. Id.

4

On June 8, 2020, GAP and FSMS executed a Mutual Non-Disclosure and Non-Circumvention Agreement (the "Non-Circumvention Agreement"). The Non-Circumvention Agreement recited that FSMS had relationships with manufacturers of PPE including diagnostic rapid tests, that GAP had relationships with "healthcare distributors who purchase such products," and that the parties wished to "form a business relationship to sell PPE to such consumer retailers." The Non-Circumvention Agreement further stated that FSMS's relationships with manufacturers of PPE were considered "Personal Relationships" to FSMS and that GAP would not conduct business with such entities "without the express written permission" of FSMS. Id. at 7.

Also on June 8, Scalia promised to send FSMS a distribution agreement to "memorialize our partnership." Id. at 7.

### C. The Sample Test Kits

On August 29, 2020, Bracey informed FSMS that the Tanner Pharma Group had an "urgent opportunity to bid on selling a large amount of antigen rapid test kits to the UK Government" and needed to provide 500 units for quality testing as quickly as possible. Id. at 8. Based on FSMS's prior relationship with Orient Gene, FSMS was able to procure the 500 units on September 2. Id. at 9. "Because the 500 sample units were a small order, Orient Gene charged FSMS a price of $5.00 per unit; lower prices would be available for larger orders." Id. The 500 sample tests arrived in the United Kingdom on

5

September 7, and on September 9, Bracey told FSMS that they had "passed [the] first stage of validation." Id. at 9.

On September 10, Bracey asked FSMS to "press" Orient Gene to provide an additional 4,250 samples on an urgent basis. FSMS worked with Orient Gene to obtain these units, and they were provided to the United Kingdom on September 23. Id. at 10. "Again, because the 4,250 sample units were a small order, Orient Gene charged FSMS a price of $5.00 per unit." Id.

FSMS contends that sending the sample products to the United Kingdom Government for trial testing ahead of other competitors "ensured that Orient Gene's products were the first antigen test certified by UK authorities, locked in the first-mover advantage, and paved the way for what would become a multi-billion-dollar relationship." Id. at 10. FSMS further contends that it did this work "with the understanding that the commercial relationship between FSMS and the Corporate Defendants would be a 'profit split' in which the Corporate Defendants would pay FSMS its true direct costs, plus half of the gross profit collected from the sale of the product to the Corporate Defendants' customers." Id. at 10.

### D. The Distribution Agreement

On September 11, 2020, FSMS signed a Distribution Agreement with GAP and TPUK. Id.; Doc. 77-1. The Distribution Agreement defined GAP and TPUK, collectively, as "TANNER" and expressly included Orient Gene antigen

6

rapid test kits in the definition of "Covered Products." Doc. 58 at 10-11; Doc.

77-1, Section 4. In the Distribution Agreement, Tanner agreed that it would

collaborate with FSMS "prior to quoting, shipping or otherwise distributing

Covered Product in any country for the first time." Doc. 58 at 11; Doc. 77-1,

Section 7.1. The Distribution Agreement also stated that Tanner agreed to

purchase the Covered Products "from FSMS (or directly from the manufacturer

of a Covered Product if directed by FSMS) to supply such Covered Products in

the Territory…." Doc. 58 at 11; Doc. 77-1, Section 7.

Section 9 of the Distribution Agreement provided as follows:

> The price ("Unit Price") payable by TANNER to FSMS
> for each package unit of a Covered Product…shall be
> the true direct cost (the "Direct Cost") of the product
> as purchased by FSMS from its
> manufacturer/supplier, … plus half of the Gross
> Product collected from the sale of the product to
> TANNERS's customer.
>
> Id. at 11; Doc. 77-1 at 4.[1]

Section 10 of the Distribution Agreement provided that:

> If TANNER identifies an opportunity to quote the
> Covered Products for a customer in the Territory, then
> TANNER will collaborate with FSMS to set the best
> price to maximize the likelihood of winning the

---

[1] The Distribution Agreement and the Non-Circumvention Agreement may be
considered in connection with the motions made pursuant to Rule 12(b)(6). See
Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (stating that courts
may take judicial notice of matters of public record, documents attached to the
complaint, and documents attached to the motion to dismiss so long as they are
integral to the complaint and authentic); Witthohn v. Fed. Ins. Co., 164 Fed. Appx.
395, 396 (4th Cir. 2006).

business and making a profit. If TANNER's quote is successful and TANNER desires to purchase units of a Covered Product, then TANNER shall deliver a written or electronic purchase order (each, a "Purchase Order" or "PO"), during the Distribution Term for the Covered Products stating the quantity of units of the Covered Product along with a statement from TANNER that it has received approval from the government authorities in the Territory to import the ordered Covered Product(s) into the Territory. TANNER's order for the Covered Product constitutes an offer by TANNER to purchase the Covered Products in accordance with this Agreement. TANNER's order shall be deemed accepted when FSMS provides any written confirmation of the PO (a "Sales Order Confirmation") including via email or authorizes shipment of the relevant Covered Products to TANNER through FSMS's standard and usual distribution channel. This Agreement shall allow TANNER to enter into a direct PO or contract with the manufacturer of a Covered Product so long as the financial arrangement outlined in Section 9 above shall be maintained as if TANNER purchased Covered Products directly from FSMS with a 50% gross profit participation to each Party.

Doc. 58 at 12; Doc. 77-1 at 4.

Additionally, Section 19.1 provided that the parties would "implement regular product reporting transmitting to FSMS mutually agreed data elements ('Data Reports'), on at least a monthly basis, so that FSMS will receive, for all ordered Covered Products, information as permitted by Applicable Law, regarding the quantity, use and destination of all ordered Covered Products." Doc. 58 at 12; Doc. 77-1 at 7-8.

