UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21-cv-00501-RJC-WCM

| | |
|---|---|
| FS MEDICAL SUPPLIES, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **ORDER** |
| TANNERGAP, INC.; ) | |
| TANNER PHARMA UK LIMITED; ) | |
| RAYMOND FAIRBANKS BOURNE; ) | |
| and STEPHEN JOHN SCALIA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** is before the Court on Defendants' Motions to Dismiss, (Doc. Nos. 62, 65, 67, 69, 71), the Magistrate Judge's Memorandum and Recommendation ("M&R"), (Doc. No. 110), and the parties' various objections and responses. (Doc. Nos. 111, 112, 113, 114, 115, 116). For the reasons below, the M&R is **ADOPTED**, and the Motions to Dismiss are **DENIED IN PART**.

I.     BACKGROUND

This case arises from a contractual relationship between FS Medical Supplies, LLC ("FSMS"), TannerGAP, Inc., and Tanner Pharma UK Limited ("TPUK"), formed in the early days of the COVID-19 pandemic. Seeking a mutually beneficial arrangement when supply chains were limited and relationships were valuable, the parties entered into two agreements: the Non-Circumvention Agreement and the Distribution Agreement. Under these two agreements, FSMS would source medical supplies from its established industry contacts, TannerGAP and TPUK would connect FSMS with healthcare distributors, and the parties would share the profits equally. The relationship ended almost before it began. Though the parties agreed that neither

1

would co-opt the "Personal Relationships" of the other without permission, and the two contracts imposed certain restrictions on TannerGAP and TPUK's ability to enter direct contracts with manufacturers of medical supplies, FSMS alleges that TPUK breached both agreements by entering into a direct contract with one of FSMS's suppliers, Orient Gene, in order to sell billions of dollars' worth of COVID tests to the government of the United Kingdom and other customers.

The Magistrate Judge recounted the factual and procedural background of this case at length in the M&R. Neither party objected to the Magistrate Judge's factual recitation, although TannerGAP and TPUK contest their legal application. The Court will address these contentions, for example, in Section III.B.i., *supra*, but otherwise adopts the facts as set forth in the M&R.

## II. STANDARD OF REVIEW

A district court may assign dispositive pretrial matters, including motions to dismiss, to a magistrate judge for "proposed findings of fact and recommendations." 28 U.S.C. § 636(b)(1)(A), (B). The Federal Magistrate Act provides that a district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3). However, "when objections to strictly legal issues are raised and no factual issues are challenged, de novo review of the record may be dispensed with." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). De novo review is also not required "when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Id.* Similarly, when no party objects, "a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72, advisory committee's note).

## III. DISCUSSION

### A. Rulings Without Objections

As noted above, when a party raises no objection to a decision of the Magistrate Judge, the Court need "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond*, 416 F.3d at 315 (quoting Fed. R. Civ. P. 72, advisory committee's note).

Defendants raised no objection to the Magistrate Judge's ruling on jurisdiction, (Doc. No. 112 at 2 n.1); its ruling on Defendants' *forum non conveniens* arguments; nor the Magistrate Judge's recommendation of dismissal on its claim for breach of the implied covenant of good faith and fair dealing. (Doc. No. 111).[1] This Court has conducted a full review of the M&R and other documents of record, and having done so, finds that the recommendations of the Magistrate Judge as to (1) the exercise of personal jurisdiction over Defendants; (2) Defendants' *forum non conveniens* arguments; and (3) FSMS's claim for breach of the implied covenant of good faith and fair dealing are, in all respects, in accordance with the law and should be approved. Accordingly, the Court will exercise personal jurisdiction over Defendants, the parties will litigate this action in this Court, and FSMS's claim for breach of the implied covenant of good faith and fair dealing is dismissed.

Finally, neither party objected to the Magistrate Judge's application of Delaware law to both the Distribution Agreement and the Non-Circumvention Agreement. According to the Distribution Agreement's choice of law provision, the Distribution Agreement "shall be

---

[1] FSMS does argue in its responses to Defendants' objections that, if the Court "adopts Defendants' position that they had the absolute discretion to 'go direct,' it must not dismiss the good faith claim." (Doc. No. 115 at 19-20). FSMS declined to object to the Magistrate Judge's recommendation of dismissal on its good faith and fair dealing claim, however, and FSMS brings this new argument too late. Nonetheless, as the Court does not adopt Defendants' interpretation of the Distribution Agreement, FSMS's argument is immaterial.

