# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

FS MEDICAL SUPPLIES, LLC,

        Plaintiff,

v.

TANNERGAP, INC. and TANNER
PHARMA UK LIMITED,

        Defendants.

**Civil Action No. 3:21-CV-00501-RJC-WCM**

---

### TANNERGAP, INC.'S AND TANNER PHARMA UK LIMITED'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT AND ~~COUNTERCLAIM~~AMENDED AND SUPPLEMENTAL COUNTERCLAIMS

## PRELIMINARY STATEMENT

Tanner Pharma UK ("TPUK") was formed in 2015 to help customers acquire pharmaceutical products and services in the United Kingdom and European Union. In the COVID-19 pandemic's early days, TPUK had forged strong relationships that positioned it to be a trusted partner of the UK government's Department of Health and Social Care ("DHSC").

FS Medical Supplies, LLC ("FSMS"), in contrast, was hastily formed after the pandemic began and had no track record. It misrepresented its capabilities to TPUK and signed a Distribution Agreement to be a "supplier" to TPUK, but it could not and did not perform that role. Nevertheless, FSMS accepted roughly $6.5 million in profit share calculated under that Distribution Agreement, but now disclaims its earlier conduct to seek far more. FSMS misrepresented its capabilities and failed to live up to its obligations. Now, FSMS improperly seeks to take advantage of TPUK's credentials and hard work to reap a profit it did not earn.

In mid-2020, TPUK was uniquely situated to address a critical public health need: providing PPE and COVID tests to the DHSC and, in turn, the UK public. As it explored many options to meet those needs, a networking post by Laird Cagan of FSMS popped up, "seeking advice to create a global sales channel partners network for PPE." When contacted, Cagan claimed to have close connections with Chinese PPE manufacturers. He also said he had contacts with the Chinese parent company of Healgen, a U.S.-based supplier of COVID tests that TPUK already knew about as a potential source. Cagan quickly tendered a form Non-Disclosure and Non-Circumvention Agreement, which the parties executed as an interim step toward a definitive Distribution Agreement.

But then FSMS and Cagan dragged their feet for months in negotiating a Distribution Agreement while TPUK's Jonathan Bracey worked urgently to scope and meet the UK government's needs. In the Distribution Agreement that the parties eventually executed, FSMS promised that it would supply products to TPUK, which would resell them. In early September, Cagan added language into the draft anticipating that TPUK would also directly contract with manufacturers. Meanwhile, Cagan and his co-owner Jim Mao promised a personal introduction and special access to the senior executive and owner of Orient Gene, Healgen's parent. The parties finalized the Distribution Agreement on September 11, 2020.

Very quickly, it became apparent that Cagan and FSMS did not have the experience and contacts that they had promised. The personal introduction never happened, and FSMS slowed rather than accelerated TPUK's efforts to meet the DHSC's stringent vendor qualifications. Critically, FSMS **never** purchased any test kits for TPUK to resell, as FSMS promised to do in the Distribution Agreement. Instead, Cagan instructed TPUK to go directly to Orient Gene to secure test kits for resale. Indeed, FSMS **never** quoted a per-unit price lower than $5.00, the price TPUK disclosed it was using in calculating the profit share. So TPUK alone fronted steep costs, pre-paid Orient Gene, handled the urgent logistics of getting test kits from China to the UK, and took on the enormous financial risks that had to be borne to achieve timely delivery of COVID tests to the British public. Ultimately, TPUK delivered tests that helped providers and hospitals around the UK to check the spread of the virus, lowering COVID infections and deaths.

From October 2020 until February 2021, FSMS ratified TPUK's reading of the Distribution Agreement and its profit-share calculation. It accepted TPUK's reconciliation statements, issued corresponding invoices, and pocketed profit-share payments TPUK made. Only after TPUK obtained lower prices from Orient Gene on its own (without FSMS help), and

payments to FSMS had ended, did FSMS first dispute the parties' agreed interpretation of the Distribution Agreement. Indeed, FSMS accepted reconciliations and then issued invoices for payment to TPUK, and TPUK paid FSMS invoices totaling ~$6.5 million. Just a week after getting a February 17 wire payment, FSMS reversed its position and demanded even greater payouts for sales it had nothing to do with. FSMS now appears to be defunct for all purposes except pursuing litigation.

Opportunistic and grasping from the start to the finish of its brief existence, FSMS now insists that it is entitled to free-rider profits that it never earned under a revisionist reading of the Distribution Agreement that is contradicted by its own conduct. This lawsuit—like its predecessor and successor—lacks legal and factual basis, for the reasons shown in this Answer, ~~Counterclaim~~Counterclaims, and Defenses.

## ANSWER

Defendants TannerGAP, Inc. ("TannerGAP"), and Tanner Pharma UK Limited ("TPUK"), hereby answer the numbered paragraphs of the Amended Complaint filed by Plaintiff FS Medical Supplies, LLC ("FSMS"), as follows. All facts not specifically admitted are denied.

1. TannerGAP and TPUK admit that Tanner Pharma Group (tannerpharma.com) is a trade name for a group of companies that are engaged in different aspects of pharmaceutical sales and services in international markets. TannerGAP and TPUK further admit that those companies collaborate for marketing and administrative purposes using a Tanner Pharma Group logo and tannerpharma.com domain. TannerGAP and TPUK further admit that Raymond Fairbanks Bourne ("Bourne") is the sole shareholder of Tanner Pharma Group, Inc., which is the holding company for four wholly owned domestic subsidiaries, including TannerGAP.

TannerGAP and TPUK further admit that Stephen John Scalia ("Scalia") is the President of Tanner Pharma Group Inc. TannerGAP and TPUK further admit that Bourne owns 75 percent of TPUK's shares and that his wife owns the remaining 25 percent. TannerGAP and TPUK deny the remaining allegations in Paragraph 1, and specifically deny any allegation of improper, unfair, or deceptive conduct.

2.     TannerGAP and TPUK admit that Jonathan Bracey ("Bracey") and Laird Cagan ("Cagan") corresponded by email in June 2020 in response to a networking post that Cagan created on the Young Presidents' Organization website. Paragraph 2 of the Amended Complaint purports to quote that email, which appears at Docket 63, Defendants' Joint Submission, Exhibit O, TannerGAP00010376-79. TannerGAP and TPUK further admit that TannerGAP and FSMS entered into a Mutual Non-Disclosure and Non-Circumvention Agreement ("NDNCA") on June 8, 2020. That agreement appears at Docket 63, Defendants' Joint Submission, Exhibit B, TannerGAP00011600-03. TannerGAP and TPUK also admit on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. That agreement appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of the email and agreements speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 2.

3.     TannerGAP and TPUK admit that, in August 2020, Bracey identified an opportunity to supply COVID antigen tests to the UK Department of Health and Social Care ("DHSC"). TannerGAP and TPUK further admit that FSMS later was involved in obtaining sample test kits so the DHSC could perform validation testing. TPUK eventually began supplying Zhejiang Orient Gene Biotech Co., Ltd. ("Orient Gene") test kits to the DHSC in

October 2020. TannerGAP and TPUK further admit that FSMS's Cagan suggested and recommended that TPUK communicate directly with, and issue purchase orders directly to, Orient Gene. TannerGAP and TPUK further admit that TPUK executed an Exclusive Distribution Agreement with Orient Gene on October 14, 2020. TannerGAP and TPUK deny the remaining allegations in Paragraph 3.

4.     TannerGAP and TPUK admit that TPUK generated more than £1 billion of revenue from contracts with the DHSC. TannerGAP and TPUK deny the remaining allegations in Paragraph 4.

## JURISDICTION AND VENUE

5.     Paragraph 5 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent that an answer is required, TannerGAP and TPUK admit that TannerGAP is incorporated in, and maintains its principal place of business, in Charlotte, North Carolina. TannerGAP and TPUK state that TPUK is organized in, and maintains its principal place of business in, the United Kingdom. TannerGAP and TPUK deny the remaining allegations in Paragraph 5.

6.     Paragraph 6 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent that an answer is required, TannerGAP and TPUK admit that TannerGAP is incorporated in, and maintains its principal place of business, in Charlotte, North Carolina. TannerGAP and TPUK state that TPUK is organized in, and maintains its principal place of business in, the United Kingdom. TannerGAP and TPUK deny the remaining allegations in Paragraph 5. TPUK specifically denies that it is subject to personal jurisdiction.

## THE PARTIES

7.     On information and belief, admitted.

8.     Admitted.

9.     Admitted.

10.     TannerGAP and TPUK admit that Tanner Pharma Group (tannerpharma.com) is a trade name for a group of companies that are engaged in different aspects of pharmaceutical sales and related business in international markets.  TannerGAP and TPUK further admit that those companies collaborate for marketing and administrative purposes using a Tanner Pharma Group logo and tannerpharma.com domain.  TannerGAP and TPUK further admit that Bourne is the sole shareholder of Tanner Pharma Group, Inc., which is the holding company for four wholly owned domestic subsidiaries, including TannerGAP.  TannerGAP and TPUK further admit that Scalia is the President of Tanner Pharma Group Inc.  TannerGAP and TPUK further admit that Bourne owns 75 percent of TPUK's shares and that his wife owns the remaining 25 percent.  Paragraph 10 of the Amended Complaint purports to quote the Tanner Pharma Group website.  The contents of the website speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.   TannerGAP and TPUK deny the remaining allegations in Paragraph 10.

11.     TannerGAP and TPUK admit that TannerGAP's principal place of business is in Charlotte, North Carolina.  TannerGAP and TPUK admit that Scalia resides in Charlotte, North Carolina.  TannerGAP and TPUK further admit that Scalia is the President of Tanner Pharma Group, Inc. and that he provides oversight of the operations of TannerGAP and its affiliates. TannerGAP and TPUK further admit that Bourne resides in Charlotte, North Carolina. TannerGAP and TPUK further admit that Bourne is an officer of TannerGAP.  TannerGAP and TPUK further admit that Bourne indirectly owns 100 percent of TannerGAP's shares. TannerGAP and TPUK deny the remaining allegations in Paragraph 11.

12.     Denied.  TannerGAP and TPUK state that TPUK's principal place of business is in the United Kingdom and deny that it is directed, controlled and coordinated from Charlotte.

13.     TannerGAP and TPUK admit that Bourne resides in Charlotte, North Carolina. TannerGAP admits that he is an officer of TannerGAP.  TannerGAP and TPUK specifically deny that Bourne is the sole officer of TannerGAP.  TannerGAP and TPUK admit that Bourne indirectly owns 100 percent of TannerGAP's shares.  TannerGAP and TPUK further admit that Bourne owns 75 percent of TPUK's shares and that his wife owns the remaining 25 percent. TannerGAP and TPUK further admit that Bourne is TPUK's sole director.  Paragraph 13 of the Amended Complaint purports to quote the Tanner Pharma Group website.  The contents of the website speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

14.     TannerGAP and TPUK admit that Scalia resides in Charlotte, North Carolina. TannerGAP and TPUK admit that Scalia is the President of Tanner Pharma Group, Inc. and that he provides oversight of the operations Tanner Pharma Group, Inc. and its affiliates.  Paragraph 14 of the Amended Complaint purports to quote the Tanner Pharma Group website.  The contents of the website speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

15.     TannerGAP and TPUK admit that Scalia resides in Charlotte, North Carolina. TannerGAP and TPUK admit that Scalia is the President of Tanner Pharma Group, Inc. and that he provides oversight of Tanner Pharma Group, Inc. and its affiliates.  TannerGAP and TPUK admit that Bourne resides in Charlotte, North Carolina.  TannerGAP and TPUK admit that Bourne is an officer of TannerGAP.  TannerGAP and TPUK admit that Bourne indirectly owns 100 percent of TannerGAP's shares.  TannerGAP and TPUK admit that Bourne owns 75 percent

of TPUK's shares and that his wife owns the remaining 25 percent. TannerGAP and TPUK also admit that Bourne is TPUK's sole director. TannerGAP and TPUK deny the remaining allegations in Paragraph 15.

