# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

FS MEDICAL SUPPLIES, LLC,

      Plaintiff,

v.

TANNERGAP, INC. *et al.*,

      Defendants.

Civil Action No.
3:21-CV-501-RJC-WCM

---

## MEMORANDUM IN OPPOSITION
## TO MOTION FOR LEAVE TO FILE
## COUNTERCLAIMS AND DEFENSE
## <u>SOUNDING IN MISREPRESENTATION</u>

**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
250 W 55th Street
New York, NY 10019
212-836-8000
kent.yalowitz@arnoldporter.com
carmela.romeo@arnoldporter.com


 – and –

1144 Fifteenth Street, Suite 3100
Denver, CO 80202
303-863-1000
eliseo.puig@arnoldporter.com

**MAYNARD NEXSEN PC**

227 W. Trade Street, Suite 1550
Charlotte, NC 28202
Telephone: (704) 339-0304
lerwin@maynardnexsen.com
dluzum@maynardnexsen.com
kzhao@maynardnexsen.com

*Counsel for Plaintiff*

September 3, 2024

Plaintiff, FS Medical Supplies, LLC ("FSMS"), respectfully submits this memorandum in opposition to the motion of defendants TannerGAP, Inc. and Tanner Pharma UK, Limited ("Tanner") for leave to file amended counterclaims and a defense sounding in misrepresentation.[1]

## INTRODUCTION

This case is about the sale of COVID test kits manufactured by a Chinese company called Zhejiang Orient Gene Biotech Co., Ltd. ("Orient Gene"). Tanner executed a Distribution Agreement with FSMS under which it promised to buy Orient Gene test kits from FSMS (or, if directed by FSMS, from Orient Gene) and split its gross profits with FSMS on a 50-50 basis. Ex. 1 (expressly incorporated in Tanner's Answer, ¶¶ 2, 49-55). In its Answer and proposed counterclaims, Tanner acknowledges—as it expressly did in the Distribution Agreement—that FSMS had a pre-existing business relationship with Orient Gene. Tanner's Answer also admits facts showing that FSMS used that relationship at a critical time to procure antigen test kits for validation testing needed to win a large order from the UK Government. And Tanner's Answer admits facts showing that FSMS introduced Tanner to personnel at Orient Gene who were otherwise unreachable to Tanner.

For more than three years, as the case has proceeded through pleading and discovery, Tanner has asserted that it fulfilled its contractual promises by paying

---

[1] FSMS does not oppose that portion of the motion in which Tanner seeks leave to amend or add defenses addressed to the legality of the Non-Circumvention Agreement and to alleged modification of the Distribution Agreement, in view of the lenient standard for pleading facts concerning defenses in this District. *See Shanti Wines, LLC v. Shanti Elixirs, LLC*, 2023 WL 5620736, at *1–2 (W.D.N.C. Aug. 30, 2023). These defenses are also meritless, but they will be addressed at an appropriate time.

Plaintiff $6.5 million. Tanner calculated this payment using a per-unit cost basis of $5.00, despite the fact that Tanner actually paid far less than $5.00 to Orient Gene. Plaintiff has repeatedly pointed out that Tanner's position required an irrational reading of the Distribution Agreement: among other things, the contract expressly ties per-unit costs in the 50-50 gross-profit split to *purchase orders*, and Tanner never issued a single purchase order at the $5.00 price, to anyone. Nonetheless, Tanner has—until now—stood by its reading of the contract. But apparently, as its Rule 30(b)(6) witness prepared for deposition (which went forward two days after Tanner filed this motion), Tanner finally internalized that its contract position is untenable and came up with something new. Now, Tanner proposes to *rescind* the contract on a misrepresentation theory. It seeks as damages the $6.5 million it paid to Plaintiff.

Tanner's new misrepresentation theory is based on the following allegations: (1) FSMS stated that it "worked directly with Orient Gene" (a statement Tanner does not allege to be false), and made unspecified statements in which it "*implied*" or "*suggested*" it had done "substantial" business with Orient Gene before June 9, 2020; (2) not all of the six workers listed on FSMS's website were "employees"; and (3) FSMS's marketing material said it sourced "all" products "directly" from "elite manufacturing facilities" of "the main and best quality Chinese manufacturers."

This is not the stuff of fraud. The motion should be denied insofar as it seeks to allege counterclaims and a defense sounding in misrepresentation, on grounds of futility, prejudice, and bad faith.

***Futility:*** Tanner suggests that the merits of its counterclaims don't matter, as long as they are not "frivolous" under the low bar set by Rule 11. That is not the law.

2

As the Fourth Circuit has explained, a counterclaim is futile if it "fails to withstand Rule 12(b)(6) scrutiny." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021).

Tanner cannot meet that standard here. Even accepted as true for purposes of the motion, Tanner's factual allegations are insufficient to support a claim or defense of misrepresentation. To begin, Tanner does not allege a *material misstatement of fact*. To the contrary, there is no dispute that FSMS's statement that it "worked directly with Orient Gene" was true. As admitted in Tanner's Answer and confirmed by documents expressly referenced in that Answer, FSMS actually had a business relationship with Orient Gene at a time that Tanner did not have such a relationship. The allegations that FSMS "implied" or "suggested" something more are not specific enough to constitute a material misrepresentation. Also immaterial are Tanner's allegations concerning the number of workers at FSMS and the puffery that FSMS sourced "all" products "directly" from "the main and best quality Chinese manufacturers." (As it turned out, the puffery was true: Orient Gene, *did* sell products to FSMS directly, and those products passed the validation tests with flying colors.)

