EXHIBIT 1

# DISTRIBUTION AGREEMENT

## FS Medical Supplies, LLC and TannerGAP, Inc.

This Distribution Agreement (this "**Agreement**") is made as of the 11th day of September 2020 (the "**Effective Date**") by and between:

(a) **TannerGAP, Inc.**, with its registered place of business at 1808 Associates Lane, Suite A, Charlotte, North Carolina 28217 in the United States of America ("**USA**") and it sister European company **Tanner Pharma UK Limited**, a company organized under the laws of England and Wales, with offices at the Tithe Barn, Harpendenbury Farm, Redbourn, St. Albans, Hertfordshire, AL3 7QA United Kingdom (hereinafter referred to as "**TANNER**")

and

(b) **FS Medical Supplies, LLC**, with its registered place of business at 20400 Stevens Creek Blvd., Suite 700, Cupertino, CA 95014 in the USA or any of its affiliates (hereinafter referred to as "**FSMS**").

TANNER and FSMS are hereinafter individually referred to as a "**Party**" and collectively as the "**Parties**".

## RECITALS

A. **WHEREAS**, TANNER is an international pharmaceutical service provider with extensive knowledge and experience in the distribution of pharmaceutical products on a global basis, including the servicing of requests for a particular medicine in markets where that medicine is not licensed. This includes the handling of inbound requests from hospitals, Ministries of Health and the importers they use, then managing the importation and distribution activities for such products. TANNER maintains a global Quality Management System to the highest EU Good Distribution Practices ("**GDP**") standards, including Standard Operating Procedures ("**SOPs**"), and it has a clean audit history with the respective regulatory agencies that issue its licenses. It has developed a global network of GDP-compliant storage facilities with the capacity to handle the distribution of products in global markets of interest.

B. **WHEREAS**, FSMS is engaged in, among other things, the supply and sale of finished Personal Protective Equipment and Diagnostic Rapid Tests; and

C. **WHEREAS**, TANNER and FSMS desire to establish a relationship, pursuant to which FSMS (or its appropriate affiliates) will supply TANNER Covered Products for the Territory (as those terms are hereafter defined), and TANNER, desires to purchase Covered Products for supply in the Territory (as hereinafter defined), on the terms and conditions set forth below.

**NOW, THEREFORE**, in consideration of the foregoing premises, and the mutual covenants and obligations set forth herein, FSMS and TANNER hereby agree as follows:

1. **Incorporation of Recitals.** The Recitals set forth above are hereby acknowledged and admitted by the Parties to be true and accurate and are hereby incorporated into the terms of this Agreement.

2. **Distribution Term.** The distribution term of this Agreement will be for three (3) years beginning on the Effective Date (the "**Distribution Term**" or "**Term**"), and shall automatically renew at each third anniversary for an additional three (3) year term unless terminated by either Party by giving written notice to the other Party at least ninety (90) days, but no more than one hundred twenty (120) days, prior to the end of the then-current three (3) year term.

3. **General Performance Obligations.** Each Party shall bear the cost of said Party's performance of this Agreement. Each Party shall comply with all laws and regulations applicable to the Party's performance of this Agreement.

    3.1. In performing this Agreement, TANNER shall ensure that (i) the distribution and sale of Covered Products and, (ii) its activities and the activities of its third-party contractors and affiliates in performing this Agreement, comply at all times during the Distribution Term with applicable laws, statutes, regulations, regulatory requirements, rules, decrees, codes and policies in force in the ("**Applicable Laws**"), including Applicable Laws in each country in the Territory, including any special import authorizations required ("**Special Importation Authorization**") of Covered Products. FSMS shall have no obligation and bear no expense for compliance with Applicable Laws in the Territory, including, without limitations, any requirements to register, provide expertise for any other person to register, provide assistance for importation matters, or advise or assist on regulatory, legal, importation or sales matters in the Territory; provided however, FSMS shall provide assistance to TANNER to enable TANNER to export Covered Products to the Territory in accordance with Applicable Laws by providing TANNER the necessary documentation (including but not limited to a Certificate of Analysis, a Free Sales Certificate, Proof of GMP Compliance, BSE/TSE Certificate of Compliance, etc.) needed to be able to legally ship the Covered Products to the Territory, clear customs and enter into the Territory.

