EXHIBIT 13

McGuireWoods London LLP
11 Pilgrim Street
London
EC4V 6RN
Phone: +44 (0)20 7632 1600
Fax: +44 (0)20 7632 1638
www.mcguirewoods.com

# McGUIREWOODS

Mr Mark R. Figueiredo, Esq
Structure Law Group, LLP
1754 Technology Drive, Suite 135
San Jose, CA 95110
United States of America

Your Ref:
Our Ref: WB/CS/2077064-0005

3 March 2021

**By mail and email to:**
**mrf@structurelaw.com**

Dear Mr Figueiredo

***Distribution Agreement between TannerGAP, Inc. ("TannerGAP"), Tanner Pharma UK Limited ("Tanner UK") and FS Medical Supplies, LLC ("FSMS") dated 11 September 2020 ("Distribution Agreement")***

1. I represent TannerGAP and Tanner UK.

2. I refer to your two letters of 24 February 2021 to Mr William Taylor, Esq, General Counsel, regarding the Distribution Agreement. Capitalised terms used in this letter shall have the same meaning as in the Distribution Agreement unless otherwise stated.

3. Dealing first with some preliminary matters:

   3.1. My clients were understandably disappointed to receive your letter out of the blue, in circumstances where FSMS had indicated no dissatisfaction with the terms of their relationship with my clients. Indeed, FSMS was apparently perfectly happy to invoice for, and receive, significant payments from my clients without giving any indication that it did not agree with the gross profit share calculations provided or making any reservation of its rights whatsoever.

   3.2. I note that you allege that your client has claims against both TannerGAP and Tanner UK. Whilst, for the reasons set out in this letter, FSMS has no valid claim against either entity, it is plain that FSMS is not in a position even to assert a claim against TannerGAP. It is Tanner UK that has entered into the relevant contracts with Orient Gene and with the Department of Health and Social Care ("**DHSC**"); TannerGAP has had no involvement in these arrangements.

   3.3. Tanner UK did indeed enter into contracts directly with Orient Gene for the purchase of Coronavirus Antigen Rapid Test Kits (the "**Test Kits**"). It is expressly permitted to do so under the final sentence of Clause 10 of the Distribution Agreement and, in any event, it was your client that first suggested that the Test Kits be acquired directly by TANNER.

111248779_4

McGuireWoods London LLP, trading as McGuireWoods, is a limited liability partnership registered in England & Wales (registered number OC307641) and is authorised and regulated by the Solicitors Regulation Authority. A list of members and their qualifications is available at McGuireWoods London LLP's registered office, 11 Pilgrim Street, London EC4V 6RN, or on our website. The word 'partner', used in relation to McGuireWoods London LLP, refers to a member of McGuireWoods London LLP or an employee or consultant of McGuireWoods London LLP of equivalent standing.

McGuireWoods London LLP operates in affiliation with McGuireWoods LLP, a limited liability partnership registered in Virginia, USA, as part of a closely integrated international legal practice. Each of McGuireWoods London LLP and McGuireWoods LLP are separately constituted and separately regulated legal entities which provide legal and other client services in accordance with the relevant laws of the jurisdictions in which they respectively operate.

    3.4. Tanner UK has not misled FSMS in relation to the price paid to Orient Gene for the Test Kits. On the contrary, the fact that a lower price than $5.00 per unit was paid by Tanner UK was made clear as early as 24 October 2020 (more than four months ago), on a call between Messrs. Steve Scalia and Jonathan Bracey of my clients and Messrs. Laird Cagan and Jim Mao of your client.

4. You assert that FSMS is entitled to "*50% of the gross profits*", going on to describe this as "*the total revenue minus the actual cost of the* [Test Kits]". Later in your letter, you state that FSMS's entitlement is to an "*additional payment equaling 50% of the gross profit for all three tenders as defined in the Agreement, using the true Direct Cost with the actual Unit Price paid by Tanner to Orient Gene, with a credit for the payments already made by Tanner to FSMS*". You do not refer to any particular clauses of the Distribution Agreement, however your use of the capitalised terms "*Direct Cost*" and "*Unit Price*" suggests that your client seeks to rely upon Clause 9, which states:

> "**9. Unit Price for Covered Products.** *The price ("**Unit Price**") payable by TANNER to FSMS for each package unit of a Covered Product identified in the Agreement shall be the true direct cost (the "**Direct Cost**") of the product as purchased by FSMS from its manufacturer/supplier, including all Direct Costs of transportation and duty, tariffs and taxes, plus half of the Gross Profit collected from the sale of the product to TANNER's customer…*"

5. It is readily apparent that this clause (and the terms Direct Cost and Unit Price) do not apply to Tanner UK's purchase of Test Kits from Orient Gene to supply to the DHSC. In particular:

    5.1. The Unit Price is defined as the price payable by TANNER <u>to FSMS</u>. Here, nothing has been purchased from FSMS.

