EXHIBIT 16

```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                   CHARLOTTE DIVISION


FS MEDICAL SUPPLIES, LLC,       )
                                )
              Plaintiff,        )
                                )   Civil Action Nos.
    v.                          )   3:21-CV-501-RJC-WCM
                                )   3:23-CV-598-RJC-WCM
TANNERGAP, INC., et al.,        )
                                )
              Defendants.       )
--------------------------------


         _____

              30(b)(6)VIDEOTAPED DEPOSITION
                           OF
                    TANNER PHARMA UK,
       BY AND THROUGH ITS CORPORATE REPRESENTATIVE,
                 STEPHEN SCALIA, VOLUME I
         _____



TAKEN AT THE LAW OFFICES OF:
MCGUIREWOODS, LLP
201 North Tryon Street, Suite 3000
Charlotte, NC 28202



                     08-23-2024
                  9:26 O'CLOCK A.M.
              _____

                     Gretchen Wells
                     Court Reporter

                   Chaplin & Associates
                132 Joe Knox Ave, Suite 100-G
                    Mooresville, NC 28117
         (704) 606-1434 | (336) 992-1954 | (919) 649-4444
```

1  reasons, to FS Medical.
2          And in that case, just inserting a PO that
3  might go directly from the government to a
4  manufacturer or directly from Tanner to a manufacturer
5  doesn't fundamentally change the arrangement that we
6  have.
7      Q.  And so the profit share would be calculated
8  off the PO that Tanner issued to the manufacturer?
9      A.  No, it would be -- this contemplates a
10 scenario where everything has been already arranged
11 with the distributor, with all of the distribution
12 parties involved.  And just as a matter of
13 convenience, as it mentions, a PO may go direct.
14         And I think what he's had outlining here is
15 a scenario where one step of all the things that are
16 required by a distributor happens that might go
17 direct, and essentially describing that in that
18 scenario, in the customary distribution arrangement
19 that is contemplated by this agreement, that we would
20 be referring back to Paragraph 9 and that there would
21 be a split.
22     Q.  The profit split would be based off of the
23 PO, right?
24     A.  The profit split -- if -- yes, if there was
25 a full -- if everything else from this agreement

 1   regarding the responsibilities of distributors was
 2   what actually happened, then this was a scenario where
 3   just a direct PO or a direct contract would simply be
 4   a way to expedite the process as it might be required
 5   by one of the parties, the UK government, or also in
 6   this case, FS Medical.
 7            The issue is the first part of this
 8   paragraph contemplates, you know, purchasing units and
 9   parts of Paragraph 9 talk about, you know,
10   transportation, duties, tariffs, taxes by the
11   distributor.
12            So in that scenario, yes, if all of those
13   things were handled by the distributor and the only
14   thing that changed was that a direct PO went from
15   either the customer to the manufacturer or from Tanner
16   to the manufacturer, then, in that case, we would
17   refer -- as it mentions, refer back to Section 9 for
18   how the economics would be determined.
19       Q.   Okay.  You're saying a lot of things kind of
20   packed in.  Some of them are -- you know, you're
21   advocating your position, and I understand that.  But
22   I want to try to unpack it and take it one step at a
23   time.  So I get your position.
24            Your position is, which I disagree with,
25   that FSMS didn't do stuff that you expected them to

1  do.  But leave that disagreement to one side.  I hear
2  you.  That's your position.  You've made that position
3  clear throughout your testimony.  The question I'm
4  asking is about the economics.
5       A.   Okay.
6       Q.   The economics are that if there is a direct
7  PO between Tanner and the manufacturer, then the 50
8  percent gross profit participation to each party is
9  maintained, correct?
10      A.   Yes.  The ---
11           MR. ANDERSON:  Objection.
12      Q.   (Mr. Yalowitz)  Okay.  Just try to answer
13  yes or no if you can.
14      **A.   Yes.  As this Agreement is written, it**
15  **mentions specifically going back to Section 9.  And**
16  **Section 9 says, "Shall honor the price originally**
17  **agreed to in purchase orders and sales order**
18  **confirmations."**
19      Q.   Thank you.  And with this language, there
20  was now a possibility of a direct transaction with
21  Orient Gene if this language wound up in a signed
22  contract, right?
23      **A.   From the standpoint of the logistics, as we**
24  **had mentioned earlier, that there's sort of this**
25  **logistics side of things that, yes, this one discusses**

1  up.
2      Q.   You said that you wanted to plant the seed
3  for equitable proper distribution of profits, right?
4      **A.   Yes.  Based on the work that was being done**
5  **and the capabilities of both parties.**
6      Q.   So, at that point, I mean, you had signed an
7  agreement with FSMS in which 50 percent of the gross
8  profits was going to be paid to FSMS, right?
9      **A.   Right.  Under the assumption that they**
10 **played the role of distributor and leveraged their**
11 **experience to perform.**
12     Q.   And by the 18th, a week later, you were
13 planning to retrade the deal, right?
14     **A.   Yes.  A lot had changed in that period of**
15 **time.**
16     Q.   In the one week, a lot had changed?
17     **A.   Less than a week.**
18     Q.   And now, you wanted to retrade the deal, but
19 you didn't say anything to Mr. Cagan any time until
20 you say the 29th?
21     **A.   Right.**
22     Q.   And did you say at that point, "I need to
23 retrade the deal"?
24     **A.   Brought up ---**
25     Q.   Yes or no?