**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| FS MEDICAL SUPPLIES, LLC,<br><br>           Plaintiff,<br><br>v.<br><br>TANNERGAP, INC. *et al.*,<br><br>           Defendants. | Civil Action No.<br>3:21-CV-501-RJC-WCM |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS COUNTERCLAIMS AND STRIKE DEFENSES**

**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
250 W 55th Street
New York, NY 10019
212-836-8000
kent.yalowitz@arnoldporter.com
carmela.romeo@arnoldporter.com

  – and –

1144 Fifteenth Street, Suite 3100
Denver, CO 80202
303-863-1000
eliseo.puig@arnoldporter.com

**MAYNARD NEXSEN PC**

227 W. Trade Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 339-0304
lerwin@maynardnexsen.com
dluzum@maynardnexsen.com
kzhao@maynardnexsen.com

*Counsel for Plaintiff*

November 27, 2024

Plaintiff, FS Medical Supplies, LLC ("FSMS"), respectfully submits this memorandum in support of its motion for an order under Rules 9(b), 12(b)(6), and 12(f) dismissing Counts I and II of the Amended Counterclaims and striking the Seventh and Thirteenth Defenses and the prayer seeking relief for rescission, disgorgement, compensatory damages, and punitive damages of the Amended Answer and Counterclaims (the "Answer" or "Counterclaims", ECF No. 228) of Tanner-GAP, Inc. and Tanner Pharma UK, Limited's ("Tanner").

## INTRODUCTION

This case is about the sale of COVID test kits manufactured by a Chinese company called Zhejiang Orient Gene Biotech Co., Ltd. ("Orient Gene"). Tanner executed a Distribution Agreement with FSMS under which it promised to buy Orient Gene test kits from FSMS (or, if directed by FSMS, from Orient Gene) and split its gross profits with FSMS on a 50-50 basis. Ex. 1 (expressly incorporated in Tanner's Answer, ¶¶ 2, 49-55). In its Answer and Counterclaims, Tanner acknowledges—as it expressly did in the Distribution Agreement—that FSMS had a pre-existing business relationship with Orient Gene. Tanner's Answer also admits facts showing that FSMS used that relationship at a critical time to procure antigen test kits for validation testing needed to win a large order from the UK Government. And Tanner's Answer admits facts showing that FSMS introduced Tanner to personnel at Orient Gene who were otherwise unreachable to Tanner.

Despite the fact that FSMS performed its obligations under the Distribution Agreement by introducing Tanner to Orient Gene and enabling Tanner to purchase and sell more than £1 billion ($1.3 billion) worth of Orient Gene test kits, Tanner

1

alleges that it was somehow misled by FSMS into entering the Distribution Agreement and seeks to rescind the agreements with FSMS and disgorge the partial consideration it paid to FSMS.

Tanner's claims of fraudulent inducement and negligent misrepresentation are based on the following allegations: (1) FSMS stated that it "worked directly with Orient Gene" (a statement Tanner does not allege to be false), and made unspecified statements in which it "*implied*" or "*suggested*" it had done "substantial" business with Orient Gene before June 9, 2020 and that somehow led Tanner to believe that FSMS had a personal relationship with Orient Gene's Chairman; (2) FSMS overstated its expertise, experience, size, and ability to fulfill large orders; and (3) FSMS's marketing material said it sourced "all" products "directly" from "elite manufacturing facilities" of "the main and best quality Chinese manufacturers."

Accepted as true for purposes of the motion, Tanner's factual allegations fail to allege misrepresentations to support either a fraud or negligent misrepresentation claim. To begin, Tanner does not allege a *material misstatement of fact*. To the contrary, there is no dispute that FSMS's statement that it "worked directly with Orient Gene" was true. As admitted in Tanner's Answer and confirmed by documents expressly referenced in that Answer, FSMS actually had a business relationship with Orient Gene when Tanner did not have such a relationship. The allegations that FSMS "implied" or "suggested" something more are not specific enough to constitute material misrepresentations. Tanner's allegations concerning the expertise, experience, size, and ability to fulfill large orders of FSMS, as well as the puffery that FSMS sourced "all" products "directly" from "the main and best quality Chinese

manufacturers," are also immaterial. (As it turned out, these statements were all true as far as anything that mattered: Orient Gene, *did* sell hundreds of millions of units to FSMS directly, and Orient Gene *was* one of the "best quality Chinese manufacturers—its products passed the validation tests with flying colors.)

