# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

FS MEDICAL SUPPLIES, LLC,

     Plaintiff,

v.

TANNERGAP, INC. AND TANNER
PHARMA UK LIMITED,

     Defendants;

and

FS MEDICAL SUPPLIES, LLC,

     Plaintiff,

v.

TANNER PHARMA UK LIMITED; RAYMOND
FAIRBANKS BOURNE; MARY EVERETT
BOURNE,

     Defendants.

Case No. 3:21-cv-501-RJC-WCM
Case No. 3:23-cv-598-RJC-WCM

## TANNER PHARMA UK LIMITED'S AND TANNERGAP, INC.'S
## POSITION ON THE UNSEALING OF THE DOCUMENTS
## FILED AT DKT. 214, 215, 216, AND 217

As directed by the Court's November 26, 2024, Order (Dkt. 232), Defendants TannerGAP,
Inc. ("TannerGAP") and Tanner Pharma UK Limited ("TPUK") (together, the "Tanner
Defendants") submit their position as to the unsealing of the documents filed at Dkt. Nos. 214,
215, 216, and 217 ("the Subject Documents"):

     1.     On November 6, 2024, the Tanner Defendants filed their Response in Opposition
to FSMS's Motion for Protective Order Concerning Depositions.  In support of that Motion, they

attached the Subject Documents, which are excerpts from the transcript of the October 29, 2024, deposition of Laird Cagan, the principal of Plaintiff FS Medical Supplies, LLC ("FSMS") (Dkt. 214); excerpts from FSMS's Expert Report of Aaron Dolgoff (Dkt. 215); excerpts from FSMS's Expert Report of Barry Lynn (Dkt. 216); and excerpts from the October 30, 2024 deposition of Jim Mao, FSMS's other principal (Dkt. 217).

2. The Tanner Defendants also filed a Consent Motion to File Exhibits Under Seal (Dkt. 212) and a supporting Memorandum (Dkt. 213), requesting that the Subject Documents be sealed.

3. In their Memorandum in support of sealing, the Tanner Defendants explained that the Subject Documents all contained information designated as Confidential and/or Confidential – Attorneys' Eyes Only under the Protective Order (Dkt. 25) and proposed Addendum to the Protective Order (Dkt. 185).

4. The Confidential – Attorneys' Eyes Only designations pertain to certain summary charts contained in FSMS's Expert Report of Aaron Dolgoff (the "Pricing Summary Charts"), as well as expert opinions relating to such charts and testimony about such charts.

5. The data that was used by Dolgoff to make certain calculations and to derive the Pricing Summary Charts was produced pursuant to a negotiated contractual agreement between Orient Gene, its subsidiary Healgen Scientific Limited Liability Company and FSMS (the "Agreement"). Declaration of Aveling Xu ("Xu Decl.") ¶¶ 6–8, Dkt. 247; Agreement ¶ 1, Dkt. 246-1. Neither the Tanner Defendants nor the Bourne Defendants are parties to that Agreement.

6. In their Agreement, FSMS, Orient Gene and Healgen agreed on specific conditions under which Orient Gene and Healgen would produce certain anonymized customer data to FSMS. This anonymized data, in spreadsheet format, shows the date, invoice number, item description,

unit price, quantity, and total revenue for sales of Covid-19 antigen test kits to customers of Orient Gene located throughout the United States and the European Union. However, the data does not include customer names or attribute sales to any specific customers. Customer information, including customer names and any other identifying information, was eliminated from the data set produced by Orient Gene to FSMS.

7. Under the Agreement between Orient Gene and FSMS, the produced data was to be designated Confidential – Attorneys' Eyes Only and anticipated the submission to the Court of an Addendum to the Protective Order that would in effect add an "Attorneys' Eyes Only" ("AEO") confidentiality designation. Xu Decl. ¶ 7.c, d; Agreement ¶ 6. As a condition of the Agreement, FSMS also agreed not to challenge the AEO designation, to oppose any attempt to challenge such designation, and to take reasonable actions as requested by Orient Gene's counsel concerning such designation. *Id.*

8. To facilitate the production of the data set, and to satisfy FSMS's obligation under the Agreement to do so, at FSMS's request the parties filed a Joint Stipulated Request for Entry of Addendum to Stipulated Protective Order (Dkt. 185), allowing a non-party to designate materials produced in discovery of such a private, sensitive, competitive or proprietary nature that disclosure to the parties is highly likely to cause significant harm to the business or the competitive position of the producing non-party's business.

