**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| FS MEDICAL SUPPLIES, LLC, | |
|     Plaintiff, | |
| v. | Case No. 3:21-cv-501-RJC-WCM |
| TANNERGAP, INC. AND TANNER PHARMA UK LIMITED, | |
|     Defendants. | |

**TANNER PHARMA UK LIMITED'S AND TANNERGAP, INC.'S**
**RESPONSE IN OPPOSITION TO**
**FSMS'S MOTION TO DISMISS COUNTERCLAIMS AND STRIKE DEFENSES**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL ALLEGATIONS ................................................................................................. 2

ARGUMENT ........................................................................................................................ 7

I.   This Court should disregard the 50 pages of exhibits attached to FSMS's brief. .................. 7

II.  The Tanner Defendants have adequately pleaded their fraud and negligent
     misrepresentation claims. ................................................................................................... 9

     A.    The Tanner Defendants have plausibly alleged that FSMS made false
           statements. ................................................................................................................. 9

     B.    The Tanner Defendants have plausibly alleged justifiable reliance. .................... 12

           1.    FSMS's misstatements are not "puffery" because they can be
                 proven true or false. ....................................................................................... 14

           2.    The Tanner Defendants had no duty to conduct "due diligence" on
                 facts peculiarly within FSMS's knowledge. ................................................. 16

     C.    Delaware law does not bar the Misrepresentation Claims. ................................... 17

III. This Court should not take the "disfavored" step of striking the Tanner Defendants'
     defenses and prayer for relief. .......................................................................................... 19

     A.    FSMS's failure to argue that it would suffer prejudice dooms its Motion to
           Strike. ....................................................................................................................... 19

     B.    The NDNCA defense is not insufficient as a matter of law. ................................ 20

     C.    The misrepresentation defense is not insufficient as a matter of law. ................. 24

     D.    FSMS's request to strike the prayer for relief is improper. ................................. 25

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbington SPE, LLC v. U.S. Bank, Nat'l Ass'n,*
  352 F. Supp. 3d 508 (E.D.N.C. 2016) ..................................................................13

*Accelerant Twister, LLC v. Marjo, LLC,*
  No. CV 22-1366, 2023 WL 4457422 (D. Del. July 11, 2023) ...............................14

*Airborne Health, Inc. v. Squid Soap, LP,*
  984 A.2d 126 (Del. Ch. 2009) .......................................................................11, 14

*Akstin v. City of Charlotte,*
  No. 3:22-CV-00284-RJC-DSC, 2023 WL 11915720 (W.D.N.C. Dec. 14,
  2023) ...................................................................................................................19

*Alabi v. DHL Airways, Inc.,*
  583 A.2d 1358 (Del. Super. Ct. 1990) ..........................................................24, 25

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc,*
  367 F.3d 212 (4th Cir. 2004) ................................................................................8

*APEX Fin. Options, LLC v. Gilbertson,*
  No. CV 19-046, 2022 WL 619833 (D. Del. Jan. 31, 2022) ...........................13, 17

*Apex Tool Grp. LLC v. Cyderes, LLC,*
  No. 3:23-CV-00236, 2023 WL 7490146 (W.D.N.C. Nov. 13, 2023) .....................14

*Appel v. Berkman,*
  180 A.3d 1055 (Del. 2018) ..................................................................................14

*Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co.,*
  630 F. Supp. 2d 1084 (N.D. Cal. 2009) ...............................................................20

*Boeing Co. v. Ten Oaks Mgmt., LLC,*
  No. 3:22-CV-00481-KDB-DCK, 2023 WL 4241679 (W.D.N.C. June 28,
  2023) .............................................................................................................14, 15

*Brown v. TGS Mgmt. Co.,*
  57 Cal.App.5th 303 (2020) ..................................................................................23

*Bucci v. Burns,*
  No. 16 CVS 15478, 2018 WL 4288524 (N.C. Super. Sept. 4, 2018) ...................16

*Continental Cleaning Serv. v. U.P.S.,*
  No. 1:98CV1056, 1999 WL 1939249 (M.D.N.C. Apr. 13, 1999) .......................7, 8

ii

*Craft v. Bariglio*,
    No. 6050, 1984 WL 8207 (Del. Ch. Mar. 1, 1984).....................................................16, 17, 18

*Dane v. Commonwealth Partners, LLC*,
    No. 5:22-CV-00449, 2023 WL 3931511 (E.D.N.C. May 4, 2023) ...........................................19

*Debakey Corp. v. Raytheon Serv. Co.*,
    No. 14947, 2000 WL 1273317 (Del. Ch. Aug. 25, 2000) ......................................................13

*Dunn v. Borta*,
    369 F.3d 421 (4th Cir. 2004) ...............................................................................................14

*Dye v. U.S. Bank Nat'l Ass'n*,
    No. 3:15-CV-82-RJC, 2016 WL 427940 (W.D.N.C. Feb. 3, 2016).........................................11

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*,
    C.A. No. 2017-0500, 2018 WL 2727542 (Del. Ch. June 6, 2018) .........................................13

*ERA Franchise Sys., LLC v. Hoppens Realty, Inc.*,
    No. 12-CV-594, 2013 WL 3967869 (W.D. Wis. July 31, 2013).............................................24

*First Wheel Mgmt. Ltd. v. Inventist, Inc.*,
    No. CV 17-1059, 2021 WL 3363504 (D. Del. Aug. 3, 2021) .................................................17

*Further Festivals, LLC v. Etix, Inc.*,
    No. 5:23-CV-676, 2024 WL 1546919 (E.D.N.C. Apr. 9, 2024) ......................................14, 15

*Garner v. Global Plasma Solutions Inc.*,
    590 F. Supp. 3d 738 (D. Del. 2022)......................................................................................14

*Glob. Hookah Distrib., Inc. v. Avior, Inc.*,
    401 F. Supp. 3d 653 (W.D.N.C. 2019) .............................................................................14, 15

*Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*,
    No. CV 2020-0378, 2021 WL 305741 (Del. Ch. Jan. 29, 2021) ...........................................13

*Green Payment Sols., LLC v. First Data Merch. Servs. Corp.*,
    No. CV 18-1463, 2019 WL 4570015 (C.D. Cal. Aug. 5, 2019).............................................23

*Greenstar, LLC v. Heller*,
    934 F. Supp. 2d 672 (D. Del. 2013)......................................................................................17

*Grzybowski v. Tracy*,
    No. CV 3888, 2013 WL 4053515 (Del. Ch. Aug. 9, 2013)....................................................18

*Hub Grp., Inc. v. Knoll*,
    No. 2024-0471, 2024 WL 3453863 (Del. Ch. July 18, 2024) ...............................................24

*Interim Healthcare, Inc. v. Spherion Corp.*,
884 A.2d 513 (Del. Super. Ct. 2005) ...................................................................13

*Ixchel Pharma, LLC v. Biogen, Inc.*,
470 P.3d 571 (Cal. 2020) ...............................................................................20, 23

*Kirchner v. Stief*,
No. CIV.A. 1999-02-209, 2001 WL 1555313 (Del. Com. Pl. July 13, 2001)........................24

*Kostyszyn v. Martuscelli*,
No. CV 8828, 2014 WL 3510676 (Del. Ch. July 14, 2014) ................................18

*Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*,
844 F. Supp. 2d 519 (D. Del. 2012)...................................................................18

*Lazard Debt Recovery GP v. Weinstock*,
864 A.2d 955 (Del. Ch. 2004)...........................................................................15

*Luxx Int'l, LLC v. Pure Water Techs.*,
No. 2:23-cv-00512, 2023 WL 5333254 (D. Nev. Aug. 17, 2023)............................8

*Lynch v. Gonzalez*,
No. CV 2019-0356, 2020 WL 4381604 (Del. Ch. July 31, 2020)...................10, 14

*Martin v. Highland Indus., Inc.*,
No. 4:18-CV-03143, 2021 WL 10282421 (D.S.C. May 4, 2021) ...................21, 22

