# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

FS MEDICAL SUPPLIES, LLC,           )
                                    )
                Plaintiff,          )
                                    )
v.                                  )      Civil Action Nos.
                                    )      3:21-CV-501-RJC-WCM
TANNERGAP, INC., et al.,            )      3:23-CV-598-RJC-WCM
                                    )
                Defendants.         )
                                    )
--------------------------------

_____

VIDEOTAPED 30(b)(6) DEPOSITION
OF TANNER PHARMA UK LIMITED - VOLUME III,
BY AND THROUGH ITS CORPORATE DESIGNEE,
KATHERINE SMOOT
_____

TAKEN AT THE LAW OFFICES OF:
MCGUIREWOODS, LLP
201 North Tryon Street, Suite 3000
Charlotte, NC 28202

12-12-2024
9:58 O'CLOCK A.M.
_____

Laura Baker
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

1     Q.   So ---

2     **A.   --- had any additional conversation, other**

3  **than the email.**

4     Q.   So just so that the record is clear, is it

5  your testimony that you don't know whether Tanner ever

6  gave guidance to Mr. Bourne as to how he should go

7  about preserving documents on his cell phone?  Is your

8  answer that you don't know?

9     **A.   I don't think that they've given guidance,**

10  **but I don't know.**

11     Q.   What makes you think that they haven't given

12  guidance?

13     **A.   Nothing.**

14     Q.   Nothing makes you think that?

15     **A.   I don't ---**

16          MR. KUTROW:  There's no indication that

17  the witness is aware of -- that such guidance was

18  given.

19     Q.   (Mr. Puig)  Okay.  At the time that Tanner

20  issued the Litigation Hold Notice to Mr. Bourne, did

21  the company ask Mr. Bourne whether any auto-delete

22  functions were activated on his cell phone?

23     **A.   No.  And we didn't have it in the litigation**

24  **hold either.**

25     Q.   You didn't have what in the litigation hold?

1       **A.    Any direction to look for auto-delete.**

2       Q.    There was a direction that records including

3  text messages should be preserved though, right?

4       **A.    That is correct.**

5       Q.    If you flip to Page -- the last page of

6  Exhibit 714.

7       **A.    Okay -- wait.  Yeah.  Okay.**

8       Q.    Do you see that there's something called a

9  "Do Not" list?

10      **A.    Yeah.**

11      Q.    Do you see that the first bullet of the "Do

12  Not" list is, "Do not delete or destroy, dispose of,

13  discard, remove or lose any of the above Records"?  Do

14  you see that?

15      **A.    I do.**

16      Q.    My question is, did Tanner investigate

17  whether Mr. Bourne's auto-delete function on his cell

18  phone was active at the time that it issued the

19  Litigation Hold Notice?

20             MR. FULLER:  I'm sorry.  Can you say

21  that again?  And I'll say, I just couldn't hear you.

22             MR. PUIG:  Sure.

23      Q.    (Mr. Puig)  At the time that the Litigation

24  Hold Notice was issued to Mr. Bourne in January of

25  2022, did Tanner undertake any investigation as to

1  whether the auto-delete function on his cell phone was

2  enabled or disabled?

3     **A.   So I will say, that in the actual litigation**

4  **hold, in the "Do Not" list, it doesn't say anything**

5  **about "Do not turn on or off any of those do not**

6  **delete."**

7          **And I didn't even know that was a function**

8  **until this all occurred.  So I will answer your**

9  **question in saying, no, we didn't investigate that**

10 **because we didn't think that that was even a thing.**

11         **And it didn't pull it out in our litigation**

12 **hold, and we've never had litigation before, so this**

13 **was new to us.  So I can answer your question as no.**

14 **We didn't know any better.**

15    Q.   You can -- you can -- if you turn to the

16 first page of the Litigation Hold Notice, do you see

17 the second paragraph?

18    **A.   Oh, litigation hold itself?**

19    Q.   Yes, ma'am.

20    **A.   Yeah.**

21    Q.   Do you see that the second paragraph says,

22 "We are required by law to take steps to preserve

23 information and documents relating (or potentially

24 relating) to this matter and we need your immediate

25 assistance in fulfilling this legal obligation"?

