# Exhibit B

# *Unredated Copy*
# *Filed Under Seal*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

FS MEDICAL SUPPLIES, LLC,       )
                                )
                Plaintiff,      )
                                )
v.                              )
                                )
TANNERGAP, INC., AND TANNER     )
PHARMA UK LIMITED,              )
                                )
                Defendants.     )
                                )        Case Nos.
and                             )   3:21-cv-501-RJC-WCM
                                )   3:23-cv-598-RJC-WCM
FS MEDICAL SUPPLIES, LLC,       )
                                )
                Plaintiff,      )
vs.                             )
                                )
TANNER PHARMA UK LIMITED;       )
RAYMOND FAIRBANKS BOURNE;       )
MARY EVERETT WHITEHURST BOURNE, )
                                )
                Defendants.     )
--------------------------------

_____

VIDEOTAPED DEPOSITION
OF
CHARLES ROACH, III
_____

TAKEN AT THE LAW OFFICES OF:
MCGUIREWOODS, LLP
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
                    12-12-2024
                9:10 O'CLOCK A.M.

_____

Susan Kittle
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

1    Q.   Okay.  And when you say, "not prior to this

2  suit," can you give me a time frame of when you first

3  heard the name Tanner?

4    **A.   I think when a PI showed up to my house and**

5  **made my neighbors nervous.  When I first talked with**

6  **Laura Marshall, I think that was the first time that**

7  **I heard the name Tanner.**

8    Q.   Okay.

9    **A.   Yeah.**

10   Q.   Do you know whether that was 2023, 2024?

11   **A.   Oh, sorry.  As far as the date.**

12   Q.   Yeah.

13   **A.   This was, gosh, maybe four months ago,**

14  **something like that.**

15   Q.   Okay.  Okay.

16   **A.   When Laura first talk -- called me.**

17   Q.   Did Mr. Cagan ever contact you about this

18  lawsuit?

19   **A.   He did, yes.**

20   Q.   Okay.  Can you tell me about that?

21   **A.   Yeah, there were -- there are a couple of**

22  **different instances.  I think this was, like, back in**

23  **2023.  He first contacted me regarding not this**

24  **lawsuit, but regarding access to the email addresses**

25  **that I no longer had access to, and he evidently**

1   didn't, either.

2              He was trying to get access because of some

3   discrepance -- because of some discrepancy.  He's --

4   I forgot the exact terminology that he used, but I

5   knew, from the tone of his voice, from how he was

6   talking, that a lot was riding on getting these

7   emails, and so I tried to help him out a little bit.

8              And unfortunately, it was a -- kind of a --

9   it was a bit of a -- an effort, because I didn't

10  quite want -- really want to -- you know, I was -- I

11  was out by this point and didn't really -- I was

12  just, you know, busy with other -- with other things.

13             And I had turned over the email addresses

14  through Google Workspaces, or it was called G Suite

15  back at the time.  I had turned that over admin

16  control back to him.  He put in his credit card

17  information or, you know, as far as, like, being able

18  to access it.

19       Q.   Do you know when that was?

20       A.   Early 2023 -- sorry, early 2021, I do

21  believe, like, at the time that I got out of FS

22  Medical.  And so I didn't have access to it from my

23  computer, from anything, from my phone.

24             And so I kind of knew that there was, like,

25  going to be a little bit of, like, a trying to figure

1    out how to get him access to it again.  But after,

2    his wife actually called me about another issue;

3    that's kind of how I was able to kind of really find

4    out that this is very urgent.

5             Because he kind of had his wife, like, call

6    me about a separate issue with some business that I

7    had -- like, I owned a film company, Aloha Films,

8    back in Hawaii and did photography and videography

9    for his house.  That's how I ended up meeting him,

10   and his wife called me up specifically about that,

11   the Aloha Films work that I did for his house.

12            And then they kind of switched it to this

13   conversation so that I could help him out with his

14   email, because I'd kind of not really been willing to

15   help him out beforehand, simply because, like, I

16   didn't have access to it.

