## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

FS MEDICAL SUPPLIES, LLC,

      Plaintiff,

v.

TANNERGAP, INC. *et al.*,

      Defendants.

Civil Action Nos.
3:21-CV-00501-UJ1-WCM
3:23-CV-00598-UJ1-WCM

## PLAINTIFF'S OBJECTION TO AUGUST 27, 2025 MEMORANDUM AND RECOMMENDATION TO DISMISS FOR LACK OF DIVERSITY JURISDICTION

The M&R recommends dismissal without prejudice of these two cases for lack of diversity jurisdiction under 28 U.S.C. § 1332(a)(3). That provision permits jurisdiction in a civil action between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." At the time of filing, the parties' citizenship was as follows:

| Plaintiff | | Defendants | |
|---|---|---|---|
| FSMS | China Texas California | Tanner Pharma UK, Ltd. ("TPUK") | United Kingdom North Carolina |
| | | TannerGAP, Inc. | North Carolina |
| | | "Banks" Bourne | North Carolina |
| | | "Mary" Bourne | North Carolina |

A strict and literal application of the two clauses of paragraph (a)(3) supports jurisdiction. First, FSMS and all defendants are "citizens of different States"—Texas and California vs. North Carolina. Second, TPUK (which is a "citizen of a foreign state") is an "additional" party.

The question is whether the rule of complete diversity nonetheless makes jurisdiction under § 1332(a)(3) unavailable because of FSMS's dual U.S. and Chinese citizenship and TPUK's

United Kingdom citizenship. As the M&R correctly observes, there is no controlling Fourth Circuit precedent addressing this issue, and cases from other jurisdictions are divided. On one side are decisions from the Fifth and Seventh Circuits and district courts in Massachusetts, California, and Texas which uphold jurisdiction where an entity has both U.S. and foreign citizenship. These cases are in harmony with the Third, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits, as well as numerous district court cases, which hold that aliens on both sides of a case does not defeat diversity jurisdiction under paragraph (a)(3) if there is complete diversity between the *domestic* citizens. On the other side are district court decisions from Puerto Rico, New Jersey, New York, South Carolina, and Illinois which find no jurisdiction in the context of dual-entity citizenship.

Congress authorized diversity and alienage jurisdiction in the Judiciary Act of 1789, and before the 1948 passage of paragraph (a)(3), the Supreme Court had consistently construed the statute to require complete diversity—that is, each plaintiff had to be capable of suing each defendant independently. Thus, the rule was that aliens on both sides of a case destroyed diversity, just as Virginians on both sides did. This was a rule of statutory construction, not a constitutional command, and all six of the Circuits that have construed paragraph (a)(3) have concluded it relaxed the complete-diversity rule by allowing aliens on both sides of a case, so long as there are also citizens of U.S. States on both sides and complete diversity among them.

The Fifth Circuit and the Seventh Circuit have applied this rule to uphold jurisdiction in cases of *dual* citizens like FSMS. That is, if a dual U.S. and foreign citizen's domestic citizenship is completely diverse from the defendants' domestic citizenships, then the presence of an alien on the other side does not defeat diversity. District courts in Massachusetts, California, and Texas have also so concluded.

In so holding, these courts have invoked the literal language of paragraph (a)(3); the fact

2

that the 1948 amendment reflected an *expansion* of diversity jurisdiction sufficient to allow aliens on both sides so long as there was complete domestic diversity; and the purpose of diversity and alienage jurisdiction, which was expressly designed by the Founding Fathers to protect out-of-state merchants from local bias in cases seeking remedies from powerful local citizens.

While several district courts have come out the other way, their reasoning is unpersuasive. Their primary rationale is that—as a matter of doctrine—"both citizenships" of a dual citizen must be tested for complete diversity. While this is a correct statement of the complete diversity requirement for *domestic* citizens, it is incorrect with respect to *aliens*. The Circuits are unanimous that aliens can be on both sides of a case under paragraph (a)(3). It is also inconsistent with the uniform rule that individuals with dual U.S. and foreign citizenship are treated solely as U.S. citizens in the diversity analysis. If the "both citizenships" test were always required under § 1332, then every Circuit to have addressed paragraph (a)(3) *and* every Circuit to have addressed the treatment of dual-citizen individuals has gone astray.

Some of the district court cases that reject jurisdiction also rely on legislative history of statutes enacted in 1958 and 2011. That legislative history indicates that in making certain amendments to § 1332 that are not applicable here, individual members of Congress expressed a desire to restrict diversity jurisdiction. But courts must not permit so-called "subsequent legislative history" to alter the meaning of a statute. What was in the hearts of members of Congress in 1958 or 2011 sheds no light on the meaning of a statute enacted in 1948.

Finally, in some of the cases rejecting jurisdiction, the party invoking federal jurisdiction argued that dual citizens were both U.S. citizens and "additional parties" who are foreign citizens. But that is *not* FSMS's argument. Rather, FSMS is arguing that its domestic citizenships are completely diverse from the defendants' domestic citizenships, that this Court should not disregard

FSMS's domestic citizenships, and that the addition of TPUK, an alien, does not defeat diversity under the well-settled construction of § 1332(a)(3). Because there is complete diversity between domestic citizenships of the parties, the Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(3), notwithstanding the presence of an English defendant.

In the event the Court decides that the current jurisdictional line-up defeats diversity—contrary to the weight of Circuit precedent—it should take steps to ensure that defendants do not parlay this late-discovered jurisdictional issue into the windfall of avoiding any adjudication on the merits in any court. First, it should entertain a motion under Rule 21 to dismiss TPUK, which would eliminate the aliens-on-both-sides problem. And, second, it should include savings language permitted by North Carolina Rule of Civil Procedure 41(b).