Section 16.4 of the Distribution Agreement provided that:

8

In the case of termination by either Party, the separate Mutual Non-Disclosure & Non-Circumvention Agreement dated June 8, 2020 between the Parties shall remain in place and in effect and neither Party shall circumvent the other Party with any relationship originally established by the first Party. To be clear, the manufacturer of any Covered Product shall be considered a prior relationship of FSMS in regard to the Covered Product and TANNER will not do any business involving of said Covered Products from such manufacturer.

Doc. 58 at 12; Doc. 77-1 at 7.

### E. The Alleged Breaches

#### 1. United Kingdom Sales

FSMS asserts that even before signing the Distribution Agreement, "Defendants began coopting" FSMS's relationship with Orient Gene. Doc. 58 at 12. Specifically, on September 9, Bracey "began pressuring FSMS to put Defendants directly in touch with Orient Gene" and explained that he (Bracey) needed to know "Who our point of contact is - and talking with them directly. How the process works for them. Setting up our account (QA and finance matters related to that). All standard stuff that you do with a new supplier. But we need to talk with them directly[.]" Id. at 13.

On September 10, FSMS agreed to set up a call with Orient Gene, and by September 15, "Tanner Pharma Group executives had already set up direct calls among themselves," Orient Gene, and representatives of the United Kingdom Government. Id. at 13-14. FSMS contends that Defendants did not

9

keep FSMS informed of these communications, and that on September 23, TPUK executed a "direct, secret contract with Orient Gene to purchase antigen rapid test kits to sell to the UK Government." Id. at 14.

On September 29, FSMS asked Bracey for an update, but Bracey

> did not tell FSMS that Tanner Pharma UK had entered into a contract with Orient Gene. He did not tell FSMS that Tanner Pharma UK had ordered hundreds of thousands of units from Orient Gene. He did not tell FSMS the price Defendants had negotiated with Orient Gene. He responded deceptively: "waiting to hear test results next week."

Doc. 58 at 15.

On October 3, TPUK and the United Kingdom Government signed a contract for the supply of antigen rapid test kits from Orient Gene in two shipments for a total price of approximately $13,000,000.00. Id. at 15. Defendants did not inform FSMS of this fact and did not inform FSMS of subsequent developments relative to future purchase orders. Id; see also id. at 15-16 (regarding FSMS's requests for updates on October 9, October 13, and October 19, and Bracey's responses).

On October 22, Scalia wrote to FSMS: "[W]e are processing a conditional transaction for Orient Gene Antigen Rapid Test Cassettes for the UK Government…. a total of 2mm units…. This is an estimate of how the numbers are shaping up:… *Cost per unit: $5/ea*." Id. at 16 (emphasis in Amended Complaint). FSMS contends Scalia's statement was false and misleading

because TPUK had paid Orient Gene less than $5.00 per unit, and because TPUK was working on a much bigger order. Id. FSMS "immediately responded" to Scalia and stated that "[a]s discussed, we asked to be included in all conversations and correspondence with [Orient Gene]. Beyond being informed, it is important for us to [] lead any negotiations with them, including on pricing." Id. at 16.

On October 23, FSMS spoke with Scalia and Bracey, who "finally admitted" that TPUK had entered into a direct contract with Orient Gene. Id. at 17. FSMS requested all correspondence and contracts between TPUK and Orient Gene, but Scalia and Bracey "refused to provide the information, referencing a non-disclosure provision included in" the contract between TPUK and Orient Gene. Id. Scalia did admit the following day, though, that TPUK had gotten a "better price" than $5.00 per unit. Id.

On November 15, Scalia provided FSMS with "'the profit split in accordance with our agreement' for Tender No. 1 in the amount of the 2,000,000 units." Id. at 17.[2] That calculation reflected a cost basis of $5.00 per unit and indicated that the amount due to FSMS would be $1,200,000.00. Id.

On February 11, 2021, Scalia sent reconciliation sheets to FSMS purporting to compute FSMS's share of gross profits on the first three sales to

---

[2] The Amended Complaint references Tenders 1, 2, and 3, but does not give further details regarding the amount of units included in each.

the United Kingdom. Id. at 18. The reconciliations all used $5.00 per unit as the cost, "despite the fact that the true cost was far less." Id. Scalia claimed that FSMS had already been paid with respect to "Tender No. 1," was owed a profit share of $5,300,000.00 for "Tender No. 2," and that "because the antigen rapid test kits were sold to the UK Government for less than the $5.00 per-unit price purportedly paid to Orient Gene, no profit split was owed" with respect to "Tender No. 3." Id.

FSMS alleges that the United Kingdom Government has awarded approximately $2 billion in contracts to TPUK for the sale of Orient Gene's antigen rapid test kits through August 2022, and that GAP, TPUK "and other affiliates" continue to sell Orient Gene-supplied products to the United Kingdom Government and other customers without paying the amounts owed to FSMS. Id.

### 2. Other Sales

FSMS also alleges that in January 2021, GAP, and later TPUK, generated purchase orders addressed to Orient Gene for antigen rapid test kits to be supplied to the Turks and Caicos Hotel & Tourism Association. Id. at 19.

In March 2021, TPUK completed additional orders of Orient Gene's antigen rapid test kits to the "Caribbean and Turks and Caicos." Id. at 20.

In April 2021, Scalia sent FSMS a reconciliation for these sales, again using the $5.00 per unit cost basis "even though that was not the true cost…." <u>Id</u>.

FSMS alleges that in addition to these sales, employees of GAP and TPUK continued to sell Orient Gene test kits in additional markets including Australia, Mexico, Brazil, and Argentina, without collaborating with FSMS. <u>Id</u>.

### F. Claims by FSMS

FSMS asserts the following claims: (1) breach of the Distribution Agreement (against the Corporate Defendants); (2) breach of the Non-Circumvention Agreement (against the Corporate Defendants); (3) breach of the implied covenant of good faith and fair dealing (against the Corporate Defendants); and (4) Unfair and Deceptive Trade Practices in violation of North Carolina General Statute § 75-1.1 *et seq.* (the "Chapter 75 claim") (against the Corporate and Individual Defendants).