3

governed by the laws of the State of Delaware, without regard to that state's conflicts of law provisions." (Doc. No. 63-1 at § 30). Such provisions are enforceable under North Carolina contract law, *Perkins v. CCH Computax, Inc.*, 333 N.C. 140, 145, 423 S.E.2d 780, 783 (1992), which this Court must apply as a federal court sitting in diversity in North Carolina. *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599 (4th Cir. 2004).

Thus, in considering FSMS's claims as related to the Distribution Agreement, and to the extent that interpretation of the Distribution Agreement affects application of the Non-Circumvention Agreement, the Court will apply Delaware law. Moreover, because the Court construes the Distribution Agreement and the Non-Circumvention Agreements as one integrated agreement, and because the parties evidently intend for Delaware law to govern their contractual relationship,[2] this Court will interpret the Non-Circumvention Agreement under Delaware law, notwithstanding the parties' California choice of law provision in that earlier agreement. (Doc. No. 63-2 at § 12); s*ee Reserves Mgmt., LLC v. Am. Acquisition Prop. I, LLC*, 86 A.3d 1119 (Del. 2014) (table) ("[T]he paramount rule for the interpretation of covenants is so to expound them as to give effect to the actual intent of the parties.").

### B. Rulings With Objections

#### i. FSMS States a Claim for Breach of the Distribution Agreement

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to

---

[2] (Doc. No. 63-1 at § 30 (Delaware choice of law provision in Distribution Agreement, which purported to supersede earlier agreements but left the Non-Circumvention Agreement in place); Doc. No. 112 at 8-14 (TPUK and TannerGAP interpreting Non-Circumvention Agreement under Delaware Law); Doc. No. 115 at 15-19 (FSMS interpreting Non-Circumvention Agreement under Delaware law)).

the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). In applying this standard, the Magistrate Judge found that FSMS stated a claim for breach of the Distribution Agreement against both TannerGAP and TPUK. TannerGAP argues that the Magistrate Judge erred because only TPUK is subject to liability and such liability is separate, not joint and several.

Under Delaware law, "[a]n obligation or written contract of several persons shall be joint and several, unless otherwise expressed." 6 Del. C. § 2701. "This presumption of joint and several liability can only be rebutted by evidence revealing the objective intent of the parties to have a different type of obligation" which may be "revealed by the language of the contract, the subject matter, and the circumstances surrounding creation of the obligation." *Falco v. Alpha Affiliates, Inc.*, No. 97-cv-494, 2000 WL 727116, at *11 (D. Del. Feb. 9, 2000) (applying Delaware law).

TannerGAP claims that Sections 9, 10, and 12 of the Distribution Agreement reveal the parties' objective intent to impose separate liability. Those sections describe various procedures for issuing purchase orders, and, TannerGAP argues, these sections indicate that liability would be based on those purchase orders on a case-by-case-basis. These sections, however – along with the rest of the Distribution Agreement – express only an intent to treat TannerGAP and TPUK as one entity. The Distribution Agreement defines "TANNER" as both TannerGAP, Inc. and its "sister European company Tanner Pharma UK Limited." (Doc. No. 63-1 at 1). Any references to "TANNER" in Sections 9, 10, and 12 refer, as a matter of definition, to both TannerGAP and TPUK. Moreover, TannerGAP and TPUK are represented in the Distribution Agreement by a single signature block, which the companies' shared President and Director signed on their

5

behalf. (*Id.* at 12). Any intent to provide separate liability is imperceptible. The presumption of joint and several liability, therefore, remains in place.

TPUK objects to the Magistrate Judge's recommendation on the Distribution Agreement on two different bases: first, that § 10 of the Distribution Agreement allows TPUK to enter into direct contracts with manufacturers, and second, that FSMS directed TPUK to contract with Orient Gene as contemplated in § 7 of the Distribution Agreement. Neither objection has merit.

The Distribution Agreement addresses direct contracts in two provisions:

> TANNER hereby agrees to purchase the Covered Products from FSMS (or directly from the manufacturer of a Covered Product if directed by FSMS) ….

> This Agreement shall allow TANNER to enter into a direct PO or contract with the manufacturer of a Covered Product so long as the financial arrangement outlined in Section 9 above shall be maintained as if TANNER purchased Covered Products directly from FSMS with a 50% gross profit participation to each Party.