## GENERAL ALLEGATIONS

16. On information and belief, TannerGAP and TPUK admit that Laird Cagan and Jim Mao are members of FSMS. Docket 63, Defendants' Joint Submission, Exhibit M, Statement of Information; *id.* at Exhibit O, TannerGAP00010376-79; Docket 58, Amended Complaint, ¶ 7. TannerGAP and TPUK state that FSMS was formed as a Delaware LLC on March 30, 2020. Docket 63, Defendants' Joint Submission, Exhibit K, Delaware Entity Search. TannerGAP and TPUK further state that, FSMS registered as a foreign LLC in California on July 31, 2020. *Id.* at Ex. L, FSMS Application. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16 and, therefore, deny them.

17. On information and belief, TannerGAP and TPUK admit that Cagan is a member of FSMS. Docket 63, Defendants' Joint Submission, Exhibit M, Statement of Information; *id.* at Exhibit O, TannerGAP00010376-79. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17 and, therefore, deny them.

18. On information and belief, TannerGAP and TPUK admit that Jim Mao is a member of FSMS. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and, therefore, deny them.

19. TannerGAP and TPUK admit that, by mid-2020, the DHSC and its global counterparts urgently needed to acquire large volumes of validated COVID tests and other PPE

because of the pandemic. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19 and, therefore, deny them.

20. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and, therefore, deny them.

21. TannerGAP and TPUK admit that, in June 2020, Laird Cagan created a networking post on the Young Presidents' Organization website that stated he was "[s]eeking advice to create a global sales channel partners network for PPE." The contents of that post speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21 and, therefore, deny them.

22. TannerGAP and TPUK admit that Bracey and Cagan corresponded by email in June 2020 in response to a networking post that Cagan created on the Young Presidents' Organization website. Paragraph 22 of the Amended Complaint purports to summarize their email chain, which appears at Docket 63, Defendants' Joint Submission, Exhibit O, TannerGAP00010376-79. The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

23. TannerGAP and TPUK admit that Bracey and Cagan corresponded by email in June 2020 in response to a networking post that Cagan created on the Young Presidents' Organization website. Paragraph 23 of the Amended Complaint purports to quote their email chain, which appears at Docket 63, Defendants' Joint Submission, Exhibit O, TannerGAP00010376-79. The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and

TPUK further admit that Bracey serves as Executive Vice President for Corporate Development for the Tanner Pharma Group companies. Paragraph 23 of the Amended Complaint purports to quote Bracey's LinkedIn profile. The contents of his profile speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

24. TannerGAP and TPUK admit that Bracey and Cagan corresponded by email in June 2020 in response to a networking post that Cagan created on the Young Presidents' Organization website. Paragraph 24 of the Amended Complaint purports to quote that email chain, which appears at Docket 63, Defendants' Joint Submission, Exhibit O, TannerGAP00010376-79. The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that Healgen is the U.S. subsidiary of Orient Gene.

25. TannerGAP and TPUK admit that Bracey and Cagan corresponded by email in June 2020 in response to a networking post that Cagan created on the Young Presidents' Organization website. Paragraph 25 of the Amended Complaint purports to quote that email chain, which appears at Docket 63, Defendants' Joint Submission, Exhibit O, TannerGAP00010376-79. The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

26. TannerGAP and TPUK admit that Orient Gene is a Chinese manufacturer of high-quality diagnostic supplies and devices. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 26 and, therefore, deny them.

27. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and, therefore, deny them.

28.     TannerGAP and TPUK admit that TannerGAP and FSMS entered into the NDNCA on June 8, 2020.  Paragraph 28 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit B, TannerGAP00011600-03. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.  TannerGAP and TPUK further admit that Bracey and Scalia communicated with Cagan prior to TannerGAP entering into the NDNCA.  TannerGAP and TPUK deny the remaining allegations in Paragraph 28, including any claim by FSMS of "Personal Relationships."

29.     TannerGAP and TPUK admit that TannerGAP and FSMS entered into the NDNCA on June 8, 2020.  Paragraph 29 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit B, TannerGAP00011600-03. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

30.     TannerGAP and TPUK admit that TannerGAP and FSMS entered into the NDNCA on June 8, 2020.  Paragraph 30 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit B, TannerGAP00011600-03. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

31.     TannerGAP and TPUK admit that Cagan and Bracey corresponded by email on or around June 8, 2020.  Paragraph 31 of the Amended Complaint purports to quote their email chain, which TannerGAP produced to FSMS at Bates range TannerGAP00013230-34.  The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

32.     TannerGAP and TPUK admit that Scalia corresponded with Bracey and other colleagues regarding FSMS on June 9, 2020.  Paragraph 32 of the Amended Complaint purports to quote their email chain, which TannerGAP produced to FSMS at Bates number TannerGAP00010402.  The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

33.     TannerGAP and TPUK admit that, on June 10, 2020, Scalia emailed a draft distribution agreement to Cagan.  Paragraph 33 of the Amended Complaint purports to quote their email chain, which TannerGAP produced to FSMS at Bates range TannerGAP00018521-23.   The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

34.     TannerGAP and TPUK admit that, on June 10, 2020, Scalia emailed a draft distribution agreement to Cagan.  Paragraph 34 of the Amended Complaint purports to quote that draft agreement, which TannerGAP produced to FSMS at Bates range TannerGAP00018524-35.  The contents of that draft agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

35.     TannerGAP and TPUK admit that, on June 10, 2020, Scalia emailed a draft distribution agreement to Cagan.  Paragraph 35 of the Amended Complaint purports to quote that draft agreement, which TannerGAP produced to FSMS at Bates range TannerGAP00018524-35.  The contents of that draft agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

36.     TannerGAP and TPUK admit that, on or around June 3, 2020, Bracey and Cagan corresponded by email about arranging a call.  Paragraph 36 of the Amended Complaint purports to quote their email chain, which appears at Docket 63, Defendants' Joint Submission, Exhibit

O, TannerGAP00010376-79. The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

37. TannerGAP and TPUK admit that, on or around August 20, 2020, Bracey emailed his colleagues regarding the NDNCA. Paragraph 37 of the Amended Complaint purports to summarize their email chain, which TannerGAP produced to FSMS at Bates range TannerGAP00011542-44. The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

38. TannerGAP and TPUK admit that, in August 2020, Bracey identified an opportunity to supply COVID tests to the DHSC.

39. TannerGAP and TPUK admit that, on or around August 29, 2020, Bracey, Scalia, and Cagan corresponded by email regarding the opportunity for TPUK to bid on selling test kits to the DHSC. TannerGAP and TPUK further admit that Bracey informed Cagan that the DHSC needed 500 units to run technical validation and asked if Orient Gene could provide them over the next week or so. TannerGAP and TPUK further admit that Bracey emailed Scalia and other colleagues on August 31, 2020 regarding the DHSC opportunity. Paragraph 39 of the Amended Complaint purports to quote their email chain, which TannerGAP produced to FSMS at Bates range TannerGAP00011560-62. The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

40. TannerGAP and TPUK admit that eventually, on or around September 2, 2020, FSMS procured 500 sample test kits so that the DHSC could perform validation testing. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 40 and, therefore, deny them.

41.     TannerGAP and TPUK state that TPUK arranged for its vendor, Quickstat Global Life Science Logistics ("Quickstat") to pick up sample test kits from Healgen in Houston, Texas using TPUK's Quickstat account.  TannerGAP and TPUK state that Quickstat picked up the sample test kits on September 4, 2020.  TannerGAP and TPUK further admit that Healgen is the U.S. subsidiary of Orient Gene.  TannerGAP and TPUK state that Quickstat delivered the 500 sample test kits directly to the DHSC in the United Kingdom on September 7, 2020.  TannerGAP and TPUK deny the remaining allegations in Paragraph 41.

42.     TannerGAP and TPUK admit that FSMS charged $5.00 per unit for the sample test kits and that FSMS and TannerGAP split the cost.  TannerGAP and TPUK also admit that the DHSC did not pay for the sample test kits.  TannerGAP and TPUK further admit that, on September 18, 2020, TannerGAP wired a payment to FSMS for $11,875.  TannerGAP and TPUK further admit that Cagan told Bracey about the possibility of a rebate from Orient Gene if the DHSC made a purchase from TPUK.  TannerGAP and TPUK deny the remaining allegations in Paragraph 42.

43.     TannerGAP and TPUK admit that Quickstat delivered the 500 sample test kits directly to the DHSC in the United Kingdom on September 7, 2020.  TannerGAP and TPUK further admit that Bracey and Cagan communicated by WhatsApp messages on or around September 9, 2020.  Paragraph 43 of the Amended Complaint purports to quote those messages, which FSMS produced to TannerGAP and TPUK at Bates number FSMS000008.  The contents of those messages speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

44.     TannerGAP and TPUK admit that FSMS ~~were~~was involved in obtaining sample test kits for the DHSC so the DHSC could perform validation testing.  TannerGAP and TPUK

further admit that Bracey, Cagan, and others corresponded by WhatsApp messages on or around September 3, 2020. Paragraph 44 of the Amended Complaint purports to quote one of those messages, which FSMS produced to TannerGAP and TPUK at Bates range FSMS000004. The contents of those messages speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44 and, therefore, deny them.

45. TannerGAP and TPUK admit that Bracey, Cagan, and others corresponded by WhatsApp messages and otherwise on or around September 10, 2020. Paragraph 45 of the Amended Complaint purports to quote some messages, which FSMS produced to TannerGAP and TPUK at Bates range FSMS000009-10. The contents of those specific messages speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

46. TannerGAP and TPUK state that FSMS procured from Orient Gene an additional 4,260 sample units. TannerGAP and TPUK further state that the units arrived in the United Kingdom on or around September 24, 2020. TannerGAP and TPUK admit that FSMS charged $5.00 per unit for the sample test kits and that FSMS and TannerGAP split the cost. TannerGAP and TPUK further admit that, on September 18, 2020, TannerGAP wired a payment to FSMS for $11,875. TannerGAP and TPUK are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 regarding what price Orient Gene charged FSMS, therefore, deny them. TannerGAP and TPUK deny the remaining allegations in Paragraph 46.

47. TannerGAP and TPUK admit that FSMS was involved in procuring sample test kits from Healgen and Orient Gene. TannerGAP and TPUK deny the remaining allegations in

Paragraph 47. TannerGAP and TPUK specifically deny that without FSMS "none of this would have been possible," and deny that TPUK could not have obtained sample test kits.

48. Denied.

49. TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. Paragraph 49 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

50. TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. Paragraph 50 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

51. TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. Paragraph 51 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

52. TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. Paragraph 52 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

53.     TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement.  Paragraph 53 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58.  The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

54.     TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement.  Paragraph 54 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58.  The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

55.     TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement.  Paragraph 55 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58.  The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

56.     TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement.  Paragraph 56 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58.  The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

57.     TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement.  Paragraph 57 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission,

Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

58.　　TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. Paragraph 58 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

59.　　TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. Paragraph 59 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

60.　　TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. Paragraph 60 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

61.　　TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. Paragraph 61 of the Amended Complaint purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58. The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

62.     TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement.  Paragraph 62 of the Amended Complaint purports to summarize that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58.  The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

63.     TannerGAP and TPUK admit that, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement.  Paragraph 63 of the Amended Complaint purports to summarize that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-58.  The contents of that agreement speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK state that when pressed about inadequate performance, FSMS's Cagan suggested and recommended that TPUK communicate directly with, and issue purchase orders directly to, Orient Gene.  TannerGAP and TPUK further state that, on or around September 2, 2020, Cagan drafted and inserted the direct-dealing language in Sections 7 and 10.  TannerGAP and TPUK deny the remaining allegations in Paragraph 63.