In addition, Tanner cannot show *reasonable reliance* on the alleged misrepresentations, because it conducted no due diligence and negotiated no contractual warranties about the matters it now complains about. To the contrary, the Distribution Agreement expressly provides: "To be clear, the manufacturer of any Covered Product [*i.e.*, Orient Gene] shall be considered a prior relationship of FSMS in regard to the Covered Product and TANNER will not do any business involving of [*sic*] said Covered Products from such manufacturer." Distribution Agreement § 16.4 (Ex.

1). "[A] sophisticated party's failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction [makes] it impossible to prove justifiable reliance." *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, C.A. No. 2020-0378, 2021 WL 305741, at *15 (Del. Ch. Jan. 29, 2021), *aff'd*, 267 A.3d 382 (Del. 2021); *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 449 (2015) ("Reliance is not reasonable if a plaintiff fails to make any independent investigation."); *Abbington SPE, LLC v. U.S. Bank, N.A.*, 352 F. Supp. 3d 508, 518 (E.D.N.C. 2016) ("when a plaintiff alleges misrepresentations that are 'directly contrary' to the express terms of a written contract[, r]eliance on such misrepresentations is unreasonable as a matter of law") (collecting cases), *aff'd*, 698 F. App'x 750 (4th Cir. 2017).

Tanner's proposed counterclaims also fail because the damages sought are just a "rehash" of the contract damages—another independently fatal flaw to the counterclaims. *See Norman v. Elkin*, 860 F.3d 111, 130-31 (3d Cir. 2017). Tanner's damage claim is merely that it paid FSMS money under the contract.

As for remedies, Tanner is not allowed to seek recission at this late date: "a party who discovers that he has been misled into entering into a contract by false representations must act with reasonable diligence if it is his intention to seek rescission as opposed to affirming the contract and suing for damages. He cannot be permitted to derive all possible benefits from the transaction and then, when he is called upon to comply with its terms, claim to be relieved of his obligation of the grounds of misrepresentation." *Craft v. Bariglio*, No. 6050, 1984 WL 8207, at *11 (Del. Ch.

4

Mar. 1, 1984). Tanner should not be allowed to seek punitive damages either, because punitive damages are not recoverable for breach of contract in the absence of an independent tort. *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996).

In short, Tanner's proposed counterclaims and defense sounding in misrepresentation are meritless on the face of the proposed pleadings and would not withstand Rule 12(b)(6) scrutiny. Leave to add them should be denied as futile.

***Prejudice:*** Allowing the misrepresentation counterclaims and defense to go forward at this late stage would be prejudicial, because doing so would inject new discovery issues into the case at a time when the parties are almost finished with discovery and trial is close at hand. "Belated claims which change the character of litigation are not favored." *Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987). Most important, Tanner challenges the bona fides of FSMS's relationships with manufacturers other than Orient Gene. Allowing discovery into those relationships would be very time-consuming. FSMS's ESI (collected by its counsel) include correspondence with and materials from approximately 140 companies and individuals that appear to be potentially relevant to FSMS's relationships with Chinese manufacturers. Puig Dec. ¶ 14 (Ex. 15). A preliminary search of the data returned more than 80,000 documents that would need to be reviewed in response to a discovery request directed to FSMS's relationships with non-Orient Gene manufacturers. *Id.* ¶ 15. A "first pass" review team of five lawyers working eight hours a day, five days a week would require three months to get through the documents. *Id* ¶ 16. There would be additional time needed for "second level" review. *Id.* There is not enough time left

5

in the discovery period to do that work, let alone the depositions that Tanner would demand.

**_Bad Faith:_** It appears that Tanner has come to understand that its initial defense—that it "correctly" calculated gross profits under the contract using a hypothetical $5.00 price—is a loser and is casting about for an alternative. But the facts on which its new misrepresentation theory is based were known at the time Tanner filed its answer and indeed expressed in the answer (not to mention correspondence from its counsel at McGuireWoods as early as March 2021). That Tanner is changing its theory after realizing that its original theory of the case is meritless supports a finding of bad faith.

## FACTS[2]

Tanner alleges that in the parties' very first conversation, in June 2020, "[Tanner's] Bracey told [FSMS's] Cagan that TannerGAP and TPUK had been pursuing a relationship with Healgen and/or Orient Gene, seeking to acquire COVID test kits from them." Proposed Am. Counterclaims ¶ 13 (ECF 179-2).

Tanner states that in that conversation and thereafter, Mr. Cagan told

---

[2] The following facts are taken from the allegations in Tanner's Proposed Counter-claim, the admissions in its Answer (which Tanner does not seek to withdraw), and the documents explicitly relied on by Tanner in its Answer and Proposed Counter-claims. "[W]hen a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." _Am. Chiropractic Ass'n v. Trigon Healthcare, Inc._, 367 F.3d 212, 234 (4th Cir. 2004); _accord Krings v. AVL Techs._, No. 1:20-cv-259, 2021 WL 1235129, at *1 (W.D.N.C. Feb. 10, 2021) (Metcalf, J.) (following _American Chiropractic_), _M&R adopted_, 2021 WL 1233478 (W.D.N.C. Apr. 1, 2021).