    3.2. TANNER may subcontract, delegate or otherwise assign portions of its performance under this Agreement to its affiliates or third-party service providers with FSMS's prior written approval, such consent not to be unreasonably withheld. If FSMS provides such approval, (i) TANNER may disclose to such entities the FSMS Confidential Information necessary to perform the services, (ii) TANNER shall ensure that each such affiliate subcontractor or third party is bound by obligations of confidentiality and non-use requiring that FSMS Confidential Information will remain subject to the Confidentiality provisions of Section 20, and (iii) FSMS's approval to the use of any subcontractor or affiliate does not relieve TANNER of any of its obligations hereunder and TANNER will at all times remain primarily liable for the performance of all its obligations under this Agreement.

4. **Covered Product(s).** The Covered Products during the Distribution Term of this Agreement may vary from time to time, but include personal protective equipment (including, but not limited to, respirators, masks, gloves, gowns, bodysuits and hand sanitizer) and diagnostic rapid tests (including, but not limited to, the Healgen IgG/IgM Antibody Rapid Test Cassette, the Orient Gene Biotech Antigen Rapid Test Kit also branded Healgen Antigen Rapid Test Kit and the Beijing Lepu Medical Technology Co, LTD Antigen Rapid Test Kit) that FSMS has or will procure from various appropriately licensed manufacturers in international markets (the "**Covered Products**").

5. **Territory.** The Territory means any country in the world outside of the United States.

6. **Special Importation Authorization.** "**Special Importation Authorization**" means the supply of Covered Products as authorized by Applicable Law (i) to a healthcare system, hospital, clinic, Ministry of Health, Secretary of Health, importer of record, distributor, company or other licensed entity lawfully permitted to receive and distribute the Covered Products in the Territory for ultimate use by persons and healthcare providers ("**Customers**") in the Territory; and/or (ii) to countries where the government is sponsoring Covered Product tenders; provided, however, that TANNER will collaborate with FSMS prior to TANNER submitting a bid in connection therewith, including the estimated quantities of Covered Products to be supplied pursuant to such tender. In all of the foregoing situations, TANNER shall ensure that the government authorities and

Page 2 of 13

Case 3:21-cv-00501-RJC-WCM    Document 188-1    Filed 09/03/24    Page 2 of 13

DocuSigned by:
BFB
Signer Name: Banks Bourne
Signing Reason: I approve this
Signing Time: 11-Sep-2020 |

TannerUK00000547

Applicable Law in the country of destination legally permit the importation of the Covered Products for supply for a government sponsored tender for the Covered Products in the Territory.

7. **Appointment and Restrictions.** FSMS hereby agrees to work with TANNER as an authorized reseller or distributor of Covered Products, for supply on its own account of the Covered Products to Customers in the Territory in accordance with Applicable Law on a Special Importation Authorization basis or for government sponsored tenders for the Covered Products that are provided by FSMS for Tanner to supply in the Territory. TANNER hereby agrees to purchase the Covered Products from FSMS (or directly from the manufacturer of a Covered Product if directed by FSMS) to supply such Covered Products in the Territory on a Special Importation Authorization basis or for a government tender subject to the terms of this Agreement.

    7.1. TANNER shall collaborate with FSMS prior to quoting, shipping or otherwise distributing Covered Product in any country for the first time.

    7.2. TANNER shall be responsible for obtaining the required permission from relevant governmental authorities in the Territory to distribute Covered Product(s) to said Territory for the ultimate legal use by local Customers in that Territory under Applicable Laws on either a Special Importation Authorization basis or to supply a government authorized tender. TANNER will maintain confidential records in its Charlotte warehouse facility of the name, address and local licensing evidence of the entity it supplies Covered Products to in the Territory to distribute to local Customers along with the government permission allowing TANNER to import Covered Product(s) into the Territory pursuant to Special Importation Authorization requests; and, for its shipments to supply government sponsored tenders for the Covered Products in the Territory, TANNER shall maintain records of the requirements of the tenders it is bidding on and share those requirements with FSMS, then upon winning a tender in the Territory TANNER shall supply FSMS with evidence that it won the government tender. Subject to confidentiality requirements that TANNER may have by contract or under Applicable Laws, TANNER will make available to FSMS the information that FSMS reasonably requests describing the number of Covered Products being exported to the particular countries of the Territory and additional details may be provided to FSMS when such information is available, such as the names of the doctors, hospitals and/or clinics, but TANNER is only obligated to provide FSMS such information (i.e., relating to the aforementioned records that TANNER maintains in its Charlotte office) that it is permitted to share pursuant to Applicable Law in the Territory and its existing agreements; provided however, TANNER will supply summaries to FSMS of the amounts of Covered Products ordered and then supplied to the particular country markets of the Territory from time to time in the reporting form and frequency as the Parties may agree to after good faith negotiations.