    5.2. The Direct Cost is defined as the true direct cost of the product <u>as purchased by FSMS from its manufacturer/supplier</u>. Likewise, FSMS did not acquire the Test Kits from Orient Gene.

6. Further, the Test Kits supplied by Tanner UK did not amount to "Covered Products" as defined by Clause 4 of the Distribution Agreement:

> "**4. Covered Product(s).** *The Covered Products during the Distribution Term of this Agreement may vary from time to time, but include personal protective equipment (including, but not limited to, respirators, masks, gloves, gowns, bodysuits and hand sanitizer) and diagnostic rapid tests (including, but not limited to, the Healgen IgG/IgM Antibody Rapid Test Cassette, the Orient Gene Biotech Antigen Rapid Test Kit also branded Healgen Antigen Rapid Test Kit and the Beijing Lepu Medical Technology Co, LTD Antigen Rapid Test Kit)* <u>*that FSMS has or will procure from*</u>

*various appropriately licensed manufacturers in international markets* (the "**Covered Products**")." (my emphasis)

7. The underlined portion is key; the parties did not agree that all Orient Gene Biotech Antigen Rapid Test Kit would be Covered Products, only those that "*FSMS has or will procure from various appropriately licensed manufacturers in international markets*". Plainly, the Test Kits supplied by Tanner UK to the DHSC are not ones that FSMS "*has or will procure*" from Orient Gene. They are not therefore Covered Products.

8. Your client's entitlement to payment (if any) arises as a result of Clause 10 of the Distribution Agreement, which states:

    "…*This Agreement shall allow TANNER to enter into a direct PO or contract with the manufacturer of a Covered Product so long as the financial arrangement outlined in Section 9 above shall be maintained as if TANNER purchased Covered Products directly from FSMS with a 50% gross profit participation to each Party.*"
    (again, my emphasis)

9. The sole requirement is that the financial arrangement in Clause 9 is maintained "*as if TANNER purchased Covered Products directly from FSMS with a 50% gross profit participation for each party*". My client has done so. The only price at which FSMS has offered to supply Orient Gene Biotech Antigen Rapid Test Kits to TANNER is $5.00 per unit.[1] Tanner UK has honoured the profit split that would have been due had it purchased the Test Kits from FSMS at that price.

10. With respect, there is no plausible commercial rationale for FSMS gaining the benefit of any price reductions negotiated with Orient Gene by Tanner UK. Not only would that be contrary to the terms of the Distribution Agreement, but it cannot have been the intention of the parties. Clause 21 of the Distribution Agreement makes clear that the parties are independent contractors; there is no intention to create a partnership or joint venture relationship. The onus is therefore plainly and rightly on your client to negotiate better terms with its own supplier if it wishes to maximise the sums due to it under this Distribution Agreement. It cannot sit back and take the fruit of Tanner UK's labours. Indeed, it is important to recognise that, as FSMS is not purchasing the product from Orient Gene, it bears no risk whatsoever in the transaction. By contrast, Tanner UK is exposed to the risk of having legally binding contracts with the DHSC and substantial prepayment commitments to Orient Gene in circumstances where, were Orient Gene to default, it faces uncertainty as to whether it would be able to recover the prepayment and/or damages from Orient Gene (given the inevitable need to pursue proceedings in a Chinese Court). Both exposures are potentially extremely significant given the quantities

---

[1] As documented by FSMS when invoicing Tanner for 50% of the cost of the sample Test Kits sent to the DHSC for initial validation testing.

involved and from which, by opting out of being a part of the supply chain, FSMS is entirely insulated.[2]

11. That the above analysis correctly reflects the terms of the Distribution Agreement is reflected in the fact that FSMS accepted the gross profit calculations supplied by Tanner UK and adopted the same when preparing its invoices, which were duly paid. Should FSMS seek to pursue this matter further, my clients will rely on the contents of those invoices, and the fact of their payment, for their full legal effect.

12. The reality is that FSMS demonstrated that it was unable to be a reliable supplier for Tanner UK of Test Kits in the quantities required for supply to the DHSC. In this regard, I would observe:

   12.1. FSMS was slow and unresponsive in its dealing with Tanner and Orient Gene from the outset, with FSMS personnel missing crucial calls altogether and being late to others as result of failing to prioritise the Orient Gene / DHSC opportunity appropriately. Quite simply, FSMS demonstrated that it was unable to move at the pace needed to secure high volume orders for Tests Kits from a governmental authority seeking instant responsiveness and supply chain transparency to mitigate the impacts of a global pandemic.