In addition, Tanner cannot show *reasonable reliance* on the alleged misrepresentations, because it conducted no due diligence and negotiated no contractual warranties about the matters it now complains about. To the contrary, the Distribution Agreement expressly provides: "To be clear, the manufacturer of any Covered Product [*i.e.*, Orient Gene] shall be considered a prior relationship of FSMS in regard to the Covered Product and TANNER will not do any business involving of [*sic*] said Covered Products from such manufacturer." Distribution Agreement § 16.4 (Ex. 1). "[A] sophisticated party's failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction [makes] it impossible to prove justifiable reliance." *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, C.A. No. 2020-0378, 2021 WL 305741, at *15 (Del. Ch. Jan. 29, 2021), *aff'd*, 267 A.3d 382 (Del. 2021); *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 449 (2015) ("Reliance is not reasonable if a plaintiff fails to make any independent investigation."); *Abbington SPE, LLC v. U.S. Bank, N.A.*, 352 F. Supp. 3d 508, 518 (E.D.N.C. 2016) ("when a plaintiff alleges misrepresentations that are 'directly contrary' to the express terms of a written contract[, r]eliance on such misrepresentations is unreasonable as a matter of law") (collecting cases), *aff'd*, 698 F. App'x 750 (4th Cir. 2017).

Tanner's claims also fail because it did not suffer any injury as a result of any

alleged misrepresentation. To the contrary, as a result of its contract with FSMS, Tanner made hundreds of millions of dollars in profit from the UK Government. Furthermore, the alleged damages are merely what Tanner paid FSMS under the contract, but Tanner has not asserted a breach of contract claim (and cannot assert one because there is no breach by FSMS). Had Tanner asserted a breach of contract claim, the damages sought would just be a "rehash" of the contract damages—Tanner cannot circumvent an invalid contract claim by mispleading it as fraud and misrepresentation claims. *See Norman v. Elkin*, 860 F.3d 111, 130-31 (3d Cir. 2017).

Tanner is also not able to seek rescission at this late date. If a party believes that they have been "misled into entering a contract by false representations," they "must act with reasonable diligence" if they wish to seek rescission "as opposed to affirming the contract and suing for damages." *Craft v. Bariglio*, No. 6050, 1984 WL 8207, at *11 (Del. Ch. Mar. 1, 1984). However, a party "cannot be permitted to derive all possible benefits from the transaction," but when "called upon to comply with its terms, claim to be relieved of [their] obligation of the grounds of misrepresentation." *Id.* Having received the benefit of the contract with FSMS—which enabled Tanner to sell more than £1 billion ($1.3 billion) worth of products to the UK Government—Tanner cannot now ask to retain those benefits while denying any obligations to FSMS through a complete rescission of the contract.

In short, Tanner's counterclaims sounding in misrepresentation do not withstand Rule 12(b)(6) scrutiny. Similarly, its Seventh Defense sounding in misrepresentation also fails, since the elements of the defense are identical to the counterclaims sounding in misrepresentation.

4

Finally, the Court should strike Tanner's Thirteenth Defense, which is based on supposed illegality under California law, because the Court has already held that the parties' contractual relationship is governed exclusively by Delaware law.

## FACTS[1]

Tanner alleges that in the parties' very first conversation, in June 2020, "[Tanner's] Bracey told [FSMS's] Cagan that TannerGAP and TPUK had been pursuing a relationship with Healgen and/or Orient Gene, seeking to acquire COVID test kits from them." Counterclaim ¶ 13.

Tanner states that in that conversation and thereafter, Mr. Cagan told Mr. Bracey that FSMS "worked directly with Orient Gene and Healgen." *Id.* (emphasis omitted). **Tanner does not allege that this statement was false.** Rather, it alleges that FSMS's generalized "experience, relationships with manufacturers, and capabilities" were inadequate. *Id.* ¶ 1. As to the specifics, Tanner alleges that FSMS made the following misrepresentations:

1.    **Relationship with Orient Gene.** Although Tanner admits—as it must—that FSMS had done business with Orient Gene at the time the parties met,

---

[1] The following facts are taken from the allegations in Tanner's Counterclaim, the admissions in its Answer, and the documents explicitly relied on by Tanner in its Answer and Counterclaim. "[W]hen a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *accord Krings v. AVL Techs.*, No. 1:20-cv-259, 2021 WL 1235129, at *1 (W.D.N.C. Feb. 10, 2021) (Metcalf, J.) (following *American Chiropractic*), *M&R adopted*, 2021 WL 1233478 (W.D.N.C. Apr. 1, 2021).