### Dolgoff's "Additional Damages" Calculations Based on the Anonymized Data Are Unreliable and Unverifiable

9. Based on the anonymized data set, FSMS's expert Aaron Dolgoff purported to calculate a median price paid per unit for Covid-19 antigen test kits by customers of Orient Gene other than TPUK from October 2020 to April 2022. Dolgoff also uses this anonymized data to

create a summary chart of what he asserts are the highest and lowest prices paid per unit for Covid-19 antigen test kits by customers of Orient Gene other than TPUK during that same time frame.

10.     Dolgoff also purports to calculate the average price TPUK paid Orient Gene per unit for Covid-19 antigen test kits from October 2020 to April 2022.[1] Dolgoff then calculates what he asserts are the percentage differences between the average price paid by TPUK and the high, median, and low prices paid by other customers according to the anonymized data.

11.     The Pricing Summary Charts purport to show the average prices paid by TPUK, the high, median, and low prices paid by other customers, and the percentages Dolgoff calculated.

12.     The Pricing Summary Charts are included in the Dolgoff report as the basis for an "Additional Damages" claim. Dolgoff's report includes a calculation that FSMS is owed an additional $116,432,863–$232,036,314 in hypothesized damages ("the Additional Damages") based on an assumption that, had FSMS negotiated for prices with Orient Gene, TPUK would have been able to obtain lower prices from Orient Gene that mirrored those prices paid by other customers.[2] Dolgoff himself offers no opinion or evidence to support the Additional Damages.

13.     Dolgoff develops the Additional Damages figure by multiplying the percentage difference between the high, median, and low prices paid by other customers and the prices paid by TPUK, multiplying those percentages by the average price TPUK paid per test, and multiplying by the volume of tests purchased in each month. Dolgoff then halves that number to adjust for his opinion that these hypothetical profits would have been split evenly between TPUK and FSMS.

_____

[1] This data was also produced by Orient Gene but was not produced pursuant to the agreement that resulted in the production of the anonymized data.
[2] Dolgoff also opined that FSMS is owed fifty percent of the profit TPUK earned from sales of Orient Gene test kits to the UK DHSC. He opines that the "Additional Damages" are damages owed in excess of that figure.

4

14.     Thus, the Additional Damages represent hypothetical "lost profits" based on the anonymized data FSMS obtained from Orient Gene and Healgen and the premise that FSMS's involvement in negotiations would have resulted in TPUK paying lower prices for the actual volumes of test kits that it purchased from Orient Gene to fulfill contracts with the government of the United Kingdom.  Specifically, Dolgoff opines that, with FSMS's involvement, TPUK's prices would have been the same as the prices paid by anonymous Orient Gene customers for different volumes at different times.

15.     It is impossible for the Tanner Defendants to validate or invalidate the data sets because they are anonymized.  Without being able to verify the information, know who the other Orient Gene customers are, know the volumes of their purchases, or know any other of the material terms of their purchases, the Tanner Defendants cannot ascertain whether there is any reliability to FSMS's contentions that the prices paid by the anonymous customers bear any meaningful comparative relationship to prices paid by TPUK.

16.     Specifically, TPUK has no way of knowing whether the anonymous customers had similar requirements and specifications for the test kits that they ordered from Orient Gene as the test kits TPUK ordered on behalf of the UK DHSC.

17.     For example, TPUK does not know, and cannot investigate because of the anonymized nature of the data, whether other customers: (1) required customized packaging for test kits; (2) required specific labeling; (3) had specific traceability requirements; (4) required a CE mark; (5) required tests with the same accuracy as those TPUK sourced; (6) were governmental entities or were buyers for governmental entities; (7) received priority for their orders; (8) received favorable payment terms; (9) required expedited delivery; (10) made successive orders from Orient Gene or were one-time customers; or (11) required Orient Gene to scale up production or otherwise

invest capital to fill their orders. TPUK also does not and cannot know what countries these customers were from (beyond knowing generally that they were located in the United States or European Union) or who bore the shipping and logistics costs for these other customers.

18.     As a result, TPUK does not and cannot know whether the other customers whose prices are reflected in the anonymized data FSMS obtained are reasonable comparators on which Dolgoff could base lost profits damages and such data could prejudice TPUK were to be assumed that the prices represented similar sales.