*McKague v. HSCGP, LLC*,
4:22-cv-00018, 2022 WL 3010472 (W.D. Va. July 29, 2022) ................................25

*Mid-Am. Salt, LLC v. D.J.'s Lawn Serv., Inc.*,
396 F. Supp. 3d 797 (N.D. Ind. 2019) ...............................................................24

*Middleton v. Andino*,
474 F. Supp. 3d 768 (D.S.C. 2020)......................................................................7

*Mobile Tech, Inc. v. Invue Sec. Prods., Inc.*,
No. 3:18-CV-52-RJC-DSC, 2018 WL 3910835 (W.D.N.C. May 1, 2018) ..........................19

*Nadendla v. WakeMed*,
24 F.4th 299 (4th Cir. 2022) ..............................................................................21

*Norman v. Elkin*,
860 F.3d 111 (3d Cir. 2017).................................................................................17

*In re P3 Health Grp. Holdings, LLC*,
No. 2021-0518, 2022 WL 15035833 (Del. Ch. Oct. 26, 2022) .......................12, 16

*Pisgah Lab'ys, Inc. v. Mikart, Inc.*,
    No. 1:14-CV-00139-MR-DLH, 2015 WL 996609 (W.D.N.C. Mar. 5, 2015) .......................14

*Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*,
    332 N.C. 1 (1992) ...........................................................................................................14, 15

*Sandler Partners, LLC v. Masergy Commc'ns, Inc.*,
    No. CV 19-6841, 2019 WL 9047103 (C.D. Cal. Nov. 25, 2019)............................................23

*Sed, Inc. of S.C. v. E. Coast Sweepstakes LLC*,
    No. 7:10-CV-135, 2010 WL 5477748 (E.D.N.C. Dec. 30, 2010) .........................................10

*Shaver v. Walker*,
    No. 22 CVS 11080, 2023 WL 2746848 (N.C. Super. Mar. 31, 2023) ......................10, 14, 16

*Silicon Knights, Inc. v. Epic Games, Inc.*,
    No. 5:07-CV-275, 2011 WL 1134453 (E.D.N.C. Jan. 25, 2011) ....................................15, 16

*Ussery v. Branch Banking & Tr. Co.*,
    368 N.C. 325 (2015) ............................................................................................................13

*Villa v. Ally Fin., Inc.*,
    No. 1:13CV953, 2014 WL 800450 (M.D.N.C. Feb. 28, 2014) .............................................24

*Virginia Innovation Scis., Inc. v. Samsung Elecs. Co.*,
    983 F. Supp. 2d 700 (E.D. Va. 2013) ...................................................................................25

*Wheeler v. BMW of N. Am. LLC*,
    534 F. Supp. 3d 527 (W.D.N.C. 2021) .................................................................................17

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ............................................................................................8, 9

**Statutes**

Cal. Bus. & Prof. Code § 16600.5(a)...........................................................................................23

## INTRODUCTION

In June 2020, FSMS pitched itself to the Tanner Defendants as a distributor that sourced "all" products "directly from" factories, that had extensive experience and capabilities in the distribution of personal protective equipment ("PPE"), that could fulfill orders up to "100M units," that vetted factories, and that supplied Target stores. FSMS touted its substantial prior business with a leading manufacturer, Orient Gene, and long personal relationship with Orient Gene's decisionmakers. The problem was that none of this was true. FSMS had begun operating barely a month before, had no employees or operational office, had no experience in PPE distribution, and had no insurance. FSMS had purchased products from only two entities, and at least one of them was a reseller and not a factory. Neither was Orient Gene. FSMS never itself vetted factories, never supplied Target, and had no "personal relationship" with Orient Gene.

Unaware of FSMS's fraud, the Tanner Defendants, who were already deep in negotiations with an actual distributor, pivoted to contract instead with FSMS. That contract, a non-disclosure and non-circumvention agreement ("the NDNCA"), purported to prevent them from doing business with Orient Gene, everywhere and in perpetuity, except through FSMS. Then, leveraging the NDNCA, FSMS effectively held up a fast-breaking opportunity the Tanner Defendants had with the UK Government until they signed a Distribution Agreement. That agreement contemplated that FSMS would act as a distributor for Orient Gene's test kits. But FSMS's lack of experience, relationships, and capabilities left it unwilling or unable to do so. TPUK had no option but to handle distribution itself. TPUK still paid FSMS $6.5 million for doing essentially nothing.

After pocketing those payments, FSMS sued for hundreds of millions more. But, after discovery revealed FSMS's fraudulent conduct, this Court allowed the Tanner Defendants to pursue fraud and misrepresentation counterclaims against FSMS. Yet FSMS now moves to

dismiss them, recycling the same unsuccessful arguments that failed to persuade this Court before.

The counterclaims contain **extensive allegations** about how FSMS misrepresented **specific facts** about its capabilities, experience, and relationships to lure the Tanner Defendants into a contractual relationship. The statements were both specific and falsifiable, unlike the types of "vague" or "optimistic" statements that courts treat as puffery. They also contain names, dates, and locations, satisfying Rule 9(b). FSMS's attempt to undercut these allegations by cherry-picking documents that FSMS's own complaint relies on, but the counterclaims do not, is improper. Thus, this Court should deny dismissal of the counterclaims.

FSMS also moved to strike two of the Tanner Defendants' defenses and their prayer for relief. But granting such a motion requires prejudice, something FSMS has not shown. Plus, FSMS already **consented** to the addition of the NDNCA defense. And this Court's prior ruling does not, as FSMS argues, dispose of the NDNCA defense. The Court's order, properly read, held that integration was a fact issue for the jury. Finally, FSMS overlooks that the misrepresentation defense is broader than the counterclaims and does not require materiality, intent, or damages.

### FACTUAL ALLEGATIONS

By mid-2020, the Tanner Defendants were working tirelessly to source PPE and COVID tests to aid in the global relief efforts for an unprecedented pandemic. Tanner Defs. Countercl., Dkt. 228 ("Countercl.") ¶ 6. During those efforts, on June 2, 2020, TPUK responded to an online networking post from Laird Cagan, who claimed to be "seeking advice to create a global sales channel partners network for PPE." *Id.*

After the initial exchange between Cagan and TPUK, Cagan and FSMS made a series of material misrepresentations. FSMS and its owners misrepresented that they had direct relationships with manufacturers, vetted factories, and did not use resellers to purchase products. *Id.* ¶ 7. They also misrepresented that they had years of experience in the distribution of PPE, and

strong business and personal connections with Chinese PPE and COVID test kit manufacturers—in particular, Orient Gene and Healgen. *Id.* These misrepresentations were intended to deceive the Tanner Defendants into entering contracts with FSMS. *Id.*

For example, on or about June 2, 2020, prior to entering into the NDNCA, Cagan directed the Tanner Defendants to the FSMS website to illustrate FSMS's capabilities. *Id.* ¶ 10. On or around that time, the website falsely stated that:

- "FS Medical Supplies provides Personal Protective Equipment **direct from the factory to you**, anywhere in the world. **We vet factories** throughout China . . . ."
- "**All FS Medical Supplies products are sourced directly** from . . . **trusted factories**."
- "We are able to fulfill orders up to **100M units.**"
- "We are targeting orders of **30,000 units to 100M units and more.**"

*Id.* But these statements were not true. FSMS did not source all of its products directly from factories and did not itself vet any factories. *Id.* ¶¶ 11, 32. In addition, the website showed the pictures and listed the titles of six individuals other than Cagan and his partner Jim Mao, purporting to work for FSMS. *Id.* ¶ 12. It created the impression that FSMS was a well-staffed company, when, in fact, FSMS had no employees and no operational office. *Id.*

On or about June 2, 2020, Cagan had a telephone conversation with TPUK employee Jonathan Bracey. *Id.* ¶ 13. Bracey told Cagan that the Tanner Defendants had been pursuing a relationship with Healgen and Orient Gene, seeking to acquire COVID test kits from them. *Id.* Bracey also told Cagan that he and his team had been negotiating an agreement to acquire test kits from a third-party distributor called Confirm BioSciences, the largest North American distributor for Healgen. *Id.* To persuade the Tanner Defendants to contract with FSMS, Cagan told Bracey that he **worked directly with** Orient Gene and Healgen. *Id.* Cagan claimed he and FSMS had a pre-existing business relationship, and had done substantial prior business with, Orient Gene and Healgen. *Id.* Cagan concealed that, in reality, FSMS had never purchased any products from