1  iClouds.  We have our server.  So having cloud-based

2  capability, we understood at the time that those were

3  taking the steps to preserve the data.

4      Q.   Are you, like, a -- like, a tech-savvy

5  person, Ms. Smoot?

6      A.   It depends on how you define tech-savvy, but

7  I do have technology under me.

8      Q.   Are you the person at the company that's in

9  charge of monitoring compliance with legal hold

10  notices?

11      A.   It's a shared -- I would say it's a shared

12  support because on business operations, we have legal

13  and compliance.

14      Q.   Uh-huh.  But just so the record is clear,

15  nobody at the company asked Mr. Bourne whether the

16  auto-delete function on his phone was enabled or

17  disabled at the time the Litigation Hold Notice was

18  issued, correct?

19      A.   To my knowledge, yes, that's correct,

20  because we wouldn't have known to do that.

21      Q.   Did anybody at the company ask to inspect

22  Mr. Bourne's cell phone?

23      A.   Not to my knowledge or information.

24          MR. PUIG:  Why don't we take a break?

25          THE VIDEOGRAPHER:  Off record, 10:58.

1   counsel as to why -- I can't speak to it.

2       Q.   (Mr. Puig)  So is your testimony that you

3   don't know why Tanner waited 11 months to tell its

4   employees to preserve documents?

5       A.   Without speculating, correct.

6       Q.   Okay.  When Tanner issued its Litigation

7   Hold Notice to Mr. Bourne and Mr. Bracey and others in

8   January of 2022, did Tanner take any steps to monitor

9   compliance with the Litigation Hold Notice?

10      A.   Tanner itself or counsel or both?  There

11  were steps throughout the process, but for us,

12  internally, we knew we had our server data, what was

13  -- we call enterprise data.  And we do not delete that

14  data.  So there was nothing else for us to do.

15          We did not have a document retention policy

16  in place that defines retention periods to delete.  We

17  don't delete data.  So there was no additional steps

18  to take, we thought, at that time.

19      Q.   So Tanner relied on the fact that its

20  enterprise data was automatically preserved, but

21  otherwise did not take any steps to monitor compliance

22  with the Litigation Hold Notice.  Do I have that

23  right?

24      A.   Again, I know, like, in the chronology, that

25  our outside counsel had spoken with Bracey a few times

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1   reiterate that we're on the litigation hold.

2        Q.   So what you're describing to me is a little

3   different than that I'm -- what I'm -- what I'm asking

4   about.  You're telling me that you had senior

5   leadership team meetings where the topic of the

6   litigation hold was sometimes discussed.  Is that

7   right?

8        A.   Just -- yes, that we have a litigation hold,

9   we're unable to delete data.

10       Q.   Is Mr. Bourne in those meetings?

11       A.   Not typically the senior management team

12  meetings.  He will come to the risk council meetings.

13       Q.   My question is, were there affirmative steps

14  taken by Tanner to monitor compliance with

15  Mr. Bourne's observance of the litigation hold, other

16  than relying on the automatic retention of enterprise

17  data?

18       A.   Not to my knowledge.

19       Q.   After the Litigation Hold Notice was issued,

20  were there trainings offered by the company about how

21  to ensure compliance with the Litigation Hold Notice?

22       A.   No.  Then again, it's because we were under

23  the -- we as a company have always seen our enterprise

24  data as our -- the data that we were supposed to hold,

25  and that's the data that we don't delete.

1                So there was no need for anybody to do --

2    for what we thought at the time, to do any type of

3    training because we were under the assumption at the

4    time that that was all the data that we needed to

5    retain.

6          Q.   So the answer to my question is no?

7          A.   What was the question, then?  I want to make

8    sure.

9          Q.   There were no ---

10         A.   Oh, the training.  No.  There were no

11   specific trainings done around the litigation hold, to

12   my knowledge.

13         Q.   And no efforts to monitor Mr. Bourne's

14   compliance with the Litigation Hold Notice?