17       Q.   Okay.

18       A.   And so after talking with them, he could

19   not get the email addresses at all, couldn't log in,

20   simply because it -- when I was logging in with his

21   credentials, since he kind of gave me his credential,

22   Google Workspaces says, "This account has been

23   suspended because of nonpayment."

24            And the way to get email addresses after

25   that point was nowhere in my hands.  And so at that

**12-12-24**

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434│336-992-1954│919-649-4444

1  point, he told me that a lot was riding -- he just

2  had question after question on how to get access,

3  because evidently, a lot was riding on getting that

4  information, a lot of money with a discrepancy.

5          And that was -- I don't think the word

6  "Tanner" was used at the -- at that time, but I knew

7  there was something to do with the UK -- with the UK

8  deal.  That was kind of what it was termed.  So I

9  don't -- you know, I don't know any more details

10  about that.  Then fast forward another year.  He --

11  sorry, not another year ---

12      Q.   Well -- yeah.  I was going to say ---

13      A.   --- this ---

14      Q.   --- can you place that conversation in --

15  somewhere in time with Ms. Cagan and Mr. Cagan?

16      A.   Oh, gosh, that's a hard one.

17      Q.   And I'm ---

18      A.   Probably ---

19      Q.   I'm going to show you some documents, so --

20  -

21      A.   Sure, sure.  I don't -- I mean, it was in

22  between when I left and now, maybe right in the

23  middle, like, a year and a half ago, I guess if I was

24  to just guess a little bit.

25      Q.   Okay.

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1        A.    And then fast forward, like, a little while

2    -- so this was, like, about maybe six months ago that

3    he emailed me and a few others called me, and a few

4    others and asked us -- or prepped us that we would be

5    contacted by some attorneys regarding this UK deal.

6    And that's when I think he first named Tanner.

7             And at that point, that's when I kind -- I

8    was like -- I kind of put together that he was trying

9    to get access to these emails pretty urgently

10   beforehand.  That's -- it kind of -- I'd started to

11   put pieces together a little bit that, like,

12   something was happening that I didn't really know

13   anything about, but...

14       Q.   Great.

15            MR. KAHN:  I am going to give you ---

16            THE WITNESS:  Yeah.

17            MR. KAHN:  --- an exhibit now.

18            THE WITNESS:  Sure.

19            (DEPOSITION EXHIBIT

20            NUMBER 746 WAS MARKED

21            FOR IDENTIFICATION)

22       Q.   (Mr. Kahn)  And it's an exhibit marked 746.

23   I want you to take a look at that, take your time,

24   review it and then let me know once you read it.

25       A.   Yep.  Remember this one.

1      Q.   Do you recognize this document?

2      A.   I do.  It's a -- it's an email from Laird

3    to me -- myself, regarding the LinkedIn page, the FS

4    Medical Supplies LinkedIn page.

5      Q.   Do you know what the -- what is this email

6    about?  Tell me specifically.

7      A.   Laird is trying to close it down, as he's

8    saying in the email.  He saying he's not the super

9    admin, so he does not have control over the page.

10     Q.   Do you ---

11     A.   He's just requesting access, I would

12   imagine, but it's also -- he's just asking

13   specifically if I created it.

14     Q.   Okay.  And did you?

15     A.   Honestly don't remember if I'm -- like, I

16   would imagine that if it did not exist, I would have

17   created that.

18     Q.   Okay.

19     A.   And giving him access was, you know, an

20   easy thing for me to do, because I did it for others.

21   The Google Workspace, the email address account, all

22   that kind of stuff, the website, et cetera.  So I

23   would -- I would have no reason to believe that I

24   didn't give him access.