## FACTUAL BACKGROUND

Judge Conrad previously summarized the background of this case: "This case arises from a contractual relationship between FS Medical Supplies, LLC ('FSMS'), TannerGAP, Inc., and Tanner Pharma UK Limited ('TPUK') formed in the early days of the COVID-19 pandemic. Seeking a mutually beneficial arrangement when supply chains were limited and relationships were valuable, the parties entered into two agreements: the Non-Circumvention Agreement and the Distribution Agreement. Under these two agreements, FSMS would source medical supplies from its established industry contacts, TannerGAP and TPUK would connect FSMS with healthcare distributors, and the parties would share the profits equally." Order at 1 (Sept. 30, 2023), ECF 117.[1]

"The relationship ended almost before it began. Though the parties agreed that neither would co-opt the 'Personal Relationships' of the other without permission, and the two contracts imposed certain restrictions on Tanner's ability to enter direct contracts with manufacturers of

---

[1] Unless otherwise indicated, ECF numbers are references to the docket in Case No. 21-cv-501.

4

Case 3:21-cv-00501-UJ1-WCM    Document 313    Filed 09/09/25    Page 4 of 27

medical supplies, FSMS alleges that Tanner breached both agreements by entering into a direct contract with one of FSMS's suppliers, Orient Gene, in order to sell billions of dollars' worth of COVID tests to the government of the United Kingdom and other customers." *Id*. at 1-2.

On an early motion for a preliminary injunction, Judge Conrad also found these facts: "In October 2020, FSMS learned that TPUK had contracted directly with Orient Gene and the UK government to sell COVID test kits. Over the next several months, FSMS began to suspect that TPUK was paying FSMS less than it owed under the parties' contract, and on February 24, 2021, FSMS demanded full payment from TPUK. When TPUK refused to pay, FSMS filed suit. But before, during, and after these events, TPUK was busy issuing dividends. From January 29 to February 2, 2021, TPUK disbursed $61,050,000, and from April to September, another $35,650,000, all to its two shareholders: Banks and Molly Bourne." Order at 2-3 (Oct. 16, 2023) ECF 39 in Case No. 23-cv-589 (footnote omitted).

"TPUK disbursed its dividends in relative secrecy, missing the United Kingdom's September 30, 2022, deadline for filing required 2021 financial disclosures. In fact, TPUK did not release any information until the UK Registrar of Companies announced on March 7, 2023, that continued failure to file the required information would result in TPUK's dissolution, with all its property ceding to the Crown. TPUK filed the report several weeks later, and now blames its inactivity on a lengthy audit process. When TPUK did file its report on March 31, 2023, FSMS learned, for the first time, of the dividend disbursals. FSMS further learned—from TPUK's 2022 financial disclosures, filed timely on September 29, 2023—that TPUK later issued another $100 million in dividends to the Bournes on March 8, 2022. The combined disbursals left TPUK with approximately $10.5 million in reported net assets, while TPUK faced, according to FSMS, at least £75 million (approximately $102 million) in contingent liabilities for its actions at issue in *Tanner I*. TPUK

represent[ed], both in a memorandum before the Court and in oral argument, that it will 'issue no further dividends while FSMS I is pending without leave of Court.'" *Id*. at 3 (citations omitted).

**PROCEDURAL HISTORY**

**The California Case**

FSMS sued TannerGAP and TPUK for breach of contract in state court in California on March 24, 2021. The defendants removed the case to federal court, representing that they were citizens of North Carolina and the United Kingdom. Notice of Removal ¶ 12, ECF 1 in *FS Medical Supplies LLC v. TannerGAP, Inc.*, No. 21-cv-3017 (N.D. Cal. filed April 26, 2021). As a limited liability company, FSMS takes the citizenship of all its members. At the time of removal, its members were its two principals, Laird Cagan and Jim Mao, and each of their spouses. The families were domiciled in Texas and California. But unbeknownst to any counsel in the case, Mr. Mao's spouse, Zhen Zhen Tong, was a permanent U.S. resident, not a U.S. citizen.

The federal court in California dismissed for lack of personal jurisdiction.

**The WDNC Cases**

FSMS refiled its case in this Court on September 23, 2021. ECF 1. The parties conducted jurisdictional discovery between January 2022 and August 2022 but did not discover the permanent-residence status of Ms. Tong. In September 2023, Judge Conrad denied the defendants' procedural motions and their motion directed to the contract claims. ECF 117. In the meantime, as noted above, FSMS learned of Mr. Bourne's asset-stripping activities and, on September 20, 2023, filed *Tanner II*. ECF 1 (No. 23-cv-598). Defendants answered, and the cases moved into merits discovery.

During discovery, the parties exchanged more than 100,000 documents and took and defended 32 depositions. The court resolved eight motions to compel or for protective orders, many presenting multiple discovery issues. *See* ECF 146, 166, 208, 232. Discovery closed December 20,

2024. At the time discovery closed, there remained several unresolved motions.

**Subject-Matter Jurisdiction**

On February 10, 2025, soon after the undersigned learned of Ms. Tong's citizenship, FSMS filed an amended citizenship disclosure. ECF 103 (No. 23-cv-598). Within hours, defendants moved to dismiss for lack of subject-matter jurisdiction.[2]

**The M&R**

The M&R recommends dismissing the case without prejudice for lack of subject-matter jurisdiction. It begins by setting out the citizenship of each party. There is one plaintiff, which for purposes of § 1332 is a citizen of Texas, California, and China. There are four defendants, which are citizens of North Carolina, one of which is also a citizen of the United Kingdom. M&R at 7. It identifies the relevant jurisdictional provision, 28 U.S.C. § 1332(a)(3), and observes that "[c]ourts considering paragraph (a)(3) have found that federal diversity jurisdiction is not defeated where (1) there is a legitimate controversy between diverse citizens and aliens are additional parties; and (2) there is complete diversity as to the citizens." M&R at 8 (internal quotation marks and citations omitted).

The M&R then states that the issue is "whether for the purposes of 28 U.S.C. § 1332(a)(3) a limited liability company may be considered both: 1) a citizen of a State (based on the citizenship of only its domestic members) and 2) an 'additional' party that is a citizen of a 'foreign state' (based on the citizenship of only its foreign member)." M&R at 8-9. The M&R observes that the Fourth Circuit has not addressed the issue and that cases from other jurisdictions are divided. *Id.* at 8-12.

---

[2] Additionally on February 10, 2025, Ms. Tong transferred her interest in FSMS to her fellow member and husband, Mr. Mao, by way of an Assignment of Membership Interest. The next day, FSMS filed a new action, No. 3:25-cv-102-UJ1-WCM ("*Tanner III*"). That action is the subject of a motion to dismiss that has been referred to the Magistrate Judge.