## III. Legal Standards

### A. Rule 12(b)(2)

"Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." <u>Grayson v. Anderson</u>, 816 F.3d 262, 267 (4th Cir. 2016).

13

If the court "addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive," id. at 268, with the court "draw[ing] all reasonable inferences arising from the proof, and resolv[ing] all factual disputes, in the plaintiff's favor." Mylan Lab'ys, Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993).

However, if the court provides "the parties a fair opportunity to present both the relevant jurisdictional evidence and their legal arguments," "it must hold the plaintiff to its burden of proving facts, by a preponderance of the evidence, that demonstrate the court's personal jurisdiction over the defendant." Grayson, 816 F.3d at 268.

Here, because the parties have been given an opportunity to conduct jurisdictional discovery and present their arguments during a hearing, the question is whether FSMS has carried its burden of establishing personal jurisdiction over TPUK by a preponderance of the evidence. See Sneha Media & Entertainment, LLC v. Associated Broadcasting, 911 F.3d 192, 197 (4th Cir. 2018); Grizzard v. LG Chem Ltd., --- F.Supp.3d ---, 2022 WL 17076706, at *4 n. 10 (E.D. Va. Nov. 18, 2022) (noting that not all evidentiary hearings involve evidence taken orally in open court and finding that "the jurisdictional discovery conducted by the Parties and the presentation of evidence to this

14

court in the thorough submissions, with supporting documentation ... and accompanying text, satisfies the 'evidentiary hearing' requirement").

### B. Rule 12(b)(6)

When considering a motion made pursuant to Rule 12(b)(6), the court, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff, determines "whether the complaint on its face states plausible claims upon which relief can be granted." Francis v. Giacomelli, 588 F.3d 186, 189, 192 (4th Cir. 2009); accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192. That is, while "detailed factual allegations" are not required, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); accord Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from

conceivable to plausible.  Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

## IV.  Discussion

### A. Rule 12(b)(2) Motion to Dismiss (Doc. 62)

In its Amended Complaint, FSMS alleges that the Corporate Defendants contractually consented to personal jurisdiction in this district. FSMS additionally alleges that all Defendants are subject to general and specific personal jurisdiction here, and that TPUK is likewise subject to personal jurisdiction, because it is the alter ego of GAP.

In the instant Motion, TPUK asserts that this Court lacks personal jurisdiction over it, and, consequently, that FSMS's claims against TPUK must be dismissed without prejudice. The Corporate Defendants also assert that this Court should dismiss this entire action under the doctrine of *forum non conveniens* so that the case may be adjudicated in England.

#### 1. Consent to Jurisdiction

Section 8 of the Distribution Agreement, which is entitled "Sale and Purchase of Product," includes the following provision:

> Upon and subject to the terms and conditions of this Agreement, FSMS hereby agrees to supply TANNER Covered Product for sale and distribution and use in the Territory, as specified herein. FSMS shall use commercially reasonable efforts to supply Covered Products in quantities requested by TANNER. The Parties acknowledge that FSMS is not the

16

manufacturer of any Covered Product and is subject to availability of Covered Products from the manufacturer of such Covered Product. The Parties shall work together to satisfy Covered Product requirements to TANNER customers. FSMS is not in a position to guarantee Covered Product quantity or quality. That can only come from the relevant manufacturer of such Covered Product FSMS has entered into or will enter into a contract with each manufacturer of a Covered Product that will include language of the delivery timing and product quality with any recourse for delivery or quality issues. FSMS will pass this through to any contract or PO with TANNER and TANNER will look only to the manufacturer for any issues or damages related to late delivery or quality issues. *Notwithstanding the foregoing sentences, FSMS shall comply with TANNER's standard terms and conditions which are attached hereto and made part hereof as Exhibit B; in the event of a conflict between the terms and conditions set forth in Exhibit B and this Agreement, this Agreement shall control.*

Doc. 77-1 at 3-4 (emphasis added).

The Distribution Agreement also includes a choice of law provision that provides that the Distribution Agreement is "governed by the laws of the State of Delaware, without regard to that state's conflict of law provisions." Doc. 77-1 at 10. The parties agree, though, that the Distribution Agreement does not include a forum selection clause. See Doc. 58 at 29; Doc. 82 at 9.

The parties also agree that certain terms and conditions (the "Terms and Conditions," Doc. 77-2) appeared on Tanner Pharma Group's website on

September 11, 2020 (the day the Distribution Agreement was signed), and included the following provision:

> This Agreement shall be governed by, and construed in accordance with, the laws of the State of North Carolina and the United States, as though made and to be fully performed therein without regard to conflicts of laws principles thereof. *Each party hereby irrevocably consents to the personal jurisdiction of such courts and each party hereto waives and agrees that it shall not assert that such forum is inconvenient or improper.* The parties specifically waive any rights and obligations under any applicable provisions of the United Nations Convention for the International Sale of Goods.
>
> Doc. 77-2 (emphasis added); Doc.75 (Joint Stipulation).[3]

The parties agree that the Terms and Conditions include a North Carolina choice of law provision, as well as a "consent to jurisdiction" clause pointing to North Carolina. However, despite the reference in the Distribution Agreement, no terms and conditions were physically attached to the Distribution Agreement as an Exhibit B, and FSMS did not read the Terms and Conditions prior to signing the Distribution Agreement. Doc. 75.

---

[3] As described below, no Exhibit B was attached to the Distribution Agreement. TPUK initially argued that was because "back in September 2020 when the parties executed the Distribution Agreement, *no* standard terms and conditions appeared on the TPG companies' website." Doc. 64 at 15 (emphasis in briefing). However, TPUK has since acknowledged that the Terms and Conditions did appear at that time on the website. See Doc. 75. TPUK does not concede, though, that the Terms and Conditions are "Tanner's standard terms and conditions" that should have been attached to the Distribution Agreement.