(Doc. No. 63-1 at §§ 7, 10). The latter provision, TPUK argues, allows TPUK to enter into contracts with manufacturers regardless of direction by FSMS. "It is well established that a court interpreting any contractual provision … must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., Ltd. P'ship v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998). These provisions are reconcilable. Reading the contract as a whole and reconciling these provisions, the Court finds that §§ 7 and 10 operate in tandem; § 10's conditions on direct contracts do not replace § 7's "if directed" provision, but rather complement it. These sections together outline a single process for entering into direct contracts, and thus, Defendants must abide by both § 10 and § 7.

Finally, TPUK argues that FSMS directed TPUK to enter into a contract with Orient Gene, as § 7 requires. TPUK points to two actions by FSMS that it characterizes as directions to

6

enter into a contract with Orient Gene: FSMS setting up an initial call between Defendants and Orient Gene and FSMS providing TPUK with an "account opening form."

FSMS paints a different picture. "Between September 21 and September 23, 2020," FSMS alleges, "Tanner Pharma UK issued Purchase Orders directly to Orient Gene for [redacted] units at a price of [redacted] per unit. Defendants did not inform FSMS of this fact and indeed induced Orient Gene to keep it secret from FSMS." (Doc. No. 58 at ¶ 73). To be sure, FSMS consented to TPUK communicating with Orient Gene, but Defendants fail to show that FSMS directed TPUK to enter into a contract. To the contrary, FSMS alleges that Defendants entered into a direct contract with Orient Gene without informing FSMS, deceived FSMS about the existence of that contract, and based that contract on a price FSMS did not ratify. (*Id.* at 73-85). Defendants reveal no direction in these allegations. Thus, because FSMS does sufficiently allege that TannerGAP and TPUK breached the parties' Distribution Agreement, FSMS survives the motion to dismiss on that claim.

### ii. FSMS States a Claim for Breach of the Non-Circumvention Agreement

The Magistrate Judge also recommended that FSMS's claim against TPUK and TannerGAP for breach of the Non-Circumvention Agreement be allowed to proceed. TPUK and TannerGAP object to that recommendation for two reasons: (1) the Distribution Agreement terminates the Non-Circumvention Agreement; and (2) if the Non-Circumvention Agreement was operative, FSMS fails to allege that TPUK and TannerGAP breached it. Because the Distribution Agreement is ambiguous, and because FSMS alleges sufficient facts to state a claim for breach of the Non-Circumvention Agreement, neither argument has merit.

When determining a party's contractual obligations, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.

2006). That intent must be unambiguous, however, and "on a motion to dismiss for failure to state a claim a trial court cannot choose between two differing reasonable interpretations of ambiguous documents." *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996). A contract is ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

TPUK and TannerGAP argue that the Distribution Agreement terminates the Non-Circumvention Agreement because the parties entered into the Distribution Agreement last, and it terminates "all prior written and oral agreements." But the Distribution Agreement is ambiguous, and their objection fails. The Distribution Agreement states that:

> This Agreement constitutes the entire agreement and understanding of the Parties regarding the subject matter of this Agreement and supersedes all prior written and oral agreements, proposals, and understandings between the Parties regarding the subject matter of this Agreement.

(Doc. No. 63-1 at § 32). The Distribution Agreement also provides:

> In the case of termination by either Party, the separate Mutual Non-Disclosure & Non-Circumvention Agreement dated June 8, 2020 between the Parties shall remain in place and in effect and neither Party shall circumvent the other Party with any relationship originally established by the first Party.

(Doc. No. 63-1 at §§ 32, 16.4).

While Defendants offer a plausible reading, theirs is not the only reasonable interpretation. Under FSMS's proposed reading, the second provision preserves the Non-Circumvention Agreement by using the language "shall remain in place and effect." Both interpretations are reasonable – an agreement cannot remain where it does not exist. Therefore, the contract is ambiguous, *see Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196, and because

the Court cannot choose between two reasonable interpretations, dismissal is improper. *Vanderbilt Income & Growth Assocs.*, 691 A.2d at 613; *see also Ruffalo v. Transtech Serv. P'rs Inc.*, Civil Action No. 5039-VCP, 2010 WL 3307487, at *10 (Del. Ch. Aug. 23, 2010) ("[W]hen a motion to dismiss requires interpretation of a contract, the finding of an ambiguity will scuttle the defendant's chances of dismissing the plaintiff's claim.").