64.     TannerGAP and TPUK admit that, on September 7, 2020, Bracey emailed a potential customer regarding test kits.  Paragraph 64 of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at Bates number TannerGAP00007292. The contents of that email speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.   TannerGAP and TPUK deny the remaining allegations in Paragraph 64.

65.     TannerGAP and TPUK admit that, on or around September 9, 2020, Bracey, Cagan, and FSMS's Jim Mao ("Mao") communicated via WhatsApp messages regarding Orient

Gene. Paragraph 65 of the Amended Complaint purports to quote those messages, which FSMS produced to TannerGAP and TPUK at Bates range FSMS000008-09. The contents of those messages speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that, on or around September 9, 2020, Mao sent Bracey a Tanner Account Opening Form for Orient Gene as reflected in the WhatsApp messages at Docket 77-21, Plaintiff's Submission at FSMS000008. TannerGAP and TPUK deny the remaining allegations in Paragraph 65.

66.     TannerGAP and TPUK admit that, on or around September 9, 2020, Bracey, Cagan, and Mao communicated via WhatsApp messages regarding Orient Gene. Paragraph 66 of the Amended Complaint purports to quote and add emphasis to those messages, which FSMS produced to TannerGAP and TPUK at Bates number FSMS000009. The contents of those messages speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents.

67.     TannerGAP and TPUK admit that, on or around September 10, 2020, FSMS agreed to set up a call with Orient Gene. TannerGAP and TPUK further admit that, on or around September 10, 2020, Bracey, Cagan, and Mao communicated via WhatsApp messages and otherwise regarding Orient Gene. Paragraph 67 of the Amended Complaint purports to quote some  messages, which FSMS produced to TannerGAP and TPUK at Bates number FSMS000011. The contents of those messages speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK admit that Bracey had a call with Mao and a representative of Orient Gene on or around September 11, 2020.

68. TannerGAP and TPUK admit that, on or around September 14, 2020, Bracey had a call with representatives from Orient Gene. TannerGAP and TPUK state that Cagan and Mao were copied on the meeting invite for the call and other communications about the call. TannerGAP and TPUK further state that Bracey sent an email on September 15, 2020 to representatives of Orient Gene, copying Cagan, about a call that Bracey and his colleagues had with the DHSC. TannerGAP and TPUK deny the remaining allegations in Paragraph 68, including allegations that contacts with Orient Gene were "concealed."

69. TannerGAP and TPUK admit that, on September 21, 2020, Bracey emailed Scalia and a consultant for the DHSC regarding Orient Gene and Healgen. Paragraph 69 of the Amended Complaint purports to quote that email chain, which TPUK produced to FSMS at Bates range TannerUK00007654-56. The contents of that email chain speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that no representative of FSMS was copied on that email chain. TannerGAP and TPUK deny the remaining allegations in Paragraph 69.

70. TannerGAP and TPUK admit that, on September 21, 2020, TPUK and DHSC executed a Non-Disclosure Agreement. TannerGAP and TPUK further admit that TPUK did not send a copy of this agreement to FSMS. TannerGAP and TPUK deny the remaining allegations in Paragraph 70.

71. TannerGAP and TPUK admit that, on September 23, 2020, Bracey, Scalia, representatives of the DHSC, and a consultant for the DHSC, exchanged emails regarding a Joinder Agreement with Orient Gene. Paragraph 71 of the Amended Complaint purports to summarize that email chain, which TPUK produced to FSMS at Bates range TannerUK00007650-52. The contents of that email chain speak for themselves, and TannerGAP

and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that Orient Gene executed the Joinder Agreement on September 24, 2020 through which Orient Gene joined the Non-Disclosure Agreement between DHSC and TPUK. TannerGAP and TPUK further admit that TPUK did not send a copy of the Joinder Agreement to FSMS. TannerGAP and TPUK further admit that Bracey forwarded that email chain to William Taylor ("Taylor"), Lizza Rodriguez, and Katty Butler, as reflected in Bates number TannerUK00007650-52. TannerGAP and TPUK further admit that Taylor was General Counsel and Senior Vice President of Legal and Compliance, was employed by TannerGAP, and resided in North Carolina as of September 2020. Lizza Rodriguez was a Senior Paralegal, was employed by TannerGAP, and resided in the North Carolina as of September 2020. Katty Butler was a Junior Paralegal, was employed by TannerGAP, and resided in the North Carolina as of September 2020. TannerGAP and TPUK deny the remaining allegations in Paragraph 71.

72. TannerGAP and TPUK admit that, on or around September 23, 2020, TPUK sent a purchase order to Orient Gene, which TPUK produced to FSMS at Bates number TannerUK00000446. TannerGAP and TPUK further admit that, on or around October 11, 2020, TPUK sent a purchase order to Orient Gene, which TPUK produced to FSMS at Bates number TannerUK00000454. The contents of those purchase orders speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that TPUK executed an Exclusive Distribution Agreement with Orient Gene on October 14, 2020 and that such agreement included a mutual confidentiality provision limiting disclosure to non-parties. TannerGAP and TPUK state that, on or around October 20, 2020, Scalia informed Cagan that TPUK was processing a conditional transaction for Orient Gene test kits to be sold to the DHSC, which discussion Scalia recounted in his email to Cagan

on October 22, 2020. TannerGAP produced that email to FSMS at TannerGAP00001577. TannerGAP and TPUK deny the remaining allegations in Paragraph 72.

73.     TannerGAP and TPUK admit that, on or around September 23, 2020, TPUK sent a purchase order to Orient Gene, which TPUK produced to FSMS at Bates number TannerUK00000446. TannerGAP and TPUK further admit that, on or around October 11, 2020, TPUK sent a purchase order to Orient Gene, which TPUK produced to FSMS at Bates number TannerUK00000454. The contents of those purchase orders speak for themselves, and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that TPUK executed an Exclusive Distribution Agreement with Orient Gene on October 14, 2020. TannerGAP and TPUK state that, on or around October 20, 2020, Scalia informed Cagan that TPUK was processing a conditional transaction for Orient Gene test kits to be sold to the DHSC, which discussion Scalia recounted in his email to Cagan on October 22, 2020. TannerGAP produced that email to FSMS at TannerGAP00001577. TannerGAP and TPUK deny the remaining allegations in Paragraph 73.

74.     TannerGAP and TPUK admit that, on September 21, 2020, Bracey emailed colleagues regarding the sale of test kits to the DHSC. Paragraph 74 of the Amended Complaint purports to quote their email chain, which TannerGAP produced to FSMS at Bates number TannerGAP00007441. The contents of that email chain speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

75.     TannerGAP and TPUK admit that, on September 29, 2020, Mao and Bracey communicated via WhatsApp messages. Paragraph 75 of the Amended Complaint purports to quote those messages, which FSMS produced to TannerGAP and TPUK at FSMS000012. The contents of those messages speak for themselves and TannerGAP and TPUK deny any

allegations inconsistent with those contents. TannerGAP and TPUK state that, on or around October 20, 2020, Scalia informed Cagan that TPUK was processing a conditional transaction for Orient Gene test kits to be sold to the DHSC, which discussion Scalia recounted in his email to Cagan on October 22, 2020. TannerGAP produced that email to FSMS at TannerGAP00001577. TannerGAP and TPUK deny the remaining allegations in Paragraph 75.

76. TPUK admits that, on or around October 3, 2020, TPUK and the DHSC entered into a contract for the sale of test kits from Orient Gene in two shipments, which Bourne signed on behalf of TPUK. Paragraph 76 of the Amended Complaint purports to summarize that contract, which TPUK produced to FSMS at Bates ranges TannerUK00007680-90 and TannerUK00000001-12. The contents of that contract speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK state that, on or around October 20, 2020, Scalia informed Cagan that TPUK was processing a conditional transaction for Orient Gene test kits to be sold to the DHSC, which discussion Scalia recounted in his email to Cagan on October 22, 2020. TannerGAP produced that email to FSMS at TannerGAP00001577. TannerGAP and TPUK deny the remaining allegations in Paragraph 76.

77. TannerGAP and TPUK admit that, on October 8, 2020, Bracey emailed his colleagues regarding the sale of test kits to the DHSC. Paragraph 77 of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at Bates number TannerGAP00018554. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK state that, on or around October 20, 2020, Scalia informed Cagan that TPUK was processing a conditional transaction for Orient Gene test kits to be sold to the DHSC, which discussion Scalia recounted

in his email to Cagan on October 22, 2020. TannerGAP produced that email to FSMS at TannerGAP00001577. TannerGAP and TPUK deny the remaining allegations in Paragraph 77.

78.     TannerGAP and TPUK admit that, on October 9, 2020, Bracey and Cagan communicated via WhatsApp messages. Paragraph 78 of the Amended Complaint purports to quote those messages, which FSMS produced to TannerGAP and TPUK at Bates number FSMS000077. The contents of those messages speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK state that, on or around October 20, 2020, Scalia informed Cagan that TPUK was processing a conditional transaction for Orient Gene test kits to be sold to the DHSC, which discussion Scalia recounted in his email to Cagan on October 22, 2020. TannerGAP produced that email to FSMS at TannerGAP00001577. TannerGAP and TPUK deny the remaining allegations in Paragraph 78.

79.     TannerGAP and TPUK admit that, on October 13 and October 14, 2020, Cagan and Bracey communicated via WhatsApp messages. Paragraph 79 of the Amended Complaint purports to quote those messages, which FSMS produced to TannerGAP and TPUK at Bates number FSMS000012. The contents of those messages speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK state that, on or around October 20, 2020, Scalia informed Cagan that TPUK was processing a conditional transaction for Orient Gene test kits to be sold to the DHSC, which discussion Scalia recounted in his email to Cagan on October 22, 2020. TannerGAP produced that email to FSMS at TannerGAP00001577. TannerGAP and TPUK deny the remaining allegations in Paragraph 79.

80.     TannerGAP and TPUK admit that, on October 19, 2020, Cagan and Bracey communicated via WhatsApp messages. Paragraph 80 of the Amended Complaint purports to

quote those messages, which FSMS produced to TannerGAP and TPUK at Bates number FSMS000077. The contents of those messages speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK state that, on or around October 20, 2020, Scalia informed Cagan that TPUK was processing a conditional transaction for Orient Gene test kits to be sold to the DHSC, which discussion Scalia recounted in his email to Cagan on October 22, 2020. TannerGAP produced that email to FSMS at TannerGAP00001577. TannerGAP and TPUK deny the remaining allegations in Paragraph 80.

81. TannerGAP and TPUK admit that, on October 21, 2020, Bracey emailed a colleague regarding the price that TPUK paid to Orient Gene for test kits. Paragraph 81 of the Amended Complaint purports to summarize that email, which TannerGAP produced to FSMS at Bates number TannerGAP00004423. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

82. TannerGAP and TPUK state that, on or around October 22, 2020, Scalia emailed Cagan regarding the conditional transaction for Orient Gene test kits to be sold to the DHSC. Paragraph 82 of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at TannerGAP00001579. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further state that, on or around October 3, 2020, TPUK and the DHSC entered a contract for test kits from Orient Gene in two shipments, which contract TPUK produced to FSMS at Bates range TannerUK00007680-90. TannerGAP and TPUK further admit that TPUK paid Orient Gene prices of less than $5.00 per kit for COVID test kits that TPUK sold to the DHSC and other customers. TannerGAP and TPUK further admit that the price that TPUK paid to Orient Gene varied, depending in part on the volume and date of the order. TannerGAP and

TPUK further state that TPUK sent a purchase order to Orient Gene for additional test kits on or around November 16, 2020, which TPUK produced to FSMS at Bates number TannerUK00000465. TannerGAP and TPUK deny the remaining allegations in Paragraph 82.