Mr. Bracey that FSMS "worked directly with Orient Gene and Healgen." *Id.* (emphasis omitted). ***Tanner does not allege that this statement was false.*** Rather, it alleges that FSMS's generalized "experience, relationships with manufacturers, and capabilities" were inadequate. Proposed Am. Counterclaims ¶ 1 (ECF 179-2). As for the specifics, Tanner alleges that FSMS made the following misrepresentations:

1. **Relationship With Orient Gene.** Although Tanner admits—as it must—that FSMS had done business with Orient Gene at the time the parties met, *id.* ¶ 35, it alleges that FSMS "misrepresented *the extent* of its relationship with Orient Gene," Proposed Seventh Defense, and "implied" it "had done *substantial* prior business with Orient Gene and Healgen," *id.* ¶ 13 (emphasis added). Tanner also alleges that FSMS made unspecified statements "that led [Tanner's] Scalia to believe that Cagan and FSMS had done prior substantial business with Orient Gene." *Id.* ¶ 18. In truth, alleges Tanner, FSMS first met with anyone from Orient Gene on May 16, 2020, *id.* ¶ 30, and as of June 2, FSMS had not yet "purchased any products *directly* from Orient Gene or Healgen *at that time*," *id.* ¶¶ 13, 34.[3]

2. **Capacity and Experience:** Tanner also alleges that FSMS misrepresented its size and experience. Tanner alleges that FSMS's website supposedly showed pictures of six individuals "purporting to work for

---

[3] This assertion is based on the fact that FSMS's two May 28, 2020 transactions were structured such that FSMS's customer issued purchase orders directly to Orient Gene and paid FSMS an agreed amount. This can be seen in FSMS's general ledger, Ex. 3 (expressly referenced in Proposed Amended Counterclaim ¶ 31).

FSMS," when, according to Defendants, "FSMS had no employees and no operational office." *Id.* ¶ 12, 24. In addition, FSMS's Cagan told Tanner that "he got into PPE distribution a few years back" and had "invested in the PPE distribution space directly with Chinese companies a while back," but FSMS had been operating "for a little over a month" and "had little experience in PPE distribution." *Id.* ¶¶ 14, 17.

3. **Sources of Product:** Finally, Tanner alleges that FSMS made false statements in its marketing materials, which stated that "all" its products were "sourced directly from … trusted factories," which FSMS "vetted," and which were "elite manufacturing facilities" of "the main and best quality Chinese manufacturers." *Id.* ¶¶ 10, 14, 16, 22, 31, 32.

On June 9, 2020, Tanner and FSMS entered into a non-circumvention agreement. *Id.* ¶ 19. Tanner also sent a draft Distribution Agreement to FSMS, which set the price for Orient Gene test kits as "the true cost of the product as purchased by FSMS from its manufacturer/supplier, plus half the Gross Profit collected from the sale of the product to TANNER's customer." Draft Distribution Agreement § 9 (Ex. 4 (expressly incorporated in Tanner's Answer, ¶¶ 33-35)). The pricing provision also states: "FSMS and TANNER shall honor the prices originally agreed to in Purchase Orders and Sales Order Confirmations between FSMS and TANNER." *Id.*

In August 2020, Tanner identified an opportunity to sell Orient Gene antigen Covid test kits to the UK Government. Answer ¶¶ 3, 38. Starting around August 29, Tanner and FSMS began communication about the opportunity. *Id.* ¶ 39. On Sep-

8

tember 2, FSMS bought 500 sample test kits from Orient Gene so that the UK Government could perform validation testing. *Id.* ¶ 40. A third-party logistics company delivered the sample test kits to the UK Government on September 7. *Id.* ¶ 41.

Two days later, on September 9, Mr. Bracey informed FSMS that "we passed first stage of validation." Ex. 5 (relied on in Answer ¶ 43). The next day, September 10, a Tanner executive informed FSMS that he had spoken with the "head of uk testing just now" and "[t]hey are pushing us to get the next kits to them ASAP (they have more companies in the mix than just us it seems!)." *Id.* According to Tanner, the UK Government urgently needed an additional 4,250 samples to conduct further clinical testing to validate the efficacy of the product: "Can you press [Orient Gene] on this please ASAP and let us know?" *Id.*

On September 10, Tanner asked to speak directly with Orient Gene. FSMS's Jim Mao arranged for a Zoom meeting among FSMS, Tanner and Orient Gene personnel, which went forward on Friday, September 11. Ex. 5 (relied on in Answer ¶¶ 66-67). The same day, Tanner and FSMS executed the Distribution Agreement. *Id.* ¶ 49.

During the week beginning Monday, September 14, 2020, things changed dramatically. According to Tanner: "Very quickly, it became apparent that Cagan and FSMS did not have the experience and contacts that they had promised." Answer p. 3. As a result, "TPUK alone … handled the urgent logistics of getting test kits from China to the UK." *Id.* To that end, Tanner:

- Executed a non-disclosure agreement with the UK Government. *Id.* ¶ 70.

- Signed a contract with the UK Government for the sale of test kits from Orient Gene. *Id.* ¶ 76.

- Issued purchase orders to Orient Gene for 3.3 million units. Exs. 6, 7 (relied on in Answer ¶¶ 72, 73).

- Executed a "joinder agreement" binding Orient Gene to the non-disclosure agreement with the UK Government. Answer ¶ 71.

- Executed an "Exclusive Distribution Agreement" with Orient Gene. *Id.* ¶ 72.