8. **Sale and Purchase of Product.**

    8.1. Upon and subject to the terms and conditions of this Agreement, FSMS hereby agrees to supply TANNER Covered Product for sale and distribution and use in the Territory, as specified herein. FSMS shall use commercially reasonable efforts to supply Covered Products in quantities requested by TANNER. The Parties acknowledge that FSMS is not the manufacturer of any Covered Product and is subject to availability of Covered Products from the manufacturer of such Covered Product. The Parties shall work together to satisfy Covered Product requirements to TANNER customers. FSMS is not in a position to guarantee Covered Product quantity or quality. That can only come from the relevant manufacturer of such Covered Product FSMS has entered into or will enter into a contract with each manufacturer of a Covered Product that will include language of the delivery timing and product quality with any recourse for delivery or quality issues. FSMS will pass this through to any contract or PO with TANNER and TANNER will look only

DocuSigned by:
RFB   LC
Signer Name: Banks Bourne
Signing Reason: I approve this
TannerUK00000548

to the manufacturer for any issues or damages related to late delivery or quality issues. Notwithstanding the foregoing sentences, FSMS shall comply with TANNER's standard terms and conditions which are attached hereto and made part hereof as **Exhibit B**; in the event of a conflict between the terms and conditions set forth in Exhibit B and this Agreement, this Agreement shall control.

    8.2.    TANNER agrees that it shall purchase Covered Products from FSMS for use in accordance with the terms of this Agreement.

9. **Unit Price for Covered Products.** The price ("**Unit Price**") payable by TANNER to FSMS for each package unit of a Covered Product identified in the Agreement shall be the true direct cost (the "**Direct Cost**") of the product as purchased by FSMS from its manufacturer/supplier, including all Direct Costs of transportation and duty, tariffs and taxes, plus half of the Gross Profit collected from the sale of the product to TANNER's customer. The Unit Price is subject to change, at the discretion of FSMS and TANNER, based on supplier or market conditions; provided however, FSMS and TANNER shall honor the prices originally agreed to in Purchase Orders and Sales Order Confirmations between FSMS and TANNER and for the supply of government tenders in the Territory when TANNER is granted the right to supply the tender.

10. **Orders.** If TANNER identifies an opportunity to quote the Covered Products for a customer in the Territory, then TANNER will collaborate with FSMS to set the best price to maximize the likelihood of winning the business and making a profit. If TANNER's quote is successful and TANNER desires to purchase units of a Covered Product, then TANNER shall deliver a written or electronic purchase order (each, a "**Purchase Order**" or "**PO**"), during the Distribution Term for the Covered Products stating the quantity of units of the Covered Product along with a statement from TANNER that it has received approval from the government authorities in the Territory to import the ordered Covered Product(s) into the Territory. TANNER's order for the Covered Product constitutes an offer by TANNER to purchase the Covered Products in accordance with this Agreement. TANNER's order shall be deemed accepted when FSMS provides any written confirmation of the PO (a "**Sales Order Confirmation**") including via email or authorizes shipment of the relevant Covered Products to TANNER through FSMS's standard and usual distribution channel. This Agreement shall allow TANNER to enter into a direct PO or contract with the manufacturer of a Covered Product so long as the financial arrangement outlined in Section 9 above shall be maintained as if TANNER purchased Covered Products directly from FSMS with a 50% gross profit participation to each Party.

11. **Purchase Order Fulfillment; Delivery.** TANNER and FSMS will work together on logistics for shipment of Covered Products either to TANNER's Customer directly or to a TANNER warehouse facility or otherwise as the Parties determine on a case-by-case basis. In any case, the cost of delivery of the Covered Products from manufacturer to end Customer shall be considered a Direct Cost in determining the gross profit.

12. **Payment for Delivered Ordered Covered Products.** The timing of payment to the manufacturer, FSMS or any logistics company shall be agreed upon for each PO.

13. **Returns.** TANNER may return Covered Products as permitted by the Returned Goods Policy provided by each manufacturer.