   12.2. FSMS was too small a company to shoulder the supply of the Test Kits in the volume required; a recent Dun & Bradstreet report reveals only 1 employee, with sales and revenue both estimated at around $48,098 per annum as at 3 December 2020. In addition to the logistical issue presented by the fact of moving negotiations, Orient Gene require significant sums upfront; they are not prepared to wait until the DHSC has paid Tanner UK for the price of the Test Kits.

   12.3. At Clause 14.5, the Distribution Agreement includes a blanket disclaimer of warranties in relation to the Covered Products including as to merchantability, fitness for purpose, non-infringement or performance. Needless to say, such disclaimer would not be acceptable to the DHSC and Tanner UK has been required to give the full usual range of warranties as to the quality and safety of the Test Kits to the DHSC. Naturally, Tanner UK would therefore only purchase from a supplier willing to giving the same warranties in turn. The terms of the Distribution Agreement permit Tanner UK to do so, as explained above.

   12.4. FSMS lacks the proper licences to be involved in the supply of the Tests Kits to the DHSC; not only does FSMS appear not to have any UK distribution licences, our clients have not been able to confirm that FSMS has the licences it may need to supply the Test Kits in its home state of California.

---

[2] This point is made without prejudice to any future argument our clients may choose to advance as to whether FSMS's actions were appropriate and/or satisfied its contractual obligations in this respect. Also see paragraph 16 below.

12.5. Finally, for Tanner UK to obtain Test Kits from FSMS, FSMS would need to be approved as a sub-contractor to Tanner UK by the DHSC. It appears unlikely, especially in light of the above points, that FSMS would be acceptable to the DHSC in that capacity.

13. Ultimately, FSMS's role in Tanner UK's supply of the Test Kits to the DHSC was as mere a introducer; it put my clients in touch with the Vice President Sales of Orient Gene, a person whose contact details are readily available online, at a company whose name and products were already known to them. FSMS has been rewarded handsomely for that role, having been paid approximately $6.5 million to date.

14. Your letters demand *"the purchase documents showing the actual purchase price(s) for each of the three tenders as well as the purchase order documents from the buyer (UK DHSC)"*. You do not identify any provisions of the Distribution Agreement that entitle your client to make this demand. Indeed it is apparent that no party has the right to make such demands under the Distribution Agreement, a position which cuts both ways. FSMS would not be obliged to disclose its agreement with a manufacturer/supplier to prove the true direct cost it has paid. In turn, Tanner UK has no such obligation to FSMS. Further, as you will appreciate, the documents demanded are in any event subject to confidentiality provisions that would prevent their disclosure to FSMS.

15. I trust that in light of the above, you will be able to advise FSMS that it does not have any claims against my clients and that normal commercial relations can resume between the parties.

16. Notwithstanding the dispute you raise, my clients trust that FSMS will avoid any steps that might disrupt Tanner UK's supply of the Test Kits to the DHSC and will refrain from making any comments that are defamatory of TANNER to their business partners. It would take such steps at its peril. Not only would my clients pursue all available legal redress in relation to the same but, further and in addition, Tanner UK reserves the right to seek the reimbursement of the c.$6.5 million already paid to FSMS, together with damages, (either in the event that FSMS took such steps and/or by way of countersuit in response to any claim legal FSMS may make to any entitlement to an increased profit share) on the basis that:

16.1. On a proper construction of Clause 10 and the meaning of Covered Products, the Test Kits supplied to the DHSC fall outside the scope of the Distribution Agreement and no payment was in fact due to FSMS;

16.2. FSMS deliberately misrepresented the nature and extent of its connections to personnel at Orient Gene and by so doing induced TANNER to enter into the Distribution Agreement;

16.3. The matters referred to at paragraph 12.1 above amounted to a breach of FSMS's undertaking pursuant to Clause 8.1 of the Distribution Agreement to *"use commercially reasonable efforts to supply Covered Products in quantities*

*requested by TANNER*". FSMS's attitude to attending calls with Orient Gene showed a careless and dismissive attitude that fell well short of the efforts that would be considered reasonable in the relevant industry; and

16.4. Further or alternatively, FSMS was in breach of the warranties and undertakings given at Clause 14.1.1 to the extent that, in light of investigations carried out recently, my clients believe that FSMS may lack the "*necessary rights, licenses, permission and consents*" required.

17. As noted above, if your client has any cause of action (which is denied) it is against Tanner UK only. Given that it would be advancing a claim against a UK company in relation to contractual arrangements entered into with a Chinese company and UK government entity, the Courts of England and Wales are plainly the appropriate jurisdiction. Tanner UK would contest jurisdiction should FSMS seek to bring proceedings in any other Court(s).

Yours sincerely

*William Boddy*

**William Boddy**
Partner
**McGuireWoods London LLP**
Direct Dial: + 44 (0)20 7632 1625
Email: wboddy@mcguirewoods.com