*id.* ¶ 35, it alleges that FSMS "implied" (through unspecified statements) that it "had done *substantial* prior business with Orient Gene and Healgen," *id.* ¶¶ 13, 18 (emphasis added). In truth, Tanner alleges FSMS did not meet anyone from Orient Gene until May 16, 2020, *id.* ¶ 30, and as of June 2, FSMS had not yet "purchased any products *directly* from Orient Gene or Healgen *at that time*," *id.* ¶¶ 13, 34.[2]

2.    **Capacity and Experience:** Tanner also alleges that FSMS misrepresented its size and experience. Tanner alleges that FSMS's website supposedly showed pictures of six individuals "purporting to work for FSMS," when, according to Defendants, "FSMS had no employees and no operational office." *Id.* ¶ 12, 24. In addition, FSMS's Cagan told Tanner that "he got into PPE distribution a few years back" and had "invested in the PPE distribution space directly with Chinese companies a while back," but FSMS had been operating "for a little over a month" and "had little experience in PPE distribution." *Id.* ¶¶ 14, 17 (emphases omitted). Tanner also alleges that FSMS's Cagan represented to Tanner in August that FSMS was supplying Target stores and had "minimum order quantities of several million." *Id.* ¶¶ 25, 26.

3.    **Sources of Product:** Finally, Tanner alleges that FSMS made false statements in its marketing materials, which stated that FSMS is "able to fulfill orders up to 100M units," "all" its products were "sourced directly" without "middlemen or brokers" "from … trusted factories," which FSMS "vetted," and which were

---

[2] This assertion is based on the fact that FSMS's two May 28, 2020 transactions were structured such that FSMS's customer issued purchase orders directly to Orient Gene and paid FSMS an agreed amount. This can be seen in FSMS's general ledger. Ex. 2 (expressly referenced in Counterclaim ¶ 31).

6

"elite manufacturing facilities" of "the main and best quality Chinese manufacturers." *Id.* ¶¶ 10(a), 10(b), 10(c), 14, 16, 17, 22, 31, 32.

On June 9, 2020, Tanner and FSMS entered into a Non-Circumvention Agreement. *Id.* ¶ 19. Tanner also sent a draft Distribution Agreement to FSMS, which set the price for Orient Gene test kits as "the true cost of the product as purchased by FSMS from its manufacturer/supplier, plus half the Gross Profit collected from the sale of the product to TANNER's customer." Draft Distribution Agreement § 9 (Ex. 3 (expressly incorporated in Tanner's Answer, ¶¶ 33-35)). The pricing provision also states: "FSMS and TANNER shall honor the prices originally agreed to in Purchase Orders and Sales Order Confirmations between FSMS and TANNER." *Id.*

In August 2020, Tanner identified an opportunity to sell Orient Gene antigen Covid test kits to the UK Government. Answer ¶¶ 3, 38. Starting around August 29, Tanner and FSMS began communicating about the opportunity. *Id.* ¶ 39. On September 2, FSMS bought 500 sample test kits from Orient Gene so that the UK Government could perform validation testing. *Id.* ¶ 40. A third-party logistics company delivered the sample test kits to the UK Government on September 7. *Id.* ¶ 41.

Two days later, on September 9, Mr. Bracey informed FSMS that "we passed first stage of validation." Ex. 4 (relied on in Answer ¶ 43). The next day, September 10, a Tanner executive informed FSMS that he had spoken with the "head of uk testing just now" and "[t]hey are pushing us to get the next kits to them ASAP (they have more companies in the mix than just us it seems!)." *Id.* According to Tanner, the UK Government urgently needed an additional 4,250 samples to conduct further clinical testing to validate the efficacy of the product: "Can you press [Orient Gene]

7

on this please ASAP and let us know?" *Id.*

On September 10, Tanner asked to speak directly with Orient Gene. FSMS's Jim Mao arranged for a Zoom meeting among FSMS, Tanner, and Orient Gene personnel, which went forward on Friday, September 11. Ex. 4 (relied on in Answer ¶¶ 66-67). The same day, Tanner and FSMS executed the Distribution Agreement. *Id.* ¶ 49.

During the week beginning Monday, September 14, 2020, things changed dramatically. According to Tanner: "Very quickly, it became apparent that Cagan and FSMS did not have the experience and contacts that they had promised." Answer at 3. As a result, "TPUK alone … handled the urgent logistics of getting test kits from China to the UK." *Id.* To that end, Tanner:

- Executed a non-disclosure agreement with the UK Government. *Id.* ¶ 70.
- Signed a contract with the UK Government for the sale of test kits from Orient Gene. *Id.* ¶ 76.
- Issued purchase orders to Orient Gene for 3.3 million units. Exs. 5, 6 (relied on in Answer ¶¶ 72, 73).
- Executed a "joinder agreement" binding Orient Gene to the non-disclosure agreement with the UK Government. Answer ¶ 71.
- Executed an "Exclusive Distribution Agreement" with Orient Gene. *Id.* ¶ 72.