## Use of the AEO Data at Summary Judgment or Trial Would Impose Procedural Burdens that Outweigh the Limited Utility of the AEO Data

19.     The problems with the anonymized data set, the Pricing Summary Charts, and the Dolgoff "Additional Damages" calculation are independent of Orient Gene and Healgen's concerns about their possible public disclosure and the advantages competitors could gain if the anonymized data is disclosed.

20.      Orient Gene has expressed significant concerns regarding the publication of its proprietary pricing data, even as anonymized. It is also the Tanner Defendants' understanding that these concerns extend to the Pricing Summary Charts derived from the underlying data, as access to either could allow competitors to undercut Orient Gene in the market. These concerns led Orient Gene to demand, and FSMS to agree, to an AEO designation as a mandatory condition for production of the data.

21.     Moreover, FSMS agreed to refrain from challenging the AEO designation and to oppose any attempt to challenge such designation. Xu Decl. ¶ 7.c, d; Agreement ¶ 6.

22.     Even if the AEO designation were to be allowed, the Tanner Defendants respectfully submit that there are substantial obstacles to using AEO designated information as the basis for a summary judgment ruling, or at trial.

6

23.     The Fourth Circuit has recognized that "the First Amendment right of access extends to civil trials." *ACLU v. Holder*, 673 F.3d 245, 252 (4th Cir. 2011) (collecting cases).  In order to maintain the AEO designation for the anonymized data, the summary judgment motions and memorandums in support thereof would need to be filed under seal and the courtroom would need to be sealed while such data was discussed.  This is neither practicable nor does it comport with the public's First Amendment right of access. If evidence is used in the course of a summary judgment ruling or at trial, the First Amendment right of access is heightened.

24.     To be sure, a court can restrict public access to trials if the "public's right of access is outweighed by competing interests." *See Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000).  However, here, restricting the public's access would be purely for the purpose of allowing the admission of anonymized, unverifiable data.  While the pricing information contained in this data is highly valuable to Orient Gene's competitors, it is essentially useless to a jury for the reasons detailed above.  Thus, the public's right of access would be restricted for the sole reason of displaying an analysis that is ultimately too speculative for the jury's consideration.

## Conclusion

In sum, given: (1) FSMS's contractual agreement to oppose any change to the AEO designation of Orient Gene's anonymized data; (2) the objection of Orient Gene and Healgen to any change in the AEO designation; (3) the problematic nature of the anonymized data and significant prejudice to the Tanner Defendants potentially resulting from its use to assert a hypothetical "Additional Damages" lost profits claim, and (4) the impracticality of using the data at summary judgment and trial in a way that reconciles the obligations imposed by the FSMS/Orient Gene Agreement and the First Amendment's requirements, the Tanner Defendants' view is that the data should remain designated Attorneys' Eyes Only.

7

Any limitations on FSMS's ability to make use of the anonymized data is a consequence of its own Agreement with Orient Gene and Healgen.

This the 6th day of December, 2024.

McGuireWoods LLP

By:    /s/ Bradley R. Kutrow
Bradley R. Kutrow
N.C. State Bar No. 13851
Brian A. Kahn
N.C. State Bar No. 29291
Anita Foss
N.C. State Bar No. 47743
Jessica O'Brien Peretz
N.C. State Bar No. 56679
Kelly A. Warlich
N.C. State Bar No. 51053
201 North Tryon Street, Suite 3000
Charlotte, NC 28202-2146
Telephone: (704) 343-2049
Facsimile: (704) 343-2300
bkutrow@mcguirewoods.com
bkahn@mcguirewoods.com
afoss@mcguirewoods.com
jperetz@mcguirewoods.com
kwarlich@mcguirewoods.com

Mark E. Anderson
N.C. State Bar No. 15764
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
Telephone: (919) 755 -6678
Facsimile: (919) 755-6699
manderson@mcguirewoods.com

Anne Doherty
N.C. State Bar No. 55494
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-7633
Facsimile: (804) 775-1061
adoherty@mcguirewoods.com

*Attorneys for Defendants*
*TannerGAP, Inc. and Tanner Pharma UK Limited*

**CERTIFICATION**

Pursuant to this Court's June 18, 2024 Order regarding the use of artificial intelligence, the undersigned states that:

1.     No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

2.     Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 6th day of December, 2024.

/s/ Bradley R. Kutrow
Bradley R. Kutrow
N.C. State Bar No. 13851
MCGUIREWOODS LLP

*Counsel for Defendants TannerGAP, Inc.*
*and Tanner Pharma UK, Ltd.*