3

Orient Gene or Healgen.  *Id.*

On the same phone call, Cagan told Bracey he got into PPE distribution **a few years back** and that **he worked directly** with Chinese manufacturers.  *Id.* ¶ 14.  He said that he had invested in the PPE distribution space **directly with Chinese companies a while back**.  *Id.*  But, in fact, FSMS had been operating for a little over a month, did not purchase products exclusively from manufacturers, and had little experience in PPE distribution.  *Id.*

On or about June 3, 2020, Stephen Scalia, the president of the Tanner Pharma Group of companies, and Bracey viewed FSMS's website, discussed how impressed they were with its products and statements, and expressed their enthusiasm about FSMS's ability to distribute Healgen and Orient Gene's products.  *Id.* ¶ 15.  On June 4, Cagan sent Bracey a price sheet, which stated that FSMS's products were "**Direct from Trusted Factories No Middlemen or Brokers**." *Id.* ¶ 16.  That price sheet also contained large minimum order quantities to falsely suggest that FSMS regularly distributed large volumes of products.  *Id.*

On or about June 5, 2020, Scalia spoke by telephone with Cagan.  *Id.* ¶ 17. During that conversation, Cagan told Scalia that he had acquired a company that manufactured a medical device in China that was on the verge of FDA approval.  *Id.*  Cagan further told Scalia that he leveraged his manufacturing experience in China to find suppliers for PPE and that FSMS had a network of suppliers in China.  *Id.*  Cagan boasted to Scalia that he and FSMS had already done substantial business with Orient Gene and Healgen and that FSMS had a close personal working relationship with Orient Gene's decisionmaker and Chairman.  *Id.* ¶ 18.

Relying on the numerous representations from Cagan and those on FSMS's website, on or around June 9, 2020, TannerGAP and FSMS executed the NDNCA.  *Id.* ¶ 19.  The NDNCA listed FSMS's address as 20400 Stevens Creek Boulevard, Suite 700, Cupertino, CA 95014.  *Id.*  In fact,

this address was occupied by a different company with which Cagan was involved. *Id.* ¶ 20. No FSMS personnel regularly worked there. *Id.*

After the execution of the NDNCA, FSMS continued to mislead the Tanner Defendants about FSMS's capabilities and relationships. *Id.* ¶ 21. On or about June 10, 2020, Cagan sent Bracey a brochure of FSMS's products, which stated "**Our elite manufacturing facilities** and **prior expertise in the field** make us uniquely equipped to respond to this medical supply crisis. See below for an overview of **our facilities** and available product." *Id.* ¶ 22. FSMS had no manufacturing facilities and little "prior expertise" in the field of PPE distribution. *Id.*

On or about June 27, 2020, Cagan told Bracey that FSMS had a number of salespeople. *Id.* ¶ 24. In fact, FSMS had no employees. *Id.* On or about August 21, 2020, Cagan told Bracey, Scalia, and other TPUK employees that FSMS was supplying Target stores in the United States. *Id.* ¶ 25. But FSMS had never made any sales to Target stores. *Id.*

On or about August 27, 2020, Cagan represented to a TannerGAP employee that FSMS had minimum order quantities of several million. *Id.* ¶ 26. Cagan made this statement to deceive TannerGAP into believing that FSMS regularly distributed large volumes of products, when in fact, it had made few large sales in its short existence. *Id.*

Again relying on the representations from Cagan and from FSMS's website, on September 11, 2020, the Tanner Defendants executed the Distribution Agreement, in which FSMS represented that it was engaged in the "supply and sale of finished [PPE] and Diagnostic Rapid Tests." *Id.* ¶ 27. FSMS also agreed to work "as an authorized reseller or distributor of Covered Products," which included Orient Gene test kits. *Id.* The Distribution Agreement again listed FSMS's address as 20400 Stevens Creek Boulevard, Suite 700, Cupertino, CA 95014. *Id.*

As described above, many of FSMS and Cagan's statements to the Tanner Defendants were

false and misleading. *Id.* ¶ 28. FSMS began operating sometime after March 30, 2020, hardly a month before it began marketing itself as a company with extensive experience, relationships, and networks in PPE distribution. *Id.* ¶ 29. FSMS's first communication with anyone from Orient Gene or Healgen was on May 16, 2020, hardly two weeks before its contact with the Tanner Defendants, and after they had already reached out to Orient Gene and were in serious negotiations with a distributor of Orient Gene's products. *Id.* ¶ 30. By the time FSMS entered the NDNCA, it had made only six purchases of products from a total of two entities, neither of which was Orient Gene or Healgen, and at least one of which was a reseller and not a manufacturer. *Id.* ¶ 31, 34. At that point, FSMS had made just one small purchase of Orient Gene-related products from a third-party reseller not affiliated with Orient Gene or Healgen called Forever Me Industrial Co. *Id.* ¶ 35.

None of Cagan, Mao, or FSMS ever had the close or personal relationship with Orient Gene, Healgen, Orient Gene's Chairman, or other decisionmakers that they claimed. *Id.* ¶ 36. As of July 2020, Cagan communicated with Healgen through its generic customer service email address, info@healgen.us. *Id.* ¶ 37. As of August 19, 2020, Healgen told FSMS that FSMS had no client account at Healgen and that Healgen did not have FSMS in its internal systems. *Id.* ¶ 38. On the same day, Cagan sent his account opening form to Healgen. *Id.* ¶ 39. On that form, Cagan said that he had been in business for only one year and under the question "How did you hear about us?" he checked the box "Website," showing that he heard of Healgen through their website and not through an existing business or personal relationship. *Id.*

In addition to misrepresenting its business and relationships, FSMS misrepresented its resources and capabilities to serve as a distributor. *Id.* ¶ 40. FSMS never had any employees and never intended to hire any employees. *Id.* ¶ 41. FSMS never maintained general liability insurance or product liability insurance, reflecting that it never intended to own or bear responsibility for any

products.  *Id.* ¶ 42.  FSMS had no licenses other than a general California business license.  *Id.* ¶ 43.  FSMS had no dedicated IT system or infrastructure.  *Id.* ¶¶ 44-45.  FSMS lacked the financial resources to perform as a distributor for large volumes of products.  *Id.* ¶ 45.

As a result of FSMS's misrepresentations, FSMS induced the Tanner Defendants to enter contracts that they otherwise would not have entered.  *Id.* ¶¶ 48-49.  Due to FSMS's inexperience and lack of access, it could not serve as an effective distributor or get direct access to Healgen or Orient Gene's decisionmakers.  *Id.* ¶ 50.  Cagan, Mao, and FSMS were consistently slow to respond to the Tanner Defendants' and their customers' requests, even where the requests were urgent, and in one case their slow response times caused TannerGAP to lose the chance to bid on a time-sensitive deal.  *Id.* ¶ 51.  In September 2020, Cagan, Mao, and FSMS failed to respond timely to several urgent requests from TPUK and Bracey relating to the UK Government's bidding process.  Bracey told Mao and Cagan that their slow responses were not allowing TPUK to move quickly enough to compete in the process.  *Id.* ¶ 52.  TPUK had no option but to handle the supplier side of the UK Government transactions itself and bear all of the financial risk.  *Id.* ¶ 53.

TPUK paid approximately $6.5 million to FSMS for doing essentially nothing pursuant to contracts that FSMS induced the Tanner Defendants to sign based on false pretenses.  *Id.* ¶ 55.