15         A.   Not internal to Tanner.

16         Q.   Are you aware of any efforts to monitor

17   Mr. Bourne's compliance with the Litigation Hold

18   Notice, internal or external?

19         A.   I'm not aware.

20         Q.   Are you aware that Mr. Bourne's counsel at

21   Robinson Bradshaw retained somebody named Clark C.

22   Walton and the firm Reliance Forensics, LLC in October

23   2023 to assist with electronic discovery and digital

24   forensic issues in this matter?

25         A.   Yes.

1  Bourne's.

2      Q.   (Mr. Puig)  --- Bourne's phone was performed

3  by counsel for Tanner in March of 2023.  Is that

4  right?

5            MR. KUTROW:  Objection to form.  And

6  Reliance did it at the direction of Tanner's counsel,

7  Reliance being Mr. Walton.

8            **THE WITNESS:  Oh, oh -- I'll answer.**

9  **Yes.  It was March of -- let me make sure I'm saying**

10 **it right, but yes, March 8th of 2023.**

11     Q.   (Mr. Puig)  Do you understand that in June

12 of 2024, it was discovered that Mr. Bourne's phone had

13 been set to auto-delete text messages older than 30

14 days?

15     **A.   Yes.**

16     Q.   You're aware that the default setting on an

17 iPhone is to keep text messages forever?

18     **A.   Yes, it's to keep -- yeah, it's to keep it**

19 **just without deletion.  Uh-huh.**

20     Q.   Do you understand when I say "default

21 setting," like if we were to walk into ---

22     **A.   I know what it is.**

23     Q.   --- an Apple store today and buy ---

24     **A.   Yes.**

25     Q.   --- an iPhone, it would be set to keep text

**Chaplin & Associates**
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1  messages forever.  Do you understand that?

2       A.    Yeah, yes.  Uh-huh.

3       Q.    And do you understand that, in order for the

4  auto-delete function to be activated, a real-life

5  human being has to change the default setting?

6       A.    In theory, yes.

7       Q.    In theory and in practice, right?

8       A.    Absolutely.  I mean, you can butt dial

9  things, and stuff can happen, but I'm not saying

10 that's what happened.  I'm just -- I mean, I can't say

11 anything in absolutes, but yes, it should be mostly a

12 person.

13      Q.    Right.  So it's like -- it's not elves,

14 right, that activate the setting?

15      A.    No.

16               MR. KUTROW:  Objection to form.

17               THE WITNESS:  That's correct, yeah.

18      Q.    (Mr. Puig)  Do you understand that that

19 can't happen by accident?

20      A.    The likelihood of it being an accident is

21 low, yes.

22      Q.    Do you understand that the setting can only

23 be activated by somebody who has access to the phone?

24      A.    Yes.

25      Q.    Somebody who has the phone's password,

1  should the phone have a password?

**2**      **A.    Yes.**

3      Q.    And do you understand that after this

4  setting is activated, messages older than the

5  retention period are automatically and permanently

6  deleted from the device?

**7**      **A.    From the device, not necessarily the iCloud.**

8      Q.    So yes?

**9**      **A.    Yes.**

10      Q.    When this discovery was made in June 2024,

11  did the company question Mr. Bourne regarding when

12  this setting was activated?

**13**      **A.    Yes.**

14      Q.    And what did Mr. Bourne tell the company?

**15**      **A.    It's in a declaration.  He did a declaration**

**16**  **around that, so he said he had -- he did not know how**

**17**  **it happened.**

18      Q.    So I'm not asking what's in the declaration.

19  I'm asking -- I asked you whether the company ---

20                MR. KUTROW:  I'm going to object to the

21  form of the question at this point because she -- the

22  witness understands what's in the declaration.

23                The investigation or the inquiry you're

24  talking about would have been performed by counsel,

25  and it would have been performed by Mr. Bourne's

1        Q.   (Mr. Puig)  And that is why I'm asking the

2    question the way that I'm asking it, and I ask you to

3    listen carefully.