25     Q.   Do you know ---

1    A.   Either right after this or before, I
2 don't -- I don't know.
3    Q.   Okay.  Do you recall any other
4 communication surrounding this?  A phone call,
5 another email, a text?
6    A.   It wouldn't surprise me if there were
7 records of it, but I don't recall.
8    Q.   Okay.  This is February 18th, 2023.
9    A.   Uh-huh.
10    Q.   Okay.  You were no longer working with
11 FSMS ---
12    A.   Oh, yeah ---
13    Q.   --- at this point?
14    A.   --- definitely not.  This was way, way
15 after, two years after.
16    Q.   Do you know why Laird reached out to you
17 about shutting down this page?
18    A.   No.
19    Q.   Okay.  Do you recall whether you would have
20 deactivated that page?
21    A.   I don't -- yeah, I would -- I wouldn't have
22 any reason to, so...
23    Q.   Okay.  Do you know if the page still exists
24 somewhere?
25    A.   I don't know.

1      Q.    Okay.  When you joined with FSMS, did

2    you -- were you involved with setting up their new

3    website and email servers?

4      A.    Yes.

5      Q.    Tell me about that.

6      A.    They were on Yahoo Mail to start off with.

7    There was a lot of spam happening with their email

8    addresses and then a lot of issues with my emails and

9    other emails getting lost inside spam folders.

10           Yahoo Mail, in my experience, has been

11   consistently a -- an underperforming piece of

12   software, so I recommended that we switch from Yahoo

13   to Google for -- to Gmail, specifically underneath

14   the Google Workspaces.  It was called G Suite at the

15   time.

16           And so I recommended that and assisted --

17   not just assisted, but, like, led the process of

18   taking all their emails from Yahoo and transferring

19   them over to Gmail.  And then I did the same thing

20   with the website, putting it on the Wix platform

21   instead of whatever platform that he had -- that Will

22   had beforehand.

23     Q.    Okay.  Did you assist with maintaining that

24   system while you were there?

25     A.    While I was there?  Yes.  Uh-huh.

1     Q.    Okay.  And what platform hosted the email

2   on the website?

3     A.    Google Workspaces or Google Suite, aka

4   Gmail.

5     Q.    Okay.  And I'll confess to you, I don't

6   know too much about email setups, but ---

7     A.    Sure.

8     Q.    --- is there -- are there licenses or how

9   does -- how does it work?  How do you set all of that

10  up?

11    A.    Yeah, it's a per-user, per-month fee.

12  Typically, you get a discount if you pay a year,

13  like, an annual basis.  And it's as simply as could

14  just go into google.com/G Suite or/Workspaces, or

15  just do a Google search and, you know,

16  workspaces.google.com.

17         I don't know, because -- the exact web

18  address right now, but you just sign up, just as

19  simple as signing up as a Gmail.

20         But once you do that, you connect your

21  domain name so that when you send an email, like

22  charles@FSMedicalsupplies.com, it'll go through the

23  email system at Gmail.

24         But you have to link the domain name FS

25  Medical Supply -- Solution -- I don't even remember

1  the domain name itself, to Gmail using a text record

2  and MX records.

3        And so these -- they're basically protocols

4  to direct data to a specific server that would give

5  access to that specific email server according to,

6  you know, the location.  Instead of saying, you know,

7  laird@gmail, it's laird@FSMedical.com.

8     Q.   So -- and you tell me if I'm wrong, but

9  does it -- is there a centralized location where all

10 of the emails reside?

11    A.   Yes.  At Google and Gmail.  So whenever you

12 install the Google app on your phone, the Gmail app

13 on your phone, or sync in with your mail client on

14 your phone or computer or laptop, whatever you're

15 syncing with, there's a setting called IMAP, I-M-A-P,

16 which allows -- anytime you send an email from your

17 phone, it syncs with the central server and syncs

18 with any other devices you have this Gmail connected.

19    Q.   And so when you set this up, were all of

20 the emails that were sent out through FSMS all

21 available on one centralized server?

22    A.   Correct.  Yes.

23    Q.   And do you remember how many email -- are

24 they licenses or how many emails were set up?