The M&R holds that a single entity cannot be "treated as a domestic citizen (by virtue of the Texas and California citizenship of certain of its members) for the purpose of one portion of the paragraph (a)(3) analysis, while, at the same time, be treated as an 'additional party' (by virtue of the foreign citizenship of its other member)." *Id.* at 13. Accordingly, the M&R recommends that FSMS's claims be dismissed without prejudice.

Finally, the M&R recommends that the Court reject FSMS's request that, in the event the Court finds subject-matter jurisdiction to be lacking, the order of dismissal provide that "a new action based on the same claim may be commenced within one year or less after such dismissal" pursuant to Rule 41(b) of the North Carolina Rules of Civil Procedure. The M&R states that the Court is powerless to enter such an order in the absence of subject-matter jurisdiction. *Id.* at 15.

## STANDARD OF REVIEW AND STATUTORY TEXT

When considering a party's objections to an M&R, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*; Fed. R. Civ. P. 72. Whether the "undisputed facts establish a lack of subject matter jurisdiction is a legal determination subject to *de novo* appellate review." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768-69 (4th Cir. 1991).

As relevant here, the diversity statute permits the exercise of jurisdiction in a civil case between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. § 1332(a)(3). Citizenship is determined at the time of filing of the complaint, *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570-71 (2004), and an unincorporated association takes the citizenship of "each State or foreign country of which any of its partners is a citizen." *Id.* at 569 (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 192-95 (1990)); *Americold*

*Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 379 (2016).

## ARGUMENT

## I.     The Court Has Subject-Matter Jurisdiction

### A.     Constitutional and Legislative Background

**1. Constitutional Purpose of Diversity Jurisdiction.** The Constitution extends "the Judicial power of the United States" to "Controversies … between Citizens of different States … and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. Const. Art. III §§ 1, 2. Chief Justice Marshall explained the reason for such jurisdiction: "the Constitution itself" reflected "apprehensions" about whether "the tribunals of the states will administer justice as impartially as those of the nation" to out-of-state plaintiffs. *Bank of the United States v. Deveaux*, 9 U.S. (5 Cranch) 61, 87 (1809); *accord Erie R. Co. v. Tompkins*, 304 U.S. 64, 74 (1938) ("Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the state.").[3]

Leading Founding Fathers expressed these apprehensions during the ratification debates. Alexander Hamilton argued in *The Federalist* that a federal court was more "likely to be impartial between the different States and their citizens, and which, owing its official existence to the Union, will never be likely to feel any bias inauspicious to the principles on which it is founded." *The Federalist* No. 80, at 497 (Alexander Hamilton). In the Virginia Convention, James Madison said

_____

[3] *See* Deirdre Mask & Paul MacMahon, *The Revolutionary War Prize Cases and the Origins of Diversity Jurisdiction*, 63 Buff. L. Rev. 477, 496-547 (2015); Kevin R. Johnson, *Why Alienage Jurisdiction? Historical Foundations and Modern Justifications for Federal Jurisdiction over Disputes Involving Noncitizens*, 21 Yale J. Int'l L. 1, 18 (1996); Henry J. Friendly, *The Historic Basis of Diversity Jurisdiction*, 41 Harv. L. Rev. 483, 497-99 (1928) (discussing "grounds for distrust of the local courts" by "merchants from abroad"); Charles Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49, 83 (1923) ("The chief and only real reason for this diverse citizenship jurisdiction was to afford a tribunal in which a foreigner or citizen of another State might have the law administered free from the local prejudices or passions which might prevail in a State Court against foreigners or non-citizens.").

that "a strong prejudice may arise, in some states, against the citizens of others, who may have claims against them." 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 533 (Jonathan Elliot ed., 2d ed. 1901). In the Pennsylvania Convention, James Wilson asked: "how will a creditor feel who has his debts at the mercy of tender laws in other states?" *Id.*, vol. 2 pp. 491-92.

    **2. Judicial Gloss on the Original Statute.** The First Congress provided for jurisdiction over civil suits where the matter in dispute exceeded $500 and "an alien is a party, or the suit is between a citizen of the State where the suit is brought, and a citizen of another State." Judiciary Act of 1798, § 11, 1 Stat. 73, 78. The Supreme Court put a judicial gloss on this statute in early cases, requiring complete diversity: "each of the plaintiffs must be capable of suing each of the defendants in the courts of the United States." *Louisville, C. & C.R. Co. v. Letson*, 43 U.S. (2 How.) 497, 554-55 (1844); *see Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 10 (1799) (Elsworth, C.J.) ("it is necessary, where the defendant appears to be a citizen of one state, to show that the plaintiff is a citizen of some other state, or an alien").

    Alienage jurisdiction presented a special case. The Judiciary Act provided for jurisdiction where "an alien is a party," but "the judicial power [in Article III] was not extended to private suits, in which an alien is a party, unless a citizen be the adverse party." *Jackson v. Twentyman*, 27 U.S. (2 Pet.) 136, 136 (1829); *see Mossman v. Higginson*, 4 U.S. (4. Dall.) 12, 14 (1800) (similar). Thus, suits strictly between aliens were not allowed. In 1875, Congress conformed the statutory text to this judicial gloss, which has remained substantively the same to date: "citizens of a State and citizens or subjects of a foreign state." Ch. 137, § 1, 18 Stat. 470, now codified at 28 U.S.C. § 1332(a)(2).

**3. The 1948 Amendment.** Congress enacted the statutory provision at issue here—paragraph (a)(3)—in 1948. ch. 646, 62 Stat. 930. The text provides for jurisdiction in civil actions between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." Courts and leading scholars have all concluded that this "language is broad enough to allow aliens to be additional parties on both sides of the dispute." 13E *Wright & Miller's Fed. Prac. & Proc.* § 3604 (3d ed.). As the Sixth Circuit put it, "an express exception to the complete diversity requirement is present in § 1332(a)(3)." *U.S. Motors v. Gen. Motors Eur.*, 551 F.3d 420, 423 n.5 (6th Cir. 2008); *see Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 858 (11th Cir. 2000) ("In 1948, when Congress reorganized and modified the existing statute on original jurisdiction, it clarified and broadened diversity jurisdiction."). Under the 1948 amendment, in cases with aliens on both sides of the case, "the presence of diverse U.S. citizens on both sides preserves diversity." 15A *Moore's Federal Practice—Civ.* § 102.77 (2025).