However, generally, parties to a contract are bound by the terms of the contract, including terms they have not read, as well as those that are expressly incorporated by reference. See McAnulla Elect. Const., Inc. v. Radius Techs., LLC, No. N10C-03-076, 2010 WL 3792129, at *4 (Del. Super. Sept. 24, 2010) ("The obligation of a contracting party to read any contract it signs extends to documents incorporated by reference, which become part of the terms of the parties' agreement at the time of execution"); Rose Heart v. Ramesh C. Batta Assocs., P.A., 1994 WL 164581, at *4 (Del.Super.Apr.12, 1994) (holding that by executing a contract, a party agrees "to be bound by the terms set forth in the agreement and those incorporated by reference"); Healy v. Silverhill Constr. Co., 2007 WL 2769799, at *2 (Del.Com.Pl. Sept.19, 2007) ("[A] sophisticated party to a construction contract at the least should have read the contract and sought out the incorporated terms").

Here, in addition to contending that the Terms and Conditions are not the "terms and conditions" referenced in the Distribution Agreement, TPUK argues that application of the Terms and Conditions' consent to jurisdiction clause would be inappropriate because the provision in which that clause appears also includes a North Carolina choice of law clause that conflicts with the Delaware choice of law clause in the Distribution Agreement. TPUK also argues that, to the extent the Terms and Conditions apply, they bind only FSMS.

The undersigned is persuaded that, based on the current record, it is appropriate at this stage of the proceedings to consider the Terms and Conditions as being the "terms and conditions" referenced by the Distribution Agreement.

Further, the Distribution Agreement states that in the event of a conflict between the Terms and Conditions and the Distribution Agreement, the Distribution Agreement will control. Bbecause the Distribution Agreement includes a Delaware choice of law provision, Delaware law governs interpretation of the Distribution Agreement. During the hearing, TPUK acknowledged that choice-of-law clauses are distinct from forum selection or consent to jurisdiction clauses, and that the Distribution Agreement did not include a forum selection clause. See Green America Recycling, LLC v. Clean Earth, Inc., No. N20C-08-189, 2021 WL 2211696, at *7 (Del. Super. June 1, 2021) ("a Delaware choice-of-law clause, without more, does not express or imply consent to jurisdiction in Delaware"); McWilliams, Murphy and Associates, Inc. v. Heart and Vascular Clinic of Northern Colorado, PC, No. 1:08CV361, 2008 WL 4933956, at *2 (M.D.N.C. Nov. 14, 2008) (discussing choice of law, forum selection, and consent to jurisdiction clauses) (citing Mark Group Intern., Inc. v. Still, 151 N.C.App. 565, 566 S.E.2d 160 (2002)); see also Johnston County, N.C. v. R.N. Rouse & Co., Inc., 331 N.C. 88, 92-93 (1992) (discussing the "very distinct purposes" of these clauses).

Finally, TPUK argues that the Distribution Agreement purports to incorporate the Terms and Conditions, if at all, into the "sale and purchase of product" paragraph (rather than the "governing law" section), and that the Terms and Conditions are applicable only "to FSMS's obligations" (and not TPUK's). However, the Terms and Conditions themselves appear to reference general obligations that apply to both parties, and the Distribution Agreement does not state that TPUK would not be bound by the Terms and Conditions.

## 2. Specific Personal Jurisdiction

"A lawful assertion of personal jurisdiction over a defendant requires satisfying the standards of the forum state's long-arm statute and respecting the safeguards enshrined in the Fourteenth Amendment's Due Process Clause." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012). North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4(1)(d), "permits the exercise of personal jurisdiction over a defendant to the outer limits allowable under federal due process." Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558-59 (4th Cir. 2014) (citing Dillon v. Numismatic Funding Corp., 291 N.C. 674 (1977)). Because "North Carolina's long-arm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause, ... the dual jurisdictional requirements collapse into a single inquiry."

Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001).

"A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" Carefirst of Maryland, Incorporated v. Carefirst Pregnancy Centers, Incorporated, 334 F.3d 390, 397 (4th Cir. 2003) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, (1945)). This standard can be satisfied "through two different approaches—by finding specific jurisdiction ... or by finding general jurisdiction." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711 (4th Cir. 2002); Universal Leather, 773 F.3d at 559.

Specific jurisdiction requires "demonstrating that the defendant purposely established minimum contacts in the forum state such that it should reasonably anticipate being haled into court there on a claim arising out of those contacts," and reaches only the specific "claims [that] ... arise out of or relate to the defendant's contacts with the forum." Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 198 (4th Cir. 2018).

When considering whether the exercise of specific personal jurisdiction over a nonresident defendant would be proper, courts consider: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting

activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." <u>Universal Leather</u>, 773 F.3d at 559 (quoting <u>Tire Eng'g v. Shandong Linglong Rubber Co.</u>, 682 F.3d 292, 301 (4th Cir. 2012)). The Fourth Circuit has explained that whether a defendant has "purposefully availed" itself of the privilege of conducting business in the forum state is a flexible analysis and that, in the business context, courts may consider:

> (1) "whether the defendant maintains offices or agents in the forum state;" (2) "whether the defendant owns property in the forum state;" (3) "whether the defendant reached into the forum state to solicit or initiate business;" (4) "whether the defendant deliberately engaged in significant or long-term business activities in the forum state;" (5) "whether the parties contractually agreed that the law of the forum state would govern disputes;" (6) "whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;" (7) "the nature, quality and extent of the parties' communications about the business being transacted;" and (8) "whether the performance of contractual duties was to occur within the forum."

<u>Id</u>.