Defendants further argue that, even if the Non-Circumvention Agreement operates, they could enter into contracts with Orient Gene because (1) the Distribution Agreement controls where it conflicts with the Non-Circumvention Agreement, and (2) FSMS gave TPUK "express written permission" to contract with Orient Gene. Both arguments again fail.

Under Delaware law, as previously noted, "a court interpreting any contractual provision … must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., Ltd. P'ship*, 715 A.2d at 854. Here, the Non-Circumvention Agreement is incorporated into the Distribution Agreement by reference, and the two agreements are interpreted as one.[3] Though the Distribution Agreement and the Non-Circumvention Agreement provide different requirements, the merged agreement is reconcilable, and the provisions do not conflict. The Distribution Agreement provides:

> TANNER hereby agrees to purchase the Covered Products from FSMS (or directly from the manufacturer of a Covered Product if directed by FSMS) ….
>
> This Agreement shall allow TANNER to enter into a direct [purchase order] or contract with the manufacturer of a Covered Produce so long as the financial arrangement outlined in Section 9 above shall be maintained as if TANNER

---

[3] *See State ex rel. Hirst v. Black*, 46 Del. 295, 299, 83 A.2d 678, 681 (1951) ("It is, of course, axiomatic that a contract may incorporate by reference provisions contained in some other instrument. … Matters contained in other writings which are referred to may be regarded as a part of the contract and may, therefore, properly be considered in the interpretation of the contract. Where a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it, the two will be interpreted together as the agreement of the parties.").

purchased Covered Products directly from FSMS with a 50% gross profit participation to each party.

(Doc. No. 63-1 at §§ 7, 10). The Non-Circumvention Agreement provides:

Each Party … represents and warrants that it shall not conduct business with any Personal Relationships of the Disclosing Party … without the express written permission (not to be unreasonably withheld) of the Disclosing Party who made the source(s) known and/or available to the Recipient.

(Doc. No. 63-2 at § 4). As discussed in Section III.B.i., *supra*, §§ 7 and 10 of the Distribution Agreement operate together. The Non-Circumvention Agreement adds a separate requirement when the manufacturer of a covered product is also a "Personal Relationship" of one of the parties. [4] In that scenario, the merged agreement allows TannerGAP or TPUK to enter a direct contract (1) so long as it maintains the parties' 50% profit share arrangement, (2) once directed by FSMS, and (3) with FSMS's express written permission. Therefore, to state a claim for breach of the Non-Circumvention Agreement, FSMS may allege that Defendants failed to secure "express written permission" before contracting directly with Orient Gene.

Defendants' final objection relates to FSMS's "express written permission," and it too fails. TPUK and TannerGAP argue that, in the event the Non-Circumvention Agreement operates, they performed under that agreement because FSMS gave TPUK its express written permission to contract with Orient Gene.

TPUK and TannerGAP first claim that the Distribution Agreement constitutes "express written permission" because it allows Defendants to enter into direct contracts under certain financial conditions. Such an interpretation leads to an absurd result: if the Distribution

---

[4] The Non-Circumvention Agreement defines "Personal Relationship": "FSMS has relationships with manufactures of various personal protection equipment ("PPE") including, but not limited to, sanitizer products, gloves, masks, gowns, goggles and diagnostic rapid tests, and TANNER has relationships with healthcare distributors who purchase such products and the Parties desire to form a business relationship to sell PPE to such consumer retailers. Such relationships are considered **Personal Relationships** to each Party." (Doc. No. 63-2).

10

Agreement extends unlimited permission for direct contracts, then the "express written permission" is meaningless. The Court need not entertain such illogical constructions. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 n.21 (Del. 2010) ("[I]f a contract was susceptible of two constructions, one of which would produce an absurd result and the other of which would carry out the purpose of the agreement, the latter construction should be adopted.") (quoting *Born v. Hammond*, 218 Md. 184, 146 A.2d 44, 47 (1958)).

Finally, TPUK and TannerGAP argue that certain WhatsApp messages between FSMS and Defendants establish "express written permission."[5] Any permission exhibited in these messages, (Doc. No. 77-21), relates to Defendants' request for administrative setup, not to a request to "conduct business" without FSMS's involvement. FSMS, therefore, states a claim for breach of the Non-Circumvention Agreement and survives the motion to dismiss on that claim.