83. TannerGAP and TPUK state that, on October 22, 2020, Cagan emailed Scalia regarding the conditional transaction for Orient Gene test kits to be sold to the DHSC. Paragraph 83 of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at TannerGAP00001578. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

84. TannerGAP and TPUK admit that, between October 22, 2020 and October 24, 2020, Scalia and Bracey had telephone calls with Cagan and Mao. TannerGAP and TPUK state that, in a telephone call on October 24, 2020, Scalia and Bracey informed Cagan and Mao that TPUK had entered a supply agreement with Orient Gene, as permitted by the Distribution Agreement. TannerGAP and TPUK further admit that FSMS requested TPUK's correspondence and agreements with Orient Gene. TannerGAP and TPUK further admit that Scalia and Bracey explained that they could not share the supply agreement with Orient Gene and communications with Orient Gene because of a non-disclosure agreement with Orient Gene.

85. TannerGAP and TPUK admit that, on October 24, 2020, Scalia and Bracey spoke with Cagan and Mao. TannerGAP and TPUK further admit that Scalia and Bracey explained that they could not share the supply agreement with Orient Gene and communications with Orient Gene because of a non-disclosure agreement with Orient Gene. TannerGAP and TPUK further admit that Cagan referenced various sections of the Distribution Agreement, said that FSMS could have added value by reducing the price from $5 each to something lower, and asked to be included in future communications with Orient Gene. TannerGAP and TPUK further state

that Scalia and Bracey responded by saying that FSMS had already suggested, and agreed to, TPUK having a direct relationship with Orient Gene; that TPUK used that option to save the DHSC opportunity; and that TPUK would have lost the DHSC opportunity if TPUK had waited for FSMS's poor response time and poor communication. TannerGAP and TPUK further state that Cagan admitted that Mao did not understand the urgency in the first couple days of the opportunity and that Mao could have done more. TannerGAP and TPUK admit that Scalia and Bracey said that TPUK sourced the opportunity, handled the customer end, handled the supplier end, and yet still was honoring the agreement with FSMS. TannerGAP and TPUK further admit that Scalia said that TPUK had obtained a lower price from Orient Gene than $5 per unit. TannerGAP and TPUK deny the remaining allegations in Paragraph 85.

86. TannerGAP and TPUK admit that, on November 4, 2020, Scalia emailed Bracey and other colleagues regarding the DHSC sales. Paragraph 86 of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at TannerGAP18654. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 86.

87. TannerGAP and TPUK admit that, on November 15, 2020, Scalia emailed Cagan and Mao a profit split reconciliation. Paragraph 87 of the Amended Complaint purports to quote that email, which FSMS produced to TannerGAP and TPUK at FSMS000105. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 87.

88. TannerGAP and TPUK admit that, by January 2021, the DHSC had ordered approximately 58.25 million units of COVID test kits from TPUK.

89.     TannerGAP and TPUK admit that, on February 11, 2021, Scalia emailed Cagan and Mao regarding a second profit split reconciliation. Paragraph 89 of the Amended Complaint purports to quote that email, which FSMS produced to TannerGAP and TPUK at FSMS000104. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that TPUK had obtained a lower price from Orient Gene than $5 per unit. TannerGAP and TPUK deny the remaining allegations in Paragraph 89.

90.     TannerGAP and TPUK admit that TPUK generated more than £1 billion of revenue from contracts with the DHSC. TannerGAP and TPUK further admit that Orient Gene manufactured all of the test kits that TPUK supplied to the DHSC. TannerGAP and TPUK deny the remaining allegations in Paragraph 90.

91.     TannerGAP and TPUK admit that TPUK made sales of Orient Gene COVID test kits to customers in or after August 2022. TannerGAP and TPUK further state that, with respect to any of TPUK's sales of Orient Gene COVID test kits to the DHSC in or after May 2021, TPUK sold the test kits to the DHSC for a price less than $5.00 per kit. TannerGAP and TPUK deny the remaining allegations in Paragraph 91.

92.     TannerGAP and TPUK admit that, on or around January 19, 2021, Bourne, Scalia, Bracey, and other colleagues corresponded with a relative of a potential customer in Turks and Caicos regarding test kits. Paragraph 92 of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at TannerGAP00007926. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

93.     TannerGAP and TPUK admit that, on or around January 20, 2021, Bracey emailed Elsa Zhao regarding inquiries from potential customers about test kits. Paragraph 93 of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at TannerGAP00019375. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that Elsa Zhao's signature on or around that time listed her title as Vice President of Sales for Orient Gene.

94.     TannerGAP and TPUK admit that, on or around January 21, 2021, a representative from the Turks and Caicos Hotel & Tourism Association emailed Bracey to place an order for test kits. Paragraph 94 of the Amended Complaint purports to summarize that email, which TannerGAP produced to FSMS at TannerGAP00016338. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 94.

95.     TannerGAP and TPUK admit that, on or around January 21, 2021, Bracey and Gaby (Martinez) Bedoya ("Bedoya") emailed with a potential customer about the sale of test kits in the Turks and Caicos. Paragraph 95 of the Amended Complaint purports to quote those emails, which TannerGAP produced to FSMS at TannerGAP00012136-38. The contents of those emails speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

96.     TannerGAP and TPUK admit that, on or around January 28, 2021, TannerGAP generated Purchase Order 21216 for a purchase of test kits from Orient Gene. Paragraph 96 of the Amended Complaint purports to summarize that purchase order, which TannerGAP

produced to FSMS at TannerGAP00014637. The contents of that purchase order speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

97.     TannerGAP and TPUK admit that, on January 29, 2021, Maryori Alvarenga emailed colleagues regarding a shipping and U.S. customs issue. Paragraph 97 of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at TannerGAP00014802. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

98.     TannerGAP and TPUK admit that, on or around February 1, 2021, TPUK generated Purchase Order 21252 for a purchase of test kits from Orient Gene. Paragraph 98 of the Amended Complaint purports to summarize that purchase order, which TPUK produced to FSMS at TannerUK00000473. The contents of that purchase order speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that Purchase Order 21252 replaced Purchase Order 21216 and that this change reflected that TPUK would purchase the test kits from Orient Gene instead of TannerGAP. TannerGAP and TPUK deny the remaining allegations in Paragraph 98.

99.     TannerGAP and TPUK admit that, on or around January 30, 2021, Bedoya emailed with Elsa Zhao and other regarding two potential orders for test kits. Paragraph 99 of the Amended Complaint purports to summarize that email chain, which TannerGAP produced to FSMS at TannerGAP00014826-28. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

100.     TannerGAP and TPUK state that, in or around February and March 2021, TPUK sold additional test kits to customers in Turks and Caicos. TannerGAP and TPUK admit that, on March 2, 2021, Bracey and Bedoya emailed regarding a reconciliation for FSMS. Paragraph 100

of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at TannerGAP00019379. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

101. TannerGAP and TPUK admit that, on April 1, 2021, Scalia emailed Cagan and others regarding a reconciliation for sales to customers in Turks and Caicos. Paragraph 101 of the Amended Complaint purports to quote that email. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 101, including any allegation of "fake price."

102. TannerGAP and TPUK admit that, on April 15, 2021, Scalia emailed Cagan and others regarding a reconciliation for sales to customers in Turks and Caicos. Paragraph 101 of the Amended Complaint purports to quote that email. The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 102.

103. TannerGAP and TPUK admit that TPUK sold Orient Gene COVID test kits to customers other than the DHSC after May 2021. TannerGAP and TPUK state that on April 15, 2021, Scalia emailed Cagan and others regarding a reconciliation for sales to customers in Turks and Caicos. TannerGAP and TPUK state that TPUK has not communicated with FSMS regarding additional sales occurring after that time. TannerGAP and TPUK state that deny the remaining allegations in Paragraph 103.

**PERSONAL JURISDICTION ALLEGATIONS**

104. Paragraph 104 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent an answer is required, TannerGAP and TPUK deny the allegations in Paragraph 104.

105. TannerGAP and TPUK admit that they, along with FSMS, entered into a Distribution Agreement on September 11, 2020. Paragraph 105 purports to quote that agreement, which appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-57. The contents of that agreement speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK further admit that no Exhibit B containing Terms and Conditions was attached to the Distribution Agreement. TannerGAP and TPUK state that Paragraph 105 in the Amended Complaint purports to quote the Tanner Pharma Group website. The contents of the website speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

106. Paragraph 106 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent an answer is required, TannerGAP and TPUK deny the allegations in Paragraph 106.

107. Paragraph 107 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent an answer is required, TannerGAP and TPUK deny the allegations in Paragraph 107.

108. Paragraph 108 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent that an answer is required, TannerGAP admits that is incorporated in North Carolina and maintains its principal place of business in Charlotte, North Carolina. TannerGAP and TPUK deny the remaining allegations in Paragraph 108.

109.     Paragraph 109 of the Amended Complaint states a legal conclusion for which no answer is required.  To the extent that an answer is required, TannerGAP and TPUK state that TPUK is formed as a private limited company in and maintains its principal place of business in the United Kingdom.  TannerGAP and TPUK deny the remaining allegations in Paragraph 109.

a.   TannerGAP and TPUK admit that Bourne resides in Charlotte, North Carolina and that he is TPUK's sole director.  TannerGAP and TPUK further admit that Bourne owns 75 percent of TPUK's shares and that his wife owns the remaining 25 percent. TannerGAP and TPUK deny the remaining allegations in Paragraph 109.a.

b.   TannerGAP and TPUK admit that Scalia resides in Charlotte, North Carolina. TannerGAP and TPUK further admit that Scalia is the President of Tanner Pharma Group, Inc. and that he provides oversight of the shared services program.  TannerGAP and TPUK further admit that Scalia reports to Bourne.  TannerGAP and TPUK further admit that, in Scalia's shared services role, he provided some oversight of, and input into, TPUK's transactions and agreements with the DHSC, FSMS, and Orient Gene. TannerGAP and TPUK deny the remaining allegations in Paragraph 109.b.

c.   TannerGAP and TPUK admit that Taylor was General Counsel and Senior Vice President of Legal and Compliance, was employed by TannerGAP, and resided in North Carolina during

2020 and 2021. TannerGAP and TPUK admit that Taylor advised TPUK and TannerGAP with regard to the Distribution Agreement and the NDNCA. TannerGAP and TPUK deny the remaining allegations in Paragraph 109.c.

d. TannerGAP and TPUK admit that Bracey testified as a Rule 30(b)(6) witness for TPUK. Paragraph 109.d of the Amended Complaint purports to quote his deposition transcript. The contents of that transcript speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

e. TannerGAP and TPUK state that Paragraph 109.e of the Amended Complaint purports to quote the Tanner Pharma Group website. The contents of the website speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

f. TannerGAP and TPUK admit that Bourne had the authority to sign contracts on behalf of TPUK at all relevant times. TannerGAP and TPUK further admit that Bourne resides in Charlotte, North Carolina. TannerGAP and TPUK deny the remaining allegations in Paragraph 109.f.

g. TannerGAP and TPUK admit that Scalia had the authority to approve payments from TPUK's bank account at all relevant times. TannerGAP and TPUK admit that Scalia resides in Charlotte, North Carolina. TannerGAP and TPUK admit that Jim Leonard ("Leonard") was the Global Controller and Senior Vice President

of Finance and Accounting for Tanner Pharma Group, Inc. and had the authority to approve payments from TPUK's bank account prior to his departure in June 2022. TannerGAP and TPUK admit that Leonard resided in Charlotte, North Carolina at all relevant times. TannerGAP and TPUK deny the remaining allegations in Paragraph 109.g.

h. TannerGAP and TPUK admit that individuals located in North Carolina had the authority to approve the release of purchase orders for TPUK in NetSuite at all relevant times. TannerGAP and TPUK state that Bracey, who is located in the United Kingdom, also had such authority. TannerGAP and TPUK deny the remaining allegations in Paragraph 109.h.

i. TannerGAP and TPUK state that TPUK's email system is managed by Teceze Ltd., an IT service provider in the United Kingdom. TannerGAP and TPUK state that TPUK's inventory system is managed by individuals on the supply chain and logistics team located in the United Kingdom. TannerGAP and TPUK state that TPUK's financial control system is managed by Visionary Accountants, a UK-based chartered accountancy firm. TannerGAP and TPUK deny the remaining allegations in Paragraph 109.i.

j. TannerGAP and TPUK admit that Bourne, and Scalia at Bourne's direction, had the authority to set the compensation of TPUK employee, Jonathan Bracey at all relevant times. TannerGAP and

TPUK admit that Bourne and Scalia reside in Charlotte, North Carolina. TannerGAP and TPUK deny the remaining allegations in Paragraph 109.j.

    k.  Denied.