The internal Tanner communications were enthusiastic. One executive wrote: "Trying to finalise the 'next' PO…..big numbers…!!!!" He further stated that it would be "nearly 20x the current order!!! BIG!!!!!!!" Ex. 8 (relied on in Answer ¶ 77). During this period, FSMS repeatedly asked Tanner for updates. Exs. 5, 8 (relied on in Answer ¶¶ 75, 78, 79, 80). In response, Tanner sent text messages saying things like "waiting to hear test results," "still waiting for 3B results," "will update u when I hear from them," "the lateral flow tests are still pending 3B field tests results," and "Still waiting to hear about 3b." *Id.* These communications did not mention the developments described above. *Id.*

On October 20, 2020, Tanner provided FSMS a "conditional" "estimate" of an amount that Tanner owed to FSMS for the first 800,000-unit transaction under the Distribution Agreement, stating that the cost per unit was $5.00 each. Ex. 10 (relied on in Answer ¶ 82).

In November 2020, Tanner sent FSMS a written statement purporting to set out "the profit split in accordance with our agreement." Ex. 11 (relied on in Answer

10

¶ 87. In February 2021, Tanner sent FSMS a further "reconciliation" purporting to set out the profit split under the contract. *Id.* (relied on in Answer ¶ 89). Tanner paid FSMS these amounts. *Id.* Tanner claimed that once its sales price had fallen below $5.00 per unit, it owed FSMS nothing. *Id.*

Tanner went on to sell more than £1 billion ($1,250,000,000.00) worth of Orient Gene test kits to the UK Government. Answer ¶ 90.

## PROCEDURAL HISTORY

On February 24, 2021, FSMS made a demand on Tanner, seeking 50% of the gross profits derived from Orient Gene products. Letter from M. Figueiredo to W. Taylor at 1 (Feb. 24, 2021) Ex. 12.

On March 3, 2021, Tanner's counsel, William Boddy of McGuireWoods, responded that Tanner "has honoured the profit split that would have been due had it purchased the Test Kits from FSMS at that price [of $5.00]." Letter from W. Boddy to M. Figueiredo p.3 ¶ 9 (March 3, 2021) (Ex. 13) (emphasis omitted).

On March 24, 2021, FSMS sued Tanner in the Superior Court of the State of California. Proposed Am. Counterclaim ¶ 58.

On September 23, 2021, after the California complaint was dismissed for lack of personal jurisdiction, FSMS refiled its claims in this Court. ECF 1.

On October 16, 2023, after the Court denied in relevant part Tanner's motion to dismiss, Tanner filed an answer and counterclaim. ECF No. 120. This document contained no counterclaim or defense sounding in misrepresentation. *Id.*

Tanner began serving document requests on November 28, 2023, with additional sets of requests on March 8, 2024, April 22, 2024, and July 9, 2024; Tanner

11

served a total of 70 RFPs. Puig Dec. ¶ 3-4 (Ex. 15). FSMS timely served responses and objections to each set. *Id.* None of Tanner's 70 individual requests sought documents or communications exchanged with any manufacturer other than Orient Gene. *Id.* ¶ 4. Likewise, in conferring about search terms to apply to FSMS's documents—a process which ultimately resulted in an agreed-upon set of more than 100 search terms—Tanner did not propose any terms directed toward PPE such as gloves, masks, or gowns, nor toward FSMS's relationships with manufacturers of those products. Instead, Tanner's RFPs and the search terms it sought were geared solely toward COVID test kits and FSMS's relationship with Orient Gene. *Id.* ¶ 6. FSMS reviewed more than 38,000 unique documents in response to Tanner's requests, producing or logging more than 6,000 documents. *Id.* ¶ 8. FSMS certified substantial completion on May 31, 2024. *Id.* ¶ 9.

Tanner served interrogatories on May 3, 2024. *See* Ex. 2 (Plaintiff's Responses and Objections to Tanner Defendants' Interrogatories (June 3, 2024)). In one interrogatory, Tanner asked that FSMS "[i]dentify all manufacturers 'of various personal protection equipment,' including diagnostic rapid tests, that FSMS had 'relationships' with…as of June 8, 2020…." *Id.* p. 4 (Interrogatory No. 1). FSMS objected that it could not answer the interrogatory as phrased "without undue labor and expense" because it "had relationships with dozens of manufacturers as of June 8, 2020." *Id.* (Response to Interrogatory No. 1). Tanner's interrogatories also expressly referenced contracts that FSMS executed with Orient Gene on May 25, 2020 and later dates. *Id.* p. 6 (Interrogatory No. 4). FSMS provided information about its transactions with Orient Gene, which began as early as May 28, 2020. *Id.*, pp. 4-5; *see*

Case 3:21-cv-00501-RJC-WCM   Document 188   Filed 09/03/24   Page 13 of 28

*also id.* pp. 6-7 (Response to Interrogatory No. 4, subpart 2). After meeting and conferring with Plaintiff, Tanner's counsel dropped their request for Plaintiff to identify "all manufactures" with which it "had 'relationships.'" Puig Dec. ¶ 10.

Depositions went forward on June 18, July 23, July 24, August 1, August 16, and August 23. Further depositions have been noticed for September 10, September 24, September 25, September 30, and October 16. Additional deposition dates have also been proposed for September 16, September 18, October 1, October 14, October 15, and October 29. *Id.* ¶ 11.