14. **Representations and Warranties.**

    14.1.    Each of TANNER and FSMS represents and warrants to the other as follows:

        14.1.1.    it is a corporation duly organized, validly existing and in good standing in the jurisdiction of its incorporation; it is qualified and has all necessary rights, licenses, permissions and consents

DocuSigned by:
RFB
Signer Name: Banks Bourne
Signing Reason: I approve th
Signing Time: 11 Sep 2020 1

(collectively "**Required Consents**") to do business and in good standing in every jurisdiction where qualification and Required Consents are required in connection with its obligations hereunder;

14.1.2. It qualifies as an authorized trading partner of FSMS and has implemented a system to support suspect product verification and disposal, each as may be defined or required by product security rules or laws in the Territory if and when applicable.

14.1.3. it has the full right, corporate power and authority to enter into this Agreement and to perform its obligations hereunder and it shall perform its obligations and activities in accordance with all Applicable Laws and shall monitor any proposed changes to Applicable Law and develop and implement plans to accommodate such changes;

14.1.4. when executed and delivered by each of FSMS and TANNER, this Agreement will constitute the legal, valid and binding obligation of FSMS and TANNER, enforceable against such Party in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally or the effect of general principles of equity (regardless of whether considered in a proceeding at law or in equity);

14.2. TANNER further represents, warrants and covenants to FSMS as follows:

14.2.1. it does and shall comply Applicable Laws in the Territory and the United States governing the performance of its obligations under this Agreement and the conduct of its business, including, without limitation, the purchase, handling, sale, and distribution of Covered Products pursuant to this Agreement. TANNER shall ensure that each Customer (in the case of Special Importation Authorization of Covered Products) to whom the Covered Product(s) is shipped by TANNER, at the time of such shipment, has supplied the required documentation to TANNER under Applicable Laws to receive such shipment(s).

14.2.2. it shall (i) provide Covered Products only to Customers or government tenders as permitted by Applicable Laws in the Territory and as permitted by Applicable Laws in the United States and to the laws of the country to which the Covered Product is being sent, (ii) not ship, deliver, or otherwise transfer, or permit the shipment, delivery or other transfer, of any Covered Product(s) to any person or entity except as provided for under this Agreement, and (iii) without limiting any other provision of this Agreement, TANNER shall not sell or offer for sale any Covered Product purchased or acquired from any third party except as TANNER may be required to do under Applicable Law as previously provided for under this Agreement;

14.2.3. it shall not amend, modify, change, add to, translate or alter in any way any materials and/or labels affixed to ordered Covered Products, packaging, or any other documentation provided by FSMS without the prior written consent of FSMS;

14.2.4. it shall handle, maintain, store, transport, deliver and/or otherwise manage and distribute ordered Covered Product in accordance with the handling and storage requirements applicable to each ordered Covered Product as contained in the package insert for the ordered Covered Product approved by the United States of America Food and Drug Administration and to the laws of the country to which the Covered Product is being sent and any other specific instructions provided by the FSMS in writing to TANNER, all at its own cost and in accordance with Applicable Laws.

DocuSigned by:
RFB
Signer Name: Banks Bourne
Signing Reason: I approve this
Signing Time: 11-Sep-2020
TannerUK00000550

14.3. TANNER shall use its commercially reasonable efforts to ensure that the Covered Products are imported into the Territory with a minimum of delay and to attend to and complete in a proper and efficient manner all necessary documents and formalities in connection with such importation. FSMS shall pass through to TANNER the contractual rights from each respective manufacturer with respect to covenants that the ordered Covered Products, when delivered to a carrier for shipment to TANNER, shall (i) be free from contaminants and defects, and will conform to the specifications for the Covered Product contained in the Covered Product labeling; and (ii) have been manufactured, stored, tested, labeled, packaged, sold, and shipped in accordance with Applicable Laws in the United States and to the laws of the country to which the Covered Product is being sent.

14.4. Further, TANNER shall notify FSMS, in writing (i) not later than forty-eight (48) hours following receipt of goods with defects reasonably discoverable upon visual inspection without unloading individual shipping units; or (ii) not later than forty-eight (48) hours after it learns of, or is notified of, a defect(s), for defects not reasonably discoverable by visual inspection. Along with notice of any defects, TANNER shall furnish to FSMS a description of the nature of the defect. TANNER shall reasonably cooperate with FSMS in investigating the cause of any defect in an ordered Covered Product and if the cause of said defect is not due to TANNER's negligence or omissions, then in that event, TANNER shall look to the manufacturer of such Covered Product for any recourse.