The internal Tanner communications were enthusiastic. One executive wrote: "Trying to finalise the 'next' PO…..big numbers…!!!!" He further stated that it would be "nearly 20x the current order!!! BIG!!!!!!!" Ex. 7 (relied on in Answer

8

¶ 77). During this period, FSMS repeatedly asked Tanner for updates. Exs. 4, 7 (relied on in Answer ¶¶ 75, 78, 79, 80). In response, Tanner sent text messages to FSMS saying things like "waiting to hear test results," "still waiting for 3B results," "will update u when I hear from them," "the lateral flow tests are still pending 3B field tests results," and "Still waiting to hear about 3b." Ex. 4. These communications to FSMS did not mention the significant developments with the UK Government described above. *Id.*

On October 20, 2020, Tanner provided FSMS a "conditional" "estimate" of an amount that Tanner owed to FSMS for the first 800,000-unit transaction under the Distribution Agreement, stating that the cost per unit was $5.00 each. Ex. 8 (relied on in Answer ¶ 82).

In November 2020, Tanner sent FSMS a written statement purporting to set out "the profit split in accordance with our agreement." Ex. 9 (relied on in Answer ¶ 87. In February 2021, Tanner sent FSMS a further "reconciliation" purporting to set out the profit split under the contract. *Id.* (relied on in Answer ¶ 89). Tanner paid FSMS these amounts. *Id.* Tanner claimed that once its sales price had fallen below $5.00 per unit, it owed FSMS nothing. *Id.*

Tanner went on to sell more than £1 billion ($1,300,000,000.00) worth of Orient Gene test kits to the UK Government. Answer ¶ 90.

## LEGAL STANDARD

**Rule 12(b)(6).** A Rule 12(b)(6) motion challenges the legal sufficiency of a complaint. *Ehmann v. Duke Energy Carolinas, LLC*, No. 3:19-CV-00311, 2021 WL

3811480, at *1 (W.D.N.C. Aug. 26, 2021) (Conrad, J.) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Crossroads Trucking Corp. v. TruNorth Warranty Plans of N. Am., LLC*, No. 3:21-CV-00318, 2022 WL 3952221, at *2 (W.D.N.C. Aug. 31, 2022) (Conrad, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

**Rule 12(f).** Rule 12(f) allows the Court to "strike from a pleading an insufficient defense." Fed. R. Civ. P. 12(f). Although motions to strike a defense are disfavored, "a defense that might confuse the issues in the case and would not, under the facts alleged, constitute a valid defense to the action can and should be deleted." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (internal quotation marks omitted); *United States v. Godley*, No. 3:19-CV-202-RJC-DSC, 2020 WL 4507324, at *2 (W.D.N.C. Aug. 5, 2020) (Conrad, J.) (striking defenses that were "insufficient as a matter of law").

**Rule 9(b).** When pleading fraud, "special rules of pleading come into play." *Dye v. U.S. Bank Nat'l Ass'n*, No. 3:15-CV-82-RJC, 2016 WL 427940, at *5 (W.D.N.C. Feb. 3, 2016) (Conrad, J.), *aff'd*, 653 F. App'x 213 (4th Cir. 2016). Specifically, "the time, place, and contents of the alleged fraudulent representation, as well as the identity of each person making the misrepresentation and what was obtained thereby." *Dye*, 2016 WL 427940, at *5 (quoting *Riley v. Murdock*, 828 F. Supp. 1215, 1225 (E.D.N.C. 1993)). A defense that sounds in fraud must be pled with particularity. *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 700 (4th Cir. 2018); *see EEOC v. Route 22 Sports Bar, Inc.*, 2021 WL 2557087, *8 (N.D. W. Va. 2021) (striking affirmative defenses

that did not satisfy the particularity requirement of Rule 9(c).

**ARGUMENT**

## I. THE MISREPRESENTATION COUNTERCLAIMS AND DEFENSE FAIL

The claims of fraudulent inducement and negligent misrepresentation require common elements, as does the misrepresentation defense. To state a claim for fraudulent inducement, one must state with particularity:

> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

*Accelerant Twister, LLC v. Marjo, LLC*, No. CV 22-1366-RGA, 2023 WL 4457422, at *4 (D. Del. July 11, 2023) (quoting *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999)).[3] Similarly, to state a claim for negligent misrepresentation, one must state "1) a particular duty to provide accurate information, based on the plaintiffs pecuniary interest in that information; 2) the supplying of false information; 3) failure to exercise reasonable care in obtaining or communicating information; and 4) a pecuniary loss caused by justifiable reliance on the false information." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 147 n.44 (Del. Ch. 2003). A fraudulent inducement defense requires the same elements.