## ARGUMENT

I. **This Court should disregard the 50 pages of exhibits attached to FSMS's brief.**

This Court should ignore the more than 50 pages of documents attached to FSMS's brief on which the counterclaims do not rely.  On a Rule 12(b)(6) motion, courts may consider only documents referenced by the claims or counterclaims, not by the answer.  *Middleton v. Andino*, 474 F. Supp. 3d 768, 771 (D.S.C. 2020) (explaining that, unlike a Rule 12(b) motion, a court "consider[s] the answer as well as the complaint and documents incorporated by reference in the pleadings" in a Rule 12(c) motion); *Cont'l Cleaning Serv. v. United Parcel Serv., Inc.*, No.

7

1:98CV1056, 1999 WL 1939249, at *1 (M.D.N.C. Apr. 13, 1999) (similar); *accord Luxx Int'l, LLC v. Pure Water Techs.*, No. 2:23-cv-00512, 2023 WL 5333254, at *3 & n.4 (D. Nev. Aug. 17, 2023) (refusing to consider extrinsic evidence not referenced in the counterclaim, even though it was referenced in the answer). Here, with three exceptions discussed below, FSMS admits the Tanner Defendants referenced the documents in their answer and not in their counterclaims. FSMS Mem. Mot. Dismiss, Dkt. 236 ("Mem.") at 7-9, 12 n.5, 13 (citing answer). Therefore, this Court should not consider them.

Further, as FSMS's own case illustrates, the justification for the rule allowing courts to consider extrinsic evidence at the Rule 12(b)(6) stage is absent here. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc*, 367 F.3d 212, 234 (4th Cir. 2004). That rule prevents a plaintiff from "extracting an isolated statement" where "the full context" would give a different impression. *Id*. Here, that rationale is not present because the Tanner Defendants did not extract or otherwise rely in their counterclaims on these extrinsic documents. FSMS is the party that relied on them in its complaint, to which the Tanner Defendants' answer merely responded. This Court should reject FSMS's attempt to get a backdoor summary judgment ruling with its one-sided evidence. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 601, 607 (4th Cir. 2015) (vacating dismissal where district court considered documents not relied on in complaint).

Exhibits 1, 2, and 11 are the three exceptions. As to Exhibit 1, the Tanner Defendants do not oppose incorporation of the executed Distribution Agreement because the counterclaims reference it. Countercl. ¶ 27. As to Exhibit 2, the Tanner Defendants oppose incorporation of FSMS's "redacted" ledger "excerpt." While the counterclaims reference a "ledger" (*id.* ¶ 31), it is not identical to the "redacted" and "excerpted" one. The counterclaims refer to a "ledger" reflecting "six purchases of products from a total of two entities," *id.*, whereas the "redacted"

ledger "excerpt" reflects only one purchase.  Mem. Ex. 2.  This Court should not consider FSMS's cherry-picked excerpt.  As to Exhibit 11, FSMS does not argue that the counterclaims **or** answer reference this document.  Mem. 20.  This Court should not consider it in ruling on the motion to dismiss.  *See Zak*, 780 F.3d at 601.

## II.     The Tanner Defendants have adequately pleaded their fraud and negligent misrepresentation claims.

The Tanner Defendants have adequately pleaded their fraud and negligent misrepresentation claims ("the Misrepresentation Claims") because they have alleged (i) a false statement or misrepresentation; (ii) justifiable reliance; and (iii) injury.  FSMS does not argue that the Tanner Defendants have failed to plausibly allege any other elements.  Mem. 2-4.

### A.     The Tanner Defendants have plausibly alleged that FSMS made false statements.

The Misrepresentation Claims abound with extensive, detailed allegations of FSMS's misrepresentations.  They allege that FSMS and its owners made these specific misrepresentations:

- "All FS Medical Supplies products are sourced directly from . . . factories"
- FSMS is "able to fulfill orders up to 100M units"
- FSMS is an "Authorized distributor for USA and globally"
- FSMS's products are "Direct from Trusted Factories No Middlemen or Brokers"
- FSMS's products are "direct from the factory"
- "FSMS had done prior substantial business with Orient Gene and Healgen"
- FSMS had a "personal working relationship with Orient Gene's decisionmaker and Chairman"
- FSMS "worked directly with Orient Gene and Healgen"
- FSMS "vet[s] factories"
- FSMS's Cagan "got into PPE distribution a few years back"
- FSMS's Cagan "worked directly with . . . Chinese manufacturers"
- FSMS had "prior expertise in the field" of PPE distribution

9

- FSMS had "suppl[ied] Target stores"

Countercl. ¶¶ 9-27. The Misrepresentation Claims contain specific details about each misstatement, including the "who, what, where, and when" required by Rule 9(b). They also contain allegations explaining the support for the Tanner Defendants' belief as to why each statement is false. *Id.* ¶¶ 28-55.

FSMS critiques the Misrepresentation Claims for alleging that FSMS "implied" or "led [the Tanner Defendants] to believe" the false statements, rather than alleging that FSMS said them explicitly. Mem. 14. But FSMS's own case recognized that "creat[ing] a false impression as to the true state of affairs" is an actionable misstatement. *Lynch v. Gonzalez*, C.A. No. 2019-0356, 2020 WL 4381604, at *35 (Del. Ch. July 31, 2020); Mem. 14. Indeed, another of FSMS's cases held that a misstatement was actionable where it "could be interpreted" to mean something false, or where it "implicitly promis[ed]" something. *Shaver v. Walker*, No. 22 CVS 11080, 2023 WL 2746848, at *5 (N.C. Super. Mar. 31, 2023); Mem. 14. Here, the Misrepresentation Claims allege that FSMS told TPUK that it "worked directly with Orient Gene." Countercl. ¶ 13. Construing that statement "in the light most favorable" to the Tanner Defendants, *Sed, Inc. of S.C. v. E. Coast Sweepstakes LLC*, No. 7:10-CV-135, 2010 WL 5477748, at *1 (E.D.N.C. Dec. 30, 2010), it created the false impression that FSMS had transacted with Orient Gene on many prior orders, when, in fact, it had an introductory phone call only two weeks before. Countercl. ¶ 30.

FSMS next complains that some of the allegations do not state what FSMS "actually said." Mem. 14. FSMS appears to complain that the allegations paraphrase, rather than quote, these misstatements. What FSMS overlooks is that the Misrepresentation Claims allege that FSMS made these statements in **oral** conversations. Countercl. ¶¶ 13-14 (describing call between Bracey and Cagan on June 2, 2020); *id.* ¶¶ 17-18 (describing Scalia-Cagan call on June 5, 2020). FSMS

cites no case holding, and nothing in Rule 12 or Rule 9 requires, the Tanner Defendants to quote any alleged misstatement word-for-word. That the Misrepresentation Claims identify the names, dates, and paraphrase the specific substance of each misstatement distinguishes them from FSMS's cases holding fraud claims insufficiently specific. *Dye v. U.S. Bank Nat'l Ass'n*, No. 3:15-CV-82-RJC, 2016 WL 427940, at *6 (W.D.N.C. Feb. 3, 2016) (allegations were "at best, conclusory"); *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 142-43 (Del. Ch. 2009) (allegations did "not mention any person or the time, place, or contents of the misrepresentation").

FSMS next attempts to disprove the falsity of some statements by pointing to extrinsic evidence. Mem. 2-3, 12-14. As discussed, this argument is improper on a motion to dismiss. *Supra* Part I. Even if this Court were to consider it, FSMS's evidence confirms the allegations rather than refutes them. First, FSMS argues that it was telling the truth when it claimed that it "worked directly with Orient Gene and Healgen" because FSMS had done "two transactions with Orient Gene" by that time. Mem. 13. It points to the "redacted" ledger "excerpt," discussed above. *Supra* Part I; Mem. Ex. 2. However, the excerpt only confirms the falsity of FSMS's statement. It shows that FSMS had made one purchase, not two, and that purchase was not from Orient Gene but from an entity called "Forever Me Industrial Co., Ltd." Mem. Ex. 2. Forever Me was a "third-party reseller not affiliated with Orient Gene or Healgen." Countercl. ¶ 35. FSMS's position is akin to saying that it "worked directly" with Apple because it bought an iPhone at Best Buy.