4        **A.   I'm listening.**

5        Q.   Did Tanner, the company, somebody at the

6    company ---

7                    MR. KUTROW:   A non-lawyer at the

8    company?

9                    MR. PUIG:   Yes.

10       Q.   (Mr. Puig)  Have a conversation with

11   Mr. Bourne after the discovery was made in June 2024

12   that all of his text messages had been deleted?

13                   MR. KUTROW:   And that would be work

14   product.  I'll object on that basis and instruct the

15   witness not to answer.

16       Q.   (Mr. Puig)  Have you read Mr. Walton's

17   declaration?

18       **A.   Yes.**

19       Q.   Do you understand from Mr. Walton's

20   declaration that all SMS and iMessage text messages

21   sent or received by Mr. Bourne on his iPhone prior to

22   November 25th, 2022, have been permanently deleted?

23       **A.   Prior to November 2022?**

24   (Witness examines document)

25       **A.   Yes.**

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1       Q.   And according to Mr. Walton, even

2  state-of-the-art forensic methods cannot retrieve

3  those deleted text messages, right?

4                MR. KUTROW:  Referring to the SMS text

5  messages, correct?

6                MR. PUIG:  And the iMessages.

7                **THE WITNESS:  Yes, according to his**

8  **testimony.**

9       Q.   (Mr. Puig)  So you understand that that ESI

10 is permanently lost, right?

11      **A.   I do.  Yeah.**

12      Q.   Do you have any idea whether Mr. Bourne used

13 his cell phone to communicate with Tanner employees

14 regarding Tanner's work?

15      **A.   Yes, he has.**

16      Q.   Do you understand that Mr. Bourne used his

17 cell phone to send text messages about FSMS and its

18 principles?

19      **A.   Typically, it would have been WhatsApp, but**

20 **yes, text messages were used.**

21      Q.   Do you understand that Mr. Bourne used his

22 cell phone to send text messages about the UK

23 government opportunity?

24      **A.   Typically, it would have been WhatsApp if it**

25 **was outside of our typical communication of email, but**

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1      Q.   Great question.  If you look at the first

2  page, if it's a WhatsApp, it'll have a WhatsApp

3  signifier in the phone number.  That's how I know.

4      **A.   Okay.  That's awesome.  Thank you.**

5      Q.   And you understand that pursuant to the

6  Litigation Hold Notice -- we can just take a look at

7  Exhibit 714 as an example.

8      **A.   Where's 714?  Is that...**

9              MR. KUTROW:  It's the litigation hold

10  addressed to Banks.

11              **THE WITNESS:  Okay.  All right.  So**

12  **it's ---**

13              MR. FULLER:  Which one are we looking

14  at?

15              MR. PUIG:  714.

16              MR. FULLER:  714.

17              **THE WITNESS:  Okay.**

18      Q.   (Mr. Puig)  And we can look at Page 2 of the

19  Litigation Hold Notice.

20      **A.   Yes.**

21      Q.   Do you see there's a heading that says

22  "Categories of Information to Preserve"?

23      **A.   Yes.**

24      Q.   And then there's a line that says, "You must

25  immediately preserve the following records."  And

1   there's some bullets.

2            Do you see that?

**3       A.   Yes.**

4       Q.   And the hold notice says that the recipient

5   of the hold has to preserve "all Records related to

6   the Dispute," right?

**7       A.   Yes.**

8       Q.   "All Records relating to GAP's sale and/or

9   distribution of PPE or COVID rapid-antigen tests to

10  any third party."

**11      A.   Yes.**

12      Q.   "Any and all Records relating to Tanner UK's

13  sale and/or distribution of PPE or COVID rapid-antigen

14  tests to any third party."

**15      A.   Yes.**

16      Q.   "Any and all Records relating to the sale

17  and/or purchase of PPE or COVID rapid-antigen test

18  kits from Zhejiang Orient Gene Biotech by Tanner UK or

19  GAP."

**20      A.   Yes.**

21      Q.   "Any and all Records relating to the sale,

22  purchase, or distribution of PPE and/or COVID

23  rapid-antigen test kits from GAP or Tanner UK to

24  UKDHSC."

**25      A.   Yes.**

1     Q.   And it goes on.  I'm not going to read them

2  all.