25    A.   Email addresses?

1      Q.    Yeah.

2      A.    User accounts is probably the best word for

3   it.

4      Q.    User boxes?

5      A.    User accounts.

6      Q.    Okay.

7      A.    I don't know about boxes.

8      Q.    Okay.

9      A.    Inboxes, but it's not -- it's more of an

10   account, because they have access to other things

11   besides just an inbox.

12      Q.    Okay.

13      A.    So I do remember there were, I don't know,

14   six-, seven-, eight-ish email addresses that we were

15   -- that I was porting over, some of which we did not

16   include, because they were no longer with FS Medical.

17          Some of which were -- like, they needed

18   access, but, like, they weren't -- it kind of -- they

19   were either fizzling out, and half of them didn't

20   even ever log in.

21          So it was pretty clear to me that, you

22   know, it was kind of just me, Amanda, Kyle, Laird,

23   Jim on the fringes.  And then that's -- I mean, going

24   forward, that was kind of the -- that was all that

25   was really needed.

1     Q.   Do you -- are you familiar with what a pass

2   through email address is?

3     A.   You mean, like, an alias?

4     Q.   Yeah.

5     A.   Yeah.

6     Q.   What is that?

7     A.   This is something, like, if you put, like,

8   info@ or support@ an email address, the alias is

9   basically -- it goes to another user account in many

10  situations.  Sometimes it goes to, like, a support

11  team or through, like, a technical process to be able

12  to kind of handle incoming tickets, all that kind of

13  stuff.

14         In this case, it just really -- we really

15  simplified it, and we just made Laird a -- having his

16  user account including, I think, a few different

17  aliases, like support@ or info@, or sales@ maybe is

18  one of them.  I'm not sure.

19    Q.   So did -- was -- and I -- maybe I've

20  misdirected you, but I'm wondering if -- was there

21  a -- it sounded to me like there was a centralized

22  location where all of these emails could be found.

23  Is that right ---

24    A.   Correct.

25    Q.   --- or not?

1      A.    Yes.

2      Q.    Is there a different process where you can

3   maybe mask an email and it just be a -- you know, a

4   Yahoo or something?

5      A.    Oh, got you.  I mean, yeah, there is a way

6   to do that, but no, we didn't have that in place.

7      Q.    That wasn't what you had?

8      A.    No.

9      Q.    Okay.

10      A.    Absolutely not.

11      Q.    Okay.

12                    (DEPOSITION EXHIBIT

13                    NUMBER 769 WAS MARKED

14                    FOR IDENTIFICATION)

15      Q.    (Mr. Kahn)  I'm going to hand you something

16   that we've marked as Exhibit 769.  Do you recognize

17   this document?

18      A.    Yeah, I'm reading.

19   (Witness examines document)

20      A.    Yep.

21      Q.    What is it?

22      A.    This is a request from Laird to Will,

23   because evidently, Will had access to email, website,

24   domain host, the domain FSMedicalsupplies.com, and he

25   was giving Will instructions to give me access so

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1    that I can modify things.

2        Q.   And was this the sort of starting step of

3    you taking over those duties?

4        A.   Yes.

5        Q.   Okay.  What is the -- there was "a new look

6    to the website."  You see that reference?

7        A.   Yes.

8        Q.   What is that about?

9        A.   Regarding the other documents that we

10   looked at beforehand, the difference between the

11   Wayback Machine and the ones that I did.  I don't --

12   I mean, that's a very unclear way to reference it ---

13       Q.   No, no, I under -- it's your -- is -- this

14   is you taking over the website to build it out?

15       A.   That's right.

16       Q.   And is that true, also, of the emails?

17       A.   Yes.

18       Q.   Okay.  I'm going to hand you another

19   document.

20       Q.   Okay.  By the way, before we start getting

21   into that document, do you ever recall receiving

22   emails from Laird from email addresses that were not

23   FSMS emails?

24       A.   Yes, of course.

25       Q.   Do you know what the suffix on those emails

1   was?