**B.  Section 1332(a)(3) Allows Diversity Jurisdiction Here**

The issue on this motion is whether the presence of TPUK (a citizen of North Carolina and the UK) destroys diversity under § 1332(a)(3) because FSMS had, in addition to its Texas and California members, a Chinese member at the time it filed the complaint. The statutory text and history support the exercise of jurisdiction, as persuasive cases have held.

**1. The 1948 Amendment Relaxed the Complete-Diversity Rule in Alienage Cases.** The complete diversity requirement is a product of statutory construction, not a constitutional command. *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530-31 (1967). Before 1948, in any diversity case (including one involving aliens), the complete-diversity rule was that "each of the plaintiffs must be capable of suing each of the defendants." *Louisville, C. & C.R. Co.*, 43 U.S. (2 How.) at 554-55.

But since the 1948 amendment, a different rule has governed—aliens on both sides are permitted if there is complete diversity between domestic citizens in the case. As a leading treatise explains: "The reason for these somewhat puzzling rules is found in the details of the statutory framework…. [T]he jurisdictional problem when there is a foreigner on one side and both a domestic and a foreign party on the other is not that there are foreigners on both sides, but that there are not citizens on both sides." *See* 15A *Moore's Fed. Prac—Civ.* § 102.77 (2025). Thus, the Third, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits have all concluded that a federal court *does* have diversity jurisdiction under paragraph (a)(3) if there is complete diversity between the *domestic* citizens, even if there are aliens on both sides of the case—contrary to the traditional diversity requirement that every plaintiff must be capable of suing every defendant. *U.S. Motors*, 551 F.3d at 423 n.5; *Tango Music, LLC v. DeadQuick Music, Inc.*, 348 F.3d 244, 245 (7th Cir. 2003); *Iraola*, 232 F.3d at 858; *Dresser Indus., Inc. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 497-98 (3d Cir. 1997); *Allendale Mutual Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 428 (7th Cir. 1993); *Transure, Inc. v. Marsh & McLennan, Inc.*, 766 F.2d 1297, 1299 (9th Cir. 1985); *Goar v. Compania Peruana de Vapores*, 688 F.2d 417, 420 n.6 (5th Cir. 1982).[4]

The Third Circuit explained why: "Congress was well aware of the judicial interpretation of the diversity statute requiring complete diversity" when it added paragraph (a)(3) in the 1948 revision to the Judicial Code, and it "specifically used language that differs from the sections in

---

[4] District courts are in accord. *Zenith Elecs. Corp. v. Kimball Int'l Mfg., Inc.*, 114 F. Supp. 2d 764, 768 (N.D. Ill. 2000) ("virtually every authority that has construed § 1332(a)(3) has held that the presence of aliens as additional parties on both sides of the action does not destroy diversity jurisdiction (provided there are diverse domestic citizens on both sides of the action who are legitimately interested parties)") (collecting cases); *Bank of New York v. Bank of Am.*, 861 F. Supp. 225, 228 (S.D.N.Y. 1994) (similar, also collecting cases); *see also Dewhurst v. Telenor Inv. AS*, 83 F. Supp. 2d 577, 596 n.11 (D. Md. 2000) ("section 1332(a)(3) permits a federal court to hear a case involving aliens on both sides of the controversy provided that United States citizens are present on both sides of the controversy and diversity exists between those citizens").

which complete diversity had been applied." *Dresser*, 106 F.3d at 498; *accord U.S. Motors*, 551 F.3d at 423 n.5; *Goar*, 688 F.2d at 421 n.6. When "citizens of states are on both sides of the litigation and are completely diverse, the presence of aliens on one or both sides of the controversy 'fits section 1332(a)(3) to a t.'" *Dresser*, 106 F.3d at 498 (quoting *Allendale*, 10 F.3d at 428).

**2. Dual Citizens Qualify as U.S. Citizens Under § 1332(a)(3).** Several courts have construed § 1332(a)(3) in well-reasoned opinions to permit jurisdiction over a dual citizen (U.S. and foreign) suing a diverse U.S. citizen and an alien. For example, in *Tango Music*, the line-up was jurisdictionally identical to this case. As here, the plaintiff was an LLC with U.S. and non-U.S. citizen members, there were U.S. and non-U.S. defendants, and there was complete diversity between the plaintiff LLC's U.S. members and the U.S.-citizen defendants. 348 F.3d at 245. The Seventh Circuit, in an opinion by Judge Posner, sustained diversity jurisdiction on the basis of the statutory text of paragraph (3) and the purpose of diversity and alienage jurisdiction, explaining: "The Judicial Code confers federal jurisdiction over suits between 'citizens of different States and in which citizens or subjects of a foreign state are additional parties.' That describes this case exactly." *Id.* (quoting paragraph (a)(3); citation omitted). The court added that "[a] reinforcing consideration is the desirability of promoting international harmony (a consideration emphasized by Hamilton, in *Federalist No. 80*) in justification of the alienage jurisdiction, by giving foreigners access to the national court system, where they are less likely to encounter provincial prejudices when litigating against U.S. citizens—as they are in this case, even though they are also litigating against their own co-nationals." *Id.* at 246 (citation omitted).

Similarly, in *Auctus Fund, LLC v. Drone Guarder, Inc.*, 588 F. Supp. 3d 177 (D. Mass. 2022), the line-up was jurisdictionally identical to this case. The sole plaintiff was an LLC with members from eight States and three foreign countries. *Id.* at 179-80. The defendants were a U.K.

citizen and a Nevada corporation with its principal place of business in London. *Id.* There was complete diversity between the plaintiff's domestic members and the U.S.-citizen defendants. The court concluded "[t]he text of [§ 1332(a)(3)], as well as the ultimate purpose of diversity and alienage jurisdiction make clear that federal courts have diversity jurisdiction in cases involving diverse U.S. citizens and alien parties on both sides." *Id.* at 181. The court reasoned that there were U.S. citizens on both sides of the dispute with complete diversity. *Id.* at 191. Provided the U.S. citizens on either side were completely diverse—"federal courts have diversity jurisdiction over matters between diverse domestic parties with alien parties on both sides as long as the amount in controversy is met." *Id.* The Court also explained that the purposes of diversity and alienage jurisdiction—"the fear of local prejudice" against an out-of-state party and "the risk of international friction"—reinforced its reading of the statutory text. *Id.* at 189.