"In breach of contract actions, only those contacts directly related to the contract at issue are relevant for purposes of establishing personal jurisdiction." <u>Mountain East Conference v. Franklin University</u>, No. 1:21-CV-104, 2022 WL 949901 at *6 (N.D. W. Va. March 29, 2022) (citing <u>CEM Corp. v. Pers. Chemistry, AB</u>, 55 F. App'x 621, 625-26 (4th Cir. 2003) ("[O]ne visit to

the state, accompanied by a few telephone calls and faxes to settle litigation ... would not put [the defendant] on notice that it 'should reasonably anticipate being haled into court' in North Carolina'") (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)); see also CSS Antenna, Inc. v. Amphenol-Tuchel Electronics, GmbH, 764 F.Supp.2d 745, 750 (D. Md. 2011) ("In the Fourth Circuit, a breach of contract claim may arise out of contacts with a forum state where a meeting in the state is 'the genesis of [the] dispute'") (quoting CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 295 (4th Cir. 2009) (concluding that the plaintiff's breach of contract claim arose out of business transactions directed at Virginia because the defendant's visit to the state prompted the parties to enter into the contract, the defendant visited the forum state on at least one other occasion, and the defendant corresponded and collaborated with the plaintiff in Virginia for several years)).

Here, the undersigned is persuaded that this Court may exercise specific personal jurisdiction over TPUK.

First, significant activities related to both the negotiation and execution of the Distribution Agreement occurred in North Carolina. TPUK's verified jurisdictional discovery responses reflect that the following individuals associated with the Corporate Defendants participated in the drafting and negotiation of the Distribution Agreement: Maryori Alvarenga, Jonathan Bracey, Steve Scalia, William Taylor (in house counsel for "Tanner Pharma

Group"), and Lizza Pinch (Mr. Taylor's paralegal). Bracey is located in the United Kingdom, but the rest of these individuals live and work in North Carolina. See Doc. 77-24 at 9. Additionally, the Distribution Agreement was signed in North Carolina by Bourne on behalf of both GAP and TPUK.[4]

Second, the Distribution Agreement referenced North Carolina for other purposes, and included a "notice address" for both Corporate Defendants in Charlotte, North Carolina. See Doc. 77-1, Section 7.2 ("TANNER will maintain confidential records in its Charlotte warehouse facility of the name, address and local licensing evidence of the entity it supplies Covered Products to in the Territory to distribute to local Customers along with the government permission allowing TANNER to import Covered Product(s) into the Territory pursuant to Special Importation Authorization requests….").

Third, TPUK's alleged breaches of the Distribution Agreement have ties to North Carolina. See Mattiaccio v. Cantu Apiaries of Florida, LLC, No. 1:21-cv-00421, 2022 WL 1597826, at *6 (E.D. Va. May 19, 2022) ("Sufficient contacts exist where the cause of action arises in the forum, including both execution and performance of the contract"). FSMS's payment for the original 500 sample test kits came from Tanner Pharmaceuticals, Inc. in Charlotte. Doc. 77-11.

---

[4] With regard to the Non-Circumvention Agreement, that document was signed by Mr. Taylor in North Carolina. During the hearing, counsel for TPUK agreed that, although the Non-Circumvention Agreement was executed by GAP and FSMS, TPUK was also bound by the Non-Circumvention Agreement as an affiliate of GAP.

Additionally, North Carolina-based GAP employees approved TPUK purchase orders for Orient Gene antigen tests. Doc. 77-4 (69:9-70:12). TPUK has also stated in its discovery responses that Scalia, who is located in North Carolina, prepared the reconciliation spreadsheets (relative to TPUK's sales to the United Kingdom Government) for FSMS's review. See Doc. 77-24 at 10.

Finally, exercising personal jurisdiction over TPUK in North Carolina would be constitutionally reasonable. In addition to the contacts discussed above, TPUK acknowledges that, in the last five years, it has entered into "approximately 98 agreements to which it is a party or co-party containing a term providing for the application of North Carolina law or to have disputes litigated in the Courts of North Carolina or heard before alternative dispute resolution providers in the State of North Carolina." Doc. 77-23 at 13. Also, the purchase orders sent by TPUK to Orient Gene also incorporate the "Tanners terms and conditions…which can be found" on the Tanner Pharma Group website. See Doc. 77-10.[5]

### 3. Forum Non Conveniens

The Corporate Defendants also argue that the only forum "where all the entities concerned – FSMS, TPUK, and the Chinese manufacturer – could

---

[5] Because the Court may exercise specific personal jurisdiction over TPUK, it is not necessary to reach the question of whether TPUK is also subject to the general personal jurisdiction in this district or may be subject to personal jurisdiction based on an alter ego theory.

appear before a common adjudicator is in the Courts of England and Wales" and that if this matter were to proceed in this Court, any judgment against TPUK would have to be "relitigated" in an English court "essentially from scratch." Doc. 64 at 7.

During the hearing, however, the Corporate Defendants acknowledged that the existence of the Terms and Conditions – even if the Terms and Conditions do not apply to the parties' relationship here – indicate generally that requiring TPUK to litigate in North Carolina would not be inconvenient. See Pacific Chloride Incorporated v. Universal Protection Service LLC, No. 3:15-CV–490–RJC–DSC, 2016 WL 1158733, at *1 (W.D.N.C. Feb. 3, 2016) ("Defendant has failed to carry the burden of showing that its own forum selection clause should not be upheld by the Court"), recommendation adopted, 2016 WL 1123108 (W.D.N.C. March 21, 2016); see also Doc. 75 ("Each party … hereto waives and agrees that it shall not assert that such forum is inconvenient or improper").

Accordingly, the undersigned will recommend that the Rule 12(b)(2) Motion to Dismiss Amended Complaint (Doc. 62) be denied.