### iii. FSMS Fails to State a Claim Under N.C. Gen. Stat. § 75-1.1, *et seq.*

To state a claim for violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*, a plaintiff must show: (i) that the defendant engaged in an unfair or deceptive act or practice; (ii) the act or practice was in or affecting commerce; and (iii) the act proximately caused injury to the plaintiff. *Tasz, Inc. v. Indus. Thermo Polymers, Ltd.*, 80 F. Supp. 3d 671, 685 (W.D.N.C. 2015) (citing N.C. Gen. Stat. § 75-1.1 (2011)). Because FSMS fails to allege facts showing that Defendants engaged in an unfair or deceptive act or practice, FSMS's UDTPA claim fails.

---

[5] "Consideration of a document attached to a motion to dismiss ordinarily is permitted only when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015). The communications referenced here are quoted in the Amended Complaint, relied upon by FSMS in the Amended Complaint, and challenged by no party.

"A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and a "practice is deceptive if it has the capacity or tendency to deceive." *Bumpers v. Comm. Bank of N. Va.*, 367 N.C. 81, 747 S.E.2d 220, 228 (2013). Whether a commercial act or practice is unfair or deceptive is a question of law. *Norman Owen Trucking, Inc. v. Morkoski*, 131 N.C.App. 168, 506 S.E.2d 267, 273 (1998).

Plaintiffs cannot, however, "piggyback" their UDTPA claims on the backs of breach of contract actions, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998), because "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under the UDTPA." *Nike USA Inc. v. WDP Soccer Inc.*, No. 3:18-CV-374-RJC-DSC, 2018 WL 4289653, at *4 (W.D.N.C. Aug. 10, 2018). Instead, in the context of a contractual relationship, a party must allege "substantially aggravating and egregious circumstances attending the breach." *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 121 (4th Cir. 2021) (applying North Carolina law). Such aggravating circumstances may include: "(1) lying and concealing a breach combined with acts to deter further investigation; and (2) intentional deception for the purpose of continuing to receive the benefits of an agreement." *Id.*

In applying these standards, the Magistrate Judge found that, though FSMS does allege Defendants "were not initially transparent and forthcoming," FSMS fails to identify any "substantially aggravating and egregious circumstances." (Doc. No. 110 at 47). FSMS objects to this recommendation on three grounds, arguing that Defendants engaged in "substantially aggravating and egregious" behavior by (1) signing the Distribution Agreement without intent to perform; (2) misappropriating FSMS's valuable and confidential business relationship; and (3) lying to FSMS, concealing the breach, deterring further investigation, and engaging in

12

intentional deception to continue to receive the benefits of the Distribution Agreement. Each objection fails.

FSMS first contends that Defendants never intended to perform under the Distribution Agreement. While entering a contract with no intent to perform may constitute an unfair or deceptive trade practice, *see Software Pricing Partners, LLC v. Geisman*, 3:19-cv-00195-RJC-DCK, 2022 WL 397192, *6 (W.D.N.C. 2022), "partial performance under a contract is evidence of the defendant's intent to fulfill the agreement when formed." *Wellness Grp., LLC v. King Bio, Inc.*, No. 1:12-CV-00281-MR-DLH, 2014 WL 1632930, at *4 (W.D.N.C. Apr. 24, 2014). FSMS admits in its Amended Complaint that Defendants performed in part by releasing payments on February 11, 2021, April 1, 2021, and April 15, 2021, which totaled approximately $6.5 million. (Doc. No. 58 at ¶¶ 89, 101, 102, 159). These allegations, taken as true, constitute partial performance by Defendants under the parties' contract. That partial performance demonstrates Defendants' intent to fulfill the agreement when formed.

FSMS next objects based on its contention that Defendants stole its "valuable personal relationship" with Orient Gene. (Doc. No. 111 at 17). Diversion of personal or client relationships can constitute misappropriation, *see Krawiec v. Manly*, 370 N.C. 602, 610, 811 S.E.2d 542, 548 (2018), but to state a claim for unfair and deceptive trade practices, a plaintiff must show that the misappropriation is distinct from a breach of contract claim. *Broussard*, 155 F.3d at 346. FSMS bases its UDPTA claim on the "existence of an agreement, the terms contained in the agreement, and the interpretation of an agreement." *Id.* at 347. Such contract-

13

based claims are "relegated to the arena of contract law," *id.* (cleaned up), and this Court will address them accordingly.[6]

Finally, FSMS argues the Magistrate Judge erred in dismissing its UDTPA claim because Defendants engaged in "substantially aggravating and egregious" deceptive conduct by: (1) concealing their relationships with Orient Gene and the UK government and (2) implying that $5.00/unit was the test kit unit price.