110.    Paragraph 110 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent that an answer is required, TannerGAP and TPUK admit that Scalia resides in Charlotte, North Carolina.

111.    Paragraph 111 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent that an answer is required, TannerGAP and TPUK admit that Bourne resides in Charlotte, North Carolina.

112.    Paragraph 112 of the Amended Complaint states a legal conclusion for which no answer is required.

113.    Paragraph 113 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent that an answer is required, TannerGAP and TPUK deny the allegations in Paragraph 113.

114.    TannerGAP and TPUK admit that Scalia is the President of Tanner Pharma Group, Inc. and that he provides oversight of the shared services program. TannerGAP and TPUK further admit that Scalia reports to Bourne and that Scalia resides in North Carolina. TannerGAP and TPUK state that the Legal Department reports to Katie Smoot, who reports to Scalia. TannerGAP and TPUK further admit that Bourne is TPUK's sole director. TannerGAP and TPUK further admit that, in Scalia's shared services role, he provided some oversight of, and input into, TPUK's transactions and agreements with FSMS. TannerGAP and TPUK admit that Bracey testified as a Rule 30(b)(6) witness for TPUK. Paragraph 114 of the Amended

Complaint purports to quote his deposition transcript. The contents of that transcript speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 114.

115. TannerGAP and TPUK admit that Bourne executed the Distribution Agreement on behalf of TannerGAP and TPUK from North Carolina. TannerGAP and TPUK further admit that Taylor executed the NDNCA on behalf of TannerGAP from North Carolina. TannerGAP and TPUK state that TPUK was not a signatory to the NDNCA. TannerGAP and TPUK deny the remaining allegations in Paragraph 115.

116. TannerGAP and TPUK admit that Scalia is the President of Tanner Pharma Group, Inc. and that he provides oversight of the shared services program. TannerGAP and TPUK further admit that Scalia resides in North Carolina. TannerGAP and TPUK further admit that, in Scalia's shared services role, he provided some oversight of, and input into, TPUK's transactions and agreements with FSMS. TannerGAP and TPUK further admit that Scalia sent reconciliation statements to FSMS for sales of test kits manufactured by Orient Gene and communicated with Cagan and Mao by email, phone, and WhatsApp. TannerGAP and TPUK further admit that Bourne is TPUK's sole director and that he resides in North Carolina. TannerGAP and TPUK further admit that Bourne executed the Distribution Agreement on behalf of TannerGAP and TPUK from North Carolina. TannerGAP and TPUK admit that, in Bourne's capacity as shareholder and director of TPUK, Bourne received reports regarding TPUK and its affiliates, including reports related to TPUK's transactions and agreements with FSMS, and on occasion gave input in response to those reports. TannerGAP and TPUK deny the remaining allegations in Paragraph 116.

a. TannerGAP and TPUK admit that Bourne is TPUK's sole director and that he resides in North Carolina. TannerGAP and TPUK further admit that Bourne owns 75 percent of TPUK's shares and that his wife owns the remaining 25 percent. TannerGAP and TPUK further admit that Scalia reports to Bourne and that TPUK employee, Bracey, reports to Scalia. TannerGAP and TPUK admit that, in Bourne's capacity as shareholder and director of TPUK, Bourne received reports regarding TPUK and its affiliates, including reports related to TPUK's transactions and agreements with FSMS, and on occasion gave input in response to those reports. TannerGAP and TPUK deny the remaining allegations in Paragraph 116.a.

b. TannerGAP and TPUK admit that Scalia is the President of Tanner Pharma Group, Inc. and that he provides oversight of the shared services program. TannerGAP and TPUK further admit that Scalia resides in North Carolina. TannerGAP and TPUK further admit that, in Scalia's shared services role, he provided some oversight of, and input into, TPUK's transactions and agreements with FSMS. TannerGAP and TPUK further admit that Scalia sent reconciliation statements to FSMS for sales of test kits manufactured by Orient Gene and communicated with Cagan and Mao by email, phone, and WhatsApp. TannerGAP and TPUK deny the remaining allegations in Paragraph 116.b.

117.     TannerGAP and TPUK admit that, consistent with the shared services model, Bracey worked with colleagues in North Carolina and elsewhere to execute sales of test kits manufactured by Orient Gene to the DHSC and other customers.  TannerGAP and TPUK further admit that some of those colleagues were employees of TannerGAP.  TannerGAP and TPUK deny the remaining allegations in Paragraph 117.

        a.  TannerGAP and TPUK admit that, on August 31, 2020, Bracey emailed Lorena Mora ("Mora") about setting up FSMS as a supplier.  Paragraph 117.a of the Amended Complaint purports to quote that email, which TannerGAP produced to FSMS at TannerGAP00011562.  The contents of that email speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.  TannerGAP and TPUK admit that, Mora was a Sales and Business Development Manager, was employed by TannerGAP, and resided in North Carolina as of August 2020.

        b.  TannerGAP and TPUK admit that Katie Smoot testified as a Rule 30(b)(6) witness for TPUK and that she resides in North Carolina. Paragraph 117.b of the Amended Complaint purports to quote her deposition transcript.  The contents of that transcript speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

        c.  TannerGAP and TPUK admit that Taylor was General Counsel and Senior Vice President of Legal and Compliance, was

employed by TannerGAP, and resided in North Carolina during 2020 and 2021. TannerGAP and TPUK admit that Taylor advised TPUK regarding the FSMS relationship. TannerGAP and TPUK deny the remaining allegations in Paragraph 117.c.

d. TannerGAP and TPUK admit that Leonard was the Global Controller and Senior Vice President of Finance and Accounting for Tanner Pharma Group, Inc. prior to his departure in June 2022. TannerGAP and TPUK admit that Leonard resided in Charlotte, North Carolina during 2020 and 2021. TannerGAP and TPUK admit that Leonard approved purchase orders from TPUK to Orient Gene in NetSuite. TannerGAP and TPUK deny the remaining allegations in Paragraph 117.d.

e. TannerGAP and TPUK admit that Scalia and Leonard resided in North Carolina at all relevant times. TannerGAP and TPUK admit that Scalia and Leonard approved payments from TPUK to FSMS and from TPUK to Orient Gene.

f. TannerGAP and TPUK admit that Bedoya was a Business Development Senior Lead, was employed by TannerGAP, and resided in North Carolina as of August 2020. TannerGAP and TPUK admit that Bedoya assisted with sales of Orient Gene test kits to private customers in Turks and Caicos. TannerGAP and TPUK admit that Mora was a Sales and Business Development Manager, was employed by TannerGAP, and resided in North

Carolina as of August 2020. TannerGAP and TPUK admit that Mora assisted with FSMS's account opening forms. TannerGAP and TPUK admit that Maryori Alvarenga was a Managing Director from January to July 2020 and an Executive Vice President starting in August 2020. TannerGAP and TPUK admit that Alvarenga was employed by TannerGAP and resided in North Carolina in 2020 and 2021. TannerGAP and TPUK admit that Alvarenga assisted with U.S. customs and shipping questions related to a sale of Orient Gene test kits to a private customer in Turks and Caicos. TannerGAP and TPUK admit that Leonard was the Global Controller and Senior Vice President of Finance and Accounting for Tanner Pharma Group, Inc. prior to his departure in June 2022. TannerGAP and TPUK admit that Leonard resided in North Carolina during 2020 and 2021. TannerGAP and TPUK admit that Leonard approved a wire transfer from TPUK to FSMS. TannerGAP and TPUK admit that Taylor was General Counsel and Senior Vice President of Legal and Compliance, was employed by TannerGAP, and resided in North Carolina during 2020 and 2021. TannerGAP and TPUK admit that Taylor executed the NDNCA on behalf of TannerGAP, advised TPUK regarding the FSMS relationship, and advised TPUK and TannerGAP with regard to the Distribution Agreement and the NDNCA. TannerGAP and TPUK admit that Catherine Williams

was a Marketing Communications Specialist, was employed by TannerGAP, and resided in North Carolina during 2020 and 2021. TannerGAP and TPUK admit that Williams assisted with marketing and communications, including reviewing a brochure of pandemic-related products that included the Orient Gene test kits. TannerGAP and TPUK deny the remaining allegations in Paragraph 117.f.

g. TannerGAP and TPUK admit that, on September 21, 2020, Bracey emailed colleagues regarding the sale of test kits to the DHSC. Paragraph 117.g. of the Amended Complaint purports to quote their email chain, which TannerGAP produced to FSMS at Bates number TannerGAP00007441. The contents of that email chain speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.

h. Denied. TannerGAP and TPUK state that Bedoya and Mora communicated with Orient Gene regarding potential sales of test kits to customers outside of the United Kingdom.

118. TannerGAP and TPUK admit that Bracey travelled to Charlotte, North Carolina in October 2020. TannerGAP and TPUK state that Bracey did not travel to North Carolina for purposes related to the Distribution Agreement or the sale of Orient Gene test kits to the DHSC. TannerGAP and TPUK admit that Bracey likely discussed the DHSC-Orient Gene relationship with Scalia and Taylor while Bracey was in North Carolina. TannerGAP and TPUK deny the remaining allegations in Paragraph 118.

119. TannerGAP and TPUK admit that TPUK executed an Exclusive Distribution Agreement with Orient Gene on October 14, 2020. TannerGAP and TPUK state that agreement has English choice of law and forum selection clauses. TannerGAP and TPUK further admit that TPUK has entered into contracts with the DHSC for the sale of COVID test kits that included English choice of law and forum-selection clauses. TannerGAP and TPUK deny the remaining allegations in Paragraph 119.[1]

      a. Denied.

      b. Denied.

      c. Admitted.

120. TannerGAP and TPUK admit that TannerGAP received and stored some test kits manufactured by Orient Gene in its warehouse in North Carolina. TannerGAP and TPUK state that none of those kits was sold, or intended to be sold, to customers.

121. Paragraph 121 of the Amended Complaint states a legal conclusion for which no answer is required. To the extent an answer is required, TannerGAP and TPUK deny the allegations in Paragraph 121.

122. TannerGAP and TPUK admit that TPUK's financial statements for the year ended December 31, 2019 are accessible from the Companies House website. The contents of those statements speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 122.

123. TannerGAP and TPUK admit that TPUK's financial statements for the year ended December 31, 2019 are accessible from the Companies House website. The contents of those

---

[1] The first paragraph of page 27 of the Amended Complaint does not have a separate number. TannerGAP and TPUK construe it to be a part of Paragraph 119, and deny the allegations contained therein.

statements speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 123.