The discovery deadline in this case is December 6. Pretrial Order and Case Management Plan at 1 (Mar. 13, 2024) (ECF 164). Trial begins May 5, 2025. *Id.*

## LEGAL STANDARD

Leave to amend should be granted unless the amendment would be *futile*, the non-moving party would be *prejudiced*, or there has been *bad faith* on the part of the moving party. *Triangle Cap. Corp. Sec. Litig.*, 988 F.3d at 750. Futility is a question of law; findings concerning prejudice and bad faith are committed to the District Court's discretion. *Id.* Tanner's motion misdescribes the futility standard, incorrectly suggesting that futility is only met when the proposed amendment is "frivolous on its face." ECF 180 at 7. That is not the law. As the Fourth Circuit has explained: "[t]raditionally, we held that a proposed amendment was 'futile' if it was 'clearly insufficient or frivolous on its face.' But in recent years, we have made clear that district courts are free to deny leave to amend as futile if the complaint fails to withstand Rule 12(b)(6) scrutiny." *Triangle Cap. Corp. Sec. Litig.*, 988 F.3d at 750.

An amendment is prejudicial if it "raises a new legal theory that would require

the gathering and analysis of facts not already considered by the [defendant, and] is offered shortly before or during trial," *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006), or comes "on the eve of the deadline for dispositive motions" and would require the court to "to reopen discovery." *Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010).

An amendment may be found to be in bad faith "[w]here the facts upon which the new claim are based were known at the time of the original complaint, and indeed, pled in that complaint." *Ferguson v. Maita*, 162 F. Supp. 2d 433, 441 (W.D.N.C. 2000), *aff'd*, 15 F. App'x 84 (4th Cir. 2001); *Bailey v. Polk Cnty., N.C.*, No. 1:10-cv-264, 2011 WL 4565449, at *3 (W.D.N.C. Sept. 29, 2011) (same).

## ARGUMENT

## I. THE MISREPRESENTATION COUNTERCLAIMS AND DEFENSE ARE FUTILE

To the (very limited) extent the proposed Counterclaims focus on FSMS's relationship with Orient Gene, Tanner does not dispute that FSMS *did* have a contractual and business relationship with Orient Gene at a time that Tanner did not have such a relationship. In fact, the documents relied on by Tanner in its Answer leave no doubt that as late as September 10—the day before the parties executed the Distribution Agreement—Tanner desperately needed FSMS to get to Orient Gene:

> 12:48 a.m.: [From Bracey]: "Jim – have u managed to get us set up with a call with OG yet please? Still not seen any reply to my emails. Really need to talk with them ASAP please."[4]

---

[4] These text messages are in Ex. 5 (relied on in Answer ¶¶ 43, 66, 67). A substantively identical but easier to read version of the text thread reflecting messages exchanged on September 10 was produced by the Defendants and is attached as Ex. 14. All times are Eastern Daylight Time (which is one hour earlier than UTC).

2:32 a.m.:   [From Cagan]: "Jim, I'm on a WhatsApp call with Jonathan right now. If you are up, please call him. He would like to have a direct call with the mgmt. at Orient Gene. Let him know if you can arrange that."

Moreover, the Distribution Agreement executed on September 11 states expressly that "the manufacturer of any Covered Product shall be considered a prior relationship of FSMS in regard to the Covered Product." Ex. 1 § 16.4.

Tanner also admits that in September 2020 timing was urgent. Proposed Am. Counterclaims ¶ 19 (DHSC "urgently needed to acquire large volumes of validated COVID tests"); Ex. 5 at 4 (referenced in Answer ¶ 44) ("big prize for first to cross the line"); *Id.* at 9 (referenced in Answer ¶ 45) ("[t]hey are pushing us to get the next kits to them ASAP (they have more companies in the mix than just us it seems!).."). The documents incorporated into Tanner's Answer also show that FSMS persuaded Orient Gene to "take 500 samples out from other customer's order to ship to UK." *Id.* at 3.

In this context, what are the alleged misrepresentations? First, Tanner alleges that FSMS's "implied" or "suggested" that its business relationship with Orient Gene was "substantial." Proposed Am. Counterclaims ¶¶ 13, 18. (Tanner identifies no actual statements in this regard. *Id.*) Second, Tanner alleges that FSMS implicitly misrepresented its size and experience, because its website supposedly showed pictures of six individuals "purporting to work for FSMS," when "FSMS had no employees and no operational office." *Id.* ¶ 12. (Tanner does not allege that these people did not actually work for FSMS, only that they were not "employees.") Third, Tanner alleges that FSMS marketing materials falsely claimed that "all" products were

"sourced directly from high-quality high-volume trusted factories," which were "elite manufacturing facilities" of "the main and best quality Chinese manufacturers." ¶ 10.b, 14, 22.

Even taken as true, these allegations are insufficient to support a claim or defense of misrepresentation, for five reasons:

***First:*** The allegations are insufficient to show materiality. Under Delaware law, as elsewhere, "the misrepresentation forming the basis for the fraud or negligent misrepresentation claim must be material, and the plaintiff generally cannot rely, for example, on puffery, expressions of mere opinion, or representations that are obviously false." *Appel v. Berkman*, 180 A.3d 1055, 1061 (Del. 2018) (internal citations omitted). A fraudulent inducement defense requires the same proof. *See Lynch v. Gonzalez*, No. CV 2019-0356, 2020 WL 4381604, at *35 (Del. Ch. July 31, 2020), *aff'd*, 253 A.3d 556 (Del. 2021).[5]

Tanner's allegation that FSMS "implied" or "suggested" that its relationship with Orient Gene was "substantial" does not even identify a false statement. *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 142 (Del. Ch. 2009) (dismissing fraud counterclaim that "do not identify any specific fact that was misrepresented"); *accord Shaver v. Walker*, No. 23 NCBC 27 ¶ 37, 2023 WL 2746848, at *5 ("To be a statement of material fact, the statement must be definite and specific.").