14.5. **Warranties Disclaimer.** EXCEPT FOR THE LIMITED EXPRESS WARRANTIES DESCRIBED ABOVE IN THIS SECTION 14, AS APPLICABLE, NEITHER FSMS NOR TANNER, NOR ANY PERSON ON BEHALF OF FSMS OR TANNER, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WHATSOEVER, INCLUDING ANY WARRANTIES WITH RESPECT TO COVERED PRODUCT OF: (i) MERCHANTABILITY, (ii) FITNESS FOR A PARTICULAR PURPOSE, (iii) NONINFRINGEMENT, OR (iv) PERFORMANCE OF COVERED PRODUCT TO STANDARDS SPECIFIC TO THE TERRITORY, WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED.

<u>FSMS SPECIFICALLY DISCLAIMS ANY LIABILITY WITH RESPECT TO ANY COVERED PRODUCTS THAT TANNER OR ANY THIRD PARTY HAS ALTERED, MODIFIED OR TAMPERED WITH, SUBJECT TO MISUSE, NEGLIGENCE OR OTHERWISE DAMAGED, OR THAT HAVE BEEN STORED, HANDLED, OR USED IN A MANNER CONTRARY TO APPLICABLE LAWS OR REGULATIONS OR FSMS's DIRECTION; FOR THE AVOIDANCE OF DOUBT, FSMS SHALL REMAIN LIABLE FOR COVERED PRODUCTS THAT IT DESIGNED, OWNED, MANUFACTURED, PACKAGED, STORED OR MISHANDLED WHILE SAID COVERED PRODUCTS WERE IT ITS POSSESSION AND/OR UNDER ITS CONTROL.</u>

## 15. Insurance.

15.1. Each Party shall maintain, and shall cause its affiliates and other subcontractors hereunder to maintain, comprehensive general liability insurance, including product liability insurance, against claims regarding its ownership of and/or its handling of the Covered Products, in such amounts as it customary maintains for its activities in such amounts, as are commercially reasonable in the pharmaceutical industry in light of the business conducted by the particular Party.

## 16. Termination.

16.1. Either Party may terminate this Agreement:

Case 3:21-cv-00501-RJC-WCM   Document 188-1   Filed 09/03/24   Page 8 of 13

DocuSigned by:
KFB
Signer Name: Banks Bourne
Signing Reason: I approve this d
Signing Time: 11-Sep-2020 | 16:
TannerUK00000551

16.1.1. upon written notice to the other Party in the event that the other Party commits any breach of this Agreement and fails to remedy such breach within thirty (30) days after receiving written notice from other Party; or

16.1.2. upon written notice to the other Party upon the filing of a bankruptcy or other insolvency proceeding by or against the other Party, or the appointment of a trustee, receiver or liquidator for all or any substantial part of the assets or business of the other Party, that is not dismissed within sixty (60) days.

16.2. TANNER may terminate this Agreement for any reason with ninety (90) days prior written notice to FSMS, provided that no such termination shall be effective prior to TANNER's fulfillment of all obligations undertaken or liability incurred prior thereto.

16.3. FSMS may terminate this Agreement, in whole or in part, including, without limitation, deletion of a country from the Territory, for any reason, with ninety (90) days prior written notice to TANNER with the understanding that, if FSMS terminates this Agreement, FSMS agrees to support the supply the ordered Covered Products to TANNER from the manufacturer (consistent with the estimated quantities of ordered Covered Products requested by TANNER pursuant to the requirements of this Agreement which are needed to fill government tenders that have been approved by FSMS for bidding in writing pursuant to this Agreement and for the period required when government tenders were won by TANNER during the Distribution Term of this Agreement.

16.4. In the case of termination by either Party, the separate Mutual Non-Disclosure & Non-Circumvention Agreement dated June 8, 2020 between the Parties shall remain in place and in effect and neither Party shall circumvent the other Party with any relationship originally established by the first Party. To be clear, the manufacturer of any Covered Product shall be considered a prior relationship of FSMS in regard to the Covered Product and TANNER will not do any business involving of said Covered Products from such manufacturer.