---

[3] The requirements under North Carolina law are similar. "To state a fraudulent inducement claim, a plaintiff must plausibly allege: (1) representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Further Festivals, LLC v. Etix, Inc.*, No. 5:23-CV-676-D, 2024 WL 1546919, at *3 (E.D.N.C. Apr. 9, 2024) (collecting cases) (cleaned up).

11

*See Lynch v. Gonzalez*, No. CV 2019-0356, 2020 WL 4381604, at *35 (Del. Ch. July 31, 2020), aff'd, 253 A.3d 556 (Del. 2021).[4]

### A. Tanner Alleges No Material Misrepresentation

Tanner does not allege any material misrepresentation. It alleges no misrepresentation at all about FSMS's relationship with Orient Gene, and fails to allege any material misrepresentation regarding FSMS's capacity, experience, and sources of products.

**1. Orient Gene.** To the (very limited) extent the Counterclaims focus on FSMS's relationship with Orient Gene, Tanner does not dispute that FSMS *did* have a contractual and business relationship with Orient Gene at a time that Tanner did not have such a relationship. In fact, the documents relied on by Tanner in its Answer leave no doubt that as late as September 10—the day before the parties executed the Distribution Agreement—Tanner desperately needed FSMS to get to Orient Gene when it contacted FSMS's Jim Mao:

> 12:48 a.m.: [From Bracey]: "Jim – have u managed to get us set up with a call with OG yet please? Still not seen any reply to my emails. Really need to talk with them ASAP please."[5]

---

[4] Similarly, "[i]t has long been held in North Carolina that the tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care." *Universal Life Ins. Co. v. Lindberg*, No. 1:20CV681, 2022 WL 1394960, at *7 (M.D.N.C. Mar. 31, 2022), *report and recommendation adopted*, No. 1:20CV681, 2022 WL 1316588 (M.D.N.C. May 3, 2022), *reconsideration denied*, No. 1:20CV681, 2023 WL 2241893 (M.D.N.C. Feb. 21, 2023), *and aff'd*, No. 23-1313, 2024 WL 3935040 (4th Cir. Aug. 26, 2024).

[5] These text messages are in Ex. 4 (relied on in Answer ¶¶ 43, 66, 67). A substantively identical but easier to read version of the text thread reflecting the messages

2:32 a.m.:   [From Cagan]: "Jim, I'm on a WhatsApp call with Jonathan right now. If you are up, please call him. He would like to have a direct call with the mgmt. at Orient Gene. Let him know if you can arrange that."

Ex. 4 (relied on in Answer ¶¶ 43, 66, 67). Moreover, the Distribution Agreement executed on September 11 expressly states that "the manufacturer of any Covered Product [*i.e.,* Orient Gene] shall be considered a prior relationship of FSMS in regard to the Covered Product." Ex. 1 § 16.4. Tanner makes no allegation that it could have contacted Orient Gene without FSMS.

Tanner also admits that the timing was urgent in September 2020. Answer ¶ 19 (DHSC "urgently needed to acquire large volumes of validated COVID tests"); Ex. 4 at 4 (referenced in Answer ¶ 44) ("big prize for first to cross the line"); *id.* at 9 (referenced in Answer ¶ 45) ("[t]hey are pushing us to get the next kits to them ASAP (they have more companies in the mix than just us it seems!).". The documents incorporated into Tanner's Answer also show that FSMS persuaded Orient Gene to "take 500 samples out from other customer's order to ship to UK." *Id.* at 3.

In this context, Tanner does not and cannot allege that Cagan's statement that he "worked directly with Orient Gene and Healgen" was untrue. Counterclaim ¶ 13. As shown in FSMS's general ledger, which Tanner's Counterclaim incorporates, FSMS had two transactions with Orient Gene on May 28, 2020, which were structured such that FSMS's customer issued purchase orders directly to Orient Gene and paid FSMS an agreed amount. Ex. 2 (expressly referenced in Counterclaim ¶ 31).

---

exchanged on September 10 was produced by the Defendants and is attached as Ex. 10. All times are Eastern Daylight Time (which is one hour earlier than UTC).