Next, FSMS asserts that the Tanner Defendants have not sufficiently alleged a false statement because they "admitted" that FSMS had a "business relationship with Orient Gene." Mem. 2; *see also id.* 14. The Tanner Defendants have never made any such admission and doing so would contradict the allegations. As explained, FSMS and Orient Gene had an introductory phone call only two weeks before FSMS met TPUK and **FSMS had never transacted business**

with Orient Gene or Healgen by that time. Countercl. ¶¶ 29-30, 34. And tellingly, the "admission" that FSMS points to is not in the Misrepresentation Claims, but in a text message attached to FSMS's brief. Mem. 12 (citing Mem. Ex. 4). This Court should not consider it for the reasons above. *Supra* Part I. Even if it did, in that message, TPUK employee Bracey begged FSMS to get in touch with Orient Gene. *Id.* Drawing inferences in the Tanner Defendants' favor, that text message again supports a showing of falsity rather than refutes it. That Bracey had to beg FSMS for information from Orient Gene reinforces that FSMS had no relationship with Orient Gene. If it had, FSMS would have had open channels of communication with key decisionmakers at Orient Gene, and Orient Gene would have been responsive to FSMS's requests. But FSMS had none of that, and Bracey was left without information at a critical time.

Finally, FSMS argues that it was being truthful when it said that it could "fulfill orders up to 100M units" because "Tanner sources [sic] more than 100 million Orient Gene test kits directly." Mem. 15. This argument is a non-sequitur. FSMS admits that "**Tanner** source[d]" the products, not FSMS. *Id.* FSMS cannot prove that it had the ability to fulfill large orders by pointing to an instance when someone else did so because FSMS could not.

### B. The Tanner Defendants have plausibly alleged justifiable reliance.

The Tanner Defendants have also plausibly alleged justifiable reliance. "Justifiable reliance requires that the representation relied upon involve a matter which a reasonable person would consider important in determining his choice of action in the transaction in question, i.e., that the matter misrepresented is material." *In re P3 Health Grp. Holdings, LLC,* No. 2021-0518, 2022 WL 15035833, at *6 (Del. Ch. Oct. 26, 2022). Here, a reasonable person would consider material the capabilities, experience, and relationships of a counterparty who had agreed to serve as an "authorized reseller or distributor" for Orient Gene's products and other PPE. Countercl.

¶ 27; Mem. Ex. 1 § 7. Unlike FSMS's cases,[1] this is not a situation where reliance was unreasonable because the misrepresentation contradicted a written document. As FSMS recognizes, the Distribution Agreement is silent on FSMS's capabilities, experience, and prior purchases from Orient Gene. Mem. 17. To the extent that it touches on FSMS's relationship with Orient Gene at all, it is **consistent** with FSMS's misrepresentations. It states that "FSMS is engaged in . . . the supply and sale of [PPE] and Diagnostic Rapid Tests," that it agrees to work "as an authorized reseller or distributor," and that Orient Gene, as the manufacturer of any Covered Product, "shall be considered a prior relationship of FSMS." Mem. Ex. 1 §§ Rec. B, 7, 16.4.

Finally, FSMS makes the puzzling argument that the "prior relationship" clause in the Distribution Agreement is evidence that FSMS actually had such a relationship. Mem. 19. But this fact hurts FSMS and does not help it. As discussed above, that FSMS's oral misrepresentations were consistent with its written misrepresentations shows that the Tanner Defendants' reliance was reasonable. In sum, FSMS has shown no inconsistencies between the parties' contracts and FSMS's misrepresentations so as to make reliance on them unjustifiable. And, as two of FSMS's own cases explain, reasonable reliance "is ordinarily a question for the jury." *Abbington SPE*, 352 F. Supp. 3d at 518; *accord APEX Fin. Options, LLC v. Gilbertson*, No. CV 19-046, 2022 WL 619833, at *5-6 (D. Del. Jan. 31, 2022).

---

[1] Mem. 17-18; *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, C.A. No. 2017-0500, 2018 WL 2727542, at *13 (Del. Ch. June 6, 2018) (reliance not reasonable where representation contradicted written document); *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 338 (2015) (same); *Abbington SPE, LLC v. U.S. Bank, Nat'l Ass'n*, 352 F. Supp. 3d 508, 518 (E.D.N.C. 2016) (same); *Debakey Corp. v. Raytheon Serv. Co.*, No. 14947, 2000 WL 1273317, at *22 (Del. Ch. Aug. 25, 2000) (same). Two of FSMS's cases did not involve fraud or negligent misrepresentation claims. *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, C.A. No. 2020-0378, 2021 WL 305741, at *14 (Del. Ch. Jan. 29, 2021) (quasi-estoppel); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 547–48 (Del. Super. Ct. 2005) (breach of contract).

### 1. FSMS's misstatements are not "puffery" because they can be proven true or false.

FSMS appears to concede that many of FSMS's statements were false but argues they did not "matter" because they were puffery. Mem. 3 ("[a]s it turned out, these statements were all true as far as anything that mattered"); *id.* 15-16. This argument is unpersuasive. False statements are material when they make "specific factual allegations that . . . can be proven true or false." *Boeing Co. v. Ten Oaks Mgmt., LLC*, No. 3:22-CV-00481-KDB-DCK, 2023 WL 4241679, at *5 (W.D.N.C. June 28, 2023) (citation omitted); *Garner v. Glob. Plasma Sols. Inc.*, 590 F. Supp. 3d 738, 744 (D. Del. 2022) (explaining "actionable statements misstate material facts that can be measured or known"). Courts have held that misstatements about "operational details," *Boeing* Co., 2023 WL 4241679, at *5; "business dealings and prospects," *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004); "skill and experience," *Pisgah Lab'ys, Inc. v. Mikart, Inc.*, No. 1:14-CV-00139-MR-DLH, 2015 WL 996609, at *9 (W.D.N.C. Mar. 5, 2015); and "capabilities," "infrastructure," and "resources," *Apex Tool Grp. LLC v. Cyderes, LLC*, No. 3:23-CV-00236, 2023 WL 7490146, at *4-5 (W.D.N.C. Nov. 13, 2023); can constitute material misrepresentations.

By contrast, few of FSMS's cases deemed a misstatement to be puffery.[2] Of those that did, the misstatement "ma[d]e no specific guarantee or disprovable fact." *Glob. Hookah Distribs., Inc. v. Avior, Inc.*, 401 F. Supp. 3d 653, 660 (W.D.N.C. 2019); *see also Accelerant Twister, LLC v. Marjo, LLC*, No. CV 22-1366, 2023 WL 4457422, at *9 (D. Del. July 11, 2023) (statement did not contain facts "that can be measured or known"); *Further Festivals, LLC v. Etix, Inc.*, No. 5:23-

---

[2] Mem. 14-15; *Appel v. Berkman*, 180 A.3d 1055, 1060-61 (Del. 2018) (alleged omission was material); *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17–18 (1992) (statements were sufficiently specific and not "mere puffing"); *Shaver*, 2023 WL 2746848, at *5 (statements were "sufficiently definite and specific to constitute representations of fact"); *see also Lynch*, 2020 WL 4381604, at *35-36, *38 (all elements of fraudulent inducement were met by clear and convincing evidence). *Airborne Health*, discussed above, commented that the alleged misrepresentations were "sales talk that the law labels puffery," but did not further analyze materiality, dismissing the claims instead because they "d[id] not identify any specific fact that was misrepresented." 984 A.2d at 142-43.

CV-676, 2024 WL 1546919, at *4 (E.D.N.C. Apr. 9, 2024) (statement promising to make a process "simple"); *Lazard Debt Recovery GP v. Weinstock*, 864 A.2d 955, 971–73 (Del. Ch. 2004) (statement that an employer had an "ideal work environment" and "unique resources").