3     **A.   Okay.**

4     Q.   And you would agree with me that, provided

5  there were text messages on Mr. Bourne's phone related

6  to these topics, that Tanner had an obligation to

7  preserve those documents, right?

8     **A.   Yes.**

9               MR. PUIG:  Okay.  Let's take a break.

10              MR. KUTROW:  Okay.  Let's make it a

11  short one, okay?  I mean, this is -- this is ---

12              THE VIDEOGRAPHER:  Off record, 11:35.

13  (Brief recess: 11:35 a.m. to 11:45 a.m.)

14              THE VIDEOGRAPHER:  On record, 11:45.

15     Q.   (Mr. Puig)  Ms. Smoot, you mentioned earlier

16  that there were executive leadership meetings during

17  which the Litigation Hold Notice and the obligation to

18  preserve documents might have been discussed.

19     **A.   Senior management team meetings.  Yes.**

20     Q.   Senior management team meetings.  Thank you.

21  And I believe your testimony was that Mr. Bourne did

22  not come to those, but he came to risk committee

23  meetings.  Is that right?

24     **A.   Yeah.  So our senior management team**

25  **meetings, Banks is not part of because he's not in the**

1   day-to-day.  But risk council is inclusive of -- it

2   includes him.

3        Q.   And did you -- did you say that at the risk

4   management ---

5        A.   Risk council.

6                  MR. KUTROW:  Risk council.

7        Q.   (Mr. Puig)  Risk council?

8        A.   Yeah.

9        Q.   I'm sorry.

10       A.   That's fine.

11       Q.   At the risk council meetings that the topic

12  of the litigation hold and the need to preserve

13  documents was sometimes discussed?

14       A.   It was part of discussions.  Yes.

15       Q.   Were -- at the risk council meetings, were

16  -- was the obligation to preserve ESI, like text

17  messages, specifically discussed?

18       A.   No.

19       Q.   And if we take a look at Exhibit 713, which

20  is the timeline that your counsel provided to us.

21       A.   Uh-huh.

22       Q.   I gathered this morning, as I was looking at

23  it, that kind of light yellow, beige color, those are

24  events that are related to Mr. Bracey.  Is that right?

25       A.   Yes.

1    Q.    And the events related to Mr. Bourne are

2    kind of in that pink color?

3    **A.    Yes.**

4    Q.    And the events that are related to

5    Mr. Bourne, on this chronology, are -- the first one

6    we see -- the first page, that's January 25th, 2022.

7    And it says, "Mr. Bourne receives the litigation

8    hold," and then, "acknowledges litigation hold"?

9    **A.    Uh-huh.  Yes.**

10    Q.    And Mr. Bourne acknowledged receipt of the

11    litigation hold.  Is that right?

12    **A.    Yes.**

13    Q.    How did that happen?

14    **A.    Email.**

15    Q.    So you sent a response to the email, saying,

16    "I acknowledge receipt of the litigation hold"?

17    **A.    Yes.  He responded to the email.**

18    Q.    Okay.  And then the next entry that pertains

19    to Mr. Bourne is on March 8th, 2023.  And that's where

20    we see "Tanner's vendor Reliance Forensics takes a

21    forensic image of B. Bourne's iPhone."  Is that right?

22    **A.    Yes, that's correct.**

23    Q.    And then I believe the only other entry on

24    this document related to Mr. Bourne is the one that we

25    see on October 18th, 2023, which is "Tanner receives a

1  copy of the Bournes' litigation hold notice."

2           And I believe that's Exhibit 716.  Do I have

3  that right?

4           MR. FULLER:  I think the one you were

5  talking about was 715, unless I've written it down

6  wrong.

7           MS. FOSS:  No, it's 716.

8           **THE WITNESS:  Yes, you're correct.**

9           MR. FULLER:  Oh, sorry.  My fault.  My

10 fault.  I apologize.