2       A.   Yeah, absolutely.  I mean, it's listed

3   right here in a lot of the documents that we've been

4   going on today.  That's coming from laird@cmcp.com.

5   That was kind of his main email address that he used

6   often.

7       Q.   Okay.

8       A.   And then we created another one, another

9   user account, laird@medicalsupplies.com, that would

10  be a replacement for his Yahoo email address.

11      Q.   Okay.  So how many email addresses are we

12  talking about for Laird?

13      A.   Oh, I don't know.  At least two, but ---

14      Q.   You've mentioned -- the one that you just

15  referenced, what was the suffix on that?

16      A.   laird@cmcp.com.

17      Q.   Okay.  And you mentioned -- was there a

18  Yahoo email address for Laird?

19      A.   I would imagine so, but we transferred all

20  of that information over to his new Gmail account.

21  And so it was -- I kind of look at those as, like,

22  one in the same, because we, like, basically moved it

23  from Yahoo to Google, and all the data from his to

24  Sent -- you know, his From and his Sent kind of

25  folders all went over.  So it was a carbon copy.

1    Q.    Is that true of the other folks that were

2    put into the new email system?

3        A.    I think, to an extent.  We did have some

4    trouble with Marybeth, I think, was the name of --

5    I'm going to have to look up -- I think it was

6    Marybeth's email address.  She had -- we had a little

7    bit of trouble with hers, but we solved -- we solved

8    that.

9            But for the most part, of the email

10   addresses that Laird wanted to bring over to the new

11   Gmail system, yes, that was the intention and what we

12   ended up doing.  Yes.

13       Q.    Okay.

14                     (DEPOSITION EXHIBIT

15                     NUMBER 770 WAS MARKED

16                     FOR IDENTIFICATION)

17       Q.    (Mr. Kahn)  And I just want to make sure I

18   understand what this document is we're looking at

19   now, which is Exhibit 770.

20       A.    Yes.

21       Q.    Can you describe what this email is?

22       A.    Yeah, so it's a little bit technical, if

23   I'm honest, but ultimately the domain name

24   FSMedicalsupplies.com has different access points, I

25   guess you can say.  Top-level information, this is

1  called -- these are called A records, and you have C

2  names, then you have MX records.

3          And we're basically trying to ensure that

4  the A records, the DNS, as it's referencing down

5  there, and not MX records, which is email or --

6  shifted over for the new website, so it does not

7  bring down access to email.

8          If someone sent an email to

9  charles@FSMedicalsupplies.com by changing name

10  servers, you change all of it.  But we just wanted to

11  change DNS records, which is a very specific

12  protocol, so that -- so that it does not impact

13  email.

14      Q.   Okay.

15      A.   No downtime, so to speak.

16          MR. KAHN:  All right.  I'm going to

17  mark another document that is Exhibit 771.

18              (DEPOSITION EXHIBIT

19              NUMBER 771 WAS MARKED

20              FOR IDENTIFICATION)

21          THE WITNESS:  Okay.

22      Q.   (Mr. Kahn)  Do you know what this document

23  is?  You can take a second.

24      A.   Yeah, these are just test emails, I think,

25  regarding switching over from FSMedicalsupplies.com,

1   switching over from the use of Yahoo for that

2   domain's email to Gmail, that domain's email.

3       Q.   And so this was the time of -- where you

4   switched from Yahoo to the Gmail account?

5       A.   Correct.

6       Q.   For FSMS?

7       A.   Yes.

8       Q.   Okay.

9                   (DEPOSITION EXHIBIT

10                  NUMBER 772 WAS MARKED

11                  FOR IDENTIFICATION)

12      Q.   (Mr. Kahn)  I'm going to hand you another

13  document.  This one's marked 772.  And, again, this

14  is a -- an email thread, which starts at the back and

15  moves to the front.