And in *Leland v. De Havilland Aircraft Co. of Canada*, 987 F.2d 771 (5th Cir. 1993) (unpublished), the Fifth Circuit similarly construed § 1332(a)(3) in a case involving a dual-citizen defendant. There, citizens of Texas and Ethiopia sued Boeing of Canada (BOC), which was incorporated in Delaware with its headquarters in Canada. *Id.* at *1. The court first recognized that § 1332(a)(3) does *not* forbid "aliens on both sides of the case." *Id.* at *2. Then, it firmly rejected the argument that "because BOC's principal place of business is in Canada, it cannot be held to be a citizen of a state for the purposes of § 1332(a)(3)," explaining that "[this] counterintuitive proposition has no support in the case law…." *Id.*

Other authorities are in accord. *See Intec USA, LLC v. Engle*, 467 F.3d 1038, 1043 (7th Cir. 2006) (explaining that an imputed dual-citizen could invoke § 1332(a)(3) if the domestic citizens on the other side of the case were from a different state); *Digital Media Solutions, LLC v. Zeetogroup, LLC*, 2024 WL 1268164, at *3 (S.D. Cal. Mar. 25, 2024) (similar); 15A *Moore's Fed.*

*Prac.—Civ.* § 102.55 ("The presence of an alien corporation with dual citizenship as a party.... destroys diversity if there is an alien on the other side of the case, unless there are citizens of states on both sides.").

In short, exercising jurisdiction under paragraph (3) is consistent with the text, history, and purpose of the statute and constitutional grant. Every Circuit to have considered the issue has held that federal courts have jurisdiction in similar circumstances, and this Court should do the same.

## C.    Contrary Cases Are Unpersuasive

The M&R recognizes that the cases are divided on the issue presented here and recommends that the Court follow the cases that have rejected jurisdiction. M&R at 10-12. We respectfully submit that those cases are unpersuasive.

**1.** The primary rationale of the cases that part ways with *Tango*, *Auctus*, and *Leland* is that having a dual-citizen on one side and an alien on the other side defeats diversity because "the diversity test must be satisfied under both citizenships" of a dual citizen, and "[i]f diversity fails under either of the parties' citizenships, then diversity fails overall." *IGY Ocean Bay Properties v. Ocean Bay Properties I*, 534 F. Supp. 2d 446, 448-49 (S.D.N.Y. 2008).[5]

This is a correct statement of the doctrine of complete diversity in *domestic* cases but an incorrect statement of the doctrine in cases involving *alienage* jurisdiction, as the Circuits have unanimously held.

Indeed, for individuals who are dual citizens, the rule is the exact opposite: As one member

---

[5] *See Phoenix Trading FZCO v. Dennis Corp.*, 2022 WL 18674462, at *2 (D.S.C. Aug. 29, 2022) ("the diversity test must be satisfied under both citizenships"); *New York Metro. Reg'l Ctr., L.P. II v. Mammoet USA Holding, Inc.*, 552 F. Supp. 3d 451, 459 (S.D.N.Y. 2021) ("if an individual foreign partner cannot bring suit under Section 1332(a)(2) … it follows that the partnership itself cannot either"); *ACCO Brands USA LLC v. Piñeyro y Lara Comercial S.A.*, 27 F. Supp. 3d 256, 260 (D.P.R. 2014) ("[d]iversity must be satisfied by both corporate citizenship designations"); *Caribbean Telecommunications Ltd. v. Guyana Tel. & Tel. Co.*, 594 F. Supp. 2d 522, 530 (D.N.J. 2009) (same).

of this Court has explained: "A broad consensus has formed that a dual citizen of the United States and another nation will be considered a U.S. citizen for diversity purposes. The Supreme Court and the Fourth Circuit Court of Appeals have not explicitly addressed whether a dual citizen of the United States and another nation, who is domiciled abroad, can be considered a foreign citizen for diversity purposes. However, every federal appellate court to consider this issue has arrived at the same conclusion: U.S. citizenship controls." *Pregel Am., Inc. v. Casol*, 2023 WL 2468980, at *2 (W.D.N.C. Mar. 10, 2023). Thus, a "both citizenships" test for dual citizens is not required and, indeed in some circumstances it is forbidden. *Id.*

Equally problematic, the cases relied on in the M&R reject jurisdiction by disregarding the citizenship of the dual citizen's domestic members. This contradicts the instruction, in several recent Supreme Court cases, that the courts must look to "the citizenship of the several persons composing the entity . . . for the purpose of determining the citizenship of the entity that is a party." *Grupo Dataflux*, 541 U.S. at 579; *see Americold Realty Trust*, 577 U.S. at 381. Just as foreign citizenship must not be disregarded, so must State citizenship not be disregarded.

In *Hil-Tech, LLC v. Shree Mahalaxmi Indus.*, 2023 WL 4602738, at *4, *R&R adopted*, 2023 WL 4602691 (S.D. Tex. July 18, 2023), the court similarly declined to disregard the U.S. citizenship of a dual citizen, explaining that "a plaintiff LLC with dual citizenship in both a State and a foreign country qualifies as a citizen of a State under § 1332(a)(3). This assumption gains support from authority treating LLCs as their constituent members for diversity purposes. That is, if 'the citizenship of an LLC is determined by the citizenship of all of its members, then the existence of one plaintiff member who is a citizen of a State should satisfy § 1332(a)(3) even if another member is a citizen of a foreign country, when the LLC itself has sued both citizens of other States and citizens of foreign countries.'" *Id.* (cleaned up).