## B. Rule 12(b)(6) Motions to Dismiss (Docs. 65, 67, 69, 71)

### 1. Breach of the Distribution Agreement

#### a. Against TPUK

TPUK asserts that FSMS has failed to state a claim for breach of the Distribution Agreement because TPUK's interpretation of the profit split provision was correct, and because TPUK was authorized by the Distribution Agreement to deal directly with Orient Gene. TPUK relies on Sections 7, 9, and 10 of the Distribution Agreement, which provide, in relevant part:

> TANNER hereby agrees to purchase the Covered Products from FSMS (or directly from the manufacturer of a Covered Product if directed by FSMS) to supply such Covered Products in the Territory…
>
> Doc. 77-1 at 3 (Section 7)
>
> This Agreement shall allow TANNER to enter into a direct PO or contract with the manufacturer of a Covered Product so long as the financial arrangement outlined in Section 9 above shall be maintained as if TANNER purchased Covered Products directly from FSMS with a 50% gross profit participation to each Party.
>
> Doc. 77-1 at 4 (Section 10)
>
> The price…payable by TANNER to FSMS…shall be the true direct cost…of the product as purchased by FSMS from its manufacturer/supplier…plus half of the Gross Profit collected from the sale of the product to TANNER's customer.
>
> Doc. 77-1 at 4 (Section 9).

TPUK interprets these provisions as allowing it to use $5.00/unit as the "the true direct cost...of the product as purchased by FSMS," because $5.00/unit is the only price FSMS has alleged in the Amended Complaint. TPUK further argues that the Amended Complaint alleges that TPUK was directed by FSMS to contact Orient Gene.[6]

The undersigned is not persuaded that FSMS's claim against TPUK for breach of the Distribution Agreement should be dismissed on these grounds.

With respect to the use of $5.00/unit, although TPUK is correct that $5.00/unit is the only specific price allegedly paid by FSMS to obtain test kits, FSMS has also alleged that this price was paid for the "small" orders of "sample" kits (500 and 4,250 units), and that "lower prices would be available for larger orders." Doc. 58 at ¶ 42; see also id. at ¶ 46. It is not clear that the "as if" language in Section 10 of the Distribution Agreement was intended to set the price per unit as $5.00 in all cases even if the actual price per unit was less than $5.00.

With respect to TPUK's contacts with Orient Gene, FSMS has alleged that when FSMS asked why such contacts were necessary, Bracey responded: "Who our point of contact is – and talking with them directly. How the process

---

[6] Specifically, TPUK relies on paragraphs 65 through 67 of the Amended Complaint, which allege that on September 9, 2020, Bracey "began pressuring" FSMS to put Defendants in touch directly with Orient Gene and that on September 10, "after repeated requests," FSMS agreed to set up a call.

works for them. Setting up our account (QA and finance matters related to that). All standard stuff that you do with a new supplier. But we need to talk with them directly." Doc. 58 at ¶ 66. FSMS then allowed TPUK to contact Orient Gene directly about these matters. However, there is no allegation that FSMS directed TPUK to purchase test kits directly from Orient Gene.

The undersigned will therefore recommend that TPUK's Rule 12(b)(6) motion to dismiss, to the extent it seeks dismissal of FSMS's claim for breach of the Distribution Agreement, be denied. See Goldberg, M.D. v. Bruck, No. 2020-1058-JRS, 2021 WL 2584197, at *4 (Del. Ch. June 23, 2021) (unpubl.) ("[D]ismissal [of a claim grounded in contract], pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the only reasonable construction as a matter of law"") (citations omitted).

### b. Against GAP

GAP argues that, although it signed the Distribution Agreement, the alleged breaches are attributable only to TPUK because the parties' actual obligations were based on subsequent purchase orders. See Doc. 68 at 5 (arguing that GAP was not the seller of the products to the United Kingdom or to the Turks and Caicos); id. at 14 ("TPUK was the entity that made all the sales, received all profit, and split that profit with FSMS"); id. at 17 ("each of Tanner GAP and TPUK is only liable to FSMS for the profit split resulting from any sales that it made").

However, considering that the Distribution Agreement was entered into by GAP and TPUK collectively and that they are referred to throughout the Agreement as "TANNER," as well as the relationship between TPUK and GAP, described above, the undersigned will recommend that FSMS's claim for breach of the Distribution Agreement against GAP be allowed to proceed. See 6 Del. C. § 2701 ("An obligation or written contract of several persons shall be joint and several, unless otherwise expressed").

### 2. Breach of the Non-Circumvention Agreement

As noted, FSMS and the Corporate Defendants agreed during the hearing that the Non-Circumvention Agreement applied to both GAP and TPUK. The parties disagree, though, about the effect of the Distribution Agreement on any obligations imposed by the Non-Circumvention Agreement.

The Distribution Agreement states that it:

> … constitutes the entire agreement and understanding of the Parties regarding the subject matter of this Agreement and supersedes all prior written and oral agreements, proposals, and understandings between the Parties regarding the subject matter of this Agreement. No changes to this Agreement shall be effective unless signed by each Party.

> Doc. 77-1 at 10.

Additionally, the Distribution Agreement provides:

> In the case of termination by either Party, the separate Mutual Non-Disclosure & Non-Circumvention

31

Agreement dated June 8, 2020 between the Parties *shall remain in place and in effect* and neither Party shall circumvent the other Party with any relationship originally established by the first Party. To be clear, the manufacturer of any Covered Product shall be considered a prior relationship of FSMS in regard to the Covered Product and TANNER will not do any business involving of said Covered Products from such manufacturer.

Doc. 77-1 at 7 (emphasis added).

The Corporate Defendants contend that FSMS cannot assert a claim for breach of the Non-Circumvention Agreement because that Agreement was superseded by the Distribution Agreement and only "became effective again" upon termination of the Distribution Agreement. Doc. 66 at 26.

In response, FSMS argues that the language of the Distribution Agreement stating that the Non-Circumvention Agreement "shall remain in place and in effect" upon termination of the Distribution Agreement indicates that the obligations set out in the Non-Circumvention Agreement remained active and that such a reading is confirmed by the "to be clear" language (which reflects that prior relationships were still significant). See Doc. 78 at 54.