Neither allegation is sufficient. FSMS alleges that Defendants entered into a contract with Orient Gene on September 23, 2020, and with the UK government on October 3, 2020. (Doc. No. 58 at ¶¶ 72, 76). When FSMS requested updates several times over the following weeks, Defendants reported that the contracts were conditioned upon the results of certain tests and that "samples have been given to uk gov for review." (*Id.* at ¶¶ 78-81). In October, Defendants notified FSMS that they were "processing a conditional transaction for Orient Gene Antigen Rapid Test Cassettes for the UK Government" and that "[t]he purchase is conditional upon successful Phase 3b testing by the UK Gov." (Doc. No. 77-18; Doc. No. 58 at ¶ 82).

When Defendants later advised FSMS that the tests had been verbally approved, FSMS congratulated Defendants on their "Orient Gene Antigen order from the UK Department of Health and Social Care." (Doc. No. 77-19). These relationships were no secret. Therefore, though FSMS does allege a breach of the parties' contracts, FSMS fails to demonstrate "substantially aggravating and egregious" behavior related to Defendants' contracts with Orient Gene and the UK government.

---

[6] *See also ACS Partners, LLC v. Americon Grp.*, Inc., No. 3:09CV464-RJC-DSC, 2010 WL 883663, at *9 (W.D.N.C. Mar. 5, 2010) (adopting memorandum and recommendation) (finding that where a plaintiff alleged unfair and deceptive trade practices based on the defendant's misappropriation of trade secrets, *i.e.*, current and prospective client relationships, plaintiff alleged only enough for a breach of contract claim, and not the sort of "substantial aggravating circumstances" necessary under the UDTPA)

FSMS next alleges that on October 22, 2020, Defendant Scalia misrepresented the price per unit Defendants paid to Orient Gene when he reported that the numbers were "shaping up" to be "$5/ea." (Doc. No. 58 at ¶ 82). Any alleged deception lasted only two days, however. During a follow-up call on October 24, FSMS objected to the $5/unit price and Defendant Scalia responded that "Tanner was doing all the work on the sourcing side," so FSMS did not deserve to be paid other than at the initial sample price of $5 per unit. FSMS noted that it could have helped secure a better price, and Defendant Scalia explained Defendants had, indeed, gotten a better price. (*Id.*).

This behavior is not "substantially aggravating and egregious." *See Foodbuy*, 987 F.3d at 121. Defendants disclosed their plan to breach the parties' contract and then carried out that plan. "[U]nfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted," but unfairness alone does not convert a breach of contract claim into a UDTPA claim. *See United Roasters, Inc. v. Colgate–Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981) (affirming the district court's denial of a North Carolina unfair and deceptive trade practices claim). Accordingly, FSMS fails to plead "sufficiently aggravating and egregious" circumstances to support its unfair and deceptive trade practices claim, and, therefore, FSMS fails to state a claim under N.C. Gen. Stat. § 75-1.1, *et seq*.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. The M&R, (Doc. No. 110), is **ADOPTED**;

2. The Motions to Dismiss (Doc. Nos. 62, 65, 67, 69, 71) are **DENIED IN PART**;

3. Tanner Pharma UK Limited's Rule 12(b)(2) Motion to Dismiss, (Doc. No. 62), is **DENIED**;

4. Tanner Pharma UK Limited's Rule 12(b)(6) Motion to Dismiss, (Doc. No. 65), is **GRANTED IN PART** and FSMS's Unfair and Deceptive Trade Practices Act Claims under N.C.G.S. § 75-1.1 *et seq.* are **DISMISSED**;

5. TannerGAP, Inc.'s Rule 12(b)(6) Motion to Dismiss, (Doc. No. 67), is **GRANTED IN PART** and FSMS's Unfair and Deceptive Trade Practices Act Claims under N.C.G.S. § 75-1.1 *et seq.* are **DISMISSED**;

6. Defendant Stephen John Scalia's Rule 12(b)(6) Motion to Dismiss, (Doc. No. 69), is **GRANTED**; and

7. Defendant Raymond Fairbanks Bourne's Rule 9(b) and Rule 12(b)(6) Motion to Dismiss, (Doc. No. 71), is **GRANTED**.

Signed: September 30, 2023

Robert J. Conrad, Jr.
United States District Judge