124.     TannerGAP and TPUK admit that TPUK's financial statements for the year ended December 31, 2019 are accessible from the Companies House website.  The contents of those statements speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.  TannerGAP and TPUK deny the remaining allegations in Paragraph 124.

125.     Denied.

126.     TannerGAP and TPUK admit that TPUK does not presently have any officers other than its director, as permitted by the law of England and Wales.

127.     TannerGAP and TPUK admit that Bourne owns 75 percent of TPUK's shares and that his wife owns the remaining 25 percent.  TannerGAP and TPUK further admit that Bourne is TPUK's sole director.  TannerGAP and TPUK further admit that Bourne had the authority to sign contracts on behalf of TPUK at all relevant times.  TannerGAP and TPUK further admit that Bourne executed the Distribution Agreement on behalf of TannerGAP and TPUK from North Carolina.  TannerGAP and TPUK admit that, in Bourne's capacity as shareholder and director of TPUK, Bourne received reports regarding TPUK and its affiliates, including reports related to TPUK's transactions and agreements with FSMS, and on occasion gave input in response to those reports.  TannerGAP and TPUK deny the remaining allegations in Paragraph 127.

128.     TannerGAP and TPUK admit that Tanner Pharma Group (tannerpharma.com) is a trade name for a group of companies that are engaged in different aspects of pharmaceutical sales in international markets.  TannerGAP and TPUK further admit that those companies collaborate for marketing and administrative purposes using a Tanner Pharma Group logo and tannerpharma.com domain.  TannerGAP and TPUK further admit that TPUK, Tanner Pharma

Group, Inc., and each of Tanner Pharma Group, Inc.'s four subsidiaries (the "TPG companies") work collaboratively to identify business opportunities and determine how best to execute them. TannerGAP and TPUK further admit that the TPG companies assess the nature of the transaction, required licensing, and location of the customer to determine what legal entity is appropriate for a given project. TannerGAP and TPUK further admit that finance, legal, compliance, and other back-office functions are shared among the TPG companies as part of a "shared services" program. TannerGAP and TPUK further admit that, as part of the shared services program, the TPG companies adhere to a transfer pricing policy. TannerGAP and TPUK further admit that, under that transfer pricing policy, each of the companies charges other companies within the affiliate group for shared services and overhead expenses to align these expenses to the associated revenues and gross profits. TannerGAP and TPUK deny the remaining allegations in Paragraph 128.

129. TannerGAP and TPUK admit that Bracey testified as a Rule 30(b)(6) witness for TPUK. Paragraph 129 of the Amended Complaint purports to quote an excerpt from his deposition transcript. The contents of that deposition speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 129.

130. TannerGAP and TPUK admit that Bourne is the sole owner of Tanner Pharma Group, Inc., which is the holding company for four wholly owned domestic subsidiaries, including TannerGAP. TannerGAP and TPUK further admit that Bourne owns 75 percent of TPUK's shares and that his wife owns the remaining 25 percent. TannerGAP and TPUK further admit that Bourne is TPUK's sole director.

131.    Denied.  TannerGAP and TPUK states that TPUK's registered office is in St. Albans, United Kingdom and its operational office is at nearby Harpendenbury Farm, Redbourn, Hertfordshire, United Kingdom.

132.    Denied.  TPUK states that individuals located in the United Kingdom can and do make sales to customers, set employee compensation, agree to business terms in contracts, approve vendors, and manage bills and invoices on behalf of TPUK.

## FIRST CLAIM
### Breach of Contract – Distribution Agreement
### (*Corporate Defendants*)

133.    Paragraph 133 of the Amended Complaint states a legal conclusion for which no answer is required.

134.    Paragraph 134 of the Amended Complaint states a legal conclusion for which no answer is required.  To the extent an answer is required, TannerGAP and TPUK admit, on September 11, 2020, FSMS, TannerGAP, and TPUK entered into a Distribution Agreement. That agreement appears at Docket 63, Defendants' Joint Submission, Exhibit A, TannerUK00000546-57.  The contents of that agreement speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents. TannerGAP and TPUK deny the remaining allegations in Paragraph 134.

135.    Paragraph 135 of the Amended Complaint states a legal conclusion for which no answer is required.  To the extent an answer is required, TannerGAP and TPUK admit that the Distribution Agreement is governed by Delaware law.

136.    Paragraph 136 of the Amended Complaint states a legal conclusion for which no answer is required.

137.    Denied.

138.    Denied.

      a.    Denied.

      b.    Denied.

      c.    Denied.

      d.    Denied.

      e.    Denied.

      f.    Denied.

      g.    Denied.

      h.    Denied.

      i.    Denied.

      j.    Denied.

139.    Denied.

## SECOND CLAIM
### Breach of Contract – Non-Circumvention Agreement
### (*Corporate Defendants*)

140.    Paragraph 140 of the Amended Complaint states a legal conclusion for which no answer is required.

141.    Paragraph 141 of the Amended Complaint states a legal conclusion for which no answer is required.  To the extent an answer is required, TannerGAP and TPUK admit that TannerGAP and FSMS entered into the NDNCA on June 8, 2020.  That agreement appears at Docket 63, Defendants' Joint Submission, Exhibit B, TannerGAP00011600-03.  The contents of that agreement speak for themselves and TannerGAP and TPUK deny any allegations inconsistent with those contents.  TannerGAP and TPUK deny the remaining allegations in Paragraph 141.

142.   Denied.

143.   Denied.

144.   Denied.

## THIRD CLAIM
### Breach of Contract – Implied Covenant of Good Faith and Fair Dealing
### (*Corporate Defendants*)

The Court dismissed this claim in its Order dated September 30, 2023. Docket 117.

Therefore, no response is required.

## FOURTH CLAIM
### Unfair and Deceptive Trade Practices

The Court dismissed this claim in its Order dated September 30, 2023. Docket 117.

Therefore, no response is required.

## PRAYER FOR RELIEF

The Amended Complaint contains an unnumbered paragraph with subparts (a) through

(e) containing FSMS's prayer for relief, to which no response is required. To the extent that a

response is required, TannerGAP and TPUK deny that FSMS is entitled to any relief in this

action.

## JURY DEMAND

The Amended Complaint contains an unnumbered paragraph containing a jury demand, to which no response is required.  To the extent that a response is required, TannerGAP and TPUK deny that FSMS is entitled to any relief in this action, thus no jury is required.

*     *     *

## AFFIRMATIVE AND OTHER DEFENSES

TannerGAP and TPUK assert the following affirmative and other defenses, without assuming the burden of proof or any other burden where such burden rests on FSMS:

### FIRST DEFENSE
(*Lack of Personal Jurisdiction*)

The claims against TPUK should be dismissed because TPUK is not subject to the personal jurisdiction of this Court.

### SECOND DEFENSE
(*Failure to State a Claim*)

FSMS failed to plead a cause of action upon which relief can be granted.

### THIRD DEFENSE
(*Ratification, Unclean Hands, Waiver, Estoppel, Laches*)

FSMS's claims are barred, in whole or in part, by the doctrines of ratification, unclean hands, waiver, laches, and estoppel.  FSMS accepted profit split payments from TPUK and was aware of how TPUK calculated the profit split at the time that FSMS accepted them, failed to object, and did not terminate the contract, ratifying ~~FSMS's~~TPUK's interpretation.

## FOURTH DEFENSE

*(Modification, Waiver, and Acquiescence by Course of Performance – Distribution Agreement)*

If the Distribution Agreement is enforceable, and if TannerGAP and TPUK's interpretation of the payment provisions of the Distribution Agreement is not accepted, TannerGAP and TPUK hereby assert, in the alternative, that FSMS's claims are barred under Delaware law, in whole or in part, by the doctrines of waiver and modification by course of performance. FSMS held itself out as an authorized reseller or distributor during the negotiations of the Distribution Agreement, which contemplated that FSMS would act as such. During the course of performance, however, FSMS proved unable and/or unwilling to do so and directed TPUK to perform as distributor in its stead and work directly with Orient Gene. Accordingly, through their course of performance, the parties modified the contract to discharge FSMS from its performance obligations under the Distribution Agreement, and to reduce TPUK's payment obligations to reflect FSMS's modified performance. The profit split accounted for this modified performance, FSMS accepted those payments with knowledge of TPUK's profit split calculations, and FSMS failed to object to those payments or calculations, thus modifying the contract, ratifying, and acquiescing to TPUK's interpretation.

## FIFTH DEFENSE

*(Accord and Satisfaction)*

FSMS's claims are barred, in whole or in part, because FSMS's acceptance of profit split payments from TPUK with knowledge of how TPUK calculated them constituted an accord and satisfaction.

## ~~FIFTH~~SIXTH DEFENSE
### (*Compliance with Distribution Agreement*)

TannerGAP and TPUK conducted themselves in conformity with the Distribution Agreement. TannerGAP and TPUK assert that FSMS did not give notice of any breach of that agreement and its terms bar FSMS's claims.

## ~~SIXTH~~SEVENTH DEFENSE
### (*Distribution Agreement Void Due to Misrepresentation*)

FSMS's claims are barred, in whole or in part, because the Distribution Agreement is void under Delaware law due to misrepresentation. As further described below in TPUK and TannerGAP's Counterclaims, FSMS misrepresented that it had direct relationships with manufacturers, vetted factories, and did not use resellers to purchase products. It also misrepresented the extent of its relationship with Orient Gene and its experience in the distribution of PPE. Finally, FSMS misrepresented its capabilities to perform as an "authorized reseller or distributor" under the terms of the Distribution Agreement, including, but not limited to: (1) its ability to leverage its alleged pre-existing relationship with Orient Gene and to make an introduction to Orient Gene's Chairman and facilitate communications and trust with Orient Gene's leadership; (2) its capability to manage the supplier side of the Orient Gene transactions; and (3) its ability to undertake the financial risk of the Orient Gene transaction; each of which was an essential purpose of the Distribution Agreement. TannerGAP and TPUK reasonably entered into the Distribution Agreement based on FSMS's representations. The specific allegations set forth in TPUK and TannerGAP's Counterclaims are also incorporated herein by reference.

### **EIGHTH DEFENSE**
(*No Joint Liability*)

TannerGAP had no payment obligations under the Distribution Agreement for any transaction in which the purchase orders and written confirmations governing the transaction did not list TannerGAP as an obligor.

### ~~SEVENTH~~NINTH DEFENSE
(*Excuse of Performance*)

FSMS's failure to perform its obligations under and material breach of the Distribution Agreement excuses TannerGAP and TPUK from any performance, including payment obligations to FSMS, and entitles TPUK to recoup its payments of approximately $6.5 million from FSMS.

### ~~EIGHTH~~TENTH DEFENSE
(*Recoupment and Setoff*)

To the extent that FSMS is entitled to recover any damages, TannerGAP and TPUK are entitled to reduction of those damages in the form of recoupment or setoff because of FSMS's failure to perform its obligations under the Distribution Agreement. Any recovery by FSMS should be reduced accordingly.

### ~~NINTH~~ELEVENTH DEFENSE
(*NDNCA Not in Effect*)

The claim for breach of the NDNCA is barred because the Distribution Agreement superseded the NDNCA and has never been terminated, and therefore, the NDNCA was not in effect during the events at issue.

### ~~TENTH~~TWELFTH DEFENSE
(*Compliance with the NDNCA*)

To the extent that the NDNCA was in effect, TannerGAP and TPUK conducted themselves in conformity with the NDNCA because FSMS gave TannerGAP and TPUK

"express written permission" to contract with Orient Gene. Further, Orient Gene was not a "Personal Relationship" of FSMS within the meaning of the NDNCA, and FSMS did not "originally" make Orient Gene known or available to TannerGAP and TPUK.