A statement that FSMS had six workers listed on its website could not have

---

[5] The parties chose Delaware law. Distribution Agreement § 30 (Ex. 1). Tanner also cites North Carolina law, which is in accord. *Glob. Hookah Distributors, Inc. v. Avior, Inc.*, 401 F. Supp. 3d 653, 659 (W.D.N.C. 2019); *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 30 (2003).

been material, in view of the fact that the Distribution Agreement includes a provision permitting FSMS to direct Tanner to place Purchase Orders with Orient Gene directly. Distribution Agreement § 7. This "go direct" provision—on which Tanner has heavily relied—made FSMS's size completely irrelevant under the contract. Finally, the allegation that FSMS's marketing materials stated that "all" its products were "sourced directly from" "elite manufacturing facilities" of "the main and best quality Chinese manufacturers" does not misrepresent a material fact. It is mere puffery, which is not actionable. *Appel* 180 A.3d at 1060 n.25 (citing *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 775 (Del. Ch. 2014)); *accord Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17 (1992) (distinguishing "mere puffing, guesses, or assertions of opinions from representations of material facts"); *Glob. Hookah*, 401 F. Supp. 3d at 659 (same).

**Second**, Tanner's reliance was unreasonable as a matter of law, because Tanner fails to allege that it conducted due diligence or protected itself with contractual representations concerning the matters it now complains of.

To begin, the proposed amended counterclaims are completely devoid of any allegation that Tanner conducted any due diligence or any independent investigation of FSMS at all. (Tanner's only mention of reasonable reliance is its conclusory allegations in paragraphs 49, 67, and 74.) Similarly, the Distribution Agreement contains no representations or warranties about FSMS's capacity. *See* Distribution Agreement § 14.1 (Ex. 1). To the contrary, the Distribution Agreement expressly provides that FSMS "is not in a position to guarantee Covered Product *quality or quantity*." *Id.* § 8.1 (emphasis added). The Distribution Agreement also assigned to

*Tanner* obligations included "the purchase, handling, sale, and distribution of Covered Products pursuant to this Agreement." *Id.* § 14.2.1. The Distribution Agreement contains no language requiring such performance by FSMS.

"Delaware courts do not rescue disappointed buyers from circumstances that could have been guarded against through normal due diligence and negotiated contractual protections." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 551 n.305 (Del. Super. Ct.), *aff'd*, 886 A.2d 1278 (Del. 2005). "[A] sophisticated party's failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction [makes] it impossible to prove justifiable reliance and ... this behavior indicate[s] that the sophisticated party made a business decision, which the court [will] not second-guess." *Golden Rule Fin. Corp.*, 2021 WL 305741, at *15; *see Debakey Corp. v. Raytheon Serv. Co.*, No. 14947, 2000 WL 1273317, at *26 (Del. Ch. Aug. 25, 2000) ("By asserting their fraud counterclaim, the defendants are seeking, in effect, to shift the cost of their inadequate due diligence to the plaintiffs."); *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, C.A. No. 2017-0500, 2018 WL 2727542, at *13 (Del. Ch. June 6, 2018) ("Under these circumstances, the pled facts do not allow a reasonable inference that Buyers could have reasonably relied upon the alleged extra-contractual representations made prior to their due diligence that were not included in the final agreement.").

North Carolina law is even more stern on this point: "If plaintiff relied on verbal assurances contrary to the documents he signed, such reliance cannot be reasonable, and he was misled through his own want of reasonable care and circumspection." *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 338 (2015) (internal

quotation marks omitted); *Abbington*, 352 F. Supp. 3d at 518 (E.D.N.C. 2016) ("when a plaintiff alleges misrepresentations that are 'directly contrary' to the express terms of a written contract[, r]eliance on such misrepresentations is unreasonable as a matter of law"); *Arnesen*, 368 N.C. at 449 ("Reliance is not reasonable if a plaintiff fails to make any independent investigation or fails to demonstrate he was prevented from doing so.") (cleaned up).

In this regard, the Distribution Agreement directly contradicts Tanner's contention that FSMS did not have a sufficient prior relationship with Orient Gene. The Distribution Agreement provides: "To be clear, the manufacturer of any Covered Product shall be considered a prior relationship of FSMS in regard to the Covered Product." Ex. 1 § 16.4.

**Third:** the proposed counterclaims fail because Tanner seeks the exact amount it paid FSMS *under the contract.* "Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's actions. And the damages allegations may not simply 'rehash' the damages allegedly caused by the breach of contract." *Norman*, 860 F.3d at 130-31; *Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 697 (D. Del. 2013) ("[T]he [fraud] damages … may not simply 'rehash' the damages allegedly caused by the breach of contract."); *APEX Fin. Options, LLC v. Gilbertson*, No. CV 19-046, 2022 WL 619833, at *4 (D. Del. Jan. 31, 2022) ("Delaware law is clear that fraud and breach of contract damages must be distinct.") (collecting cases).