## 17. Adverse Events and Complaints.

TANNER shall report any Adverse Events and/or Product Complaints to FSMS pharmacovigilance department within three (3) business days of TANNER's cognizance in accordance with TANNER's SOPs and to the local regulatory authority of the applicable Territory if required to do so and within the timeline required under local Applicable Laws. TANNER shall provide to FSMS monthly line listings of Adverse Events/Product Complaints received on the Product or weekly in the event of Adverse Events.

## 18. Recall.
TANNER shall promptly notify FSMS if any Covered Product is subject to a recall (hereinafter a "**Recall**") in the Territory and FSMS shall notify TANNER if any Covered Product is subject to a Recall in the United States of America and/or the country where the Covered Products are manufactured. FSMS shall instruct TANNER regarding any such Recalls in the Territory and TANNER shall co-operate fully with FSMS in conducting the recall. Except as otherwise required by law, TANNER shall be responsible for handling Recalls in the Territory and shall be responsible for the costs of the Recall in the Territory if TANNER has directly caused the need of the Recall by its breach of this Agreement during its handling of the Covered Products otherwise, the cost of the Recall will be borne by the manufacturer as dictated in the manufacturing agreement.

## 19. Data Reports.

19.1. The Parties agree that, no later than sixty (60) days after the Effective Date of this Agreement, they will implement regular product reporting transmitting to FSMS mutually agreed data

Page 7 of 13

Case 3:21-cv-00501-RJC-WCM   Document 188-1   Filed 09/03/24   Page 7 of 13

DocuSigned by:
RFB
Signer Name: Banks Bourn
Signing Reason: I approve
TannerUK00000552

elements ("**Data Reports**"), on at least a monthly basis, so that FSMS will receive, for all ordered Covered Product, information as permitted by Applicable Law, regarding the quantity, use and destination of all ordered Covered Products. Notwithstanding anything herein to the contrary, FSMS shall have the right, during and after the term of this Agreement, to use and disclose the Data Reports (to the extent permitted by law) for FSMS's business purposes.

19.2. Except as required by Applicable Laws, TANNER agrees to not disclose any data related to Covered Product withdrawal, Covered Product sales, or other Covered Product data included in its electronic data system to: (i) any third party pharmaceutical data reporting services provider (each a "**Data Reporting Service**"); or (ii) to any affiliate or other third-party, which to TANNER's actual knowledge, intends to disclose such electronic data to a Data Reporting Service, without FSMS's prior written consent (which shall not be unreasonably withheld or conditioned), unless in each case, such data is aggregated with similar data from other suppliers in a manner that does not specifically identify either the FSMS or any of the Covered Products. For the avoidance of doubt, nothing herein is intended to limit TANNER's right to notify a third-party that, pursuant to this Agreement, TANNER is bound by certain restrictions relating to the disclosure of electronic data relating to the Covered Products.

19.3. Additionally, to the extent permitted by law, TANNER will provide FSMS a monthly data report that includes the country of destination, inter distribution center transfers (if applicable), and depending on accessibility on the information and subject to Applicable Laws and regulations, TANNER will provide Customer, healthcare system, and other information requested by FSMS.

## 20. Confidentiality.

20.1. In carrying out the terms of this Agreement it may be necessary, from time to time, for a Party to disclose (the "**Disclosing Party**") to the other Party (the "**Recipient**") certain Confidential Information. The Recipient shall not use the Disclosing Party's Confidential Information for any purpose other than for the purposes of fulfilling its obligations under this Agreement. The Recipient shall disclose Confidential Information only to those of its employees and other contracted representatives (all being hereinafter referred to as its "**Representatives**") requiring knowledge thereof in connection with their duties directly related to the implementation of this Agreement, and said Representatives shall hold the Confidential Information in confidence pursuant to this Agreement. The Recipient agrees that it will exercise the same degree of care and protection to preserve the proprietary and confidential nature of the Confidential Information disclosed by the Disclosing Party, as Recipient would exercise to preserve its own proprietary and confidential information, and in any case, no less than a reasonable degree of care. The Recipient shall promptly notify the Disclosing Party of any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of the Disclosing Party's Confidential Information of which the Recipient becomes aware.