So what are the alleged misrepresentations? *First*, Tanner alleges that FSMS's "implied" or "suggested" that its business relationship with Orient Gene was "substantial." Counterclaim ¶¶ 13, 18. Tanner does not allege that FSMS actually represented that its relationship with Orient Gene was substantial. Such nebulous allegation fails to identify the "contents" of an actual statement and therefore fails under Rule 9(b). *See Dye*, 2016 WL 427940, at *5 (quoting *Riley v. Murdock*, 828 F. Supp. 1215, 1225 (E.D.N.C. 1993)); *see also Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 142 (Del. Ch. 2009) (dismissing fraud counterclaim that "do not identify any specific fact that was misrepresented"); *accord Shaver v. Walker*, No. 23 NCBC 27 ¶ 37, 2023 WL 2746848, at *5 (N.C. Super. Mar. 31, 2023) ("To be a statement of material fact, the statement must be definite and specific.").

*Second*, Tanner alleges that FSMS somehow led Tanner "to believe … that FSMS had a personal working relationship with Orient Gene's decisionmaker and Chairman." Counterclaim ¶ 18. Again, Tanner does not allege what FSMS actually said that led to such belief. While courts recognize that a misrepresentation can be "literally true" while "creat[ing] a false misrepresentation as to the true state of affairs," here Tanner does not allege the contents of a specific statement. *See Lynch v. Gonzalez*, No. CV 2019-0356-MTZ, 2020 WL 4381604, at *35 (Del. Ch. July 31, 2020), *aff'd*, 253 A.3d 556 (Del. 2021).

**2. Capacity, Experiences, Resources, Relationships.** Tanner alleges that FSMS misrepresented about its "experiences, resources, and relationships with manufacturers." Counterclaim ¶ 61. However, the alleged misrepresentations are either puffery or immaterial.

Under Delaware law, as elsewhere, "the misrepresentation forming the basis for the fraud or negligent misrepresentation claim must be material, and the plaintiff generally cannot rely, for example, on puffery, expressions of mere opinion, or representations that are obviously false." *Appel v. Berkman*, 180 A.3d 1055, 1061 (Del. 2018) (internal citations omitted). "Under Delaware law, a person's optimistic statements about his 'skills, experience, and resources' are mere puffery and cannot form the basis for a fraud claim." *Accelerant Twister, LLC v. Marjo, LLC*, No. CV 22-1366-RGA, 2023 WL 4457422, at *8 (D. Del. July 11, 2023) (cleaned up).

First, Tanner alleges that FSMS marketing materials falsely claimed that "all" products were "sourced directly from high-quality high-volume trusted factories," which were "elite manufacturing facilities" of "the main and best quality Chinese manufacturers" and which FSMS "vetted" and that it was able to fulfill large orders. Counterclaim ¶¶ 10.a-c, 14, 22. These statements are quintessential examples of puffery and not actionable. *Appel* 180 A.3d at 1060 n.25 (citing *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 775 (Del. Ch. 2014)); *accord Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17 (1992) (distinguishing "mere puffing, guesses, or assertions of opinions from representations of material facts"); *Glob. Hookah*, 401 F. Supp. 3d at 659 (same). Moreover, the statement turned out to be true as Tanner sources *more* than 100 million Orient Gene test kits directly from an elite manufacturer.

Second, Tanner's allegations regarding Cagan and FSMS's experiences fall into the same category of puffery. *See Accelerant Twister*, 2023 WL 4457422, at *8 (finding representations about "ability," "technical expertise," and "knowledge,

know-how and extensive personal connections" "are exactly the kind of 'classically vague statements that a commercial party routinely makes during deal-making court-ship'"); *Lazard Debt Recovery GP, LLC. v. Weinstock*, 864 A.2d 955, 971 (Del. Ch. 2004) (holding statements in which party touted its "ideal work environment" and "unique resources" to be "at best enthusiastic puffery that no rational prospective investor ... would find material").

Third, Tanner alleges that FSMS implicitly misrepresented its size and experience, because its website supposedly showed pictures of six individuals "purporting to work for FSMS," when "FSMS had no employees and no operational office." Counterclaim ¶ 12. (Tanner does not allege that these people did not actually work for FSMS, only that they were not "employees.") A statement that FSMS had six workers listed on its website could not have been material, in view of the fact that the Distribution Agreement includes a provision permitting FSMS to direct Tanner to place Purchase Orders with Orient Gene directly. Distribution Agreement § 7. This "go direct" provision—on which Tanner has heavily relied upon as a defense—made FSMS's size irrelevant under the contract.