Here, FSMS's statements that it sourced "all" products "directly" from manufacturers and did not use resellers is both a "guarantee [and] disprovable fact." *Glob. Hookah Distrib.*, 401 F. at 660. So are its statements that it bought products without "[m]iddlemen or [b]rokers," that it was a distributor for Orient Gene and Healgen, that it had transacted business with Orient Gene and Healgen, that it had PPE distribution experience, that it vetted factories, and that it supplied Target stores. Each of these statements "can be proven true or false," and thus is not puffery. *Boeing Co.*, 2023 WL 4241679, at *5. And as FSMS's own cases illustrate, that FSMS made some misstatements on its website and in price sheets does not turn them into puffery. *U.S. Gypsum Co.*, 332 N.C. at 17-18 (holding statements in "sales brochures" were material and not puffery).

FSMS next argues that it should not matter how much it overstated the personnel on its website because the Distribution Agreement allowed TPUK to go direct to Orient Gene. Mem. 16. This argument only underscores the merits of the Misrepresentation Claims. First, it illustrates exactly why FSMS made these misrepresentations in the first place. FSMS never planned to – and could not – do the work of a distributor. Instead, it waited for TPUK to realize it would not be able to sell Orient Gene products unless TPUK did all the work and FSMS sat back and collected the money. Second, it illustrates exactly why TPUK had to go direct. FSMS lacked the capabilities, resources, and relationships that would have enabled it to serve as an effective "authorized reseller or distributor" of Orient Gene's products. Mem. Ex. 1 § 7.

Finally, FSMS argues its misrepresentation about supplying Target stores was not material. Mem. 16. But this Court should allow a jury to decide the materiality of that representation. *Silicon*

*Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275, 2011 WL 1134453, at *7 (E.D.N.C. Jan. 25, 2011) ("The determination whether a particular statement is one of fact or opinion . . . is normally left to the jury."). A reasonable person would consider FSMS's prior experience distributing PPE on a large scale for a high-profile customer like Target to be important in determining whether to contract with it as a distributor. *In re P3 Health Grp. Holdings*, 2022 WL 15035833, at *6.

### 2. The Tanner Defendants had no duty to conduct "due diligence" on facts peculiarly within FSMS's knowledge.

FSMS is wrong that a plaintiff alleging fraud must always show that it conducted due diligence. Mem. 16-18. As two of FSMS's own cases state, diligence is not required where the matter is within the knowledge of one party and not the other. "Where a representation is made of a fact . . . peculiarly within the knowledge of the person making the representation, the person receiving [it] . . . **is not required to seek means of information to determine its falsity**, although such means are available." *Craft v. Bariglio*, No. 6050, 1984 WL 8207, at *9 (Del. Ch. Mar. 1, 1984) (emphasis added) (citation omitted); *accord Bucci v. Burns*, No. 16 CVS 15478, 2018 WL 4288524, at *2 (N.C. Super. Sept. 4, 2018) (further diligence not required where defendants were "the only ones alleged to have known the truth about either misrepresentation" and the circumstances did not put plaintiffs on notice). FSMS's other case explains that "[a] plaintiff may justifiably rely on representations made by a defendant with superior knowledge on a subject where the parties are not on equal footing and nothing about the defendant's representations should have given plaintiff cause to suspect the veracity of the representations." *Shaver*, 2023 WL 2746848, at *5 (citation omitted). Here, only FSMS had access to information about its prior expertise, relationships, and capabilities, and the Tanner Defendants had no reason to believe FSMS's statements were untrue.

In addition, FSMS is wrong that the Misrepresentation Claims do not contain "any

inference" that the Tanner Defendants "sought any information" about FSMS. Mem. 17. Bracey and Scalia both "viewed FSMS's website" after talking with Cagan over the phone. Countercl. ¶ 15. FSMS's website echoed the same misrepresentations that FSMS made orally, and gave Bracey and Scalia no reason to be suspicious.

### C. Delaware law does not bar the Misrepresentation Claims.

FSMS argues that Delaware law bars recovery for the Misrepresentation Claims because they are not distinct from the breach of contract. Mem. 19-20. It is mistaken for three reasons. First, unlike all FSMS's cases,[3] the Tanner Defendants have not alleged a breach of contract claim.[4]

Second, "[w]here a fraud claim alleges damages for rescission or rescissory damages, it is not barred as a 'rehash' of the Complaint's breach of contract damages." *First Wheel Mgmt. Ltd. v. Inventist, Inc.*, No. CV 17-1059, 2021 WL 3363504, at *2 (D. Del. Aug. 3, 2021). As FSMS's own cases show, "the doctrine of merger . . . by contract does not preclude a claim for rescission where a plaintiff was induced to enter into the contract because of a fraudulent misrepresentation." *Craft*, 1984 WL 8207, at *8; Mem. 4. "[R]escissory damages based on a fraud claim are distinguishable from breach of contract damages." *APEX Fin.*, 2022 WL 619833, at *4.

Third, as FSMS's own case states, "[c]laims for fraud can coexist with claims for breach of contract where a defendant committed intentional fraud." *Greenstar*, 934 F. Supp. 2d at 696; Mem. 19.[5] Here, the Tanner Defendants have alleged that FSMS fraudulently induced them into

---

[3] Mem. 19; *Norman v. Elkin*, 860 F.3d 111, 130–31 (3d Cir. 2017) (plaintiff alleged fraud and contract claims); *APEX Fin.*, 2022 WL 619833, at *5-6 (same); *Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 693-96 (D. Del. 2013) (same).

[4] The Tanner Defendants have alleged that FSMS breached the Distribution Agreement as part of its excuse of performance **defense**. Dkt. 120 at 51; Dkt. 228 at 52-53. They also alleged the defenses of recoupment and setoff "because of FSMS's failure to perform its obligations under the Distribution Agreement." Dkt. 228 at 53; *see also* Dkt. 120 at 51.

[5] To the extent that FSMS is trying to invoke the economic loss doctrine, fraud in the inducement, as alleged here, is a well-recognized exception to that doctrine. *Wheeler v. BMW of N. Am. LLC*, 534 F. Supp. 3d 527, 534 (Conrad, J.)

17

contracting and seek rescission to unwind those contracts, and therefore, Delaware law does not bar their claims.

Next, FSMS argues that the Tanner Defendants did not suffer any injury because FSMS allegedly provided "access" to Orient Gene. Mem. 19-20. FSMS ignores the allegations that (1) the Tanner Defendants were already "negotiating an agreement" with a distributor for Healgen, Countercl. ¶ 13; (2) because of FSMS's fraud, they contracted instead with FSMS, *id.* ¶ 48; and (3) they paid FSMS approximately $6.5 million under their contracts with it. *Id.* ¶¶ 66, 75. Plus, the Tanner Defendants stand to lose hundreds of millions more from this litigation if FSMS were to prevail on its claims (which the Tanner Defendants vigorously dispute).

Next, FSMS's "equitable fraud" authorities have no bearing here. Mem. 20. The Tanner Defendants did not bring an "equitable fraud" claim, which, as FSMS's cases show, has different elements than legal fraud. *Grzybowski v. Tracy*, No. 3888-VCG, 2013 WL 4053515, at *6 (Del. Ch. Aug. 9, 2013) (explaining elements and that "equitable fraud is both more and less difficult to establish than with legal fraud"); *Kostyszyn v. Martuscelli*, No. CV 8828-MA, 2014 WL 3510676, at *4 (Del. Ch. July 14, 2014) (similar). Second, FSMS's authorities addressed sales of assets where the asset value changed over time, and therefore, a remedy of undoing the contract and reversing the sale would be inequitable. *Grzybowski*, 2013 WL 4053515, at *6-7 (real estate); *Kostyszyn*, 2014 WL 3510676, at *4 (retail business); *Craft*, 1984 WL 8207, at *12 (same). Here, this case does not involve the sale of any asset, much less one that changed in value over time.

Finally, FSMS invokes a March 2021 letter to try to show that the Tanner Defendants have known of the fraud for years. Mem. 20 (citing Mem. Ex. 11). This Court should not consider the

---

(W.D.N.C. 2021) (so stating); *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 529 (D. Del. 2012) (same).

letter because it is improper extrinsic evidence. *Supra* Part I. And even if it did (it should not), FSMS's argument is specious. The Tanner Defendants have explained that they learned of the facts giving rise to the Misrepresentation Claims "during discovery and [their] follow-on investigation, with some learned only in **June 2024**." Dkt. 189 at 6. Until discovery, the Tanner Defendants had no access to FSMS's internal communications about its relationships, finances, and business records.