11     Q.   (Mr. Puig)  So my question is, other than

12 these three events that we see on the ledger that your

13 counsel provided and the risk council meetings, are

14 you aware of any communications between Tanner and

15 Mr. Bourne regarding the Litigation Hold Notice and

16 his obligation to preserve documents?

17     **A.   No, I'm not aware.**

18     Q.   Okay.  How often does the risk council meet?

19     **A.   Once every quarter.**

20     Q.   And you mentioned that there were no

21 discussions at risk council meetings that Mr. Bourne

22 might have attended regarding the preservation of text

23 messages or ESI on the phone specifically, correct?

24     **A.   Not on the phone specifically, no.**

25     Q.   Okay.  You understand from Mr. Walton's

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1  declaration that text messages, SMS, MMS and iMessages

2  prior to November 25th, 2022, are permanently lost and

3  can't be recovered even by the most modern forensic

4  methods, right?

5      **A.   Right.**

6      Q.   And you understand that Tanner's vendor,

7  Reliance Forensic, took the first forensic image of

8  Mr. Bourne's iPhone on March 8th, 2023?

9      **A.   Yes.**

10     Q.   Which was about a year and two months after

11  the Litigation Hold Notice was first issued to

12  Mr. Bourne, right?

13     **A.   Correct.**

14     Q.   And about two years and a month after FSMS

15  first notified Tanner of its claims against Tanner,

16  right?

17     **A.   Yes.  Was there a requirement to do that**

18  **before?**

19     Q.   It's a -- it's a legal question.

20          MR. KUTROW:  Exactly.

21          **THE WITNESS:  To my understanding, in**

22  **jurisdiction, there was an agreement to -- that we did**

23  **not have to pull information from the phones, just**

24  **from a cost savings perspective, so...**

25          MR. KUTROW:  She means jurisdictional

1        Q.    I'm asking, could Tanner have made the

2   decision to forensically image Mr. Bourne's phone in

3   January of ---

4        A.    Oh, January.

5        Q.    In February of 2021, when it was put on

6   notice that Tanner had claims -- that FSMS had claims

7   against Tanner.

8        **A.    I mean, I would be, again, speculating on**

9   **that.  I don't -- why would we -- why would we have**

10  **taken his phone in February of 2021?  We got a demand**

11  **letter.  Why would we take the phone at that time and**

12  **do a forensic?  I -- so I don't ---**

13       Q.    I want you to assume with me, Ms. Smoot,

14  that a company's obligation to preserve documents

15  arises when it anticipates litigation, okay?

16       **A.    Uh-huh.**

17       Q.    So with that assumption in mind, could

18  Tanner, in February of 2021, after it received the

19  demand letter from FS Medical Supplies, have made the

20  decision to image Mr. Bourne's phone?

21       **A.    That would be a counsel decision.**

22       Q.    Would it have been possible for Tanner, if

23  counsel had directed Tanner to do so, for Mr. Bourne's

24  phone to be imaged in February of 2021 after Tanner

25  received the demand letter from FS Medical Supplies?

1      A.   Is it possible -- our counsel would have

2   done that, but I would say it's possible.

3      Q.   Nothing would have prevented that -- nothing

4   is -- that you're aware of, would have prevented that

5   from happening, right?

6      A.   Not that I'm aware of.  I ---

7      Q.   And had that occurred in February of 2021,

8   is it possible that Tanner would have captured some of

9   the text messages that have been permanently lost?

10             MR. FULLER:  Objection.

11             MR. KUTROW:  Objection.

12             THE WITNESS:  In technicality,

13   potentially.

14      Q.   (Mr. Puig)  Is it possible that in January

15   2021 -- or February 2021, Mr. Bourne's auto-delete

16   function wasn't activated?

17      A.   Is it ---

18             MR. KUTROW:  Objection to the form.

19             MR. FULLER:  Objection.

20             MR. KUTROW:  There's just no factual

21   information available to the company to know that.

22      Q.   (Mr. Puig)  You can answer.

23      A.   I don't -- I don't want to speculate.  I

24   don't -- I don't know.

25      Q.   You don't know, because the company doesn't