16      A.   Okay.  Yeah, I remember all this.  This is

17  kind of a bit of a long process after I left, of

18  giving access, all administrative access, back to

19  Laird.

20          I gave him access, but he needed, honestly,

21  and forgive the terminology, but a little bit of

22  handholding in the process of transferring that

23  ownership.  And so I was involved in kind of helping

24  that that process out.  Again, a cordial departure

25  from FS Medical and...

1      Q.   So this email chain starts in March of

2    2021?

**3      A.   That's right.**

4      Q.   Is that after you left?

**5      A.   Yes.**

6      Q.   And then the first document is -- it says,

7    "A Wix Website is Being Transferred to You."  Do you

8    see that?

**9      A.   That's right.  Yep.**

10      Q.   What does that indicate?

**11      A.   The you, quote, unquote, "you," is Laird, I**

**12    would imagine, right?  Let's see.  So upon leaving,**

**13    he has administrative access to my email, which means**

**14    that he could go in and transfer it to himself from**

**15    my charles@FSMedicalsupplies.com.  Just wanted to**

**16    make it easier for him to have access to -- so I went**

**17    in and transferred it for him.**

18      Q.   And is that -- and there's a bottom email

19    subject that says, "A Wix Website is Being

20    Transferred to You" that's dated March 19th.  Do you

21    see that?

**22      A.   That's right.  Yep.**

23      Q.   Is -- that's what that is.

**24      A.   Uh-huh.  Yes, sir.**

25      Q.   Okay.  And then what happens next?

1      A.   A little bit of back-and-forth that looks

2   like he was confused about the Wix account being set

3   up from Will, and I'm saying, like, "That's basically

4   not really Will's account, really, anymore.  This is

5   yours.  So you just have to click on 'accept

6   transfer.'"

7           And we mention about Mark, who's -- it's

8   our -- that's our graphic designer for the -- for the

9   work that he did back in, I think, October.

10     Q.   There's a -- there's a sentence in here

11  that talks about "CC for monthly renewal."  Do you

12  see that?

13     A.   Yeah, there's something.  Hold on a second.

14  Which page ---

15     Q.   Sure.

16     A.   --- is this?

17     Q.   It's the -- it's an email that starts on

18  Page 512 and goes on to 513.  It's the bottom email

19  from you.  And I think -- I'm ---

20     A.   Oh, yeah.  CC, credit card.

21     Q.   What -- tell me about that.  What is --

22  what is that?  What are you saying there?

23     A.   I'm helping him -- like, I'm constantly

24  kind of like -- it's handholding again.  I'm sorry

25  again for the language.

1          But it's basically prompting him to --

2     like, "Hey, like, I pulled my credit card off of this

3     account.  It's not going to renew unless you put

4     yours in there.  Do you want me to help you so that

5     you don't lose access to, like, a really important

6     thing?"

7          And so just -- you know, just going above

8     and beyond helping him out so that he doesn't lose

9     access to a lot of this stuff.

10     Q.   So are you telling Laird that he needs to

11     put in a credit card ---

12     A.   That's right.

13     Q.   --- number?

14     A.   Yes.

15     Q.   Why?

16     A.   If there's nonpayment, then he loses access

17     to his website and his email addresses.

18     Q.   Do you know if he -- if he made that

19     payment?

20     A.   Well, I definitely know he didn't make that

21     payment.

22     Q.   You know he did not?

23     A.   Did -- yes, correct.  Because Google

24     suspended the account.

25     Q.   How do you know that?

1       A.   Well, because he called me way later and

2    asked me to get access to the Google accounts and I

3    couldn't log in, and it says, "suspended for

4    nonpayment."

5       Q.   Okay.  But you had already communicated

6    that to him in this email, right?

7            MR. YALOWITZ:  Object to the leading.

8       Q.   (Mr. Kahn)  Or had you?  Had you

9    communicated that to him in this email?

10      A.   Yes, I did communicate that to him.  Phone,

11   email.  I think this is kind of multiple times, too,

12   so just one of the many times.