**2.** Several of the cases on which the M&R relies also looked to the legislative history of amendments to § 1332 that took place years after the statutory text at issue came into the Judicial Code—amendments that did not alter the text of paragraph (a)(3). For example, in *Caribbean Telecommunications*, the court invoked legislative history of a 1958 amendment to § 1332, which added subsection (c). The Court said that this legislative history showed that Congress "sought to eliminate a loophole that permitted otherwise local businesses to gain access to a federal forum by incorporating in another State." 594 F. Supp. 2d at 527. The court reasoned that if it did not adopt the "both citizenships" test in construing paragraph (a)(3), "the [1958] corporate citizenship provision would accomplish nothing...contrary to the historical intent of Congress." *Id.* at 530; *accord ACCO*, 27 F. Supp. 3d at 259-60 ("the recent amendment to [§ 1332(c) of] the diversity statute...sought to limit rather than expand the availability of diversity jurisdiction"); *IGY*, 534 F. Supp. 2d at 449 (similar). Similarly, *New York Metropolitan Regional Center* concerned a 2011 amendment addressing permanent residents (whose citizenship was at issue in that case), and the court observed that "Congress's intent was to contract diversity jurisdiction, not to expand it." 552 F. Supp. 3d at 460.

This reasoning is erroneous. The free-floating desires of individual legislators recorded in committee reports or floor statements from 1958 or 2011 cannot be used to construe a statute enacted in 1948. As Justice Scalia put it, "the views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed.... Arguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously...." *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring in part). Congress can alter the meaning of a statute by *amending* it, but so-called subsequent legislative history cannot do so. *Id.*; *United States v. Price*, 361 U.S. 304, 313

(1960) ("the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one").

In short, the text enacted by Congress and signed by the President governs, not inferences about legislative desires gleaned from committee reports and floor statements in the lead-up to enactment of subsequent statutes that did not in and of themselves alter the meaning of paragraph (a)(3). This case does not turn on the text of the 1958 amendment addressing corporations. Nor does it turn on the text of the 2011 amendment addressing resident aliens. It turns on the text of the 1948 amendment. That amendment *expanded* alienage jurisdiction and relaxed the rule of complete diversity, in furtherance of the Framers' original purpose to provide a federal forum to creditors and merchants from outside the state seeking redress from locals, because the Framers believed that such creditors should not face the risk of local bias. FSMS—with members from Texas, California, and China seeking recovery from a group of North Carolina defendants—is just such a plaintiff. The facts fit the text of the 1948 legislation and the purpose of diversity jurisdiction.

**3.** In some of the cases rejecting jurisdiction, the party invoking federal jurisdiction argued that dual citizens were both U.S. citizens and "additional parties" who are foreign citizens. *FPACP4 LEX, LLC v. Stantec, Inc.*, 586 F. Supp. 3d 824, 826 (N.D. Ill. 2022); *N.Y. Metro.*, 552 F. Supp. 3d at 452; *IGY*, 534 F. Supp. 2d at 447. The courts in those cases rejected the argument, reasoning that an artificial person is a single party, not a collection of parties, and therefore cannot be disaggregated to create the "additional party" required by § 1332(a)(3). That reasoning is not relevant here because that is not FSMS's argument. Rather, FSMS is arguing that this Court should *not* disregard its Texas and California citizenship, that its domestic citizenships are completely diverse from all defendants' domestic citizenships (North Carolina), and that the addition of TPUK—a citizen of North Carolina and the United Kingdom—does not defeat diversity under the

well-settled construction of § 1332(a)(3).

FSMS's logic can be understood with a simple hypothetical. Suppose that TPUK were not a party, but otherwise the parties in this case were the same: The lawsuit in that hypothetical is by FSMS—an entity with Texas/California/China citizenship—against a group of North Carolina defendants. In that situation, the federal courts have diversity jurisdiction. *E.g.*, *Bendit v. Canva, Inc.*, 2023 WL 5391413, at *2 (S.D.N.Y. Aug. 22, 2023) (citizen of New York could sue citizen of Australia and a dual citizen of Australia and Delaware); *Starr Indem. & Liab. Co. v. Signature Flight Support Corp.*, 2022 WL 17400956, at *5 (D. Nev. Dec. 1, 2022) (citizen of New York and Texas could sue citizen of Delaware, Florida and the United Kingdom).

Here, FSMS is simply arguing that the addition of TPUK does not change the result. *See Hil-Tech*, 2023 WL 4602738, at *4.

### D. The Fourth Circuit Has Not Addressed This Issue

Defendants' reply brief on their motion to dismiss erroneously contended that the question on this motion is controlled by *General Technology Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 120-21 (4th Cir. 2004). The M&R correctly rejected that assertion, explaining that "[t]he parties do not cite any controlling authority from the Fourth Circuit directly addressing the precise issue presented here." M&R at 8. *General Technology* did not involve a dual citizen suing a diverse U.S. citizen, as this case does. The case arose out of a dispute between a Virginia corporation and a Columbia corporation, which had formed an LLC. When litigation arose, the Columbian corporation sued the dual-citizen LLC and a group of Virginia individuals. Importantly, the Columbian corporation was an alien and only an alien. The question arose whether the LLC should be realigned as a plaintiff or remain as a defendant for the diversity analysis, but that question did not alter the outcome under § 1332. If it was a defendant, as named, then the suit was between an alien

(the Columbian corporation) and a dual citizen (the LLC), which meant that § 1332(a)(2) was unavailable, because there were aliens on both sides and no U.S. plaintiff to provide complete diversity between citizens of U.S. States. If the LLC was realigned as a co-plaintiff, then there were citizens of Virginia on both sides.

## II.     The Court Should Not Allow Defendants To Avoid A Merits Decision

It is apparent from the record that defendants are aiming to parlay the diversity issue into a complete avoidance of *any* adjudication of the merits of this case in *any* court. In their reply brief on this motion, defendants contended that this Court is without subject-matter jurisdiction, that the Court does not have jurisdiction over *Tanner III* (*see supra* p. 7 n.2), that refiling the case in state court would be futile because statutes of limitations and repose have expired, and that this Court does not even have authority to invoke a North Carolina procedure authorizing courts to extend the statute of limitations. The Court should reject this overreach by defendants.