The Distribution Agreement, which was entered after the Non-Circumvention Agreement, states that it supersedes all prior agreements between the parties, yet it also references the Non-Circumvention Agreement

specifically and states that the obligations set forth in the Non-Circumvention Agreement "remain in place."[7]

In light of this ambiguity, the undersigned will recommend that this claim be allowed to proceed. See e.g., Ruffalo v. Transtech Serv. P'rs Inc., Civil Action No. 5039-VCP, 2010 WL 3307487, at *10 (Del. Ch. Aug. 23, 2010) ("When a motion to dismiss requires interpretation of a contract, the finding of an ambiguity will scuttle the defendant's chances of dismissing the plaintiff's claim, insofar as the defendant's motion relies on a specific interpretation of the contract.").

### 3. The Implied Covenant of Good Faith and Fair Dealing

In Truinhect Corp. v. Nestle Skin Health, SA, No. 19-592-LPS-JLH, 2020 WL 70981 (D. Del. Jan. 7, 2020), the court explained the scope of "implied covenant" claims under Delaware law as follows:

> Every contract governed by Delaware law is subject to the implied covenant of good faith and fair dealing. The implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." The implied covenant does not impose a "free-floating requirement that a party act in some morally commendable sense." The implied covenant does provide "a way to deal with unanticipated developments or to fill gaps in [a] contract's provisions[,]" but only where it is clear that

---

[7] During the hearing, counsel for the Corporate Defendants acknowledged that the use of "remain in place" was inartful.

the parties would have agreed to the obligation had they considered the issue. The implied covenant cannot be used when the contract already speaks to the obligation at issue.

Application of the implied covenant is a "limited and extraordinary legal remedy." It is "rarely invoked successfully." To plead a claim for breach of the implied covenant "a litigant must allege a specific obligation implied in the contract, a breach of that obligation, and resulting damages."

2020 WL 70981, at *13-14 (internal citations omitted).

Here, TPUK argues that FSMS cannot state an "implied covenant" claim because any obligations between the parties were set out in the Distribution Agreement. Doc. 66 at 27.

In response, FSMS argues that there was an implied promise that "Defendants would not mislead FSMS as to the facts and circumstances of purchases from Orient Gene," and that the implied covenant claim raises factual issues that should not be resolved on a motion to dismiss. Doc. 78 at 56 (citing Baldwin v. New Wood Resources LLC, 283 A.3d 1099, 1123 (Del. 2022) ("a fairly pleaded claim of good faith/bad faith raises essentially a question of fact which generally cannot be resolved on the pleadings or without first granting an adequate opportunity for discovery")).

The Amended Complaint alleges, in part, as follows:

147. The implied covenant prevented Defendants TannerGAP and Tanner Pharma UK from dealing direct with Orient Gene, hiding the truth from FSMS, cutting FSMS out of the chain of communication,

34

secretly ordering product from Orient Gene, and keeping the fruits of the bargain all for themselves.

148. Similarly, the implied covenant prevented Defendants TannerGAP and Tanner Pharma UK from deceiving FSMS by using an artificially inflated cost of $5.00 in computing the amount they owed to FSMS. Defendants TannerGAP and Tanner Pharma UK did not pay Orient Gene $5.00 per antigen rapid test kit. Instead, Orient Gene offered, and Defendants TannerGAP and Tanner Pharma UK paid, a bulk discount price ranging between [redacted] depending on sales volume.

149. To the extent the Distribution Agreement left any discretion to Defendants TannerGAP and Tanner Pharma UK to compute the amount owed to FSMS, or to deal directly with Orient Gene, the implied covenant of good faith and fair dealing forbade them to compute the amount they owed to FSMS on the basis of a fake price of $5.00 per unit.

Doc. 58 at 31.

As discussed above, the Corporate Defendants' authority to deal directly with Orient Gene, as well as the formula for determining FSMS's share of the profits from relevant sales, are referenced by the Distribution Agreement. Because the contract itself speaks to these obligations, the undersigned will recommend that FSMS's claim for breach of the implied duty of good faith and fair dealing be dismissed. See Sharma v. TriZetto Corp., No. 15-419-LPS, 2016 WL 1238709, at *5 (D. Del. Mar. 29, 2016) (granting motion to dismiss implied covenant claims because "Plaintiffs' allegations relate to conduct governed by the express terms of the SPA" and plaintiffs failed to allege "facts

demonstrating that the parties' conflict falls into a gap in the contract"); <u>Fisk Ventures, LLC v. Segal</u>, No. 3017-CC, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008) ("[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue"); <u>see also</u> <u>Nadendla v. WakeMed</u>, 24 F.4th 299, 308 (4th Cir. 2022) (a plaintiff may base a claim on the implied covenant when "the implied duty is not contrary to an express provision of the contract").

### 4. Chapter 75 Claim

During the hearing, the parties confirmed their view that North Carolina law governs this claim, and that the Court may consider the Non-Circumvention Agreement, Distribution Agreement, and the Terms and Conditions.[8]

"To set out a valid claim for unfair and deceptive trade practices, a plaintiff must allege that (1) defendant has committed unfair and deceptive acts or practices; (2) defendant's conduct was in commerce or affected

---

[8] During the hearing, counsel for Scalia presented various email chains and argued that they may also be considered in the context of the Rule 12(b)(6) motions because they were referred to in the Amended Complaint. Counsel for FSMS objected to the Court's consideration of those email chains. The undersigned has not considered any specific emails or email chains between the parties except to the extent language from those messages is quoted in the Amended Complaint.

36

commerce; (3) defendant's conduct caused injury to plaintiff." <u>Norman v. Nash Johnson & Farms, Inc.</u>, 140 N.C.App. 390, 417 (2000).

 "[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action" under Chapter 75; however, "North Carolina courts have consistently held that a party may demonstrate and prove such a claim in conjunction with a breach of contract claim if it can show substantially aggravating and egregious circumstances attending the breach." <u>Foodbuy, LLC v. Gregory Packinging, Inc.</u>, 987 F.3d 102, 121 (4th Cir. 2021) (citing <u>Post v. Avita Drugs, LLC</u>, No. 17-CVS-798, 2017 WL 4582151, at *4 (N.C. Super. Oct. 11, 2017)). "Examples of such aggravating and egregious behavior include: (1) lying and concealing a breach combined with acts to deter further investigation; and (2) intentional deception for the purpose of continuing to receive the benefits of an agreement." <u>Foodbuy</u>, 987 F.3d at 121.