### ~~ELEVENTH~~THIRTEENTH DEFENSE
*(NDNCA Void Under Cal. Bus. & Prof. Code § 16600)*

FSMS's claims for breach of the NDNCA are barred, in whole or in part, because the NDNCA violates Cal. Bus. & Prof. Code § 16600, which prohibits contracts that restrain anyone from engaging in a lawful profession, trade, or business of any kind. The NDNCA, as written, purports to prevent TannerGAP and its affiliates from engaging in business with FSMS's "Personal Relationships" in perpetuity and without regard to territorial limits or limits on type of business activity. Such a restraint is unreasonable, and, therefore, unenforceable under California law. *See Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571 (Cal. 2020).

### FOURTEENTH DEFENSE
*(No Injury or Damages)*

FSMS has suffered no legal injury or damages resulting from any conduct on the part of TannerGAP or TPUK.

### ~~TWELFTH~~FIFTEENTH DEFENSE
*(Failure to Mitigate Damages)*

To the extent that FSMS has suffered any damages, which is denied, FSMS failed to take proper and reasonable steps to mitigate those alleged damages and they should be reduced or eliminated accordingly.

### OTHER DEFENSES

TannerGAP and TPUK reserve the right to add those affirmative defenses that they deem necessary to their defense during or upon the completion of discovery or as otherwise permitted by Rule 15.

*     *     *

**TANNERGAP AND TPUK'S ~~COUNTERCLAIM~~COUNTERCLAIMS**

~~TannerGAP and TPUK hereby allege a counterclaim for attorneys' fees pursuant to Section 31 of the Distribution Agreement as follows:~~

Pursuant to Federal Rules of Civil Procedure 13 and 15, TannerGAP, Inc. ("TannerGAP") and Tanner Pharma UK Limited ("TPUK") assert the following counterclaims against FS Medical Supplies, LLC ("FSMS"), showing this Court as follows:

**NATURE OF THE COUNTERCLAIMS**

1.      These Counterclaims set forth claims arising from the repeated misrepresentations of FSMS and its owners, Laird Cagan and Jim Mao, regarding their and FSMS's business, experience, relationships with manufacturers, and capabilities, thereby inducing TannerGAP and TPUK to enter into a Non-Disclosure and Non-Circumvention Agreement ("NDNCA") and later into a Distribution Agreement under false pretenses.  TannerGAP and TPUK seek to rescind those contracts because of FSMS's material misrepresentations and to disgorge the approximately $6.5 million paid to FSMS under the Distribution Agreement.  In addition, TannerGAP and TPUK also hereby allege a counterclaim for attorneys' fees pursuant to Section 31 of the Distribution Agreement.

**PARTIES, JURISDICTION, AND VENUE**

2.      ~~1.~~TannerGAP, Inc. is a corporation organized under the laws of North Carolina with its principal place of business in Charlotte, North Carolina.

3.      ~~2.~~Tanner Pharma UK Limited is a limited liability company organized under the laws of England and Wales with its principal place of business in the United Kingdom.

4. ~~3.~~ On information and belief, FS Medical Supplies, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Weatherford, Texas.  On information and belief, FSMS has four members: Laird Q. Cagan ("Cagan"), Jim Mao ("Mao") and their respective spouses.  On information and belief, Cagan and his spouse reside in Texas, and Mao and his spouse reside in California.

5. ~~4.~~ To the extent this Court has jurisdiction over the claims in the Amended Complaint, such jurisdiction extends to this counterclaim.

**FACTUAL BACKGROUND**

6. By mid-2020, TannerGAP and TPUK were working tirelessly to source personal protective equipment ("PPE") and COVID tests to aid in the global relief efforts for an unprecedented pandemic.  During those efforts, on June 2, 2020, TPUK responded to an online networking post, with Cagan, who claimed to be "seeking advice to create a global sales channel partners network for PPE."

7. Following the initial exchange between Cagan and TPUK, Cagan and FSMS made a series of misrepresentations to TannerGAP and TPUK.  FSMS and its owners intentionally and materially misrepresented that they had direct relationships with manufacturers, vetted factories, and did not use resellers to purchase products.  FSMS and its owners also misrepresented that they had years of experience in the distribution of PPE, and strong business and personal connections with Chinese PPE and COVID test kit manufacturers—in particular, Orient Gene and Healgen.  These misrepresentations were intended to deceive TannerGAP and TPUK into believing that FSMS could provide a valuable service by connecting TannerGAP and TPUK with FSMS's partnered manufacturers and acting as a distribution partner to handle

Chinese-side logistics and communications to obtain and provide low-cost, high-quality COVID test kits to end customers around the globe.

8.  FSMS and its owners' intentional and material misrepresentations have damaged TPUK and TannerGAP because those misrepresentations induced TPUK and TannerGAP to enter into the NDNCA and then the Distribution Agreement, which ultimately led to TPUK's payment of $6.5 million to FSMS based on false premises.

### a. FSMS and Its Owners Induce TannerGAP and TPUK to Contract with FSMS

9.  FSMS and its owners intentionally and materially misrepresented that they had direct relationships with manufacturers, vetted factories, and did not use resellers to purchase products. Cagan and FSMS also misrepresented that they had extensive experience and capabilities in the distribution of PPE.

10. For example, on or about June 2, 2020, prior to entering into the NDNCA, Cagan directed TPUK employees to the FSMS website to illustrate FSMS's capabilities. On information and belief, at or around that time, the website falsely stated that:

    a.  FS Medical Supplies provides Personal Protective Equipment ***direct from the factory to you***, anywhere in the world. ***We vet factories*** throughout China and other countries to find the best quality and most reliable factories to provide high-quality, high-volume factories for your PPE needs, always at competitive pricing.

    b.  ***All FS Medical Supplies products are sourced directly*** from high-quality high-volume ***trusted factories***.

    c.  We are able to fulfill orders up to ***100M units.***

d.    We are targeting orders of ***30,000 units to 100M units and more.***

e.    FSMS is an "***Authorized distributor for USA and globally***."

11.    On information and belief, as of June 2, 2020, FSMS did not source all of its products directly from factories, had made modest purchases from only two entities and at least one of those entities was not a factory or manufacturer, and did not itself vet any factories.

12.    The website also showed the pictures and listed the titles of six individuals other than Cagan and Mao purporting to work for FSMS, thereby creating the impression that FSMS was a well-staffed company, when, in fact, upon information and belief, FSMS had no employees and no operational office.

13.    On or about June 2, 2020, Cagan had a telephone conversation with Jonathan Bracey ("Bracey").  Bracey told Cagan that TannerGAP and TPUK had been pursuing a relationship with Healgen and/or Orient Gene, seeking to acquire COVID test kits from them. Bracey told Cagan that he and his team had been negotiating an agreement to acquire test kits from a third-party distributor called Confirm BioSciences, the largest North American distributor for Healgen.  To persuade TannerGAP and TPUK to contract with FSMS, Cagan told Bracey that he ***worked directly with*** Orient Gene and Healgen, and implied that he and FSMS had a pre-existing business relationship, and had done substantial prior business with, Orient Gene and Healgen. Cagan concealed that FSMS had never purchased any products directly from Orient Gene or Healgen at that time.

14.    On the same phone call, Cagan told Bracey he got into PPE distribution ***a few years back*** and that ***he worked directly*** with the main and best quality Chinese manufacturers.  He further said that he had invested in the PPE distribution space ***directly with Chinese***

*companies a while back*.  In fact, FSMS had been operating for a little over a month, did not purchase products exclusively from manufacturers, and had little experience in PPE distribution.

15.    On or about June 3, 2020, Stephen Scalia ("Scalia"), the president of the Tanner Pharma Group of companies, and Bracey viewed FSMS's website, discussed how impressed they were with its products and statements, and expressed their enthusiasm about FSMS's ability to distribute Healgen and Orient Gene's products.

16.    On or about June 4, 2020, Cagan sent Bracey a price sheet, which stated that FSMS's products were "*Direct from Trusted Factories No Middlemen or Brokers*."  That price sheet also contained large minimum order quantities to falsely suggest that FSMS regularly distributed large volumes of products.

17.    On or about June 5, 2020, Scalia had a telephone conversation with Cagan.  During the conversation, Cagan told Scalia that he had acquired a company that manufactured a medical device in China that was on the verge of FDA approval.  Cagan further told Scalia that he leveraged his manufacturing experience in China to find suppliers for PPE and that FSMS had a network of suppliers in China.

18.    Cagan further made statements to Scalia that led Scalia to believe that Cagan and FSMS had done prior substantial business with Orient Gene and Healgen and that FSMS had a personal working relationship with Orient Gene's decisionmaker and Chairman.  Upon information and belief, these statements were false.

19.    Relying on the numerous representations from Cagan described above as well as FSMS's website, on or around June 9, 2020, TannerGAP and FSMS executed the NDNCA. The NDNCA listed FSMS's address as 20400 Stevens Creek Boulevard, Suite 700, Cupertino, CA 95014.

20.     Despite listing this address as FSMS's own, in fact, on information and belief, Suite 700 at 20400 Stevens Creek Boulevard, Cupertino, CA 95014 was occupied by a different company with which Cagan was involved.  On information and belief, no FSMS personnel regularly worked there.

21.     After the execution of the NDNCA, FSMS continued to mislead TannerGAP and TPUK about FSMS's capabilities and relationships.

22.     On or about June 10, 2020, Cagan sent Bracey a brochure of FSMS's products, which stated "***Our elite manufacturing facilities*** and ***prior expertise in the field*** make us uniquely equipped to respond to this medical supply crisis.  See below for an overview of ***our facilities*** and available product."  On information and belief, FSMS had no manufacturing facilities and little "prior expertise" in the field of PPE distribution.

23.     On or about June 23, 2020, Bracey sent an email to his colleagues reflecting his belief, created by the misrepresentations described above, that Cagan and FSMS dealt directly with manufacturers and dealt in huge quantities.

24.     On or about June 27, 2020, Cagan told Bracey that FSMS had a number of salespeople.  In fact, on information and belief, FSMS had no employees.

25.     On or about August 21, 2020, Cagan told Bracey, Scalia, and other TPUK employees that FSMS was supplying Target stores in the United States.  On information and belief, FSMS never made any sales to Target stores.

26.     On or about August 27, 2020, Cagan represented to a TannerGAP employee that that FSMS had minimum order quantities of several million.  On information and belief, Cagan made this statement to deceive TannerGAP into believing that FSMS regularly distributed large volumes of products, when in fact, it had made few large sales in its short existence.

62

27.    Again relying on the representations from Cagan and from FSMS's website, on September 11, 2020, TannerGAP and TPUK executed the Distribution Agreement, in which FSMS represented that it was engaged in the "supply and sale of finished [PPE] and Diagnostic Rapid Tests."  FSMS also agreed to work "as an authorized reseller or distributor of Covered Products."  The Distribution Agreement again listed FSMS's address as 20400 Stevens Creek Boulevard, Suite 700, Cupertino, CA 95014.

**b.    FSMS's Representations Were False and Misleading**

28.    As described above, many of the representations that FSMS and Cagan made to TannerGAP and TPUK were false and misleading.

29.    On information and belief, FSMS began operating sometime after March 30, 2020, hardly a month before it began marketing itself to TannerGAP and TPUK as a company with extensive experience, relationships, and networks in PPE distribution.

30.    On information and belief, FSMS's first communication with anyone from Orient Gene or Healgen was on May 16, 2020, hardly two weeks before its contact with TPUK and TannerGAP, and after TPUK and TannerGAP had already reached out to Orient Gene and was in serious negotiations with a distributor of Orient Gene's products.