**Fourth:** Tanner cannot now assert a claim of recission, because it was not diligent. In order to pursue a claim of recission claim, "a party who discovers that

he has been misled into entering into a contract by false representations must act with reasonable diligence if it is his intention to seek rescission as opposed to affirming the contract and suing for damages. He cannot be permitted to derive all possible benefits from the transaction and then, when he is called upon to comply with its terms, claim to be relieved of his obligation of the grounds of misrepresentation. *Craft v. Bariglio*, No. 6050, 1984 WL 8207, at *11 (Del. Ch. Mar. 1, 1984); *Grzybowski v. Tracy*, Civ. A. No. 3888, 2013 WL 4053515, at *7 (Del. Ch. Aug. 9, 2013) (same, following *Craft*); *Kostyszyn v. Martuscelli*, Civ. A. No. 8828, 2014 WL 3510676, at *5 (Del. Ch. July 14, 2014) (similar). Here, Tanner alleges that it knew of the alleged misrepresentations "very quickly." Answer p. 3. In its March 3, 2021 letter to FSMS—more than three years ago—McGuireWoods wrote "FSMS demonstrated that it was unable to be a reliable supplier for Tanner UK of Test Kits," that "FSMS was too small a company," and "FSMS deliberately misrepresented the nature and extent of its connections to personnel at Orient Gene." Ex. 13. But rather than seek rescission, Tanner elected to enjoy the benefits of the transaction. It is too late to seek rescission.

**Finally:** "Punitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort." *E.I. DuPont de Nemours & Co.*, 679 A.2d at 445; *SciGrip, Inc. v. Osae*, 373 N.C. 409, 428 (2020) ("punitive damages may not be awarded based upon the breach of a contract in the absence of the commission of an identifiable tort").

## II.     THE AMENDMENT WOULD BE PREJUDICIAL

"A common example of a prejudicial amendment is one that 'raises a new

legal theory that would require the gathering and analysis of facts not already considered by the defendant, and is offered shortly before or during trial.'" *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (cleaned up) (quoting *Johnson*, 785 F.2d at 510); *Smith v. Angelone,* 111 F.3d 1126, 1134 (4th Cir. 1997) ("If an amendment is proposed late enough and requires the opponent to engage in significant new preparation or results in the added expense and the burden of a more complicated and lengthy trial, prejudice may be found.") (cleaned up). Further, "a district court does not abuse its discretion in denying leave to amend when the amendment would add a new legal theory to the case after the close of discovery." *Advanced Training Grp. Worldwide, Inc. v. Pro-Active Techs., Inc.*, No. 22-1945, 2023 WL 8945846, at *4 (4th Cir. Dec. 28, 2023) (citing *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019)).

That is the situation here. Tanner alleges that FSMS did not actually have relationships with Chinese manufacturers. FSMS disputes that allegation. Allowing Tanner to inject the dispute into the case would require FSMS to rebut the allegation. Tanner would demand extensive additional discovery, which would inevitably delay the trial. The first step, of course, would be Tanner's request for production of documents. FSMS would respond, and the parties would then meet and confer about search terms. Negotiations over search terms at the outset of court-enforceable discovery took six months, beginning in November 2023 and lasting through April 2024. Puig Dec. ¶ 5.

Even if the request-response-conferral process took only three months, the parties would have exhausted the discovery period without production of a single

document. The production process would also take months. A preliminary search of the data that FSMS provided to counsel has uncovered correspondence with and materials from approximately 140 companies and individuals that appear to be potentially relevant to FSMS's relationships with Chinese manufacturers. *Id.* ¶ 14. Running the names of those companies, as well as some basic terms like "gloves," "masks," and "wipes," against FSMS's data returned more than 80,000 documents that FSMS has not produced (and in most cases has not even reviewed). *Id.* ¶ 15. A first-level review of these documents would take 2,500 person-hours. A review team of five, working 40 hours per week, would require three months to complete the first-level review. A significant number of potentially responsive documents are in Chinese. Additional time would be required for second-level review, processing, and translation of important and responsive documents into English. *Id.* ¶ 16.

Given the volume of documents that would be implicated by the new allegations, compliance with the discovery cutoff would be impossible, even in the unlikely event that Tanner accepted FSMS's search terms and waived its right to take depositions about its new allegations. Discovery would have to be reopened and trial rescheduled.

Prejudice sufficient to deny a motion for leave to amend arises when "a significant amount of discovery ha[s] already been conducted" and the evidence on the new claim should have been addressed during the prior discovery period. *See Mayfield v. NASCAR*, 674 F.3d 369, 379 (4th Cir. 2012); *Deasy v. Hill*, 833 F.2d at 42 ("The proof required to defend against this new claim would be of an entirely different character than the proof which the defendant had been led to believe would

be necessary."); *Gifford v. Pro Line Prod., Inc.*, No. 3:17-cv-00346, 2018 WL 4328262, at *2 (W.D.N.C. June 15, 2018) (denying motion for leave to amend: "Plaintiffs seek to completely revise their factual allegations ten months after filing their Complaint and answering written discovery."); *Graham v. Golden Corral Franchising Sys., Inc.*, No. 5:04-CV-541-H(2), 2006 WL 8438606, at *3 (E.D.N.C. Mar. 17, 2006) (denying motion for leave to amend where the opposing party "would likely be forced to drastically change their defense strategy," as well as to conduct new investigation and engage in new discovery).