20.2. Confidential Information shall not be deemed to include information that (i) was known to the Recipient other than on a confidential basis at the time of its disclosure hereunder and such knowledge is documented in records made by the Recipient prior to the disclosure, which records the Recipient shall furnish to the Disclosing Party at the latter's request; or (ii) is or later becomes generally available to the public through no wrongful action or inaction of the Recipient; or (iii) is given to the Recipient on other than a confidential basis by a third party who is lawfully in possession of such information and not subject to a contractual or fiduciary relationship to the Disclosing Party with respect thereto; or (iv) is independently developed by the Recipient without

Page 8 of 13

Case 3:21-cv-00501-RJC-WCM   Document 188-1   Filed 09/03/24   Page 8 of 13

DocuSigned by:
Signer Name: Banks Bourn
Signing Reason: I approve
TannerUK00000553

the aid, application or use of the Disclosing Party's Confidential Information (and such independent development can be properly demonstrated by the Recipient)

20.3. Nothing shall prevent the Recipient from disclosing the Disclosing Party's Confidential Information required by law, regulation, rule, act, subpoena or order of any governmental authority, court or agency or similar legal process to be disclosed by the Recipient; provided, however, that such Recipient gives the Disclosing Party sufficient advance written notice (if permitted by law) to permit it to seek a protective order or other similar order with respect to such Confidential Information and thereafter discloses only the minimum information, in the reasonable opinion of the Recipient's legal counsel, required to be disclosed in order to comply, whether or not a protective order or other similar order is obtained by such Disclosing Party. Any Confidential Information so disclosed shall maintain its confidentiality protection and nonuse restrictions for all purposes other than such legally compelled disclosure.

20.4. Upon the expiration or earlier termination of this Agreement, the Recipient shall, as the Disclosing Party shall direct in writing, either destroy (and shall provide the Disclosing Party with certification of such destruction) or return all Confidential Information disclosed to it hereunder, in whatever form contained, including all notes or memoranda made by its Representatives obtained or derived from any such Confidential Information, including any listing that identifies the documents that were provided; provided, however, that the Recipient may retain one (1) copy of the Confidential Information in a secure location for purposes of identifying such Receiving Party's obligations under this Agreement. Provided further, this obligation to return or destroy Confidential Information does not extend to automatically generated computer back-up or archival copies generated in the ordinary course of information system procedures, provided that except as expressly provided herein, the Recipient shall make no use of such copies.

20.5. Each Party further understands and acknowledges that, due to the unique nature of each Party's Confidential Information, any unauthorized disclosure of any portion of the Disclosing Party's Confidential Information may cause irreparable injury to the Disclosing Party and that no adequate or complete remedy may be available to the Disclosing Party to compensate for such injury. Accordingly, each Party hereby acknowledges that the Disclosing Party may be entitled to seek injunctive relief in the event of such unauthorized disclosure by the Recipient or any of its Representatives in addition to whatever other remedies it might have at law or in equity. The Recipient, for itself and for any of its Representatives, agrees to waive any requirements for security or the posting of any bond in connection with such injunctive relief remedies being sought pursuant to this Section 20.5.

20.6. The provisions relating to confidentiality in this Section 20 shall remain in effect following termination of this Agreement for a period of five (5) years.

21. **Independent Contractors.** The Parties are independent contractors. Nothing in this Agreement shall be construed to create any venture or entity that is inconsistent with the Parties' status as independent contractors. Neither Party shall take any action or make any representation that would suggest that any relationship exists between the Parties other than that of independent contractors. Neither Party shall have any right or authority to assume or create any obligations on behalf of the other Party, express or implied, nor shall either Party represent to any person that the Party has such authority or that the Party serves the other Party in any capacity other than as an independent contractor.

*LC*

DocuSigned by:

*RFB*

Signer Name: Banks E
Signing Reason: I app
Signing Time: 11-Sep-

TannerUK00000554

22. **Mutual Indemnification.** Each Party (the "**Indemnifying Party**") shall indemnify and defend the other Party (the "**Indemnified Party**") against any claims asserted against the Indemnified Party by a third party for losses, injuries, or damages caused by the Indemnifying Party's breach of its obligations under this Agreement.

23. **Force Majeure.** If a Party is reasonably prevented from performing an obligation of this Agreement because of fire, flood, wind, earthquake, explosion or other disaster, acts of military authorities, acts of civil authorities unrelated to any violation of law by the Party, war, riot, insurrection, pandemic, act of terrorism or other cause beyond the Party's reasonable control (collectively, a "**Force Majeure Event**"), then that Party shall not be in breach of the Product Agreement during the period that said Party is prevented from performing the obligation because of the Force Majeure Event provided that the Party (i) promptly delivers notice to the other Party identifying the Force Majeure Event and (ii) immediately uses best efforts to perform the obligation notwithstanding the Force Majeure Event.