Finally, Tanner alleges that FSMS misrepresented that it supplied Target stores. Counterclaim ¶ 25. However, Tanner cannot explain why that should be material to Tanner's decision to partner with FSMS to purchase test kits from Orient Gene, especially at a time that Tanner desperately needed FSMS to connect it to Orient Gene and was begging FSMS to set up a call.

**B.     Tanner Fails to Allege Its Reliance Was Reasonable**

Tanner's reliance was unreasonable as a matter of law, because Tanner fails

to allege that it conducted due diligence or protected itself with contractual representations concerning the matters it now complains of. Tanner's reliance allegations are exactly the kind of conclusory statements that courts reject as inconsistent with the requirements of Rule 8.

To begin, the Counterclaim is completely devoid of *any* facts supporting *any* inference Tanner conducted *any* due diligence or *any* independent investigation of FSMS *at all*. (Tanner's only mention of reasonable reliance is its conclusory allegations in paragraphs 49, 67, and 74.) There is no allegation that Tanner asked a single question or sought any information other than regarding the existence of FSMS's relationship with Orient Gene.

Tanner may argue that because the Distribution Agreement is so named, it required *FSMS* to somehow act as a distributor. However, the Distribution Agreement contains no representations or warranties about FSMS's capacity. *See* Distribution Agreement § 14.1 (Ex. 1). To the contrary, the Distribution Agreement expressly provides that FSMS "is not in a position to guarantee Covered Product *quality or quantity*." *Id.* § 8.1 (emphasis added). The Distribution Agreement also assigned to *Tanner* obligations included "the purchase, handling, sale, and distribution of Covered Products pursuant to this Agreement." *Id.* § 14.2.1. The Distribution Agreement contains no language requiring such performance by FSMS.

"Delaware courts do not rescue disappointed buyers from circumstances that could have been guarded against through normal due diligence and negotiated contractual protections." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 551 n.305 (Del. Super. Ct.), *aff'd*, 886 A.2d 1278 (Del. 2005). "[A] sophisticated party's

17

failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction [makes] it impossible to prove justifiable reliance and ... this behavior indicate[s] that the sophisticated party made a business decision, which the court [will] not second-guess." *Golden Rule Fin. Corp.*, 2021 WL 305741, at \*15; *see Debakey Corp. v. Raytheon Serv. Co.*, No. 14947, 2000 WL 1273317, at \*26 (Del. Ch. Aug. 25, 2000) ("By asserting their fraud counterclaim, the defendants are seeking, in effect, to shift the cost of their inadequate due diligence to the plaintiffs."); *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, C.A. No. 2017-0500, 2018 WL 2727542, at \*13 (Del. Ch. June 6, 2018) ("Under these circumstances, the pled facts do not allow a reasonable inference that Buyers could have reasonably relied upon the alleged extra-contractual representations made prior to their due diligence that were not included in the final agreement.").

North Carolina law is even more stern on this point: "If plaintiff relied on verbal assurances contrary to the documents he signed, such reliance cannot be reasonable, and he was misled through his own want of reasonable care and circumspection." *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 338 (2015) (internal quotation marks omitted); *Abbington*, 352 F. Supp. 3d at 518 ("when a plaintiff alleges misrepresentations that are 'directly contrary' to the express terms of a written contract[, r]eliance on such misrepresentations is unreasonable as a matter of law"); *Arnesen*, 368 N.C. at 449 ("Reliance is not reasonable if a plaintiff fails to make any independent investigation or fails to demonstrate he was prevented from doing so.") (cleaned up).

18

In this regard, the Distribution Agreement directly contradicts Tanner's contention that FSMS did not have a sufficient prior relationship with Orient Gene. The Distribution Agreement provides: "To be clear, the manufacturer of any Covered Product shall be considered a prior relationship of FSMS in regard to the Covered Product." Ex. 1 § 16.4. Therefore, the allegation cannot support a fraud claim.

### C. Tanner Fails to Allege Damages Separate from the Contract

Tanner fails to assert claims of fraudulent inducement and negligent misrepresentation because Tanner seeks the exact amount it paid FSMS *under the contract*. Tanner's theory of liability is entirely circular. Tanner does not assert a claim for breach of contract because it cannot in good faith allege that FSMS breached the contract. However, it can point to no injury other than what it paid under the contract.

"Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's actions. And the damages allegations may not simply 'rehash' the damages allegedly caused by the breach of contract." *Norman*, 860 F.3d at 130-31; *Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 697 (D. Del. 2013); *APEX Fin. Options, LLC v. Gilbertson*, No. CV 19-046, 2022 WL 619833, at *4 (D. Del. Jan. 31, 2022) ("Delaware law is clear that fraud and breach of contract damages must be distinct.") (collecting cases). Putting aside the alleged misrepresentations, FSMS admittedly provided Tanner with access to Orient Gene that allowed it to purchase millions of test kits from Orient Gene; Tanner paid FSMS for the provision of that access and as a result of the Distribution Agreement. Tanner did not suffer any injury *as a result of* any alleged misrepresentation and therefore fails to assert any claim

sounding in misrepresentation.

### D. Tanner Cannot Assert Rescission

Tanner cannot now assert a claim of rescission, because it was not diligent. In order to pursue a rescission claim, a party must "act with reasonable diligence" with pursuing rescission "as opposed to affirming the contract and suing for damages." *Craft*, 1984 WL 8207, at *11; *accord Grzybowski v. Tracy*, Civ. A. No. 3888, 2013 WL 4053515, at *7 (Del. Ch. Aug. 9, 2013) (same, following *Craft*); *Kostyszyn v. Martuscelli*, Civ. A. No. 8828, 2014 WL 3510676, at *5 (Del. Ch. July 14, 2014) (similar). But a party cannot "be permitted to derive all possible benefits from the transaction" and when "called upon to comply with its terms, claim to be relieved of [their] obligation of the grounds of misrepresentation." *Craft*, 1984 WL 8207, at *11.

Here, Tanner alleges that it knew of the alleged misrepresentations "very quickly." Answer at 3. In its March 3, 2021 letter to FSMS—more than three years ago—McGuireWoods wrote "FSMS demonstrated that it was unable to be a reliable supplier for Tanner UK of Test Kits," that "FSMS was too small a company," and "FSMS deliberately misrepresented the nature and extent of its connections to personnel at Orient Gene." Ex. 11. But rather than seek rescission, Tanner elected to enjoy the benefits of the transaction. It is too late to seek rescission.

## II. THE THIRTEENTH DEFENSE SHOULD BE STRICKEN

The Thirteenth Defense contends that the Non-Circumvention Agreement is void under California law. (The California Supreme Court has adopted a "rule of reason" for evaluation of non-circumvention agreements. *Ixchel Pharma, LLC v. Bi-*

*ogen, Inc.*, 9 Cal. 5th 1130, 1162 (2020).) The trouble with this defense is that California law does not apply to the Non-Circumvention Agreement. As the Court explained earlier in this case: "the Court construes the Distribution Agreement and the Non-Circumvention Agreements as one integrated agreement, and because the parties evidently intend for Delaware law to govern their contractual relationship, this Court will interpret the Non-Circumvention Agreement under Delaware law, notwithstanding the parties' California choice of law provision in that earlier agreement." Order at 4 (Sept. 30, 2023) [ECF 117]. Non-circumvention agreements are enforceable under Delaware law. *Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc.*, C.A. No. 18278, 2001 WL 1334188, at *17 (Del. Ch. Oct. 22, 2001) ("The idea that confidentiality agreements arrived at during the preliminary stages of commercial negotiations are unenforceable is not one that has won favor with this court.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss Tanner's claims of fraudulent inducement and negligent misrepresentation and strike its Seventh and Thirteenth Defenses and its prayer seeking relief for rescission, disgorgement, compensatory damages, and punitive damages.

This the 27th day of November, 2024.

/s/ Kent A. Yalowitz

Kent A. Yalowitz (admitted *pro hac vice*)
N.Y. State Bar No. 2188944
Carmela T. Romeo (admitted *pro hac vice*)
N.Y. State Bar No. 5058151
**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
250 W 55th Street
New York, NY 10019
212-836-8000
kent.yalowitz@arnoldporter.com
carmela.romeo@arnoldporter.com


– and –


Eliseo R. Puig (admitted *pro hac vice*)
Colorado State Bar No. 49022
**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
303-863-1000
eliseo.puig@arnoldporter.com

/s/ Lex M. Erwin

Lex M. Erwin
N.C. State Bar No. 34619
David A. Luzum
N.C. State Bar No. 41398
Kevin Y. Zhao
N.C. State Bar No. 53680
**MAYNARD NEXSEN PC**
227 W. Trade Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 339-0304
Facsimile: (704) 338-5377
lerwin@maynardnexsen.com
dluzum@maynardnexsen.com
kzhao@maynardnexsen.com


*Counsel for Plaintiff*

## CERTIFICATION

Pursuant to the Court's June 18 2024 Standing Order regarding Use of Artificial Intelligence, the undersigned certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line research sources WestLaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.


*/s/ Lex M. Erwin*
Lex M. Erwin