## III. This Court should not take the "disfavored" step of striking the Tanner Defendants' defenses and prayer for relief.

This Court should deny FSMS's Motion to Strike the Tanner Defendants' NDNCA defense, misrepresentation defense, and prayer for relief. Mem. 1. "Rule 12(f) motions are generally disfavored because striking a portion of a pleading is a drastic remedy and is often sought by the movant simply as a dilatory tactic." *Akstin v. City of Charlotte*, No. 3:22-CV-00284-RJC-DSC, 2023 WL 11915720, at *4 (W.D.N.C. Dec. 14, 2023). Even FSMS recognizes that there is a "lenient standard for pleading facts concerning defenses" (Dkt. 188 at 1) and that "motions to strike are disfavored." Mem. 10.

### A. FSMS's failure to argue that it would suffer prejudice dooms its Motion to Strike.

FSMS's failure to argue that it would suffer prejudice dooms its Motion to Strike. "A motion to strike typically requires a showing that the denial would prejudice the moving party." *Akstin*, 2023 WL 11915720, at *4 (declining to strike allegations where defendant had not shown prejudice); *Dane v. Commonwealth Partners, LLC*, No. 5:22-CV-00449, 2023 WL 3931511, at *2 (E.D.N.C. May 4, 2023) (same); *Mobile Tech, Inc. v. Invue Sec. Prods., Inc.*, No. 3:18-CV-52-RJC-DSC, 2018 WL 3910835, at *4 (W.D.N.C. May 1, 2018) (same). Here, FSMS does not argue that it will be prejudiced by the two defenses and prayer if they are not stricken. *Dane*, 2023 WL 3931511, at *2. Therefore, this Court should deny FSMS's motion to strike.

**B.    The NDNCA defense is not insufficient as a matter of law.**

FSMS's NDNCA claim fails because the NDNCA is void under section 16600 of California's Business and Professional Code as an unlawful restraint of trade.  Dkt. 228 at ¶¶ 53-54.  The NDNCA purports to prohibit the Tanner Defendants from doing business with Orient Gene and Healgen **in perpetuity** and without any territorial limitation or limitation on type of business activity.  *See* Dkt. 63-2, §§ 4, 10 (providing no term limit on the non-circumvention provision).   A provision of that kind is void under California law because it unreasonably suppresses competition.  *See Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 581-82, 588, 590 (Cal. 2020) (holding section 16600 invalidates business contracts that unreasonably restrain trade and suppress competition); *Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co*., 630 F. Supp. 2d 1084, 1091 (N.D. Cal. 2009) (holding contract void and unenforceable where it was "overly broad with respect to both subject matter and temporal scope").

FSMS now moves to strike the NDNCA defense even though it **consented** to the Tanner Defendants' addition of this defense.  Dkt. 188 at 1 n.1.  FSMS suggests this Court already decided that Delaware law governed the NDNCA, and therefore, California law does not apply.  Mem. 21; Dkt. 117 at 4.  Respectfully, FSMS misunderstands Judge Conrad's holding.  Judge Conrad stated that, while it was "plausible" that the Distribution Agreement terminated the NDNCA, the Distribution Agreement was ambiguous on that point.  Dkt. 117 at 8-9. The Court explained that a "trial court cannot choose between two differing reasonable interpretations of ambiguous documents."  *Id.* at 8.  The Court never concluded that the two agreements should be integrated. Indeed, there would be nothing to integrate if the Distribution Agreement terminated the NDNCA.

FSMS's confusion appears to stem from the Court's ruling elsewhere, which stated that Delaware law applied to the NDNCA, notwithstanding the California choice-of-law clause, "because the Court construes the Distribution Agreement and the [NDNCA] as one integrated

agreement." Dkt. 117 at 4. That statement on its face is inconsistent with the Court's ruling discussed above. Thus, the Tanner Defendants understand the Court's order to hold that "if" the Distribution Agreement and NDNCA were to be construed as an integrated agreement, the Court would apply Delaware law. The difference is important because, if the fact finder were to conclude that the agreements are **not** integrated, then California law would likely apply.[6] If California law applies, FSMS does not appear to dispute that the Tanner Defendants have pled a defense that is legally sufficient to withstand a Rule 12(f) motion to strike.

To resolve this confusion, the Tanner Defendants respectfully urge this Court to reconsider two of its prior holdings in ruling on the M&R. As recognized by Rule 54(b), a "district court has the inherent power to reconsider and revise any interlocutory order at any time prior to final judgment." *Martin v. Highland Indus., Inc.*, No. 4:18-CV-03143-SAL, 2021 WL 10282421, at *5 (D.S.C. May 4, 2021). Rule 54(b) provides "flexibility to revise interlocutory orders . . . as the litigation develops and new facts or arguments come to light." *Id.* "[T]he ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law." *Nadendla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022). Here, the Tanner Defendants respectfully believe that this Court made two errors in its order adopting the M&R with respect to its decision to apply Delaware law to the NDNCA. Dkt. 117 at 4.

First, this Court should reconsider its view that Judge Metcalf made a "ruling" on the NDNCA's governing law and that "neither party objected" to that ruling. Dkt. 117 at 3. Respectfully, Judge Metcalf never made such a ruling. Dkt. 110 at 31–33. He did not discuss this issue at all. *Id.* Instead, he concluded that the Distribution Agreement was ambiguous as to whether it terminated to the NDNCA. Dkt. 110 at 32-33. And while he cited a Delaware case for

---

[6] Also, to the extent that FSMS alleges that the Tanner Defendants breached the NDNCA **before** the execution of the Distribution Agreement, there is no dispute that California law would apply.

that proposition, he was interpreting section 16.4 of the **Distribution Agreement**, not the NDNCA. That neither the Tanner Defendants' nor FSMS's motion to dismiss briefing addressed the issue confirms that Judge Metcalf never ruled on it.[7] And because Judge Metcalf made no ruling on this issue, the Tanner Defendants had no occasion or ability to raise an "objection" to it.

Second, the Tanner Defendants respectfully ask this Court to reconsider its holding that the parties' briefing "evidently" showed an intent to apply Delaware law to the NDNCA. Dkt. 117 at 4. To support that point, the Court cited in part to "Doc. No. 112 at 8-14," which was the NDNCA section of the Tanner Defendants' objections to the M&R. *Id.* at n.2. But the Court apparently overlooked that the Tanner Defendants were interpreting the **Distribution Agreement** and not the NDNCA. Dkt. 112 at 8-14. The Tanner Defendants never cited any legal authorities to interpret the NDNCA as a standalone agreement. *Id.* In sum, the Tanner Defendants respectfully ask this Court to exercise "its inherent power to reconsider and revise" its prior interlocutory order to reach the correct conclusion. *Martin*, 2021 WL 10282421, at *5.

The Tanner Defendants would suffer "manifest injustice" if the Court did not correct these errors. *Id.* Such a holding could jeopardize their NDNCA defense if the Court were to agree with FSMS. Moreover, it would deny the Tanner Defendants the opportunity to be heard on the choice-of-law and integration issues. The Tanner Defendants believe there are at least three problems with the Court's approach of integrating the agreements.

First, the Distribution Agreement and NDNCA do not contain any "explicit manifestation of intent" to be construed together. *Town of Cheswold v. Central Del. Bus. Park*, 188 A.3d 810, 819 (Del. 2018); *accord Swinden v. Vanguard Grp., Inc.*, No. C 09-03816, 2009 WL 3415376, at

---

[7] The parties' Rule 12(b)(6) briefing did not raise this issue. Dkt. 66 at 22-23 (TPUK Opening Brief); Dkt. 68 at 16-17 (TannerGAP Opening Brief); Dkt. 78 at 40-41 (FSMS Opposition); Dkt. 83 at 18-19 (TPUK Reply); Dkt. 84 at 7 (TannerGAP Reply). TPUK's Rule 12(b)(2) brief explained that the NDNCA has "a California choice-of-law clause." Dkt. 64 at 6.