13      Q.   Do you have access to the FSMS Gmail emails

14   at this point?

15      A.   Now, no.  I haven't for a long time.

16      Q.   Okay.  Did you -- you mentioned about a

17   conversation later.  Can you tell me about that later

18   conversation that you had with Laird about emails?

19           MR. YALOWITZ:  He -- you already asked

20   him about it, and he already told you about it.

21           MR. KAHN:  I don't think so.  I think

22   he -- go ahead.

23           THE WITNESS:  So I got a phone call

24   from Laird -- maybe a couple of phone calls from

25   Laird, that I honestly ignored, because I was busy.

1    Like, I had some other work stuff going on.

2            And I -- he -- I think he, like, left a

3    message or text.  I don't remember.  I don't really

4    have access to a lot of that stuff, I don't think,

5    anymore.  And it was clear that he needed something.

6    And my assumption was technical, because that's kind

7    of -- most of the time, that's what it was about.

8            And so I responded only after Sherry called

9    me, his wife, regarding another situation with Aloha

10   Films and the photos of their house.  So I still kind

11   of had a little bit of Aloha Film stuff every once in

12   a while kind of going on.

13           And so I answered that call, because it was

14   obviously a little bit more relevant to what I was

15   currently doing; somewhat relevant.

16           And she asked me about some photo stuff,

17   that I give her access to -- I don't -- I don't

18   remember the -- but it was about her access to the

19   photos or something about the photos of her house.

20   And then she told me that Laird really needs to talk

21   to me and they have some important information.

22           So I was like, "Okay, I'll give him a

23   call."  And so I ended up giving him a call, I think,

24   like, later that day, or he called me and I picked up

25   -- I forgot exactly what happened, but he was really

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1  adamant about getting access to the Google emails.

2          And that's kind of -- that's basically

3  when, you know, we tried to troubleshoot getting

4  access to them, so -- unsuccessfully.

5      Q.   (Mr. Kahn)  Do you know when that

6  conversation happened?

7      A.   I really can't say or couldn't say.  A year

8  ago.  I don't know.  I'm -- it's a little bit of a

9  guess.

10          MR. YALOWITZ:  Object to the

11  speculation.  Move to strike.

12      Q.   (Mr. Kahn)  Do you know, on this email,

13  there's something about six email addresses?  Do you

14  know what that's about?  And I'm -- and I'm referring

15  to Exhibit 772.

16      A.   "Can you tell me which are the six email

17  addresses?"  When we transferred over accounts from

18  Yahoo to Google, that's what those six email

19  addresses are associated with: accounts that we

20  created.  This is -- like, this is, you know, mine,

21  Will's, Laird's, a few others'.

22      Q.   So at the time that you originally

23  transferred the emails from Yahoo to Google, there

24  were six active accounts?

25      A.   It looks like that's ---

1              MR. YALOWITZ:  Object to the leading.

2        Q.   (Mr. Kahn)  You tell me.  I want to make

3   sure I understand.

4              MR. YALOWITZ:  Well, you know, you ask

5   him something that's not correct and then you -- and

6   then you led him ---

7        Q.   (Mr. Kahn)  You tell me -- you tell me how

8   many accounts were created.

9        **A.   I don't think I really remember how many**

10  **exactly were created, but at this time it, looks like**

11  **that they were -- that there were six accounts, of**

12  **which four were actually active.  And so I was kind**

13  **of telling him a little bit, like, "Hey, two people**

14  **haven't even logged in."**

15       Q.   Is there anything else that you want to

16  tell us today?

17             MR. YALOWITZ:  Object to the form.

18  Calls for a narrative.

19             MR. KAHN:  Making sure that if there's

20  anything he wants to say, I want him to be able to

21  say it.

22             **THE WITNESS:  I mean, I'm here serving**

23  **a Subpoena, right?  I'm forced to tell my testimony.**

24  **This is not something that is -- these details are**

25  **not something that I would just want to offer up**