**A.** If the Court concludes that it lacks diversity jurisdiction because of the presence of aliens on both sides of the case, it should invite a motion under Rule 21 to dismiss TPUK, thereby dismissing a non-diverse party and salvaging jurisdiction. "Dismissal of a case is a drastic remedy, … which should be employed only sparingly." *Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 918 (4th Cir. 1999). "Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989); *accord Grupo Dataflux*, 541 U.S. at 573 (quoting *Newman-Green*).

Thus, if TPUK's interests are severable from the case, "the jurisdiction of the court should be retained and the suit dismissed" as against TPUK rather than as against all defendants. *Newman-Green*, 490 U.S. at 835 (quoting *Horn v. Lockhart*, 84 U.S. (17 Wall.) 570, 579 (1873)); *see Trans*

*Energy*, 743 F.3d at 901 (dismissing non-diverse party under *Newman-Green*); *Koehler v. Dodwell*, 152 F.3d 304, 308 (4th Cir. 1998) ("a party or claim whose presence deprives the court of jurisdiction may be dropped or severed from the action"); *Miller v. Longacre*, 1996 WL 550006, at *1 (4th Cir. Sept. 27, 1996) (unpublished) (reversing refusal to dismiss dispensable non-diverse party); *Caperton v. Beatrice Pocahontas Coal Co.*, 585 F.2d 683, 691 (4th Cir. 1978) ("non-diverse parties whose presence is not essential under Rule 19 may be dropped to achieve diversity between the plaintiffs and the defendants"); *Parker v. Ctr. Grp. L.P.*, 1995 WL 709724, at *2 (4th Cir. Dec. 4, 1995) (exercising discretion to dismiss a non-diverse party because "all of the defendants would be jointly and severally liable"); *Hardaway v. Checkers Drive-In Restaurants, Inc.*, 483 F. App'x 854, 855 (4th Cir. 2012) (reversing where district court declined to retain jurisdiction by dropping a non-diverse party); *Martinez v. Duke Energy Corp.*, 2005 WL 1009648, at *6 (4th Cir. May 2, 2005) (unpublished) (same); *Carpenter v. Babalola*, 2012 WL 1836015, at *1 (W.D.N.C. Apr. 6, 2012) (granting motion to dismiss dispensable non-diverse party and denying motion for lack of jurisdiction as moot), *M&R adopted*, 2012 WL 1835902 (W.D.N.C. May 21, 2012).

**B.** Any order of dismissal should include language allowing FSMS to refile its dismissed claims within one year under N.C. R. Civ. P. 41(b). That rule provides that "[i]f the court specifies that the dismissal of an action … is without prejudice, it may also specify in its order that a new action based on the same claim may be commenced within one year or less after such dismissal."

"Federal courts sitting in diversity apply North Carolina Rule of Civil Procedure 41(b)." *Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*, 203 F. Supp. 3d 608, 611 (M.D.N.C. 2016) (quoting *Haislip v. Riggs*, 534 F. Supp. 95, 98 (W.D.N.C. 1981)); *Wood v. United States*, 2017 WL 722018, at *4 (M.D.N.C. Feb. 23, 2017) ("It is well-established that when sitting in diversity over a North

Carolina State–law claim, a federal court may apply Rule 41(b)."). The Rule "provides a mechanism for a court to extend the statute of limitations by adding a savings clause to a dismissal without prejudice." *Topshelf*, 203 F. Supp. 3d at 611; *see McAdoo v. United States*, 2015 WL 4757003, at *5 (W.D.N.C. July 8, 2015) ("Rule 41 of the North Carolina Rules of Civil Procedure provides that where a dismissal is without prejudice, the court may specify in its order that a new action based on the same claim may be commenced within one year of the dismissal."), *M&R adopted*, 2015 WL 4757284 (W.D.N.C. Aug. 12, 2015); *see also Watterson v. Millis*, 2020 WL 1429213, at *4 (E.D.N.C. Mar. 19, 2020) (granting Rule 41(b) motion where state law applied).

The M&R recommended against including Rule 41(b) relief because it questioned whether such an order can be entered "by a court that does not have subject matter jurisdiction." M&R at 15 (citing a state court case concerning personal jurisdiction). The answer is "yes, it can." "It is well established that a federal court may consider collateral issues [even] after an action is no longer pending." *Willy v. Coastal Corp.*, 503 U.S. 131, 138 (1992). Thus, as noted above, the Court has authority even after a dismissal for lack of subject-matter jurisdiction to salvage jurisdiction by severing a party. This is because resolving collateral issues "implicates no constitutional concern" if it does not constitute "a district court's assessment of the legal merits of the complaint" and therefore does not "raise the issue of a district court adjudicating the merits of a 'case or controversy' over which it lacks jurisdiction." *Id.*

Extending the period to file suit does not constitute an adjudication of the merits—to the contrary, it preserves the dispute for adjudication on the merits in another court. Thus, in *SouthStar Funding, L.L.C. v. Warren, Perry & Anthony, P.L.L.C.*, 445 F. Supp. 2d 583, 586 (E.D.N.C. 2006), the court dismissed for lack of subject-matter jurisdiction and included language in the order specifying that a new action based on the same claim could be commenced within one year or less after

the dismissal of the instant action, finding that North Carolina Rule 41 "falls into a category of substantive matters of state law to be followed by this court absent substantial countervailing federal interests." *Id.* Similarly, in *Falls v. Goldman Sachs Tr. Co., N.A.*, 2017 WL 1628885 (E.D.N.C. May 1, 2017), the court observed that "[c]ommencement of a prior action dismissed for lack of subject matter jurisdiction does not serve to toll the running of this statute of limitations under North Carolina law, *unless the dismissal order specifies an extension of the limitations period*." *Id.* at \*4 (emphasis added).