Stated another way, a Chapter 75 claim "cannot 'piggyback' on a breach of contract action, even where the breach of contract was clearly intentional." <u>ACS Partners, LLC v. American Group, Inc.</u>, 3:09cv464–RJC–DSC, 2010 WL 883663, at *9 (W.D.N.C. Mar. 5, 2010) (citing <u>Broussard v. Meineke Discount Muffler Shops, Inc.</u>, 155 F.3d 331, 347 (4th Cir. 1998)); <u>see also</u> <u>PCS Phosphate Co., Inc. v. Norfolk Southern Corp.</u>, 559 F.3d 212 (4th Cir. 2009) (refusing to award treble damages pursuant to Chapter 75 for claims that were essentially contractual in nature because it would be tantamount to re-writing the parties'

contract); <u>Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corporation</u>, 16 CVS 217, 2017 WL 1148793, at *8 (N.C. Super. Ct. Mar. 27, 2017) (finding false and fraudulent statements and "concealed plans to breach the Agreement" did "not constitute unfair or deceptive trade practices").

Here, the Corporate Defendants argue that the parties negotiated TPUK's right to buy directly from Orient Gene, and that TPUK did nothing deceptive by exercising that right. In addition, Scalia argues that the allegations in the Amended Complaint show that he was "direct and transparent with FSMS in disclosing TPUK's position as to how profits should be split under the Distribution Agreement." Doc. 81 at 2. Finally, Bourne contends that there are no sufficiently specific allegations regarding his actions to support a Chapter 75 claim against him.[9]

FSMS contends, in contrast, that it has alleged a pattern of behavior tending to show that Defendants intended to breach the Distribution Agreement, concealed the status of their relationship with Orient Gene and the UK Government even after FSMS asked Defendants for updates, and sent deceptive reconciliation statements to lull FSMS into believing $5.00/unit was the actual unit price of the test kits.

---

[9] During the hearing, the parties agreed that any Chapter 75 claim against either Scalia or Bourne would have to be based on that individual defendant's actions. Although not necessary to the analysis herein, the undersigned agrees that FSMS's allegations regarding Bourne are sparse. <u>See</u> Doc. 58, ¶ 168.

However, the allegations of the Amended Complaint, read as a whole, describe circumstances involving possible breaches of contract, rather than circumstances that would support a Chapter 75 claim.

First, the Amended Complaint includes allegations acknowledging that FSMS complied with Defendant's request to provide contact information for Orient Gene so that Defendants could contact that company directly. Doc. 58, ¶¶ 65-67.

Further, while FSMS contends that Defendants intended to deceive FSMS about Defendants' business with Orient Gene, FSMS has also alleged that, as of October 22, 2020, Scalia informed FSMS that TPUK was processing a "conditional" transaction to purchase 2,000,000 units from Orient Gene for the United Kingdom Government, that FSMS immediately asked to be involved in discussions with Orient Gene, and that the following day, Bracey "admitted" that TPUK had entered into a direct contract with Orient Gene. See Doc. 58, ¶¶ 82-84.

Additionally, the Amended Complaint alleges that on October 24, 2020,

> Defendant Scalia claimed "now Tanner was doing all the work on the sourcing side" and that FSMS did not deserve to be paid other than at the initial sample price of $5 per unit. When pressed by FSMS that it could have helped secure a better price to maximize the profit under the Distribution Agreement to both parties, Defendant Scalia admitted that they had, in fact, negotiated a lower price than $5 per unit, saying,

in words or substance: "we're not stupid, we did get a better price."

Id. at ¶ 85.

Finally, the Amended Complaint alleges that the reconciliations were subsequently sent to FSMS.

FSMS's allegations do indicate that the Corporate Defendants were not initially transparent and forthcoming with FSMS regarding the status of the Corporate Defendants' dealings with Orient Gene. However, the Amended Complaint does not set forth "substantially aggravating and egregious circumstances" related to the alleged breach of contract to support a Chapter 75 claim. See Foodbuy, 987 F.3d at 121.

Under these circumstances, the undersigned will recommend that FSMS's Chapter 75 claim be dismissed. See Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998) (stating that a Chapter 75 claim was "out of place" "[g]iven the contractual center of this dispute").

## V.    Recommendation

The undersigned **RESPECTFULLY RECOMMENDS**:

1. That Tanner Pharma UK Limited's Rule 12(b)(2) Motion to Dismiss Amended Complaint (Doc. 62) be **DENIED**;

2. That Tanner Pharma UK Limited's Rule 12(b)(6) Motion to Dismiss Amended Complaint (Doc. 65) be **GRANTED IN PART** and FSMS's claims for breach of the implied covenant of good faith and fair dealing and for violation of North Carolina General Statute § 75-1.1 et seq. (the "Chapter 75 claim") against TPUK be **DISMISSED**;

3. That TannerGAP, Inc.'s Rule 12(b)(6) Motion to Dismiss Amended Complaint (Doc. 67) be **GRANTED IN PART** and FSMS's claims for breach of the implied covenant of good faith and fair dealing and for violation of Chapter 75 against GAP be **DISMISSED;**

4. That Defendant Stephen John Scalia's Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Rule 12(b)(6) (Doc. 69) be **GRANTED**; and

5. That Defendant Raymond Fairbanks Bourne's Motion to Dismiss Amended Complaint Under Rules 9(b) and 12(b)(6) (Doc. 71) be **GRANTED**.

In the event these recommendations are accepted, the following claims would proceed against the Corporate Defendants only: breach of the Distribution Agreement and breach of the Non-Circumvention Agreement.

Signed: July 14, 2023

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636, and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See <u>Thomas v. Arn</u>, 474 U.S. 140, 140 (1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).