31.    On information and belief, and according to FSMS's own ledger, FSMS had made approximately six purchases of products from a total of two entities when it entered the NDNCA, and at least one of those two entities was a reseller and not a manufacturer.  Therefore, FSMS did not source all of its products directly from factories.

32.    On information and belief, FSMS did not itself vet any factories.

33. On information and belief, neither Cagan nor anyone else at FSMS had the experience, resources, or capabilities to act as a distributor or supplier of PPE or COVID test kits at scale.

34. On information and belief, FSMS had never purchased any products directly from Orient Gene or Healgen when it entered the NDNCA.

35. On information and belief, up to that point, FSMS had made one small purchase of Orient Gene-related products from a third-party reseller not affiliated with Orient Gene or Healgen called Forever Me Industrial Co. Therefore, that purchase was not direct from the factory.

36. On information and belief, none of Cagan, Mao, or FSMS ever had the close or personal relationship with Orient Gene, Healgen, Orient Gene's Chairman, or other decisionmakers that they claimed.

37. As of July 2020, Cagan communicated with Healgen through its generic customer service email address, info@healgen.us, suggesting the lack of any personal relationship and the lack of a prior substantial business relationship.

38. As of August 19, 2020, Healgen told FSMS that FSMS had no client account at Healgen and that Healgen did not have FSMS in its internal systems.

39. On the same day, Cagan sent his account opening form to Healgen. On that form, Cagan said that he had been in business for only one year and under the question "How did you hear about us?" he checked the box "Website," showing that he heard of Healgen through their website and not through an existing business or personal relationship.

40. In addition to misrepresenting its business and relationships with manufacturers, FSMS misrepresented its resources and capabilities to serve as a distributor.

41.     On information and belief, FSMS never had any employees and never intended to hire any employees.

42.     On information and belief, FSMS never maintained general liability insurance or product liability insurance, reflecting that it never intended to own or bear responsibility for any products.

43.     On information and belief, FSMS never had any licenses other than a general California business license.

44.     On information and belief, FSMS never had a dedicated IT system or infrastructure.

45.     On information and belief, FSMS did not have the financial resources to perform as a distributor for large volume sales.

46.     On information and belief, FSMS's address listed in the NDNCA and Distribution Agreements was occupied by a different, unrelated company with which Cagan was involved. On information and belief, no FSMS personnel regularly worked there.

47.     FSMS did not have the expertise, resources, or relationships that it had represented to TPUK and TannerGAP.

48.     As a result of FSMS's misrepresentations, FSMS was able to get TannerGAP and TPUK to enter contracts that they otherwise would not have entered.

49.     TPUK and TannerGAP reasonably relied on FSMS's misrepresentations in entering the NDNCA and Distribution Agreement.

50.     Due to FSMS's inexperience and lack of access, it could not serve as an effective distributor or get direct access to Healgen or Orient Gene's decisionmakers.

51.     Cagan, Mao, and FSMS were consistently slow to respond to TannerGAP's, TPUK's, and their customers' requests, even where the requests were urgent, and in one case their slow response times caused TannerGAP to lose the chance to bid on a time-sensitive deal.

52.     In September 2020, Cagan, Mao, and FSMS, failed to respond timely to several urgent requests from TPUK and Bracey relating to the DHSC bidding process. Bracey told Mao and Cagan that their slow responses were not allowing TPUK to move quickly enough to compete in the DHSC bidding process.

53.     After entering the Distribution Agreement, Cagan, Mao, and FSMS's inexperience and lack of resources and relationships left TPUK no option but to handle the supplier side of the DHSC transactions and bear all of the financial risk.

54.     None of Cagan, Mao, or FSMS ever introduced TPUK to the Chairman of Orient Gene.

55.     TPUK had to pay approximately $6.5 million to FSMS pursuant to a contract that FSMS induced TannerGAP and TPUK to sign based on false pretenses.


**FSMS's Obligation to Pay TannerGAP and TPUK's Attorneys' Fees**

a.     ~~A.~~ The Distribution Agreement

56.     ~~5.~~ On September 11, 2020, ~~FSMS,~~ TannerGAP~~,~~ and TPUK ~~executed a~~ entered into the Distribution Agreement.

57.     ~~6.~~ Section 31 of the Distribution Agreement provides that: "If a Party prevails against another Party regarding any claim arising from or related to this Agreement, then the non-prevailing Party shall reimburse the prevailing party for necessary costs, expenses, and

attorneys' fees reasonably incurred by the prevailing party regarding that claim." ~~Docket~~Dkt. 63-1, Dist. Agmt. § 31.

### **b. ~~B.~~ The California Litigation**

58. ~~7.~~ On March 24, 2021, FSMS filed an action against TannerGAP and TPUK in California alleging common law and statutory causes of action ("the California Litigation"). ~~Docket~~Dkt. 16-6.

59. ~~8.~~ After removal to the Northern District of California, the court granted ~~defendants'~~TannerGAP and TPUK's motion to dismiss for lack of personal jurisdiction on July 12, 2021. ~~Docket~~Dkt. 16-7.

### **COUNT I – FRAUD/FRAUDULENT INDUCEMENT**

60. TannerGAP and TPUK incorporate by reference the preceding paragraphs of their Counterclaims as if fully set forth herein.

61. FSMS intentionally made material misrepresentations of fact in oral and written communications to TannerGAP and TPUK employees regarding FSMS's experience, resources, and relationships with manufacturers—including but not limited to Orient Gene and Healgen.

62. These misrepresentations induced TannerGAP to enter into the NDNCA, which FSMS has argued limits the ability of TannerGAP and its affiliates, such as TPUK, to transact with Orient Gene and Healgen.

63. These misrepresentations also induced TannerGAP and TPUK to enter into the Distribution Agreement, which afforded a profit share to FSMS.

64. FSMS's misrepresentations and omissions described and alleged more fully in the preceding paragraphs of TannerGAP and TPUK's Counterclaims were made with an actual

intent to cause TannerGAP and TPUK to contract with FSMS and later on for TPUK to pay substantial sums to FSMS based on false pretenses.

66.    FSMS's misrepresentations were reasonably calculated to deceive and did in fact deceive TannerGAP and TPUK into contracting with FSMS.

66.    In the absence of FSMS's misrepresentations and omissions, TannerGAP and TPUK would not have contracted with FSMS or paid it approximately $6.5 million.

67.    TPUK and TannerGAP reasonably relied upon the false information and representations made by FSMS, and their reliance was justifiable.

68.    TPUK and TannerGAP are entitled to rescind the NDNCA and Distribution Agreement and to an award of compensatory and punitive damages, in an amount that may be shown in discovery and proven at trial, but reasonably believed to be at least $6.5 million.

## COUNT II – NEGLIGENT MISREPRESENTATION

69.    TannerGAP and TPUK incorporate by reference the preceding paragraphs of their Counterclaims as if fully set forth herein.

70.    Pleading in the alternative to TPUK and TannerGAP's First Counterclaim, if it is determined that the representations and omissions of material fact by FSMS were not made with actual knowledge that they were false and with a fraudulent intent, then such representations and omissions of material fact were made when the representatives of FSMS, in the exercise of ordinary care, should have known they were false.

71.    FSMS owed a duty to TPUK and TannerGAP to exercise reasonable care or competence in communicating information to them regarding FSMS's experience, resources, and

relationships. FSMS was in control of this information, which TPUK and TannerGAP had no ability to investigate independently.

72. FSMS failed to exercise reasonable care by communicating information to TPUK and TannerGAP and making representations to them which were false and misleading and/or by omitting material facts for their consideration.

73. FSMS intended for TPUK and TannerGAP to rely on that information and false representations in deciding whether to enter contracts and business transactions with FSMS.

74. TPUK and TannerGAP reasonably relied upon the false information and representations made by FSMS, and their reliance was justifiable.

75. Had TPUK and TannerGAP known the true facts, they would not have entered into the NDNCA or Distribution Agreement and would not have paid approximately $6.5 million to FSMS.

76. As a direct and proximate result of TPUK and TannerGAP's reasonable reliance on the false information, misrepresentations, and omissions of material fact by FSMS, TPUK and TannerGAP have been financially damaged.

77. TPUK and TannerGAP are entitled to rescind the NDNCA and Distribution and to an award of compensatory and punitive damages, in an amount that may be shown in discovery and proven at trial, but reasonably believed to be at least $6.5 million.

**COUNT ~~I~~III – ATTORNEYS' FEES**

78. TannerGAP and TPUK incorporate by reference the preceding paragraphs of their Counterclaims as if fully set forth herein.

69

79. Pleading in the alternative to TPUK and TannerGAP's First and Second Counterclaims, if the Distribution Agreement is enforceable, then TannerGAP and TPUK are entitled to recover their attorney's fees.

80. 9. TannerGAP and TPUK incurred attorneys' fees and costs in connection with the California Litigation. As prevailing parties, they are entitled to reimbursement from FSMS of those fees and costs pursuant to Section 31 of the Distribution Agreement if it is enforceable.

81. 10. TannerGAP and TPUK have incurred, and continue to incur, attorneys' fees and costs in this action. Once TannerGAP and TPUK prevail in this action, they are entitled to reimbursement from FSMS of their fees and costs pursuant to Section 31 of the Distribution Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, TannerGAP and TPUK pray for judgment as follows:

82. 1. FSMS have and recover nothing from TPUK and TannerGAP, and that the Amended Complaint be dismissed with prejudice;

83. Rescission of the NDNCA and Distribution Agreement;

84. Disgorgement of the amounts paid under the Distribution Agreement;

85. Compensatory damages in an amount to be determined at trial;

86. Punitive damages in an amount to be determined at trial;

87. 2. That the costs of this action, including TPUK and TannerGAP's reasonable attorneys' fees, be taxed to FSMS;

88. 3. That, if the Distribution Agreement is enforceable, this Court enter judgment against FSMS for attorneys' fees and costs in the California Litigation, and when TannerGAP and TPUK prevail in this action, for such fees and costs in this action;

70

89. 4. That this Court specify in its judgment a reasonable time by which FSMS must pay such fees and costs; and

90. 5. That this Court grant such additional relief as it deems just.


This the 16th __ day of October August, 2023 2024.

McGuireWoods LLP


By: /s/ Bradley R. Kutrow
Bradley R. Kutrow
N.C. State Bar No. 13851
Brian A. Kahn
N.C. State Bar No. 29291
Jessica L. O'Brien
N.C. State Bar No. 56679
Kelly A. Warlich
N.C. State Bar No. 51053
201 North Tryon Street, Suite 3000
Charlotte, NC 28202-2146
Telephone: (704) 343-2049
Facsimile: (704) 343-2300
bkutrow@mcguirewoods.com
bkahn@mcguirewoods.com
jobrien@mcguirewoods.com
kwarlich@mcguirewoods.com


Mark E. Anderson
N.C. State Bar No. 15764
McGuireWoods LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
Telephone: (919) 755-6678
Facsimile: (919) 755-6699
manderson@mcguirewoods.com


Anne L. Doherty
N.C. State Bar No. 55494
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916

71

Telephone: (804) 775-7633
Facsimile: (804) 775-1061
dhayes@mcguirewoods.com
adoherty@mcguirewoods.com

*Attorneys for Defendants TannerGAP, Inc.
and Tanner Pharma UK, Ltd.*

## CERTIFICATION

Pursuant to this Court's June 18, 2024 Order regarding the use of artificial intelligence, the undersigned states that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the ___ day of August, 2024.

*/s/ Bradley R. Kutrow*
Bradley R. Kutrow
N.C. State Bar No. 13851
McGuireWoods LLP

*Counsel for Defendants TannerGAP, Inc.
and Tanner Pharma UK, Ltd.*