In *Mayfield*, the Fourth Circuit affirmed the denial of a motion for leave to amend on the basis of prejudice where, as here, "the conduct giving rise to this lawsuit occurred nearly three years ago," the complaint "was filed over two and a half years ago," and "a significant amount of discovery had already been conducted." 674 F.3d at 379. Similarly, in *Equal Rights Center*, 602 F.3d at 604 n.3 (4th Cir. 2010), the Fourth Circuit affirmed the denial of a motion for leave to amend on the basis of prejudice where "the addition of a [proposed] claim after the close of a three-year long discovery process and on the eve of the deadline for dispositive motions would have required [the District Court] to reopen discovery." So too, here.

## III. THE COURT WOULD BE JUSTIFIED TO FIND BAD FAITH

Whether Tanner's motion reflects bad faith or a dilatory motive must also be considered. Here, Tanner candidly admits that its "theory of the case has evolved." ECF 180 at 6. Up until July 2023, Tanner's theory of the case was that it "used the correct measure of cost in calculating the profit split and breached no duty to FSMS." Mem. In Support of TPUK's 12(b)(6) Mot. p. 18 (Oct. 14, 2022) (ECF 66). More

particularly, it took the position that it did not owe half the gross profits from its sale of Orient Gene test kits because FSMS supposedly paid $5.00 for the validation batch, such that a hypothetical $5.00 price had to be used for the duration of the parties' relationship. *Id.* at 15-18.

Apparently, as Tanner's President and Rule 30(b)(6) witness prepared for his deposition, Tanner recognized that its interpretation of the contract was untenable. That witness (who began his preparation before Tanner sent over the proposed amended answer and counterclaims), admitted that "the economics of [§ 10] are that if there is a direct PO between Tanner and the manufacturer, then the 50 percent gross profit participation to each party is maintained" and the profit split would be "based off of the PO" issued by Tanner. Dep. of Stephen Scalia (Ex. 16), pp. 175-77. This testimony tracks Section 9 of the Distribution Agreement, which provides that the prices would be those "agreed to in Purchase Orders and Sales Order Confirmations between FSMS and TANNER." Ex. 1 § 9. As the witness put it:

> As this Agreement is written, it mentions specifically going back to Section 9. And Section 9 says, shall honor the price originally agreed to in purchase orders and sales order confirmations.

*Id.* at 177. The 50-50 profit split, according to these admissions, *had* to be based on purchase orders issued and sales confirmations issued to Orient Gene, because Tanner never issued a single purchase order or sales confirmation to FSMS.

Tanner's request to change its theory of the case thus came on the eve of the debunking of its contract-construction defense. But the facts that Tanner now proposes to allege were known to it long ago. Tanner's Rule 30(b)(6) witness testified

that he was planning to re-trade the contract "less than a week" after signing it, because "a lot had changed." Scalia Dep. (Ex. 16), p. 265. As early as March 2021, McGuireWoods asserted that "FSMS deliberately misrepresented the nature and extent of its connections to personnel at Orient Gene," that "FSMS was small a company," and that FSMS "was unable to be a reliable supplier." Letter from W. Boddy to M. Figueiredo ¶¶ 12, 12.2, 16.2 (March 3, 2021) (Ex. 13). In its October 2023 Answer and Counterclaim, Tanner again stated that FSMS "misrepresented its capabilities." Answer p. 1 (ECF 120) (Preliminary Statement). But Tanner did not allege fraudulent inducement or misrepresentation, and it did not seek damages or recission, even though Rule 8(c) requires fraud to be pled as an affirmative defense.

In these circumstances, the Court would be justified in concluding that Tanner acted in bad faith by changing its core theory of the case so late in the day. "Where the facts upon which the new claim are based were known at the time of the original complaint, and indeed, pled in that complaint, it is not an abuse of discretion to find bad faith." *Ferguson*, 162 F. Supp. 2d at 441; *Orban v. Nationwide Tr. Servs., Inc.*, 2015 WL 4132935, at *4 (W.D.N.C. July 8, 2015) (same).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to amend their answer and counterclaims to assert claims and defenses sounding in misrepresentation (*i.e.*, Defendants (proposed) Seventh Defense and First and Second Counterclaims). The Court should also deny Defendants motion to amend their prayer for relief to seek recission, disgorgement, compensatory damages, and punitive damages.

This the 3rd day of September, 2024.

/s/ Kent A. Yalowitz

Kent A. Yalowitz (admitted *pro hac vice*)
N.Y. State Bar No. 2188944
Carmela T. Romeo (admitted *pro hac vice*)
N.Y. State Bar No. 5058151
**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
250 W 55th Street
New York, NY 10019
212-836-8000
kent.yalowitz@arnoldporter.com
carmela.romeo@arnoldporter.com

  – and –

Eliseo R. Puig (admitted *pro hac vice*)
Colorado State Bar No. 49022
**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
303-863-1000
eliseo.puig@arnoldporter.com

/s/ Lex M. Erwin

Lex M. Erwin
N.C. State Bar No. 34619
David A. Luzum
N.C. State Bar No. 41398
Kevin Y. Zhao
N.C. State Bar No. 53680
**MAYNARD NEXSEN PC**
227 W. Trade Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 339-0304
Facsimile: (704) 338-5377
lerwin@maynardnexsen.com
dluzum@maynardnexsen.com
kzhao@maynardnexsen.com

*Counsel for Plaintiff*

**CERTIFICATION**

Pursuant to the Court's June 18 2024 Standing Order regarding Use of Artificial Intelligence, the undersigned certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line research sources WestLaw, Lexis, Fast-Case, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

_/s/ Lex M. Erwin_
Lex M. Erwin

27