24. **Exclusion of Consequential Damages.** NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF BUSINESS OR PROFITS. THE FOREGOING LIMITAITONS DO NO APPLY TO LIABILITY ARISING FROM OBLIGATIONS OF CONFIDENTIALITY OR INDEMNIFICATION.

25. **Assignment.** Neither Party may assign any rights or obligations under this Agreement without the other Party's prior written consent, which no Party shall unreasonably withhold.

26. **Notices.** Any notice from one Party to the other Party related to this Agreement shall be in writing and shall be deemed to be given (i) upon delivery if by overnight courier, or (ii) when sent via email with evidence of sending and no delivery failure notice to the receiving Party's Notice Address below. Either Party may change its Notice Address upon delivery of notice to the other Party.

27. **Severability.** If a court or other body of competent jurisdiction declares any term of this Agreement invalid or unenforceable, then the remaining terms shall continue in full force and effect.

28. **Non-Waiver.** No right created by this Agreement shall be deemed waived unless specifically and expressly waived in a writing signed by the Party possessing the right.

29. **Singular and Plural Forms.** The use herein of the singular form shall also denote the plural form, and the use herein of the plural form shall denote the singular form, as in each case the context may require.

30. **Governing Law.** This Agreement shall be governed by the laws of the State of Delaware, without regard to that state's conflicts of law provisions.

31. **Prevailing Party.** If a Party prevails against another Party regarding any claim arising from or related to this Agreement, then the non-prevailing Party shall reimburse the prevailing party for necessary costs, expenses, and attorneys' fees reasonably incurred by the prevailing party regarding that claim.

32. **Entire Agreement; Amendment.** This Agreement constitutes the entire agreement and understanding of the Parties regarding the subject matter of this Agreement and supersedes all prior written and oral agreements, proposals, and understandings between the Parties regarding the subject matter of this Agreement. No changes to this Agreement shall be effective unless signed by each Party.

*LC*

(Signature page follows)

DocuSigned by:
*RFB*
Signer Name: Banks F
Signing Reason: I app
Signing Time: 11-Sep-
6BC4AF749051438F

TannerUK00000555

Page intentionally left blank 

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the Effective Date first above written.

| FS Medical Supplies, LLC | TannerGAP, Inc. and Tanner Pharma UK Limited |
|---|---|
| By: *Laird Cagan* | By: [DocuSigned signature]<br>Signer Name: Banks Bourne<br>Signing Reason: I approve this document<br>Signing Time: 9-Sep-2020 \| 16:06 EDT<br>6BC4AF749051438FBEAA216FFD24EA4F |
| Name: Laird Q. Cagan | Name: Raymond F. Bourne |
| Title: President & CEO | Title: President and Director |

Notice Address:

FS Medical Supplies, LLC
Attention: Laird Q. Cagan
20400 Stevens Creek Blvd., Suite 700
Cupertino, CA 95014
Telephone: +1-650-823-5559
Facsimile: +1-408-904-6085
Email: laird@FSMedicalSupplies.com

Notice Address:

TannerGAP, Inc.
Attention: General Counsel
1808 Associates Lane, Suite A
Charlotte, North Carolina 28217
Telephone: 1-704-552-8408 x222
Facsimile: 1-704-552-8411
Email: WTaylor@tannerpharma.com

Exhibit A

# FS Medical Supplies, LLC (FSMS) RETURN GOODS POLICY

**Effective Date:**


**All returns are handled directly with the manufacturer of such Product according to the contract in place with such manufacturer. And the costs associated with any return will be included in the Direct Cost calculation, or will be used to recalculate the Direct Costs of the transaction and are subject to 50% split as indicated in the Agreement above.**

**RETURNABLE PRODUCTS**


**NONRETURNABLE ITEMS (NO CREDIT WILL BE ISSUED)**


**DAMAGED IN SHIPPING AND SHORTAGES**


**PROCEDURE FOR RETURNING AND RECEIVING CREDIT**

All returnable product must be returned to FSMS at:

> FS Medical Supplies, LLC
> Attn:
> Address:


**TERMS**


**THIRD PARTY PROCESSOR INFORMATION**


*Return Goods Policy is subject to change*



DocuSigned by:
KFB
Signer Name: Banks
Signing Reason: I ap
Signing Time: 11-Se
6BC4AF749051438