*4 (N.D. Cal. Oct. 21, 2009) (explaining that documents construed together must involve "the same subject-matter" and "[be] interdependent"). Here, the agreements were executed three months apart and did not involve the same subject matter (information exchange versus distribution). While the Distribution Agreement referenced the NDNCA, this Court held that reference was ambiguous. Dkt. 117 at 8. And under one reading this Court deemed "plausible" (*id.*), the NDNCA would revive only "[i]n the case of termination." Mem. Ex. 1 § 16.4. The clause, if read that way, would not merge the documents **prior to** termination. Similarly, after termination, the Distribution Agreement would cease, leaving nothing to merge. In any case, any merger is undercut by the Distribution Agreement itself, which says that it "supersedes all prior written . . . agreements . . . regarding [its] subject matter." Mem. Ex. 1 § 32. There is no carveout for the NDNCA, unlike cases where courts have found merger. *See, e.g.*, *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1082 (Del. Ch. 2021).

Second, if the non-circumvention provision of the NDNCA were void *ab initio* when it was executed, it could never have become part of the Distribution Agreement. Cal. Bus. & Prof. Code § 16600.5(a) ("Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed"); *Brown v. TGS Mgmt. Co.*, 57 Cal.App.5th 303, 319 (2020) (holding that contract provisions violating section 16600 were "void *ab initio*"); *accord Green Payment Sols., LLC v. First Data Merch. Servs. Corp.*, No. CV 18-1463, 2019 WL 4570015, at *5–6 (C.D. Cal. Aug. 5, 2019) (similar); *Sandler Partners, LLC v. Masergy Commc'ns, Inc.*, No. CV 19-6841, 2019 WL 9047103, at *5 (C.D. Cal. Nov. 25, 2019) (similar).[8]

Third, even if the agreements were integrated, the choice-of-law decision is not a binary

---

[8] Some of these cases were decided before the reasonableness standard set forth in *Ixchel Pharma*. *See* 470 P.3d at 1150, 1153–56, 1159–60. But *Ixchel Pharma* did not change the remedy for a violation of section 16600. Any prohibited provisions would still be void and unenforceable.

one.  Other courts faced with two choice-of-law provisions have harmonized them.  *See, e.g.*, *ERA Franchise Sys., LLC v. Hoppens Realty, Inc.*, No. 12-CV-594, 2013 WL 3967869, at *8 (W.D. Wis. July 31, 2013) (holding that, where contract contained two choice-of-law provisions, one state law applied to some provisions and the other state law applied to other provisions).  Here, placing the two provisions in separate documents delineates their scope, and therefore, California law would govern the provisions within the NDNCA portion of the "integrated" agreement.    It would violate the rule against surplusage to integrate the agreements and give effect to all of the NDNCA's provisions **but not** the choice-of-law provision.

Finally, if this Court were to strike the NDNCA defense (it should not), it should grant the Tanner Defendants leave to re-plead the defense.  "[W]hen affirmative defenses are stricken, the defendant should normally be granted leave to amend."  *Villa v. Ally Fin., Inc.*, No. 1:13-CV-953, 2014 WL 800450, at *4 (M.D.N.C. Feb. 28, 2014).  Like California courts, Delaware courts apply a reasonableness test to certain commercial agreements that restrain trade and competition.  *See, e.g.*, *Hub Grp., Inc. v. Knoll*, No. 2024-0471, 2024 WL 3453863, at *8-12 (Del. Ch. July 18, 2024) (holding non-compete unenforceable because it was overbroad and unreasonable); *accord Mid-Am. Salt, LLC v. D.J.'s Lawn Serv., Inc.*, 396 F. Supp. 3d 797, 809–10 (N.D. Ind. 2019) (holding non-circumvention agreement that lacked temporal and geographic limitations was an unenforceable restraint of trade).

### C.    The misrepresentation defense is not insufficient as a matter of law.

FSMS argues that the misrepresentation defense rises and falls with the Misrepresentation Claims because they share common elements.  Mem. 11.  FSMS is incorrect because the defense is broader than those claims.    The defense applies to both "fraudulent or innocent misrepresentation[s]."  *Kirchner v. Stief*, No. CIV.A. 1999-02-209, 2001 WL 1555313, at *2 (Del. Com. Pl. July 13, 2001).  In addition, in the case of a fraudulent misrepresentation, the

misrepresentation need not be "material for the contract to be voidable." *Alabi v. DHL Airways, Inc.*, 583 A.2d 1358, 1362 (Del. Super. Ct. 1990). Moreover, damages are not an element of the misrepresentation defense. *Id.* (listing elements). Thus, FSMS's challenges to the Misrepresentation Claims, even if successful (they should not be), do not defeat this defense.

### D. FSMS's request to strike the prayer for relief is improper.

In the first and last sentences of its brief, FSMS asks this Court to strike the prayer for relief. Mem. 1, 21. It offers no legal authority in support. FSMS's argument appears to be that, if it succeeds in its Rule 12(b)(6) motion, the Tanner Defendants cannot recover the relief in the prayer. This request is improper because "Rule 12(f) is not a proper vehicle for procuring dismissal of all or part of a pleading on the ground that it fails to state a claim for relief." *Virginia Innovation Scis., Inc. v. Samsung Elecs. Co.*, 983 F. Supp. 2d 700, 706 (E.D. Va. 2013) (denying motion to strike prayer for relief)*; see McKague v. HSCGP, LLC*, 4:22-cv-00018, 2022 WL 3010472, at *5 (W.D. Va. July 29, 2022) (holding Rule 12(f) was "unavailable as a tool to strike" a request for certain damages). Therefore, this Court should deny FSMS's request to strike the prayer for relief.

### CONCLUSION

For the reasons above, the Tanner Defendants respectfully request that this Court disregard FSMS's Exhibits 2 through 11; deny FSMS's Motion to Dismiss; and deny FSMS's Motion to Strike. If this Court were to grant either motion, the Tanner Defendants request leave to amend their Misrepresentation Claims and defenses.

This the 13th day of December, 2024.

McGuireWoods LLP

By:    /s/ Bradley R. Kutrow
       Bradley R. Kutrow
       N.C. State Bar No. 13851
       Brian A. Kahn
       N.C. State Bar No. 29291
       Anita Foss
       N.C. State Bar No. 47743
       Jessica O'Brien Peretz
       N.C. State Bar No. 56679
       Kelly A. Warlich
       N.C. State Bar No. 51053
       201 North Tryon Street, Suite 3000
       Charlotte, NC 28202-2146
       Telephone: (704) 343-2049
       Facsimile: (704) 343-2300
       bkutrow@mcguirewoods.com
       bkahn@mcguirewoods.com
       afoss@mcguirewoods.com
       jperetz@mcguirewoods.com
       kwarlich@mcguirewoods.com

       Mark E. Anderson
       N.C. State Bar No. 15764
       501 Fayetteville Street, Suite 500
       Raleigh, NC 27601
       Telephone: (919) 755-6678
       Facsimile: (919) 755-6699
       manderson@mcguirewoods.com

       Anne Doherty
       N.C. State Bar No. 55494
       Gateway Plaza
       800 East Canal Street
       Richmond, VA 23219
       Telephone: (804) 775-7633
       Facsimile: (804) 775-1061
       adoherty@mcguirewoods.com

       *Attorneys for Defendants TannerGAP, Inc.
       and Tanner Pharma UK Limited*

## <u>CERTIFICATION</u>

Pursuant to this Court's June 18, 2024 Order regarding the use of artificial intelligence, the undersigned states that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 13th day of December, 2024.

*/s/ Bradley R. Kutrow*
Bradley R. Kutrow
N.C. State Bar No. 13851
McGuireWoods LLP

*Counsel for Defendants TannerGAP, Inc.*
*and Tanner Pharma UK, Ltd.*