Moreover, including an explicit Rule 41(b) extension is consistent with the policy purposes of the statute of limitations. In *Bockweg v. Anderson*, 402 S.E.2d 627 (N.C. 1991), the North Carolina Supreme Court held that a voluntary dismissal of a federal court action should trigger the savings provision of North Carolina Rule 41(a) because "[t]he purpose of the statute of limitations, which is to avoid stale claims *by giving a defendant notice of a claim within a prescribed period*, would not be undermined, and the remedial purpose of the savings provision would be furthered, by allowing a federal dismissal/state refiling." *Id.* at 634 (emphasis added). That reasoning applies equally to a non-voluntary dismissal for lack of jurisdiction. Here, defendants have been on notice, and indeed, *have been actively litigating*, Plaintiff's claims since 2021. *See Clark v. Velsicol Chem. Corp.*, 110 N.C. App. 803, 807-08 (1993) ("Filing an action in federal court puts a defendant on notice that a claim is being asserted against him. We see no reason why filing in federal court should not toll the statute of limitations on a claim which is based on state substantive law."), *aff'd*, 336 N.C. 599 (1994).

The case of *Martin Marietta Corp. v. Forsyth Cnty. Zoning Bd. of Adjustment*, 65 N.C. App. 316, 317 (1983), is not to the contrary. That case held that where a *state* court lacks personal jurisdiction over a defendant, it does not have judicial power to enter a Rule 41(b) extension. But

whether a *federal* court has judicial power is a question of federal law, not state law. Moreover, the holding of *Martin Marietta* has been undermined by a later holding of the North Carolina Supreme Court that dismissal "does not deprive the court of jurisdiction to consider collateral issues that require consideration [even] after the action has been terminated." *Bryson v. Sullivan*, 330 N.C. 644, 653 (1992). Since then, the North Carolina Court of Appeals has repeatedly indicated that a federal court sitting in diversity but dismissing for lack of subject-matter jurisdiction *does* have authority under North Carolina Rule 41(b) to enter a savings order. Thus, in *Clark v. Velsicol*, 110 N.C. App. at 809, the court held that Rule 41(b) could not save plaintiff's claims *because he failed to ask the federal court to invoke it*. And in *Huang v. Ziko*, 132 N.C. App. 358, 362 (1999), the court assumed that Rule 41(b) "could apply in this case," but again noted that the District Court did not invoke it.

In their reply brief, defendants cited cases holding that "it is inappropriate for that court to engage in the balancing process required by [Federal] Rule 41(a)(2)" if that court believes that it is without subject matter jurisdiction, because subject-matter jurisdiction is a "threshold issue" that must be decided before other issues. *Cavalry SPV I, LLC v. Hughes*, 2016 WL 5338516, at *3 (S.D.W. Va. Sept. 21, 2016); *see Shortt v. Richlands Mall Assocs., Inc.*, 1990 WL 207354 (4th Cir. Dec. 19, 1990) (unpublished). Including a Rule 41(b) extension in an order of dismissal does not raise the same concern, because the order *is* resolving the question of subject-matter jurisdiction.

Defendants also asserted that it would be "inequitable" to ensure adjudication of the case on the merits because FSMS "dragged the Court, the Defendants, and non-parties through three and a half years of wasteful and needlessly contentious litigation" by "failing to verify the citizenship" of Ms. Tong. ECF 303 at 16-17. That is incorrect. Defendants have not been prejudiced by conducting discovery in federal court, where, as here, "discovery performed during the course of

24

the federal phase of the case may be used in state court." *Flath v. Bombardier, Inc.*, 217 F.3d 838 (4th Cir. 2000) (unpublished); *see Davis v. USX Corp.*, 819 F.2d 1270, 1276 (4th Cir. 1987) ("extensive discovery is not prejudicial where evidence discovered may be used in subsequent action") (quoting *Tyco Labs. Inc. v. Koppers Co.*, 627 F.2d 54, 56 (7th Cir. 1980)).[6]

## **CONCLUSION**

The Court should rule that it has subject matter jurisdiction. Alternatively, the Court should entertain a motion to dismiss TPUK under Rule 21 and, in either case, should state, in its order of dismissal, that pursuant to North Carolina Rule of Civil Procedure 41(b), that "a new action based on the same claim may be commenced within one year or less after such dismissal."

This the 9th day of September, 2025.

---

[6] Tanner argues that FSMS is solely responsible for the late discovery of the citizenship issue, but Tanner bears responsibility as well. Tanner hired a private investigator to look into Mr. Mao's and Ms. Tong's citizenship. That investigator reported that Mr. Mao had lived in California for decades, had a California driver license, and was registered to vote; in contrast, the investigator reported that Ms. Tong had only lived in California since 2019. Declaration of Ernest Brod (May 18, 2021) ¶¶ 6-8, ECF 12-1 in Case No. 5:21-cv-3017 (N.D. Calif.). Despite this disparity, Tanner elected not to ask about her citizenship, either in jurisdictional discovery or in merits discovery. Tanner has offered no explanation for its lack of inquiry on this issue. As the 2022 Advisory Committee Notes to Rule 7.1 say, "discovery may be appropriate to test jurisdictional facts by inquiring into such matters as … the accuracy of [the parties'] described citizenships."

25

/s/ Kent A. Yalowitz
Kent A. Yalowitz (admitted *pro hac vice*)
N.Y. State Bar No. 2188944
Carmela T. Romeo (admitted *pro hac vice*)
N.Y. State Bar No. 5058151
**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
250 W 55th Street
New York, NY 10019
212-836-8000
kent.yalowitz@arnoldporter.com
carmela.romeo@arnoldporter.com

  – and –

Eliseo R. Puig (admitted *pro hac vice*)
Colorado State Bar No. 49022
**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
303-863-1000
eliseo.puig@arnoldporter.com

/s/ Lex M. Erwin
Lex M. Erwin
N.C. State Bar No. 34619
David A. Luzum
N.C. State Bar No. 41398
Kevin Y. Zhao
N.C. State Bar No. 53680
**MAYNARD NEXSEN PC**
227 W. Trade Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 339-0304
Facsimile: (704) 338-5377
lerwin@maynardnexsen.com
dluzum@maynardnexsen.com
kzhao@maynardnexsen.com

*Counsel for Plaintiff FS Medical Supplies,
LLC*

**CERTIFICATION**

Pursuant to the Court's June 18 2024 Standing Order regarding Use of Artificial Intelligence, the undersigned certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line research sources WestLaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

*/s/ Lex M. Erwin*
Lex M. Erwin